**2022-2171**

# United States Court of Appeals
# for the Federal Circuit

GMG PRODUCTS LLC,

*Appellant,*

– v. –

INTERNATIONAL TRADE COMMISSION,

*Appellee.*

TRAEGER PELLET GRILLS LLC,

*Intervenor.*

*On Appeal from the United States
International Trade Commission in No. 337-TA-1237*

## NON-CONFIDENTIAL OPENING BRIEF
## FOR APPELLANT

<div align="right">

DAVID A. LOWE
LAWRENCE D. GRAHAM
LOWE GRAHAM JONES PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 381-3300
lowe@lowegrahamjones.com
graham@lowegrahamjones.com

*Counsel for Appellant*

</div>

DECEMBER 19, 2022

1. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:

a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform, the electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker;

a notification generator configured to generate notifications that are to be sent to one or more software applications being executed at a mobile device, the one or more software applications being configured to control one or more functions of the electronically-controlled appliance;

a transmitter configured to send at least one generated notification to at least one of the software applications selected from the one or more software applications, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;

the receiver receiving a second input from the at least one software application indicating that one or more specified functions are to be performed on the electronically-controlled appliance; and

the transmitter sending one or more instructions to the electronically-controlled appliance to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-2171 |
| **Short Case Caption** | GMG Products LLC v. ITC |
| **Filing Party/Entity** | GMG Products LLC |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/13/2022

Signature:    s/David A Lowe

Name:    David A Lowe

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| GMG Products LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| Lowe Graham Jones: | David A. Lowe | Lawrence D. Graham |
| Devlin Law Firm: | Andrew Pratt | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| Traeger Pellet Grills LLC v. ITC | Case No. 2022-1312 | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

Statement of Related Cases ........................................................................1

Jurisdictional Statement ...........................................................................2

Statement of the Issues ............................................................................3

Statement of the Case .............................................................................5

    A.    The Asserted Patent ...................................................................5

    B.    The Accused GMG Grills ..........................................................8

    C.    The Post Grant Review ...........................................................10

    D.    The Asserted Prior Art .............................................................13

    E.    Procedural History .................................................................14

Summary of Argument ..........................................................................15

Argument .............................................................................................18

    A.    The ITC Erred in Claim Construction.........................................18

            1.    *Standard of Review* ........................................................18

            2.    *The ITC Erred in Construing "One or More Computing Systems" to Encompass the "Hardware Controller"*....................18

            3.    *The ITC Erred in Construing "Generated Notification"* ..............25

    B.    The Finding of Infringement was Erroneous .......................................30

            1.    *Standard of Review* ........................................................31

            2.    *The GMG System Lacks the Required "One or More Computing Systems"* ........................................................31

            3.    *The GMG System does not Generate the Required Notification*...................................................................34

C.    **The ITC Erred in Upholding Validity** ...................................................**40**

     1.    *GMG should not have been estopped from relying on MAK or Fireboard* ...................................................................*41*

     2.    *The claims were anticipated by the MAK system* ..........................*44*

     3.    *The claims were obvious in view of the Fireboard system* ............*49*

D.    **The ITC Erred in not Finding Unenforceability for Inequitable Conduct** .............................................................**51**

     1.    *The initial direct connection was conceived by others* .................*56*

     2.    *Attempting/permitted to communicate was conceived by others* ..............................................................................*58*

     3.    *Indication of a communicable connection was conceived by others* ..............................................................................*60*

     4.    *The true inventors were omitted with deceptive intent* .................*62*

**Conclusion** ...............................................................................**65**

## Redactions Statement

The addendum includes orders filed by the ITC containing redactions requested by the parties in order to produce public versions of the confidential orders. The material omitted at Appx59 illustrates the connection process and read flow for the GMG system, and GMG has agreed to remove the confidentiality request for purposes of the appeal. Content omitted at Appx61 relates in part to the above material, and describes the GMG server configuration. The material omitted at Appx62 also relates to the structure of the GMG server configuration. The material

omitted at Appx63-66, Appx68-77, and Appx79-84 relates to technical details of the operation of the GMG system, particularly including aspects of the source code. The material omitted at Appx92-95 all relates to technical details of a proposed technical redesign of a GMG system, none of which is at issue on appeal. The material omitted at Appx97-105 relates to the Traeger system and whether it satisfies the technical industry requirement, and this topic is not at issue on appeal. The material omitted at Appx110 illustrates the structure of the prior art MAK grills system. The material omitted at Appx111-112 and Appx114-115 describes certain technical details of the operation of the MAK system. The material omitted at Appx124-125 describes technical details of the operation of the Fireboard system. The material omitted at Appx132 mentions a specific communications protocol. The material omitted at Appx133 illustrates a proposed Traeger system configuration. The material omitted at Appx134-135 is a reproduction of a technical description of a proposed Traeger system. The material omitted at Appx137 mentions a specific communications protocol. The material omitted at Appx138-139 mentions technical details of possible Traeger systems. The material omitted at Appx141-143 mentions a specific communications protocol. The material omitted at Appx149-150 mentions a specific bond percentage, and is not at issue on appeal. The material omitted at Appx174 mentions market share percentages and sales figures. The material omitted at Appx178-179 mentions bond percentages and its application to sales and revenues.

# TABLE OF AUTHORITIES

## Cases

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075 (Fed. Cir. 2003)...................................................................20

*Agfa Corp. v. Creo Prods.*, 451 F.3d 1366 (Fed. Cir. 2006) ...................................55

*Ajinomoto Co. v. ITC*, 932 F.3d 1342 (Fed. Cir. 2019) .................................... 29, 39

*Asetek Danmark A/S v. Coolit Sys.*, No. 19-cv-00410-EMC, 2019 U.S. Dist. LEXIS 225134 (N.D. Cal. Dec. 30, 2019).......................................43

*Bd. of Regents v. BENQ Am. Corp.*, 533 F.3d 1362 (Fed. Cir. 2008) ..................................................................................20

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249 (Fed. Cir. 2010)........................................................... 23, 31

*Checkpoint Sys., Inc. v. United States Int'l Trade Comm'n*, 54 F.3d 756 (Fed. Cir. 1995) ................................................................31

*Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) ..................................................................................25

*Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804 (Fed. Cir. 1990) ..............................................................................55

*Consolidated Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 83 L. Ed. 126, 59 S. Ct. 206 (1938)............................ 31, 55

*Cyborg Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) ..................................................................................18

*Driscoll v. Cebalo*, 731 F.2d 878 (Fed. Cir. 1984)...................................................64

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1996).....................................................................25

*Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456 (Fed. Cir.), *cert. denied*, 525 U.S. 923 (1998)............................... 53, 54, 60, 62

*Fox Indus., Inc. v. Structural Preservation Sys, Inc.*, 922 F.2d 801 (Fed. Cir. 1990).............................................................55

*Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363 (Fed. Cir. 2002) .............................................62

*Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004)..........................................31

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345 (Fed. Cir. 2019)..................................................... 30, 39

*Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020) ..............................................................42

*Linear Tech Corp. v. ITC*, 566 F.3d 1049 (Fed. Cir. 2009)....................................23

*Medline Indus. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 U.S. Dist. LEXIS 167052 (N.D. Ill. Sep. 14, 2020) ...................................42

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319 (Fed. Cir. 2004)..............................................................51

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .......................................18

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011) ..............................................................24

*Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*, 817 F.3d 1293 (Fed. Cir. 2016).........................................................42

*Springs Window Fashions LP v. Novo Indus., LP.*, 323 F.3d 989 (Fed. Cir. 2003)..................................................... 28, 39

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 190 L. Ed. 2d 719 (2015) ..............................................................18

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).............................................................55

*Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003) ..............................................................19

**Statutes**

19 U.S.C. § 1337(c) ................................................................31

28 U.S.C. § 1338 ....................................................................2

35 U.S.C. § 325(e)(2)............................................................41

5 U.S.C. §§ 701-706.............................................................31

**Rules**

19 C.F.R. § 210.14(c)...........................................................48

37 C.F.R. § 42.204(b)(4).......................................................42

Federal Circuit Rule 47.5 .......................................................1

**STATEMENT OF RELATED CASES**

This appeal is related to a companion appeal filed by Traeger Pellet Grills LLC in this Court, Appeal No. 2022-1312, which had been consolidated with this appeal but was subsequently deconsolidated and dismissed on October 18, 2022. There are no other related cases.

# JURISDICTIONAL STATEMENT

The International Trade Commission had jurisdiction over this patent infringement action pursuant to 19 U.S.C. §§ 1337.

In an order dated December 6, 2021, then-Chief Administrative Law Judge Charles E. Bullock issued an Initial Determination on Violation of Section 337. GMG filed a timely petition for review of the Initial Determination on December 20, 2021. The ITC issued its Commission Opinion on May 12, 2022, deciding not to review the Initial Determination and thus adopting it. The ITC determination became final on July 11, 2022. GMG timely appealed on August 29, 2022.

This Court has as exclusive jurisdiction over applicable final determinations of the United States International Trade Commission under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337), pursuant to 28 U.S.C. § 1295(a)(6) (1994); *see also* 19 U.S.C. § 1337(c) (1994).

## STATEMENT OF THE ISSUES

This appeal is directed to the following issues:

1.     Whether the ITC erred in construing the term "one or more computing systems" so that could encompass the separately claimed "hardware controller," despite no antecedent relationship between the two limitations?

2.     Whether the ITC erred in construing the "generated notification" that the cloud computing platform "is communicably connected to the grill" in a manner that did not require a specific server-generated notification to "expressly indicate" that the grill is connected, and to be a present tense notification that is valid at the exact moment of the transmission of the signal?

3.     Whether the ITC erred in finding infringement based on the erroneous claim construction that the hardware controller can be one of the "one or more computing systems"?

4.     Whether the ITC erred in finding infringement based on a finding that the hardware controller provides the required "first input" to the cloud computing platform?

5.     Whether the ITC erred in finding infringement based on the conclusion that the GMG server "generates" the required "notification" even though any applicable notification is generated at the mobile device, not the server?

6.      Whether the ITC erred in upholding validity based on the application of PGR estoppel and a finding that a validity position had been waived?

7.      Whether the ITC erred in not finding the patent unenforceable for inequitable conduct based on a pattern of filing patent applications in the name of a sole Traeger employee who lacked the technical capability to invent them, hired teams of people from three separate companies to develop the grill, and stood to benefit financially in an IPO by creating the false impression that Traeger was innovative?

**STATEMENT OF THE CASE**

The International Trade Commission erroneously found that GMG Products LLC ("GMG") infringed claims 1 and 2 of U.S. Patent No. 10,158,720 ("720 Patent") asserted by Traeger Pellet Grills LLC ("Traeger"), based on an incorrect interpretation and application of the claims.

The ITC also erred in finding that, because of an earlier Post Grant Review, GMG was estopped from asserting the claims to be invalid based on third party products which were known during the Post Grant Review, but for which the crucial details were not publicly available during the Post Grant Review.

The ITC further erred in finding the 720 patent not to be unenforceable for inequitable conduct, even though the manager of the Traeger grill project employed several companies and dozens of individuals to design and develop the Traeger grill because he lacked the technical background or capability to do so himself, yet he named himself as sole inventor of the 720 patent and many other related patents.

## A.    The Asserted Patent

The 720 Patent is entitled "Cloud System for Controlling Outdoor Grill with Mobile Application." Appx183. Figure 3 appears on the cover of the patent, and depicts a mobile phone 303 communicating with a grill 302 through a network server 301 (also called a "cloud computing platform"). An additional computer 304 is also shown in communication with the grill via the cloud computing platform.



*Figure 3*

As shown in Figure 1 reproduced below (color added), the cloud computing platform 101 includes modules for performing a variety of different functions, including a communications module 104, a receiver 105, a notification generator 106, and a transmitter 107. Appx186; Appx194 at 6:26-37; Appx195 at 7:11-13, 7:38–41, 7:47–49. The cloud computing platform 101 communicates with the mobile device 113 and the grill 120 so that the mobile device can control the grill through the cloud computing platform. Appx193 at 4:32–45; Appx194 at 6:35–37, 43–44, 60–61; Appx195 at 7:9–16. Data travels from the grill through a home WiFi Access Point 118, through a Communications Module 104 at the server (in green), and then as Indirect Communication 117 (green) to the mobile device 113. Notifications 112 (in yellow) are "generated" in a Notification Generator 106

(yellow) contained within the cloud computing platform, and sent separately from the grill's data communications.



Figure 1

The server's "notification generator" generates a notification indicating that the cloud computing platform is communicably connected to the grill, sending it to the mobile device for presentation to the user. As the patent explains: "[t]he notification generator 106 of the cloud computing platform 101 may generate notification 112 which is sent to be sent [sic] to the software application 114 of the mobile computing device 113. The notification 112 indicates that the cloud computing platform is communicably connected to the electronically-controlled appliance 120. After this notification 112 is generated, the transmitter 107 of the

cloud computing platform 101 transmits the generated notification to the software application 114 (530)." Appx197 at 12:2-12.

The receiver 117 at the cloud computing platform receives a second input 116 from the mobile device indicating that certain functions are to be performed by the grill, such as a temperature to be maintained. The transmitter 107 sends the instructions to the grill, where they are interpreted and executed by a hardware controller on the grill. Appx195 at 7:38-53.

## B.    The Accused GMG Grills

GMG sells pellet grills that can be controlled wirelessly from a smart phone. The accused GMG system includes (1) a mobile phone Application (or "App"), (2) a server which communicates with the mobile phone (called the "API server," or sometimes the "Parse server"), (3) a server database, (4) another server which communicates with the grill (called the "Grill Server"), and (5) a grill having a grill controller.

To control the grill over the servers, the phone initially connects to the GMG grill locally. Appx4988. While connected locally, the App provides home WiFi credentials and instructs the grill to initiate communication with the server. The grill cannot connect to the mobile phone App both locally and via the server at the same time, so the grill controller breaks its direct connection to the App to initiate a

connection to the server. Appx4990; Appx2063-2065 (Dr. Shoemake); Appx2071-2072; Appx2137-2138 (Mr. Scott).

Once connected to the Grill Server, the grill periodically transmits updated state information. The Grill Server applies a timestamp and stores the update in a server database (the blue box in the illustration below, called "MLab MongoDB") where it sits until later requested. The grill state information includes the current grill temperature, the grill target temperature (or setpoint), and other information. Appx33965-33966. The App periodically requests grill state information from the API Server, which retrieves the most recently stored grill state data from the database and sends it to the App. Appx4990 (reproduced below).



The GMG App can control the grill, such as by setting a new target temperature. For this, the App transmits a command to the API Server, which stores it in the server database where, much like the grill data, it sits until a contact by the grill causes it to be sent to the grill. Appx4989 ("App Write Flow").

**C.    The Post Grant Review**

GMG filed two Post-Grant Reviews (PGRs) directed to the 720 patent. In PGR2019-0024, claims 23-29 were held unpatentable, while claims 1-3, 12, 16, 19, and 21-22 were not held unpatentable. Appx3444-3445. In PGR2019-0036, claim 30 was held unpatentable, while claims 4-11, 13-15, 17-18 and 20 were not held unpatentable. Appx3568-3570. GMG also filed two PGRs for the related parent patent 10,218,833, which is relevant because some claim limitations are common to both patents. In PGR2019-0034, claims 1-10 were not held unpatentable. Appx3480-3481. In PGR2019-0035, claims 11-25 were not held to be unpatentable. Appx3512-3513.

In the PGRs of both patents, GMG argued that U.S. Patent Pub. No. 2015/0134727 to Lee (Appx11806-11824) rendered the claims obvious when combined with other prior art references. Lee discloses a cloud-based server for remote management of a home appliance, as shown in Lee's Figure 5, reproduced below as color-coded by the Patent Trial & Appeal Board ("PTAB"). Appx3419. The home appliance sends metadata (535) to a home gateway which passes it along to a data server (110) where it is extracted and stored (540, 542). A terminal apparatus requests (545) appliance data from the data server, which retrieves and sends the stored metadata (555) to the terminal apparatus in response to the request.



In the PGRs of the parent 833 Patent, GMG argued that the transmission of metadata 555 by Lee was an indication that the appliance "is communicably connected" to the cloud service. Appx3468. The terminal apparatus (red) corresponds to the mobile device, while the data server (blue) mapped to the cloud service and the home appliance (green) is the grill. Thus, GMG argued that when the data server 110 sends metadata 555 (yellow) to the terminal apparatus 160, it serves as an indication that the appliance is communicably connected to the cloud service.

Traeger responded that the transmission of data cannot provide this notification, arguing that Lee assumes, but does not expressly indicate, network

connectivity. Appx3469 (quoting Traeger's arguments as: "there is nothing in Lee that would need to *indicate* network communication—by 'metadata' or otherwise." (emphasis original); and "…Lee is less than specific in conveying that it recognized the presence of an active indication of communication between the network and the appliances.").

The PTAB also acknowledged Traeger's further distinction of Lee based on the storage of appliance data and the later transmission of the data to the terminal apparatus:

> At most, the existence of metadata on the cloud-based data server 110 means that the appliance ***has been*** communicably connected [to] the *home gateway*."

Appx3474 (emphasis original).

The PTAB agreed with Traeger, pointing out that the claims require an indication that the grill "is" communicably connected and that the nature of "is" in that context requires that "the indication must be about the present communicable connection status of the grill." Appx3472. Because the metadata in Lee is stored, at the time of the request the metadata would be stale and the appliance might no longer be connected. Appx3473-3474. This applied to the claims of the 720 patent, for the same reasons. Appx3506-3508.

**D.    The Asserted Prior Art**

GMG identified two primary prior art references in challenging the validity of the claims before the ITC: a wireless grill system developed by MAK Grills ("MAK System"), and a wireless temperature monitoring system developed by Fireboard Labs ("Fireboard System"). GMG also relied on secondary references, including Amer, U.S. Patent Pub. No. 2016/0072638 (Appx11845); Tucker, U.S. Patent No. 9759429 (Appx11900); and Henderson, U.S. Patent Pub. No. 2015/0025687 (Appx11825).

Before filing its PGRs, GMG was aware of the existence of the MAK and Fireboard systems, but could not determine how they operated because important details were not publicly available. At the ITC, GMG served subpoenas and conducted depositions which led to the production of confidential materials not available at the time of the PGRs. The asserted claims require the transmission of a generated notification indicating that the grill "is in network communication" or "is communicably connected" with the cloud. Without access to confidential information, GMG would have no way to know whether the MAK or Fireboard systems operated as claimed, or whether they were more like the prior art Lee publication. Appx31769 (lines 5-20, regarding inability to determine MAK server structure; Appx31817 (MAK grill and server code not publicly available);

Appx31938-31939 (Fireboard architecture not publicly available); Appx32007-32008 (Fireboard software not publicly available).

In the MAK System, a grill controller (also called "Pellet Boss") communicates with a cloud-based Web service ("MAK server") to transmit status updates and receive commands (e.g., setpoint temperature settings). A user operates a client device to access a webpage that allows the user to interact with the grill via the MAK server. Appx14660; Appx14400. Details of the Fireboard System are likewise revealed in confidential source code, App screenshots, development documents, and the deposition of Mr. Conrad, the principal developer of the Fireboard System.

**E.    Procedural History**

On December 6, 2021, then-Chief Administrative Law Judge Bullock, issued an initial determination ("ID") finding a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("section 337"), with respect to asserted claims 1 and 2 of U.S. Patent No. 10,158,720 ("the '720 patent"). Appx36-153. On March 8, 2022, the ITC determined not to review, and thus adopted the ID pursuant to 19 C.F.R. § 210.42(h)(2). Appx154 (87 Fed. Reg. 14288-89 (Mar. 14, 2022)). The ITC thereafter issued a notice of intention to issue a limited exclusion order, Appx156-158, and a corresponding Commission Opinion. Appx159-182.

## SUMMARY OF ARGUMENT

Claim 1 of the asserted patent includes a limitation requiring "one or more computing systems" and a separate limitation requiring a "hardware controller" on the grill, with no antecedent relationship between them. The ITC erroneously construed "one or more computing systems" in a way that allowed it to be met by the hardware controller, despite the written description and illustrations clearly describing these as separate components in the system. This construction led to an erroneous conclusion of infringement.

Even with the erroneous claim construction, the hardware controller still did not provide the claimed "first input" required by the "one or more computing systems" because the hardware controller simply transmits grill state data. The grill does not know whether it is in communication with the server, and thus cannot indicate that it is. Moreover, the patent illustrated the transmission of grill data to be something distinctly different from an indication of a network connection, and never stated that it could serve this purpose.

The ITC further erred in construing the requirement that the cloud computing platform must have a "notification generator" which must generate a notification that the grill is communicably connected to the server. This limitation should have been construed to require a server-generated express notification of connectivity, indicating the present connectivity status, not one from an earlier time.

This limitation was also erroneously applied to the GMG system, particularly in that the GMG server does not generate the required notification. Traeger's expert identified notifications for other purposes, but (as the ITC acknowledged) it presented no evidence that the required notification is generated by the GMG server. Instead, a notification is generated at the GMG mobile device and presented to the user interface. With no such notification being generated at the server, the ITC erroneously allowed the periodic transmission of grill data to serve this purpose, even though it is not a generated notification, and even though the patent describes this generated notification as being something different from the receipt and retransmission of grill data.

GMG also challenged the validity of the patent based on two primary prior art references, but the ITC applied Post-Grant Review estoppel to exclude them. This finding was erroneous because the key details were not publicly discernible, and could only be obtained through the use of subpoenas in the ITC. The ITC also applied waiver to preclude GMG from making a conditional argument that the MAK reference taught the "first input" from "one or more computing systems" limitation if the GMG system was also found to satisfy it. It was an abuse of discretion to find waiver, because the argument was contained in GMG's pre-hearing brief, and Traeger fully addressed the argument without objecting that it had been waived.

Finally, the ITC erred in not finding inequitable conduct. Traeger embarked on a project to develop a wirelessly controlled grill, but had no in-house expertise. It hired teams of people from three different companies to develop it, leading to the filing of dozens of patent applications naming Traeger's Mr. Colston as the sole inventor. This incorrect claim to inventorship was intentional, based on advice of counsel. It was corrected on a few patents after being caught, and only after hiring the complaining individuals as new Traeger employees. But Traeger did not correct the patent-in-suit, and needed to create the public impression of technological capability to bolster an imminent initial public offering. Traeger and Mr. Colston profited handsomely as a result of the deceit, and it should have resulted in a finding of unenforceability.

**ARGUMENT**

### A.    The ITC Erred in Claim Construction

The ITC erred in claim construction, leading to errors in finding infringement.

#### 1.    *Standard of Review*

The "ultimate issue of the proper construction of a claim" is "a question of law." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839, 190 L. Ed. 2d 719 (2015). Accordingly, this Court reviews claim construction *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). A claim construction analysis begins by considering the language of the claims themselves. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). However, "claims must be read in view of the specification, of which they are a part." *Id.* at 1315 (quotation marks omitted). "[A] court should also consider the patent's prosecution history, if it is in evidence. . . . Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent." *Id.* at 1317 (citations and quotation marks omitted).

#### 2.    *The ITC Erred in Construing "One or More Computing Systems" to Encompass the "Hardware Controller"*

The ITC erred in construing the limitation "one or more computing systems" such that it could encompass the separately claimed limitation "hardware controller." These two components are separately and distinctly required in claim 1, and neither can be substituted for the other. The ITC concluded, however, that "the

term 'one or more computing systems' in claim 1 is broad enough to include the hardware controller of a GMG Grill." Appx66. This erroneous construction led to an erroneous finding of infringement.

As illustrated in a highlighted version of claim 1 below, the claim requires several distinct "computerized" components, including: (1) a cloud computing platform; (2) an electronically-controlled appliance, or grill; (3) one or more computing systems; (4) a mobile device; and (5) a hardware controller on the electronically-controlled appliance. None has an antecedent relationship with any others, except that the hardware controller must be on the grill.

> 1. **A cloud computing platform** for communicating with and controlling operation of an **electronically-controlled appliance** comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:
>
> a receiver configured to receive inputs from **one or more computing systems** including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform, the electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker;
>
> a notification generator configured to generate notifications that are to be sent to one or more software applications being executed at **a mobile device**, the one or more software applications being configured to control one or more functions of the electronically-controlled appliance;
>
> a transmitter configured to send at least one generated notification to at least one of the software applications selected from the one or more software applications, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;
>
> the receiver receiving a second input from the at least one software application indicating that one or more specified functions are to be performed on the electronically-controlled appliance; and
>
> the transmitter sending one or more instructions to the electronically-controlled appliance to perform the one or more specified functions, the functions being interpreted and carried out by a **hardware controller on the electronically-controlled appliance**.

The use of different terms for "one or more computing systems" and "a hardware controller," with no antecedent relationship between them, compels the conclusion that these are distinct components. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) (discussing antecedent relationships and

explaining that the definite article "the" particularizes the subject which it precedes, serving as a word of limitation as opposed to the indefinite or generalizing force of "a" or "an"); *Bd. of Regents v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings.").

The claim does not link the hardware controller to the one or more computing systems by, for example, stating "the one or more computing systems comprising a hardware controller." Instead, it simply refers to "a hardware controller," with no antecedent relationship. Thus, the hardware controller is distinct from, and cannot be one of, the "one or more computing systems."

This interpretation is also compelled by the written description. Figure 3 in the 720 Patent (Appx188, below) plainly illustrates the very same components, including a cloud service 301, computing system 304, mobile device 303, and grill 302 (with its hardware controller). Claim 1 is directed to this exact configuration, expressly requiring all four components. Figure 3 even appears on the front page of the patent, confirming it to be the principal illustration of the claimed invention. *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003). The ITC's construction allowing the grill's hardware controller to satisfy the "one or more computing systems" limitation would mean the deletion of the computing system 304 from Figure 3, treating it as mere surplusage not required by the claim.



Figure 3

GMG's construction is also consistent with the text of the written description, in which the term "computing system" is *never* used to refer to the grill or any computer processors or controllers that may reside on the grill. Instead, the processor on the grill is *always* identified as a hardware controller. For example, the patent states that the grill is "operated by the electronic hardware controller 121." Appx194 (6:63-64). It further explains that the hardware controller interacts with the computing systems such as the mobile phone 101 and the cloud service 113. Appx194-195 (6:64-7:5). Although the 720 Patent defines "computing system" broadly, it never uses this term for the hardware controller on the grill.

Nor does the patent illustrate the hardware controller as providing the claimed "first input." In Figure 1 (Appx186, reproduced below with color added), it is something *other than* the grill itself that provides the "first input" to the server. Thus, the "first input" (outlined in green) to the cloud computing platform (orange) is provided by a Mobile Computing Device (red). The grill (blue) is shown connected to the Communications Module of the cloud computing platform, through the home WiFi access point. The grill is shown sending data to the cloud, but this transmission from the grill's hardware controller is *never* described as the required "first input," and *never* described as providing an indication that the grill is in network communication with the cloud.



*Figure 1*

In sum, nothing in the patent states that the hardware controller can be one of the "one or more computing devices," or that the hardware controller can inform the cloud computing platform that the grill "is in network communication" with the cloud. Conversely, there is consistent support for the conclusion that it cannot.

The ITC concluded that the "one or more computing systems" and the "hardware controller" are claim elements defined by their function, and that separate and distinct structures are not required to perform those functions. Appx67. This characterization of functionality is erroneous, and it would permit many claim limitations to be ignored or rendered superfluous. Every claim term must have meaning, and Traeger expressly claimed, illustrated, and described two different *structures* which perform these separate functions.

In *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010), this Court held that distinct structures are required "[w]here a claim lists elements separately." The ITC distinguished *Becton* as being limited to structural limitations, Appx67, saying that it is permissible for multiple claimed functions to be performed by a common structure, even though the "hardware controller" and "one or more computing systems" are plainly structural limitations.

The ITC further cited *Linear Tech Corp. v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir. 2009) as holding that a claimed "second circuit" and "third circuit" did not require separate and distinct circuits. Appx67. *Linear Tech*, however, did not allow

the second circuit to be *identical* to the third circuit; although they could overlap, they still must be distinct. *Linear Tech* thus would not allow the hardware controller to be "one or more computing systems."

The ITC also relied on *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011) for the proposition that a claimed "cutting box" and "dust collection structure" could be satisfied by a single common structure. Crucially, the specification of the patent in *Powell* expressly taught that the cutting box could also function as a dust collection structure. *Id.* at 1232. The *Powell* decision also distinguished *Becton* on this basis, explaining that the claim language in *Becton* did not suggest that the two claimed components could be the same structure, and further that the patent specification at issue confirmed that the two components were separate structures. *Id.* at 1232. But in this case, nothing in the specification states that the hardware controller can provide the "first input." Conversely, the hardware controller is always referred to by that name, and the patent illustrations show the hardware controller being in communication with the cloud to transmit grill data but *never* states or suggests that the transmission of grill data can serve this purpose.

The ITC ultimately concluded that a mobile device and a hardware controller are both types of computing systems, and that either of them could satisfy the "one or more computing systems" requirement. This general proposition, however, remains at odds with the written description. The inventor wanted to, and did, claim

the embodiment as illustrated on the front page of the patent, which includes a separate and distinct computing system, mobile device, and hardware controller on the grill. The ITC erred in permitting Traeger to disavow what it expressly claimed, described, and illustrated.

Each word in a claim must have meaning. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996). The claim limitations "mean exactly what they say," and must be given that meaning. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004). Claim 1 specifically requires the structure shown in Figure 1—with a separate "one or more computing systems" and "hardware controller" on the grill each performing separate and distinct functions. The inventor described, illustrated, and claimed it that way, and a person of ordinary skill would interpret it that way as well.

The ITC construed the limitation "one or more computing systems" to encompass the separately claimed "hardware controller," and erred in doing so. Instead, claim 1 should have been construed to require these two components to be separate and distinct from one another.

### 3.    The ITC Erred in Construing "Generated Notification"

Claim 1 further requires the cloud computing platform to have a "notification generator" which must "generate" a notification indicating that the cloud computing platform "is communicably connected to the grill." GMG urged that the generated

notification must be (1) a specific one generated at the server to "expressly indicate" that the grill is connected, and (2) a present tense one, being valid at the exact moment of the transmission of the signal. Appx31. The ITC adopted neither of these requirements, construing it as "a notification indicating that the grill is connected for communication" while leaving the "to the cloud computing platform" portion implicit. Appx32.

Claim 1 requires a "notification generator" which must generate a specific notification indicating the cloud "is communicably connected" to the grill. As such, the notification must be an express one related to connectivity status. Figure 1 in the patent, reproduced below with color added, shows the server receiving and forwarding grill data along one path (in green, through the communication module 104 and the indirect communication path 117), while having a separate notification generator 106 (in yellow) to generate the required notification 112. Plainly, Figure 1 illustrates that the generated notification is something different from grill's state data which is passed along to the mobile device.



Figure 1

The written description explains that communications are relayed between the mobile device, cloud computing platform, and the grill, through the "indirect communication 117" path as illustrated. Appx198 (at 13:15-18). Likewise, the "communications module 104" is used to communicate with computing systems such as the mobile device. Appx194 (at 6:35-45). Notifications, however, are "generated" by the notification generator module, and sent separately. Appx195 (at 7:32-43). Claim 1 is directed to such a system as described and illustrated, claiming the same receiver, notification generator, and transmitter. Accordingly, the notification must be "generated," and must expressly indicate the connectivity status.

The claim limitation at issue also requires the generated notification to relate to the *present tense* connection status of the grill, not an earlier connectivity status even if it was a recent one. This present tense aspect of GMG's proposed construction (formulated as the "exact moment" in the proposed construction) is borne from the plain language of the limitation itself, containing the word "is," and Traeger's arguments during the PGRs in which Traeger emphasized that it must indicate a present connection, not a prior one.

In the PGRs of the parent 833 Patent, GMG argued that the prior art Lee reference taught the transmission of a signal indicating that the grill is connected, but Traeger responded that when the data is stored and retransmitted later, it cannot indicate a present transmission status. Instead, Traeger argued that it would only show that the grill "has been" connected, not that it "is" connected. Appx3474.

Traeger also distinguished the Lee appliance as being connected to the "cloud service" only indirectly, through a home gateway, but that is irrelevant. Traeger plainly advanced an argument about the meaning of "is" communicably connected, and that argument is part of the record. "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Indus., LP.*, 323 F.3d 989, 995 (Fed. Cir. 2003). The fact that "the prosecution shifted to a different focus does not blunt the impact of those remarks made to overcome the prior

rejection." *Id.* Moreover, the patentee is held to such positions even when the patentee made amendments or advanced arguments that were narrower or more restrictive than what may have been necessary to differentiate the prior art. *Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1351 (Fed. Cir. 2019) (further holding: "[t]he question is what a person of ordinary skill would understand the patentee to have disclaimed during prosecution, not what a person of ordinary skill would think the patentee needed to disclaim during prosecution.") (citation omitted).

The PTAB agreed with Traeger's present tense argument, pointing out that the claims require an indication that the grill "is" communicably connected and that the nature of "is" in that context requires that "the indication must be about the present communicable connection status of the grill." Because the metadata in Lee is stored, at the time of the request the appliance might no longer be connected. The PTAB explained:

> In the absence of any disclosure that the server queries the appliance only upon request from the user, and in light of Lee's disclosure that the uploaded state information is for future use, the reference to monitoring a current state of the refrigerator is not sufficient to support Petitioner's assertion that receiving state information is itself an indication of present network connectivity of the appliance.

Appx3473-3474. Indeed, the PTAB explained that even if the data was obtained recently and therefore was not "stale," it still would "not equate to present communication connectivity." Appx3473. Thus, Traeger argued (and the PTAB

agreed) that sending stored state information from an intermediate database can indicate that the appliance "was" connected, but not that it "is" in communication with the server.

Although the above arguments were advanced in the PGRs for the 833 Patent, claim 1 of the 720 Patent has the identical limitation. It would be erroneous to construe this limitation differently when used in separate claims of continuation patents, and the prosecution history of one patent therefore implicates the claim construction in another. "Statements made during prosecution of a parent application are relevant to construing terms in a patent resulting from a continuation application if such statements relate to the subject matter of the claims being construed." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1350 (Fed. Cir. 2019).

The ITC thus erred in failing to construe the limitation requiring "the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance" to (1) be an express notification, generated at the server for this purpose, and (2) to indicate present connection status at the exact moment of the transmission of the notification.

**B.    The Finding of Infringement was Erroneous**

The application of the erroneous claim construction resulted in an erroneous finding of infringement.

### *1.    Standard of Review*

This Court reviews a final determination of the ITC in accordance with Chapter 7 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706 (1994). *See* 19 U.S.C. § 1337(c). Accordingly, factual findings of the ITC are reviewed under the "substantial evidence" standard. *See Checkpoint Sys., Inc. v. United States Int'l Trade Comm'n*, 54 F.3d 756, 759 (Fed. Cir. 1995). The "substantial evidence" standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 229, 83 L. Ed. 126, 59 S. Ct. 206 (1938).

### *2.    The GMG System Lacks the Required "One or More Computing Systems"*

The GMG system includes a grill with a hardware controller, and it employs a mobile device, but there is no separate "one or more computing systems" as claimed. "There can be no literal infringement where a claim requires two separate structures and one such structure is missing from an accused device." *Becton*, 616 F.3d at 1255; *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288-90 (Fed. Cir. 2004). If this limitation is properly construed to require "one or more computing systems" to be distinct from the separately claimed hardware controller on the grill, there can be no possibility of infringement because this is the sole basis for finding this limitation to be satisfied.

Even if the hardware controller could be one of the "one or more computing systems," it still would not satisfy the requirements of the claim because the grill's transmissions do not indicate the grill (1) is in network communication (2) with the cloud computing platform. According to the ITC, the grill's transmissions "explicitly" indicate that the GMG grill is communicating over a network. Appx68. (citing Traeger expert Dr. Shoemake, at Appx5141-5148 and Appx5155-5156).

As GMG explained, the grill's hardware controller sends outbound messages, without ever knowing whether they are received. Appx66. Though the messages may be formatted in a way that is consistent with network transmissions, they do not indicate that the connection has been made or that the messages were received. Indeed, Traeger's expert Dr. Shoemake only offered testimony about the format and protocol of the message, but never regarding any content of the message indicating the fact of a successful connection with the cloud computing platform. Instead, Dr. Shoemake asserted that messages are "repeatedly sent" by the grill, and opined that the fact of the transmission of such messages serves as the indication that the grill is communicating over a network. Appx2056-2057; Appx2089. Even if this means the grill is communicating over a network, it says nothing about whether a network connection has been established between the server and the grill, as the claim requires.

This conclusion is not affected by the inclusion of information identifying a user, or the fact that a connection has been achieved, despite the ITC's conclusion otherwise. Appx68-69. The user identifying information is included even if the grill never achieves a connection, and thus says nothing about it. Similarly, the outgoing transmissions are the same regardless of whether a connection has been achieved, and thus the outgoing transmissions do not indicate that it has been achieved.

The patent makes it clear that the one or more computing systems is distinct from the grill itself. As explained above, this is consistent with Figure 1, which shows the grill connected and sending data to the cloud computing platform while also requiring a separate computing system (illustrated as a mobile device) to provide the claimed first input indicative of the network connection between the grill and the cloud computing platform.

The claim limitation at issue cannot be satisfied by a communication from the grill to the server, because the claim requires the indication to come from one or more computing systems that cannot be the grill's hardware controller. But even if the hardware controller could be one of the "one or more computing systems," the transmissions from the hardware controller are outbound only, without indicating whether a connection has been achieved. They may be indicative of a desire to connect, but the claim language requires the input to the server to be a confirmation that the connection has been achieved.

The ITC erred in allowing the hardware controller to be one or more computing systems, and further erred in allowing unrelated and irrelevant aspects of the grill's hardware controller transmissions to satisfy the requirement of an input indicating that the grill "is in network communication" with the cloud computing platform. This claim language is not satisfied, and there can be no infringement.

### 3.    *The GMG System does not Generate the Required Notification*

The ITC further erred in concluding that the GMG server includes a notification generator and transmitter configured to send a "generated notification indicating that the cloud computing platform is communicably connected to the electronically controlled appliance."

The express requirement of a "notification generator" and the act of "generating" a notification plainly requires something more than simply receiving data from the grill and retransmitting it to the phone. The ITC reached this exact conclusion with respect to the claim term "generating" as used in the parent 833 patent. In the 833 patent, a claim required the mobile device to perform the step of "generating one or more instructions" configured to cause a hopper to feed wood pellets to maintain a temperature. The ITC found this limitation required the mobile device to do more than forward a user-entered temperature to the server and then to the grill's hardware controller, and instead it must generate a hopper feed instruction from that entered temperature. Appx2821-2825. Merely forwarding the temperature

along would move the act of "generating" from the phone to the grill rather than performing it at the mobile device, as required by the claim. Appx2825. The "generating" language in the present limitation similarly makes a specific choice in the division of labor between the server and the mobile device, requiring the server, not the mobile device, to generate the claimed notification of the fact of connectivity.

In the GMG system, certain notifications are generated at the server level, though the claimed notification is not. For example, when the grill's target temperature is reached, a text notification is generated at the server and sent to the phone, with the message: "The grill's target temperature has been reached." Appx5167 (Dr. Shoemake direct witness statement). Once received by the mobile device, the server-generated notification is displayed to the user in the form as generated at the server. Appx5169; Appx70.

Although there are server-generated messages regarding the target temperature, in the GMG system there is no server-generated notification that the grill is communicably connected to the server. The ITC acknowledged GMG's to this effect, stating that "GMG argues that Traeger has failed to carry its burden to prove infringement of claim 1, because the connectivity information that Dr. Shoemake identifies for the 'communicably connected' limitation is not one of the alerts he identified for the 'notification generator' limitation." Appx72. The ITC even *agreed* that Dr. Shoemake did not identify the claimed notification as one that

is generated at the GMG server, and further noted that Traeger conceded as much. Appx73. But the ITC then concluded—without further explanation or evidence—that Dr. Shoemake's analysis was "sufficient" to show that such a notification is generated by the GMG server. *Id.* Traeger did not identify this required server-generated notification because there is none, and it was erroneous for the ITC to conclude otherwise, particularly after acknowledging it does not exist.

Because the GMG server does not generate this required notification, Traeger resorted to pointing to a computer algorithm performed at the mobile device, through which the mobile device would analyze received transmissions to draw inferences about whether the grill was connected, and then the mobile device (not the server, as the claim requires) would generate and present a user display notification accordingly. Specifically, Traeger referred to a process in which the GMG App on the mobile device performs an analysis and then updates a data field to indicate whether the GMG Server is believed to be communicably connected to the GMG Grill. Appx2756. Through this method, the mobile device assesses the age of the grill data, and infers (correctly or incorrectly) that the grill is still connected to the server unless the grill data is more than three minutes old. But again, this process of data analysis and generation of a notification takes place at the mobile device, as Traeger admits. Appx2754 ("the GMG App invokes" the method). GMG likewise explained that this indication is generated at the GMG App, not the server.

Appx2600; Appx33873-33876 (testimony of GMG expert David Williams); Appx33919-33923 (testimony of GMG witness David Scott, author of the source code). No part of this analysis occurs at the server, and thus the notification is generated at the GMG App, not the GMG server.

The fact that the GMG mobile device must perform this connectivity analysis, and must thereafter generate any notification that may be presented to the user, proves that the server did not perform the analysis and did not generate or transmit any notification regarding whether the grill "is communicably connected" to the server. Accordingly, the GMG System does not meet this "generated notification" claim requirement, and the ITC erred in concluding that it does.

The ITC inaccurately described the operation of the GMG System in a manner that presupposed the erroneous conclusion by calling the transmission of grill state data "connectivity status messages" and the mobile phone's request for such data a "connectivity status request." Appx71. In the GMG System, however, there are no "connectivity status" requests or "connectivity status" messages. Indeed, even Traeger's expert Dr. Shoemake did not apply this label to messages between the mobile device and the server. *See* Appx5173-5175 (cited by the ITC at Appx71 as Shoemake DWS at Q/A 114). This label seems to appear only in Traeger's briefing, and was not used by any witnesses or any documentation describing the GMG

System. The use of this inaccurate label created the impression that the messages contained a generated notification, though they did not.

Ultimately, the ITC concludes that the transmission of state information at five second intervals is essentially close enough, saying that such delays do not affect the infringement analysis. Appx73. But sending data along at a particular frequency is not the same thing as *generating a notification* that the grill is communicably connected to the server. The conclusion about the five-second timing frequency may be directed to the present tense aspect of "is" communicably connected, but says nothing about the "generated notification" aspect and its express indication requirement.

Even the present tense requirement of "is" communicably connected is not established merely by five second frequency. Importantly, data from the GMG grill is parked on a server database where it sits until requested by the mobile device. The GMG grill may or may not be connected to the server after depositing a given set of data, and because the mobile device receives data from the stored database rather than from the grill itself upon request, the data cannot indicate whether the grill is communicably connected to the server.

As explained above with respect to claim construction, during the PGR process Traeger advanced arguments about this exact "is communicably connected" claim language, stressing that it requires an indication of a present connection, not a

prior one. Traeger also argued that the Lee appliance connected to the "cloud service" through a home gateway, but that is irrelevant because the law requires Traeger to be held to arguments made during the prosecution of the patent. *Springs*, 323 F.3d at 995. This applies even if Traeger advanced arguments that were narrower or more restrictive than may have been necessary. *Ajinomoto*, 932 F.3d at 1351. The PTAB agreed with Traeger's present tense argument, observing that the claims require an indication that the grill "is" communicably connected to the cloud, which means that "the indication must be about the present communicable connection status of the grill." Appx3472. When the data is stored, at the time of the request the appliance might no longer be connected. Appx3473-3474. As such, the PTAB concluded that data retrieved from a database, even if stored there recently, cannot indicate the present connection status of the appliance.

The ITC erred in discounting the above prosecution history because it occurred in the parent 833 Patent, not the 720 Patent prosecution. Importantly, claim 1 of the 720 Patent has the identical limitation, making the prosecution history applicable. *Iridescent Networks,* 933 F.3d at 1350. Traeger's argument confirms that the limitation "is communicably connected" requires the "notification" to indicate the ***present*** state of connectivity rather than at some earlier time. The GMG System does not have such a notification, and does not meet this limitation.

In summary, the GMG server does not generate a notification related to whether the grill "is communicably connected" to the server. There is no generated notification, because any analysis and generation of a notification that is presented to the user is performed at the mobile device, not the server. The data sent by the server also does not indicate, and certainly not expressly, whether the grill "is communicably connected" to the server, and any notification to that effect must be generated at the mobile device, not at the server as required by the claim. In addition, setting aside whether there is a "generated notification," there is no information from the server concerning whether the grill "is" presently communicably connected, because any state data passed from the server to the mobile device can only indicate that the grill was connected at some point in the past. This claim limitation is not satisfied by the GMG System, and the ID erred in concluding that it was.

## C.    The ITC Erred in Upholding Validity

The ITC erred in not finding the claims to be invalid in view of the prior art MAK system or Fireboard system, either alone or in combination with other references.

This Court reviews ITC Final Determinations in accordance with the Administrative Procedure Act (APA), setting aside conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Lelo Inc. v. ITC*, 786 F.3d 879, 883 (Fed. Cir. 2015); 5 U.S.C. § 706(2)(A). Questions

of law, as interpreted and applied by the ITC, are reviewed de novo and questions of fact are reviewed for substantial evidence. *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1361-62 (Fed. Cir. 1999); *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013).

### 1. *GMG should not have been estopped from relying on MAK or Fireboard*

The ITC held that GMG was precluded from asserting the claims to be invalid based on the prior art MAK system or Fireboard product, finding that GMG knew or reasonably could have found the information necessary to assert invalidity at the time of the PGRs. Although GMG was aware of the MAK and Fireboard systems *generally*, the details of the systems were confidential and not reasonably publicly accessible and were not sufficient to support an assertion of invalidity at that time. It was only with the availability of subpoenas in this ITC proceeding that GMG was able to obtain confidential documents and testimony in order to assert grounds of invalidity that were not, and could not have been, advanced in the PGRs. Under these circumstances, estoppel should not apply, and the ITC's application of estoppel was not in accordance with the law.

The estoppel statute, 35 U.S.C. § 325(e)(2), provides that a petitioner in a PGR may not later assert invalidity on any ground that was "raised or reasonably could have [been] raised" during the PGR proceedings. The term "ground" has been

applied to mean specific assertions of invalidity based on specific combinations of evidence, not references generally without regard to the nature of the assertion. *E.g., Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1335-37 (Fed. Cir. 2020); *Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*, 817 F.3d 1293, 1296 (Fed. Cir. 2016) (characterizing different combinations of prior art references as different grounds in an IPR petition). Accordingly, an invalidity assertion that draws from new information not previously available amounts to a new ground—even if it relates to a device for which certain other information was available earlier. *E.g., Medline Indus. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 U.S. Dist. LEXIS 167052, at *11 (N.D. Ill. Sep. 14, 2020).

In order to present a ground for invalidity in a Post-Grant Review, a petition must specify "where each element of the claim is found in the prior art." 37 C.F.R. § 42.204(b)(4). The PTAB will not institute a PGR proceeding unless it is "more likely than not" that at least one of the claims is unpatentable. 35 U.S.C. § 324(a). Because of the gaps in the publicly available information, GMG could not have successfully asserted invalidity based on the MAK or Fireboard systems in its PGR petition.

Traeger cannot deny that GMG obtained confidential documents, source code, and testimony directed to the asserted MAK and Fireboard systems during the ITC proceeding. GMG's reliance on confidential details in its invalidity assertion of

MAK and Fireboard is confirmed in the ITC's decision, which specifically discusses confidential source code, system details, and related testimony. *See, e.g.*, Appx113-115 (citing testimony of GMG expert Mr. Williams regarding the operation of the systems, based on a review of code). Mr. Williams likewise offered testimony about the operation of the MAK system based on confidential information acquired during discovery regarding structure, source code, and operational details. Appx29911-29912. GMG's invalidity assertion was rooted in details that were not public and could not have been obtained at the time of the PGRs.

The ITC concluded, adopting Traeger's argument, that the confidential details could have been obtained by the use of engineering investigatory techniques such as "packet sniffing." Appx129. GMG submits that such actions are well beyond the scope of "reasonable diligence" required by the estoppel statute, and is aware of no precedent requiring such steps. To require a party to hire an expert to use packet sniffing or reverse engineering to investigate every prior art device or system is surely beyond the reasonable diligence standard. *See Asetek Danmark A/S v. Coolit Sys.*, No. 19-cv-00410-EMC, 2019 U.S. Dist. LEXIS 225134, at *26-29 (N.D. Cal. Dec. 30, 2019) (holding that the statute does not impose a "scorched earth" investigation standard). Even if some details could have been ascertained by employing investigatory reverse engineering, gaps would still remain. Witnesses from MAK and Fireboard confirmed that while certain data may be ascertainable via

such forensic investigation, it would not provide the level of detail required to apply such prior art to the claims of the Asserted Patents. Appx31856 (Mr. Ryan Comingdeer of MAK, testifying); Appx32087-32089 (Mr. Theodore Conrad of Fireboard, testifying); Appx31769 (lines 5-20, regarding inability to determine MAK server structure); Appx31817 (MAK grill and server code not publicly available); Appx31938-31939 (Fireboard architecture not publicly available); Appx32007-32008 (Fireboard software not publicly available). Accordingly, GMG still could not have advanced its present invalidity grounds in the PGRs, and should not have been estopped from doing so.

### 2.    *The claims were anticipated by the MAK system*

The ITC found that the MAK system was prior art and that it taught everything as claimed in claims 1 and 2, other than the "first input" indicating that the grill "is in network communication with the cloud computing platform." Appx110-116. GMG argued that this limitation was *not* present in the MAK system for the same reasons that it was not present in the accused GMG system, but that *if* GMG infringed the patent then the claims were anticipated by MAK for the same reasons that would support a finding of infringement. Appx111. The ITC held, however, that GMG had waived the ability to assert this conditional and alternative basis for invalidity, under ITC Ground Rule 8.2. *Id*. The waiver finding was erroneous, and an abuse of discretion, because GMG's pre-hearing brief disclosed GMG's position.

Appx1586. Even if GMG's position had not been sufficiently detailed, it was further an abuse of discretion because Traeger consented to the admission of testimony supporting it at trial, without objection, even *voluntarily* submitting testimony from its own expert on this specific issue. The nature of Traeger's infringement position resulted in the anticipation of the claims by the MAK system, and the ITC erroneously ruled otherwise.

The origin of the waiver issue began with Traeger's infringement and claim construction contentions. At the outset, Traeger asserted that the limitation for the first input indicating that the grill "is in network communication" should be construed to mean an input that the grill "is permitted to communicate" over the network. Appx28. The ITC rejected this construction, and Traeger's prehearing brief argued that transmissions from the mobile device satisfied the requirement for an input from "one or more computing systems." Appx1373. After clearly stating that the infringement contention was that the mobile device was the "one or more computing system," Traeger then embarked on a step-by-step description of the operation of the GMG system. Then Traeger argued that the GMG grill's hardware controller provided the required first input. Appx1375. In response, GMG explained in its prehearing brief that this would be an improper construction and application of the claim, for the reasons outlined above regarding the hardware controller and one or more computing systems interpretation. Appx1516-1520. GMG also complained

that this was a new infringement argument by Traeger that triggered a new claim

construction position not previously raised, Appx1517.

In further response to Traeger's new hardware controller infringement

position, GMG asserted that "if the GMG instrumentalities identified by Traeger are

sufficient to infringe the Asserted Claims, then the claims would be invalid in view

of the prior art, given that the same claim construction and application must be

applied for purposes of invalidity as for infringement." Appx1564. With respect to

the MAK system specifically, GMG further stated "[a]ssuming that Traeger's

application of the claims is accepted as correct and could encompass the GMG

System, then the MAK System, either alone or in combination with another

reference, discloses each and every claim limitation. Appx1585. And with respect to

the "is in network communication" limitation (referred to below as Limitation 1.2),

GMG stated that the "MAK System operates in a manner similar to the Lee and

GMG Systems" and that "this limitation would only be satisfied by the MAK System

if it is also satisfied by Lee and GMG." Appx1586 (further citing RDX-0003, claim

chart applying the MAK System as above). Relatedly, GMG explained that the MAK

system had a grill controller that transmitted status updates, just as with the

communications Traeger asserts to supply the "first input" for the GMG system.

Appx1585. GMG further explained that the MAK server operated in the same way

as the accused GMG server. Appx1587. Collectively, these assertions express that

the MAK system includes a grill controller that sends status updates to the server in the same way as the GMG System, and thus that the "in network communication" limitation would be satisfied by the MAK system in the event it was also deemed satisfied by the GMG System.

GMG further explained that it had advanced this same position in its amended answer, filed August 3, 2021, asserting:

> Traeger also argues that the hardware controller on an accused grill provides the "first input" and is a "computing system" in accordance with this limitation. GMG disagrees that this is a permissible interpretation or application of the claim limitation, but to the extent Traeger is permitted to assert that the limitation can be satisfied in the GMG System this manner, by the grill's hardware controller sending data to a cloud computing platform, then the MAK System operates in this same way, with the MAK grill sending state data to the server, as described below in 1.4.

Appx35203.

These assertions and disclosures put Traeger on notice of GMG's contention that the MAK System taught the applicable limitation if the GMG system was found to satisfy it, and met the requirements of GR 8.2.

Moreover, GMG included the above invalidity position in its prehearing brief without any objection by Traeger. In addition, Traeger consented to the admission of the MAK Grills testimony from Mr. Amero and Mr. Comingdeer, again without objection, detailing the features of the MAK Grills product that disclosed each and every element of the asserted claims. Traeger itself *voluntarily* submitted testimony

47

from its expert Dr. Shoemake, developing and arguing the evidence about this specific application of this claim limitation. Appx6332-6333; Appx6346-6355. Additionally, Traeger allowed GMG to elicit admissions from Dr. Shoemake at trial, again without objection, concerning this very issue on cross examination. Appx2341-2342. Consequently, Traeger should have been found to have waived any ability to object to this invalidity assertion by GMG by failing to object to the position in GMG's prehearing brief, and by actually litigating the issue at trial. GMG also specifically requested the pleadings be conformed to the evidence, to the extent it was necessary and in accordance with 19 C.F.R. § 210.14(c), and this, too, should have been allowed. Appx35204-35205. Under these circumstances, it was an abuse of discretion for the ITC to find that GMG had waived its assertion of the MAK grills system, and to thereby exclude the conditional argument of invalidity.

The MAK system anticipates claims 1 and 2. The ITC expressly found that the MAK system taught every limitation other than the "first input" indicating the grill "is in network communication" with the cloud computing platform. Appx110-115. If the ITC had not erroneously applied waiver, it would also have found that MAK satisfied this limitation at least for the same reason it found the GMG system to satisfy it.

In its finding of infringement, the ITC concluded that sending data from the grill's hardware controller every five seconds satisfied the requirement to have a

"first input" at the server which received an input from "one or more computing systems" indicating that the grill was "in network communication" with the server. Appx68-69. Though this is an incorrect interpretation and application of the claim, it would apply to the MAK system in the same way.

The MAK system has a grill hardware controller that periodically transmits status messages to the MAK server, as Traeger's expert Dr. Shoemake agreed. Appx6333; Appx2341-2342; see also Appx31770-31773 (MAK software developer Mr. Comingdeer). Dr. Shoemake even testified using language specifically mapped to this limitation, saying that it operates as an indication that the grill is communicating over a network with the server. Appx6353-6354.

The MAK and GMG Systems are so similar in the way they transmit and process status messages and grill identifiers that if the GMG System meets Limitation 1.2 then the MAK System surely also discloses that limitation. The ITC abused its discretion in finding waiver, and should have found claim 1 to be anticipated by MAK.

Claim 2 is clearly invalid if claim 1 is found to be invalid, as the ITC concluded. Appx116.

### 3.    *The claims were obvious in view of the Fireboard system*

The claims of the 720 Patent were also obvious in view of the prior art Fireboard system, either alone or in combination with other references such as the

MAK system above. The commercialized version of the Fireboard system was directed to remote temperature monitoring of a grill, lacking the ability to remotely control it. GMG established that the Fireboard system satisfied every limitation of at least claims 1 and 2, other than the ability to control the grill remotely. Appx124-125.

GMG also proved that Fireboard had internal plans to add the control function, and the computer code to do so was in development and "stubbed out" in the Fireboard software. The ITC concluded, however, that the Fireboard plans and partial source code were not publicly available before the priority date of the 720 Patent, and therefore could not be used as evidence of obviousness. Appx125 ("Fireboard's business plans and inoperable source code were not available to the public, and accordingly, GMG has failed to identify clear and convincing evidence that one of ordinary skill in the art would have been motivated to modify the Fireboard system to implement temperature control."). Based on this conclusion, the ITC did not consider any aspect of the Fireboard, either alone or in combination with other references.

The ITC erred in failing to consider the Fireboard business plan and source code development as evidence of a motivation to proceed with the addition of control functionality, either in view of the Fireboard system alone or as combined with other references such as the MAK System. "It has long been the law that the motivation

to combine need not be found in prior art references, but equally can be found in the knowledge generally available to one of ordinary skill in the art." *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337 (Fed. Cir. 2004) (internal quotations omitted). The Fireboard evidence demonstrates that a real-life skilled artisan was *actually* motivated to make the necessary changes to the Fireboard System to incorporate the missing limitation, and thus is evidence that it would likewise be obvious to a person of ordinary skill in the art. The ITC erred in failing to consider invalidity based on Fireboard as a primary reference, applying the erroneous conclusion that the motivation to modify Fireboard was not found in the prior art. If it had been fully considered, it would have established the invalidity of the asserted claims.

## D.    The ITC Erred in not Finding Unenforceability for Inequitable Conduct

The claims of the 720 Patent should have been found to be unenforceable due to inequitable conduct. The named inventor Mr. Colston was not the true sole inventor of the claimed subject matter, and he willfully omitted the names of the true inventors with an intent to deceive. Mr. Colston lacked the technical education or experience to have conceived of the claimed invention, and he authored no documents supporting such conception. Instead, he hired large teams of people at three other companies to develop the product, and individuals at those three other companies invented the claimed subject matter.

This practice of intentionally omitting inventors went far beyond the 720 patent; Mr. Colston falsely named himself as sole inventor on a large number of patent filings that resulted from the remote grill project. For some of those, after being caught and after hiring the omitted inventors as employees, Traeger filed documents to amend the inventorship. But the 720 patent continues to name Mr. Colston as sole inventor, and the ITC should have found that Traeger and Mr. Colston omitted the true inventors, knowingly and with an intent to deceive.

Prior to the development of the claimed invention, Traeger lacked the technical capability to develop either the grill or the electronic controls. Appx30018. At that time, Traeger was merely a "branding and marketing company." Appx33317. Traeger hired Mr. Colston as Vice President of Product Development, but he had a biology degree and no prior education or experience with grills, software, or Internet control of appliances. Appx1882-1885.

Lacking any ability to develop the remotely controlled grill himself, or with any others in-house at Traeger, Mr. Colston hired three companies to do it for him. The first company, Tekna, served as overall project manager and developed the grill. A second company, Oven Bits, was hired to design and develop the mobile phone App to interact with the server and control the grill. A third company, DornerWorks, collaborated to design and develop key aspects of the grill's hardware controller and

the nature of the communications among the grill, server, and mobile phone App. Appx30435; Appx30470-30472; Appx30779-30781.

Mr. Colston's role was limited to supervising the activities of the teams at these three companies and telling them generally that he wanted them to develop a grill that could be controlled by a mobile phone. This high-level instruction, of course, is not an act of inventorship, nor is an aspirational request to develop a product having a list of particular features. *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir.), *cert. denied*, 525 U.S. 923 (1998) ("One who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole does not qualify as a joint inventor."); *see also Caterpillar,* 387 F.3d at 1377 ("[A] person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known in the current state of the art." (quotation marks omitted)).

Mr. Colston alleged to have conceived of the inventions claimed in the 720 patent between August and December 2014, shortly after joining Traeger. Appx131. But he produced no written documents reflecting any conception of his own, and considering the technical nature of the product, and the need to hire three companies to develop it, the assertion of conception is not credible. Mr. Colston testified that he passed along his conceptions to others verbally, but again that

assertion is not credible. He may have interacted verbally, but the nature of the invention would have required details to be put in writing. Indeed, the three companies he hired did just that—creating voluminous documents in the course of developing, designing, testing, and documenting the remotely controlled grill.

Despite having allegedly conceived of the invention in late 2014, Mr. Colston did not contact a patent attorney until ten months later, in late 2015. Mr. Colston did not produce the written technical description of the invention given to his patent attorney, and it is clear that it was documentation authored by the teams he had hired, not by Mr. Colston. Indeed, this is indisputably true, because he did not author any documents describing the invention, and further because drawings included as patent illustrations were created by another company. Appx1937-1938.

There is nothing which corroborates, from the perspective of a person of ordinary skill in the art at the time, that Mr. Colston was in possession of the claimed inventions. Mr. Colston's input was nothing more than the generalized concept of a connected grill having some high-level features. On the other hand, as explained below, clear and convincing evidence proves that at least third parties David Johnson and Wes Gilpin conceived of certain specific claim limitations and thus should have been named as inventors.

A co-inventor is one who contributes to at least one limitation of any single claim of the patent. *Ethicon,* 135 F.3d at 1460. Mr. Johnson and Mr. Gilpin did just

that, at least contributing to the limitations of the claims, if not conceiving and reducing to practice the entirety of them. Moreover, they were co-inventors for the claimed inventions of the parent 833 patent as well, but were omitted from that patent also.

Inequitable conduct occurring during the prosecution of a parent patent's application infects a later-issued continuation patent with similar subject matter, regardless of whether any misconduct occurs during the prosecution of the continuation patent. *Agfa Corp. v. Creo Prods.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006); *Therasense, Inc. v. Becton, Dickinson & Co .*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (recognizing that "the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family."); *Consolidated*, 910 F.2d at 811-12; *Fox Indus., Inc. v. Structural Preservation Sys, Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990). The relationship between the 720 and 833 patents was "immediate and necessary" under *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808-12 (Fed. Cir. 1990), at least because (1) both patents were asserted against GMG in this action, (2) the patents are linked, with one being a continuation of the other, (3) the nature of the inequitable conduct is identical, and (4) this same act of inequitable conduct was performed at the same time for the two patents.

### *1. The initial direct connection was conceived by others*

Claim 12 of the 720 patent, and claims 3, 11, and 18 of the 833 patent, require a process in which a remote device first connects to the grill locally and then, after establishing a direct connection, breaks that connection and connects through the server. Appx199-200; Appx7500-7501.

The second limitation of claim 12 incorporates this process expressly, stating that the "mobile devices, having previously established an initial, direct connection…" Appx199 (at col. 16, lines 65-68). It was Mr. Johnson, not Mr. Colston, who considered different approaches leading to a defined flow that included the use of an initial direct connection between the mobile device and the grill controller. An email dated May 15, 2015 lays out options for the initial connection of the grill. Appx14861. Mr. Johnson testified that he and Wes Gilpin conceived the process which included the step of the above limitation, and that Mr. Colston did not. Appx2232-2236.

In a June 29, 2015 email exchange with Wes Gilpin, Mr. Johnson detailed the very specific process he originated. Appx14007. Mr. Johnson testified that this was his process, and that Mr. Colston did not contribute to it. Appx2238-2239. This email again reflects Mr. Johnson's development and refinement of the process, outlining in detail the steps required by the claimed invention.

There were other possible ways to perform this initial connection process, other than the claimed process and the one described in the above email. Appx29951. Indeed, Mr. Johnson's May 15 email indicates that he and others were considering at least two other options, and that by the time of his June 29 email, one or more such options had been abandoned. Appx14861.

Mr. Johnson also did not merely select one of the modes that were available to the processor chip he had selected, as GMG's expert Mr. Williams explained. Appx29952. Rather, Mr. Johnson's process further includes details beyond those that were standard choices. *Id*. Mr. Johnson's final process requires creativity of the human mind to identify, evaluate, and select the options and functions for initiating the ability to connect the grill. It was this creative endeavor that ultimately resulted in the formation in his mind of the definite and permanent idea of a mobile device that "previously established an initial, direct connection with the electronically-controlled appliance" as recited by claim 12 of the 720 Patent. *Id*. Mr. Johnson's conception of this claimed limitation is further corroborated by the testimony of Mr. Johnson and other witnesses. Mr. Johnson explained that he needed to incorporate an initial process for the Traeger grill to be able to communicate with the cloud servers. Appx2231. He further testified that the second limitation of claim 12 of the 720 patent ("…mobile devices have previously established an initial direct connection…") was directed to this same process. Appx2232. He confirmed that he

and Wes Gilpin, perhaps with others, conceived of the process used in the Traeger grill, Appx2233, and that Mr. Colston did not. Appx2233-2235. And he confirmed that his conceived process is the very same one that was incorporated into claim 12. Appx2240. While his conception process is well documented and supported, there is nothing in the record supporting the proposition that Mr. Colston invented it. Without doubt, this aspect of claim 12 was conceived by individuals hired by Mr. Colston, not by Mr. Colston himself.

### 2. *Attempting/permitted to communicate was conceived by others*

Mr. Johnson and Mr. Gilpin also originated the "attempting to communicate" and "permitted to communicate" limitations of claims 3, 11 and 18 of the parent 833 Patent. Appx7500 (claim 3: column 14, lines 1 and 5; claim 11: column 14, lines 52 and 58); Appx7501 (claim 18: column 15, line 53).

Mr. Johnson conceived and described the "attempting to communicate" step as part of his proposed process, described above. Appx14007. Mr. Johnson testified that he and Mr. Gilpin conceived of the steps in the process that were incorporated into the Traeger grill and claimed, and that Mr. Colston did not. Appx2249-2251. GMG's expert Mr. Williams testified that a person of ordinary skill in the art would understand Mr. Johnson's proposal to show that he had possession of the claim limitation, and thus conceived it. Appx29954-29956.

Mr. Johnson also conceived of the "permitted to communicate" limitation within his process. Appx14007. Mr. Williams again testified that a person of ordinary skill in the art would understand Mr. Johnson's proposal to show that he had possession of the claim limitation, and thus conceived it. Appx29952-29953.

Mr. Johnson discussed his proposed process with Wes Gilpin, who then captured the conversation in an email dated July 1, 2015. Appx14447-14448. Notably, Mr. Colston was not part of the conversation and was not even copied on the email. Mr. Gilpin's email builds on the process originally presented in Mr. Johnson's email from two days earlier regarding the "attempting" and "permitted" aspects of his process, as Mr. Williams explained. Appx29953-29954. Mr. Johnson further confirmed that he and Mr. Gilpin figured out the steps to make this work, and that they correspond to the attempting and permitted limitations of the claims at issue. Appx2251-2253. Mr. Colston had no role in the process, and no documentation showed he had conceived of the claimed aspects of the inventions. Appx29953; Appx32550-32551 (Mr. Gilpin testifying that Mr. Colston never provided any instructions or direction regarding this aspect of the process); Appx32640-32644 (Mr. Gilpin testifying that neither Mr. Colston nor anyone from Traeger provided such instructions or directions). Indeed, Mr. Johnson explained the process to Mr. Colston, rather than the other way around. Appx2237 (lines 10-1254).

It was only after Messrs. Johnson's and Gilpin's contributions that the idea for the claimed steps as claimed were "sufficiently definite and permanent" such that "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Ethicon*, 135 F.3d at 1460 (internal quotations omitted). Mr. Colston was not involved in the development of the process, is not copied on the emails describing it, never authored any descriptions of it, and never provided any instructions to the team about it. Mr. Colston's only involvement was to listen to the developments of others and approve them for incorporation into the grill. Accordingly, Mr. Johnson and Mr. Gilpin conceived of this aspect of the claims, and should have been included as inventors.

### 3.    *Indication of a communicable connection was conceived by others*

All of the claims (including 720 claims 1, 12, 16 and 833 claims 1, 11, 18) include the requirement of either an "indication" or "notification" of a "communicable connection" between the grill and the server or that the grill is "in network communication" with the server. As with the above limitations, it was Mr. Johnson and Mr. Gilpin—and not Mr. Colston—who conceived of this aspect of the claims.

The ITC acknowledged that Mr. Johnson and Mr. Gilpin were instrumental in developing this aspect, and that there was "no reliable documentary evidence" supporting Mr. Colston's conception. Appx144. Nonetheless, the ITC concluded

that GMG did not prove Mr. Johnson or Mr. Gilpin to be co-inventors, observing that they disclaimed inventorship and that this feature was allegedly "standard" to Internet of Things practice. *Id*.

Even if one were to accept the premise that the inclusion of an indication that the appliance was "in network communication" is standard practice in Internet of Things implementations, Mr. Colston did not know that and never instructed the others about it, as Mr. Johnson testified. Appx2262 (lines 16-20). Moreover, even this "standard practice" could be implemented in a variety of ways, and Mr. Colston likewise never conceived of, or instructed the others about, the use of a "first input" to the server from "one or more computing systems" to provide this indication. *Id*. Indeed, Traeger produced nothing even suggesting that Mr. Colston conceived of such features, because he did not. Yet again, this is a claimed feature conceived by others and not by Mr. Colston.

This Court addressed the process for evaluating inventorship in *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd*., 292 F.3d 1363 (Fed. Cir. 2002), finding inequitable conduct by deliberately omitting a co-inventor. *Id.* at 1376-77. "To determine whether [a person] made a contribution to the conception of the subject matter of [a claim, the] court must determine what [the person's] contribution was and then whether that contribution's role appears in the claimed invention." *Id*. The Court explained that an inventor need not make a contribution to

every claim in the patent. "A contribution to one claim is enough." *Id*. at 1373 (quoting *Ethicon,* 135 F.3d at 1460).

In this case, the evidence uniformly confirms that others conceived of claimed aspects of the inventions and are inventors. Traeger produced nothing in writing to corroborate Mr. Colston's alleged inventorship, even admitting that he authored no such documents. As was the case in *Frank's Casing*, it is clear that Messrs. Johnson and Gilpin were inventors and should have been named on both Asserted Patents. The ITC committed clear error in failing to properly apply these precedents.

### 4.     *The true inventors were omitted with deceptive intent*

The exclusion of Mr. Johnson and Mr. Gilpin was also with deceptive intent. Traeger and Mr. Colston were aware of the obligation to name proper inventors. Appx1970. Yet Mr. Colston filed many patent applications for the grill project, mainly listing himself as sole inventor. At some point thereafter, individuals from the third party hired by Traeger to develop the grill had become aware of some of the patent filings and complained about the inaccurate inventorship claims. Appx1973-1974; Appx1977.

Tekna's Matt Czach testified that he learned about the filings during a conversation with Mr. Colston. Appx30672-30674. Mr. Colston confirmed the conversations, and responded that Traeger would only name Traeger employees on its patent applications, as instructed by counsel. Appx1978-1979; Appx30676-

30680. Mr. Colston characterized the conversation as one that "started" the process of correcting the patents. Appx1979. But consistent with its plan to name only Traeger employees, Traeger ignored the requests to amend the inventorship until 2018, two years later, when it had hired former Tekna employees Mr. Czach and Mr. Altenritter. Appx1980.

This practice by Mr. Colston and Traeger was hardly an isolated incident that could be characterized as inadvertent. Between March 11, 2015 and November 2, 2018, Traeger filed "dozens" of design and utility patent applications related to its remote operated grill project, claiming all manner of details developed by others— all claiming Mr. Colston to be the sole inventor. Appx32220-32221 (testimony of patent attorney Michael Frodsham). Traeger's counsel, Mr. Frodsham, testified that he had seen nothing in writing that could corroborate Mr. Colston's claim to be the sole inventor of the content in the application resulting in 833 and 720 patents. Appx32378-32379. Accordingly, Mr. Frodsham named Mr. Colston as sole inventor simply because he said to, and added others as inventors later when they became Traeger employees, simply because he was told to.

Traeger and Mr. Colston were motivated to create the strong public impression that their in-house employees (that is, Mr. Colston) had the technological capability to develop new products such as its new grill with cloud-based controller. Appx14386-14387. Primarily, this would bolster the perceived value of the company

ahead of an imminent Initial Public Offering. Appx1983. Mr. Colston also was promoted, given a raise, and awarded a substantial number of stock options. Appx1983-1984. Mr. Czach and Mr. Altenritter were also given extremely handsome packages when hired by Traeger, and thereafter became far less cooperative in their testimony. Appx1984-1985. To facilitate this objective of stock riches, Traeger and Mr. Colston knowingly and repeatedly omitted true inventors from patent applications resulting from the grill project in order to deceive the USPTO and investors in a way that would produce handsome financial benefits.

Where a party has a practice of misrepresentation across multiple applications, it supports an intent to deceive the patent office. *Driscoll v. Cebalo*, 731 F.2d 878, 885 (Fed. Cir. 1984). That is surely the case here, in which documentary evidence proves inventorship by third parties and no written records corroborate Mr. Colston's inventorship, yet Mr. Colston was named as sole inventor on dozens of patents stemming from the project in which he hired teams of people from three other companies to invent the grill for him. He corrected some of the inventorship, but only later, after hiring the additional inventors. His motivation, and that of Traeger, was clearly the product of greed, to bolster the perceived image and capabilities of the company in order to maximize profit in the imminent IPO. On this record, the evidence clearly established that Traeger and Mr. Colston committed inequitable

conduct in the Patent Office, and that both the 720 and 833 Patents should have been held unenforceable.

## CONCLUSION

For each of the foregoing reasons, the order of the ITC should be reversed, such that the 720 patent is found invalid, unenforceable, and not infringed.

RESPECTFULLY SUBMITTED December 16, 2022.

LOWE GRAHAM JONES<sup>PLLC</sup>

/s/ David A. Lowe
_____

David A. Lowe
Lawrence D. Graham
Lowe@LoweGrahamJones.com
Graham@LoweGrahamJones.com
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
T: 206.381.3300
F: 206.381.3301

# Addendum

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

In the Matter of

**CERTAIN CLOUD-CONNECTED
WOOD-PELLET GRILLS AND
COMPONENTS THEREOF**

Inv. No.  337-TA-1237

**ORDER NO. 22:    CONSTRUING TERMS OF THE ASSERTED CLAIMS OF THE
PATENTS AT ISSUE**

(July 28, 2021)

This order addresses the construction of disputed claim terms in the asserted patents, U.S.

Patent No. 10,218,833 (the "'833 patent") and U.S. Patent No. 10,158,720 (the "'720 patent").

## I.    BACKGROUND

The '833 patent and '720 patent are the two patents asserted in this investigation by

Complainant Traeger Pellet Grills LLC ("Traeger").  *See* Notice of Investigation at 1-2 (Dec. 28,

2020).  The respondent is GMG Products LLC ("GMG").  *Id*. at 2.  Pursuant to the Procedural

Schedule (Order No. 7, Feb. 12, 2021), the parties filed opening claim construction briefs on

April 14, 2021.[1]  The parties filed rebuttal claim construction briefs on April 28, 2021.[2]  A

*Markman* hearing was conducted on May 13, 2021, where counsel for Traeger and GMG

participated and presented their claim construction arguments.[3]

---

[1] Complainant's opening claim construction brief is referenced herein as "CIB."  Respondents'
opening claim construction brief is referenced herein as "RIB."

[2] Complainant's rebuttal claim construction brief is referenced herein as "CRB."  Respondents'
rebuttal claim construction brief is referenced herein as "RRB."

[3] Citations to the *Markman* hearing transcript are referenced herein as "Tr."

## II.    LEGAL STANDARDS

"The construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (alterations in original) (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991)). "[O]nly those [claim] terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Claim construction focuses mainly on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See generally Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-17 (Fed. Cir. 2005) (*en banc*). The words of a claim "'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in art" as of the date that the patent application was filed. *Id*. at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)) (citations omitted). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges." *Id*. at 1314. Often, however, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id*. "[T]he court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id*. (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). Those sources include "the words

2

of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id*.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova*, 381 F.3d. at 1115)). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. For example, "the context in which a term is used in the asserted claim can be highly instructive," and "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.*

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). "The longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification." *Innova*, 381 F.3d at 1117.

In addition to the claims and the specification, the prosecution history should be examined if in evidence. "The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

3

Appx3

If the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence may be considered. Extrinsic evidence "consists of all evidence external to the patent and the prosecution history, including inventor and expert testimony, dictionaries, and learned treatises." *Id.* at 1317. Extrinsic evidence is generally viewed "as less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318. "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

## III.     LEVEL OF ORDINARY SKILL IN THE ART

Traeger proposes that a person of ordinary skill in the art for the asserted patents would have had a Bachelor of Science Degree in Computer Science or an equivalent field, as well as two years of academic or industry experience related to Internet connectivity, Internet content delivery, network applications, as well as familiarity with smart home appliances. CIB at 8. This is consistent with the level of ordinary skill that was adopted in proceedings before the Patent Trial and Appeal Board ("PTAB") regarding the asserted patents. *See, e.g., GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-0034, Final Written Decision at 9-12 (Aug. 31, 2020). There is no dispute regarding this proposed level of ordinary skill, and Traeger's proposal shall be adopted in this investigation.

## IV.     THE '833 PATENT

The '833 patent is entitled "Mobile Application for Controlling Outdoor Grill" and names inventor Michael Colston. '833 patent, cover.[4] The patent issued from U.S. Patent Application

---

[4] The '833 patent is attached to the parties' briefing as CIB Exhibit CX-0002 and RIB Exhibit 2.

No. 15/510,996, which was filed on March 29, 2016. *Id.* The claims of the '833 patent were addressed by the PTAB in two post-grant review proceedings: *GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-0034, Final Written Decision (Aug. 31, 2020) ("PGR2019-034 Decision") and *GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-0035, Final Written Decision (Aug. 31, 2020) ("PGR2019-035 Decision").[5]

## A. Specification

The specification of the '833 patent describes an invention for "controlling an electronically-controlled appliance using a software application" and "providing a user interface for controlling an electronically-controlled appliance." '833 patent at 3:19-22. In one embodiment, "a smoker 202 is controlled via a smart phone 203 (or rather via a software application running on the smart phone)." *Id.* at 7:20-22.



*Figure 2*

---

[5] The PTAB decisions for the '833 patent were attached to the parties' briefing as CIB Exhibit CX-0008 and Exhibit CX-0009, and as RIB Exhibit 3 and Exhibit 4.

*Id*. at Fig. 2. As depicted in Figure 2, "[t]he smart phone 203 may communicate with a cloud service 201 which, in turn, communicates with the smoker 202." *Id*. at 7:22-24.

The specification describes an implementation of the invention where a software application provides a "notification of availability," which "may indicate that the electronically-controlled appliance 115 is available to receive control instructions." *Id*. at 6:31-34. "These control instructions 109 may include, for example, an indication that a certain amount of fuel pellets are to be added to a smoker's combustion area, or that a specified amount of fuel (such as propane) is to be burned by a grill, or that a specified internal temperature is to be reached and maintained." *Id*. at 6:35-40.



**Figure 1**

*Id*. at Fig. 1. The specification further describes a user interface for the software application that includes input fields, notification fields, and indicators. *Id*. at 12:42-13:3.

6



*Figure 6*

*Id*. at Fig. 6.

### B. Claims

Traeger asserts claims 1-3, 6-9, 11-14, 18, and 22-24 of the '833 patent. Notice of

Investigation at 2. Claims 1 is a method claim that is an independent claim; and claims 2, 3, 6, 7,

8, and 9 depend from claim 1:

> 1. A method for controlling an electronically-controlled wood-pellet grill
>    using a software application on a mobile device, the electronically-

7

controlled wood-pellet grill having at least one hardware controller, the method comprising:

receiving an indication from one or more remote computing systems indicating that the electronically-controlled wood-pellet grill is communicably connected to the one or more remote computing systems, wherein the one or more remote computing systems comprise a cloud service;

providing a notification in the software application indicating that the electronically-controlled wood-pellet grill is available to receive instructions;

receiving a user input at the software application indicating that a particular temperature is to be maintained by the electronically-controlled wood-pellet grill;

generating one or more instructions configured to cause a hopper to feed wood pellets into the electronically-controlled wood-pellet grill at a particular rate in order to maintain the particular temperature; and

sending the generated instructions to the electronically-controlled wood-pellet grill to activate the hopper, the generated instructions being interpreted and carried out on the electronically-controlled wood-pellet grill via the hardware controller.

2. The method of claim 1, further comprising:

receiving an initiation input that indicates that the software application is to be instantiated on the mobile device; and

instantiating the software application on the mobile device.

3. The method of claim 2, further comprising:

receiving an indication at the software application indicating that the electronically-controlled wood-pellet grill is attempting to communicate with the one or more remote computing systems; and

receiving the user input at the software application indicating that the electronically-controlled wood-pellet grill is permitted to communicate with the one or more remote computing systems.

\*      \*      \*

6. The method of claim 1, wherein the software application is configured to receive instructions from a user indicating one or more changes that are to be applied to the electronically-controlled wood-pellet grill.

7. The method of claim 1, wherein the software application receives one or more portions of information from the one or more remote computing systems, the received information including data regarding the electronically-controlled wood-pellet grill.

8. The method of claim 1, wherein the software application provides a user interface that allows one or more functions of the electronically-controlled wood-pellet grill to be monitored by a user.

9. The method of claim 1, wherein the software application provides a user interface that allows one or more functions of the electronically-controlled wood-pellet grill to be controlled by a user.

'833 patent at 13:34-14:6, 14:23-40.

Claim 11 is an independent claim directed to "non-transitory computer-readable media" and claims 12, 13, and 14 depend from claim 11.

11. One or more non-transitory computer-readable media that store computer-executable instructions that, when executed, implement a method for controlling an electronically-controlled wood-pellet grill using a software application on a mobile device, the method comprising:

receiving an indication at the software application indicating that the electronically-controlled wood-pellet grill is attempting to communicate with one or more remote computing systems, wherein the one or more remote computing systems comprise a cloud service;

receiving a first user input at the software application indicating that the electronically-controlled wood-pellet grill is permitted to communicate with the one or more remote computing systems;

receiving an indication from at least one of the one or more remote computing systems indicating that the electronically-controlled wood-pellet grill is communicably connected to the one or more remote computing systems;

providing a notification in the software application indicating that the electronically-controlled wood-pellet grill is available to receive instructions;

receiving a second user input at the software application indicating that a particular temperature is to be maintained by the electronically-controlled wood-pellet grill;

generating one or more instructions configured to cause a hopper to feed wood pellets into the electronically-controlled wood-pellet grill at a particular rate in order to maintain the particular temperature; and

sending one or more instructions to the electronically-controlled wood-pellet grill to activate the hopper, the one or more instructions being interpreted and carried out by a hardware controller on the electronically-controlled wood-pellet grill.

12. The computer program product of claim 11, wherein the software application provides alerts for timers, probes or temperature.

13. The computer program product of claim 11, wherein the software application provides a user interface that allows users to program one or more custom smoking cycles.

14. The computer program product of claim 13, further comprising sending at least one customized smoking cycle to the electronically-controlled wood-pellet grill, such that the customized smoking cycle is carried out by the electronically-controlled wood-pellet grill.

*Id*. at 14:45-15:24.

Claim 18 is an independent claim directed to a "computer program product" and claims 22, 23, and 24 depend from claim 18.

18. A computer program product comprising one or more non-transitory computer storage media having thereon computer-executable instructions that, when executed by one or more processors of the computing system, cause the computing system to instantiate a user interface comprising the following:

a first input field configured to receive input indicating whether an electronically-controlled wood-pellet grill is permitted to communicate with one or more remote computing systems, wherein the one or more remote computing systems comprise a cloud service;

a notification field configured to indicate whether the electronically-controlled wood-pellet grill is communicably connected to the one or more remote computing systems, and to further provide notifications indicating that the electronically-controlled wood-pellet grill is available to receive instructions;

a second input field configured to receive input indicating that a particular temperature is to be maintained by the wood-pellet grill;

an instruction generating indicator configured to indicate that one or more instructions configured to cause a hopper to feed wood pellets into the wood-pellet grill at a particular rate in order to maintain the particular temperature are being generated based on the received user input; and

10

a transmission indicator configured to indicate that the one or more
instructions are being sent to the electronically-controlled wood-pellet grill
to activate the hopper, the one or more instructions being interpreted and
carried out by a hardware controller on the electronically-controlled wood-
pellet grill.

*Id*. at 15:45-16:20.

22. The computer program product of claim 18, wherein the user interface
allows users to program one or more custom smoking cycles.

23. The computer program product of claim 22, wherein the user interface
displays a user-selectable element that, when selected by a user, sends at
least one customized smoking cycle to the electronically-controlled wood-
pellet grill through the cloud service, such that the customized smoking
cycle is carried out by the electronically-controlled wood-pellet grill.

24. The computer program product of claim 22, wherein the user interface
feature displays a user-selectable element that enables the user, upon
selection of the user-selectable element to save the customized smoking
cycle to: (i) a data store in the cloud service, (ii) the electronically-controlled
wood-pellet grill, or (iii) the mobile device.

*Id*. at 16:33-49.

### C. Agreed Constructions

The parties have agreed to construe the term "cloud service" to mean *a service for*

*enabling on-demand network access to a shared pool of configurable computing resources*.

CIB at 9.

### D. Disputed Constructions

The parties dispute the meaning of seven terms in the claims of the '833 patent.

#### 1. An "indication" or "notification field configured to indicate" that the grill "is communicably connected"

The term "communicably connected" appears in independent claims 1, 11, and 18 of the

'833 patent. Claims 1 and 11 describe an "indication" that the grill "is communicably

connected," and claim 18 describes a "notification field configured to indicate" whether the grill

"is communicably connected."

11

The parties dispute the meaning of these terms, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning consistent with the specification, which is a notification/indication indicating that the grill is available to communicate | An input expressly indicating that the grill is in network communication at the exact moment of the input. |

Traeger proposes to construe this term to have its plain meaning, which Traeger defines as a notification/indication indicating that the grill is available to communicate. CIB at 19-20, 14-16 (addressing similar term for '720 patent); CRB at 15-16, 10-13 (addressing similar term for '720 patent); *see* Tr. at 17-32. GMG proposes to construe this term to mean an input expressly indicating that the grill is in network communication at the exact moment of the input. RIB at 30-32, 13-28 (addressing similar term for '720 patent); RRB at 16, 1-15 (addressing similar term for '720 patent); *see* Tr. at 33-59.

Traeger submits that the claim language and specification are consistent with the ordinary meaning of this term. CIB at 20. The first step of the method in claim 1 is: "receiving an indication from one or more remote computing systems indicating that the electronically-controlled wood-pellet grill is communicably connected to the one or more remote computing systems." '833 patent at 13:38-43. Claim 11 recites a similar step: "receiving an indication from at least one of the one or more remote computing systems indicating that the electronically-controlled wood-pellet grill is communicably connected to the one or more remote computing systems." *Id*. at 14:60-64. The corresponding limitation in claim 18 describes part of a user interface: "a notification field configured to indicate whether the electronically-controlled wood-pellet grills is communicably connected to the one or more remote computing systems." *Id*. at 15:56-16:2. The specification uses the same language as the claims, where a step labeled 550 is described as "receiving an indication from one or more remote computing systems indicating

Appx12

that the electronically-controlled appliance is communicably connected to the one or more remote computing systems." *Id*. at 10:37-41; *see* Fig. 5 ("Receive Indication That Appliance is Connected to Remote Systems"). The specification also describes a user interface with "a notification field 607 configured to indicate whether the electronically-controlled appliance 115 is communicably connected to the one or more remote computing systems 113." *Id*. at 12:42-46.

GMG criticizes Traeger's proposed construction for using the phrase "available to communicate" in place of "communicably connected." RIB at 31. GMG cites a portion of the specification that describes a separate notification "indicating that the electronically-controlled appliance is available to receive instructions (560)." '833 patent at 10:46-48, Fig. 5. In reply, Traeger submits that being "available to communicate" describes the "communicably connected" step that precedes being "available to receive instructions." CRB at 15-16.

GMG's proposed construction adds two limitations to the claims, which are based on arguments that were addressed in the post-grant review proceeding for the '833 patent. *See* RIB at 6-9. GMG had argued before the PTAB that the "communicably connected" limitation was disclosed by U.S. Patent Application Publication No. 2015/0134727 A1, naming inventors Lee *et al.* ("Lee"). PGR-2019-0034 Decision at 20-29; *see also* PGR-2019-0035 Decision at 18-27. GMG identified "metadata" in Lee and argued that this metadata "includes connectivity information" and that "the signal itself indicates there's a connection." *Id*. at 21-22. With respect to the alleged "connectivity information," the PTAB found that "Lee is less than specific in conveying that it recognized the presence of an active indication of communication between the network and the appliances." *Id*. at 23. Although the metadata in Lee includes "state information," the PTAB found no disclosure that this includes network connectivity information and "no disclosure that any sensor exists in Lee's appliance to monitor its own network

13

connectivity to create such state information." *Id*. at 25. With respect to GMG's argument that the metadata signal implicitly indicates a connection, the PTAB found that the Lee's metadata is stored in a cloud-based server and may not indicate "the present communicable connection status of the grill." *Id*. at 26-27.

According to GMG, the PTAB's decision requires an express notification, precluding implicit indications of a connection, and the notification must show that the grill is in network communication at the exact moment it is sent. RIB at 10-11, 27-28. Traeger disputes GMG's contentions, arguing that nothing in the PTAB proceedings was a clear and unmistakable disclaimer of claim scope. CRB at 5-7. Moreover, Traeger notes that the PTAB determined that "no claim term requires express construction." PGR-2019-0034 Decision at 8.

Based on a review of the intrinsic evidence, the undersigned agrees with Traeger that this term should be construed in accordance with its plain and ordinary meaning. The PTAB did not clearly adopt the limitations proposed by GMG when distinguishing the claims from Lee. To address GMG's arguments that transmission of the metadata signal in Lee is an implicit indication of connectivity, the PTAB focused on the timing of the signal rather than distinguishing between implicit and explicit indications. Moreover, the PTAB did not specify an "exact moment" of connection, describing the "communicably connected" limitation as "the present communicable connection status of the grill." PGR-2019-0034 Decision at 26-27. The word "is" in the claim language connotes a present tense connection, but GMG has failed to show that this must be tied to an "exact moment." Accordingly, the undersigned declines to adopt the "expressly" and "exact moment" limitations proposed by GMG.

The undersigned agrees with GMG, however, that there is no intrinsic support for Traeger's proposed construction of "communicably connected" to mean that the grill is

"available to communicate." The plain meaning of "communicably connected" requires a connection, which may not be the same as being "available."

Accordingly, the limitation in claims 1 and 11 requiring an "indication . . . that the . . . grill is communicably connected" shall be construed to mean ***an indication that the grill is connected for communication***. The limitation in claim 18 describing a "notification field configured to indicate whether the . . . grill is communicably connected" shall be construed to mean ***a field that indicates whether the grill is connected for communication***.

### 2. An "input . . . indicating whether/that" a grill "is permitted to communicate"

The term "permitted to communicate" appears in independent claims 11 and 18 of the '833 patent, in the context of an "input . . . indicating whether/that" a grill "is permitted to communicate." The parties dispute the meaning of this claim language, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning consistent with the specification, which is an input indicating that the appliance is permitted to communicate | A data signal expressly indicating that the grill is permitted to communicate (with the cloud service). |

Traeger proposes to construe this term to have its plain meaning, which Traeger defines as an input indicating that the appliance is permitted to communicate. CIB at 21-22; CRB at 17-18; *see* Tr. at 83-86. GMG proposes to construe this term to mean a data signal expressly indicating that the grill is permitted to communicate. RIB at 32-33; RRB at 16; *see* Tr. at 86-95.

GMG argues that the input must be an express indication of permission, citing arguments that Traeger raised during the post-grant review for claims 11-18 of the '833 patent. RIB at 32-33. Traeger argues that the distinction made before the PTAB was related to the nature of the communication, without distinguishing between implicit and express indications. CRB at 17-18.

Based on a review of the post-grant review briefs submitted by the parties, the undersigned agrees with Traeger that the arguments raised before the PTAB were unrelated to GMG's proposed "expressly indicating" construction.  *See* RIB, Exhibit 13 at 15-16 (discussing whether an indication in a prior art reference permitted communication with the cloud or with a Wi-Fi access point).

Accordingly, this term shall be construed in accordance with its plain and ordinary meaning, which is ***an input indicating whether the grill is permitted to communicate***.

### 3.  A "notification[s] . . . indicating that the . . . grill is available to receive instructions"

The term "available to receive instructions" appears in independent claims 1, 11, and 18 of the '833 patent, in the context of a "notification[s] . . . indicating that the . . . grill is available to receive instructions."  The parties dispute the meaning of this this term, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
| --- | --- |
| Plain meaning | A data signal expressly indicating that the grill is available to receive instructions at the exact moment of the transmission of the data signal |

Traeger proposes to construe this term to have its plain meaning.  CIB at 22-23; CRB at 18-19; *see* Tr. at 96-105.  GMG proposes to construe this term to mean a data signal expressly indicating that the grill is available to receive instructions at the exact moment of the transmission of the data signal.  RIB at 33-35; RRB at 17; *see* Tr. at 106-114.

GMG proposes to add the same limitations discussed above in the context of the "communicably connected" limitation, requiring an "express" notification and specifying "the exact moment of the transmission of the data signal."  RRB at 17.  GMG explains that its proposed limitation of "expressly indicating" would require that the notification of availability be

separate from the indication that the grill is "communicably connected." RIB at 34-35. GMG cites portions of the specification describing indications that the grill is "communicably connected" separate from notifications that the appliance is "available to receive instructions." '833 patent at 12:42-52. GMG also cites arguments that Traeger made in post-grant review proceedings describing a situation where an appliance could be connected but unavailable for instructions. *See* RIB, Exhibit 6 (Traeger's response, arguing that "the appliance could be in the middle of processing other instructions, could be in a low-power or standby mode, or could be waiting until the appliance finishes a warm-up mode such that the appliance—although communicably connected—would not be available to receive instructions."). In its reply brief, Traeger argues that there is nothing in the specification requiring an "express" indication or an "exact moment" limitation. CRB at 18-19. Traeger submits that its statements in the PTAB are unrelated to the limitations proposed by GMG. *Id*.

The undersigned agrees with Traeger that GMG has failed to identify evidence to support the "express" and "exact moment" limitations recited in its construction. With respect to GMG's arguments regarding a distinction between the notification of availability for instructions and the indication of communicable connection, the differences between these two signals are already reflected in the claim language. In claims 1 and 11, the connection indication is received from the cloud service while the availability notification is provided in the software application. *See* '833 patent at 13:38-46, 14:60-68. Claim 18 recites a "notification field" that is configured to indicate a communicable connection and "to further provide notifications indicating that the . . . grill is available to receive instructions." *Id*. at 15:56-16:4.

Accordingly, this term shall be construed in accordance with its plain and ordinary meaning, which is *a notification indicating that the grill is available to receive instructions*.

#### 4.  An "instruction generating indicator"

An "instruction generating indicator" is a limitation of claim 18 of the '833 patent.  The parties dispute the meaning of this term, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning | An express indication that instructions are being generated |

Traeger proposes to construe this term to have its plain meaning.  CIB at 23-24; CRB at 20; *see* Tr. at 114-21.  GMG proposes to construe this term to mean an express indication that instructions are being generated.  RIB at 35-37; RRB at 18; *see* Tr. at 124-31.

To support its construction, GMG relies on the specification's depiction of an instruction generating indicator 612 that is distinct from a transmission indicator 613.  *See* '833 patent at 12:60-67, Fig. 6.  In response, Traeger argues that there is nothing in the specification that limits the instruction generator indicator to be an express indication.  CRB at 20.

The undersigned agrees with Traeger that GMG has failed to identify evidence to support an "express" limitation for this term.  With respect to GMG's arguments that the instruction generating indicator and the transmission indicator are distinct from one another, the claim language reflects different requirements for these indicators: the "instruction generating indicator" must "indicate that one or more instructions . . . are being generated based on the received user input," while the "transmission indicator" must "indicate that the one or more instructions are being sent."  '833 patent at 16:8-20.  No additional construction is necessary to recognize the differences between these indicators.

Accordingly, this term shall be construed in accordance with its plain and ordinary meaning, which is ***an indication that instructions are being generated***.

### 5. A "transmission indicator"

A "transmission indicator" is a limitation of claim 18 of the '833 patent. The parties

dispute the meaning of this term, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning | An express indication that instructions are being transmitted |

Traeger proposes to construe this term to have its plain meaning. CIB at 24-25; CRB at

21; *see* Tr. at 121-24. GMG proposes to construe this term to mean an express indication that

instructions are being transmitted. RIB at 37-38; RRB at 18; *see* Tr. at 124-31.

The parties' arguments with respect to the "transmission indicator" are the same as those

discussed above for the "instruction generating indicator." Accordingly, this term shall be

construed in accordance with its plain and ordinary meaning, which is ***an indication that***

***instructions are being transmitted***.

### 6. "generating one or more instructions" and "instructions . . . are being generated"

The limitation "generating one or more instructions" is recited in claims 1 and 11 of the

'833 patent. The "instruction generator indicator" of claim 18 indicates that "instructions . . . are

being generated." The parties dispute the meaning of these terms, proposing the following

constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning | Converting a user input into an instruction specific to a particular device |

Traeger proposes to construe this term to have its plain meaning. CIB at 25-27; CRB at

21-22; *see* Tr. at 136-42. GMG proposes to construe this term to mean converting a user input

into an instruction specific to a particular device. RIB at 38-40; RRB at 18-19; *see* Tr. at 132-36.

To support its construction, GMG cites a description of the "instruction generator 108" in the specification:

> As the inputs 112 are received from the user 111, the instruction generator 108 may generate instructions that are specific to that device, and that are interpretable and understandable by the electronically-controlled appliance 115. These control instructions 109 are then sent to the electronically-controlled appliance 115 to control the functions 110 specified by the user 111.

'833 patent at 6:65-7:4.  GMG argues that the instruction generator in the specification converts user input into instructions that are specific to a particular device.  RIB at 39-40.  In reply, Traeger argues that neither the claim language nor the specification requires a conversion.  CRB at 21-22.  Traeger further submits that instructions specific to the device are recited in the claim language, which describes "instructions configured to cause a hopper to feed wood pellets into the electronically-controlled wood pellet grill at a particular rate in order to maintain the particular temperature."  '833 patent at 13:50-54 (claim 1); *see also id.* at 15:5-8 (claim 14), 16:8-13 (claim 18).

Based on a review of the intrinsic evidence, the undersigned agrees with Traeger that limitations requiring "converting a user input" and "instruction specific to particular device" limitations should not be imported from the specification.  Accordingly, this term shall be construed in accordance with the plain and ordinary meaning of the claim language, which is ***generating one or more instructions***.

## V.    THE '720 PATENT

The '720 patent is entitled "Cloud System for Controlling Outdoor Grill with Mobile Application" and names inventor Michael Colston.  '720 patent, cover.[6]  The patent issued from U.S. Patent Application No. 15,954,199, which was filed on April 16, 2018.  *Id.*  This application

---

[6] The '720 patent is attached to the parties' briefing as CIB Exhibit CX-0001 and RIB Exhibit 1.

is a continuation of U.S. Application No. 15/511,319, filed on April 8, 2016, and a continuation-in-part of U.S. Application No. 15/510,966 (the application that led to the issuance of the '833 patent), filed on March 29, 2016, and U.S. Application No. 15/114,744, filed on June 24, 2016. *Id*. at 1:5-25. The '720 patent was addressed by the PTAB in two post-grant proceedings, *GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-0024, Final Written Decision (Sept. 27, 2020) ("PGR2019-0024 Decision"), and *GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-0036, Final Written Decision (Sept. 17, 2020) ("PGR2019-0036 Decision").[7]

## A. Specification

The specification of the '720 patent describes "a cloud computing platform" for "communicating with and controlling operation of electronically-controlled appliances." '720 patent at 4:25-27. In one embodiment, "a cloud service 301 links various devices including a smoker/grill 302 and a smart phone 303 or other electronic computing device." *Id*. at 9:40-43.

---

[7] The PTAB decisions for the '720 patent were attached to the parties' briefing as CIB Exhibits CX-0007 and CX-0010, and as RIB Exhibit 7 and Exhibit 8.



**Figure 3**

*Id.* at Fig. 3.

The specification describes a "receiver 105" that is "configured to receive inputs from computing systems," including a "first input 115 indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform." *Id.* at 7:27-31. The specification also describes a "notification generator 106" that is "configured to generate notifications (e.g. 112) that are to be sent to software applications such as software application 114 running on mobile computing device 113." *Id.* at 7:32-36. The specification further describes a "transmitter 107" that "may be configured to send a generated notification 112 to software application 114, where the notification indicates that the cloud computing platform 101 is communicably connected to the electronically-controlled appliance 120." *Id.* at 7:39-43.



*Figure 1*

*Id*. at Fig. 1.

The specification further describes a method "for communicating with and controlling operation of electronically-controlled appliances." *Id*. at 11:47-49. Five steps of this method are depicted in Figure 5:



**Figure 5**

*Id*. at Fig. 5. In the first step (510), "cloud computing platform 101 may receive first input 115 from mobile computing device 113 indicating that electronically-controlled appliance 120 is permitted to communicate with the cloud computing platform." *Id*. at 11:52-59. In the second step (520), "[t]he notification generator 106 of the cloud computing platform 101 may generate notification 112 which is sent to be sent to the software application 114 of the mobile computing device 113." *Id*. at 11:66-12:6. In the third step (530), "the transmitter 107 of the cloud computing platform 101 transmits the generated notification to the software application 114." *Id*. at 12:8-11. In the fourth step (540), "the receiver 105 of the cloud computing platform 101 may receive second input 116 from the mobile computing device 113. The second input specifies functions 122 that are to be performed on the electronically-controlled appliance 120." *Id*. at 12:12-20. In the fifth step (550), "[t]he transmitter 107 then transmits control instructions 119 to the electronically-controlled appliance 120 to perform the specified functions 122. *Id*. at 12:24-27.

**B. Claims**

Traeger asserts claims 1, 2, 12, 16, 21, and 22 of the '720 patent. Notice of Investigation at 2. Claim 1 is an independent claim for a "cloud computing platform;" and claim 2 depends from claim 1.

> 1. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:
>
> a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform, the electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker;
>
> a notification generator configured to generate notifications that are to be sent to one or more software applications being executed at a mobile device, the one or more software applications being configured to control one or more functions of the electronically-controlled appliance;
>
> a transmitter configured to send at least one generated notification to at least one of the software applications selected from the one or more software applications, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;
>
> the receiver receiving a second input from the at least one software application indicating that one or more specified functions are to be performed on the electronically-controlled appliance; and
>
> the transmitter sending one or more instructions to the electronically-controlled appliance to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.
>
> 2. The cloud computing platform of claim 1, wherein the cloud computing platform communicates directly with the electronically-controlled appliance via an access point within range of the electronically-controlled appliance.

'720 patent at 15:36-16:6.

Claim 12 is another independent claim for a "cloud computing platform."

12. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:

a receiver at the cloud computing platform configured to receive inputs from one or more mobile devices including at least a first input indicating that the electronically-controlled appliance is in network communication with the cloud computing platform;

wherein the one or more mobile devices have previously established an initial, direct connection with the electronically-controlled appliance, and wherein the one or more mobile devices and the electronically-controlled appliance maintain independent connections to the cloud computing platform over the internet;

the receiver at the cloud computing platform receiving a second input from the one or more mobile devices indicating that one or more end user specified functions are to be performed by the electronically-controlled appliance;

a control signal generator configured to generate control signals that are to be sent to the electronically-controlled appliance, the control signals being configured to control functions of the electronically-controlled appliance according to the received second input; and

a transmitter configured to transmit the generated control signals directly to the electronically-controlled appliance over the internet for performance of the one or more specified functions received from the one or more mobile devices, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

*Id.* at 16:54-17:20.

Claim 16 is an independent claim that is a method claim, and claims 21 and 22

depend from claim 16.

16. A method for remotely controlling an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker via one or more mobile devices and an internet-connected network server, the electronically-controlled appliance having at least one hardware controller, the method comprising:

receiving at a network server of a cloud computing platform a first input from one or more mobile devices, the first input indicating that at least a first electronically-controlled appliance is in network communication with a

cloud computing platform, the first electronically-controlled appliance comprising an outdoor barbecue grille or outdoor barbecue smoker;

generating a notification at the network server that is to be sent to a software application being executed at a mobile device, the software application being configured to remotely control one or more functions of the electronically-controlled appliance over the internet;

transmitting the generated notification from the network server to the software application at the mobile device, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;

receiving at the network server a second input from the software application, the second input indicating that one or more specified functions initiated by the user on the mobile device are to be performed on the electronically-controlled appliance; and

transmitting from the network server to the electronically-controlled appliance over the internet one or more instructions to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

*       *       *

21. The method of claim 16, wherein the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet via separate internet connections.

22. The method of claim 16, wherein the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet.

*Id*. at 17:55-18:21, 18:46-52.

### C. Agreed Constructions

The parties have agreed to construe the term "cloud computing platform" to mean *a platform for enabling on-demand network access to a shared pool of configurable computing resources*.  CIB at 9.

### D. Disputed Constructions

The parties dispute the meaning of three terms in the claims of the '720 patent.

27

**1.  A "first input indicating that" an appliance "is in network communication"**

The term "in network communication" appears in independent claims 1, 12, and 16 of the '720 patent.  Claims 1 and 12 describe "a first input indicating that the electronically-controlled appliance is in network communication with the cloud computing platform," and claim 16 describes "the first input indicating that at least a first electronically-controlled appliance is in network communication with a cloud computing platform."

The parties dispute the meaning of these terms, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning consistent with the specification, which is an input indicating that the appliance is permitted to communicate | A data signal expressly indicating that the appliance is in network communication at the exact moment of the transmission of the data signal. |

Traeger proposes to construe this term to have its plain meaning, which Traeger defines as an input indicating that the appliance is permitted to communicate.  CIB at 10-13; CRB at 4-10; *see* Tr. at 17-32.  GMG proposes to construe this term to mean a data signal expressly indicating that the appliance is in network communication at the exact moment of the transmission of the data signal.  RIB at 13-28; RRB at 1-15; *see* Tr. at 33-59.

Traeger's proposed construction relies on the "first input" described in the specification, which is a "first input 115 indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform 101."  '720 patent at 7:27-31; *see also id.* at Abstract, 2:2-5, 3:51-54, 11:52-55, 14:33-36.  GMG disagrees with Traeger's construction, arguing that the claim language "in network communication" is not the same as the specification language describing an input indicating that the appliance is "permitted to communicate."  RRB at 1-2.  GMG's proposed construction for "in network communication" is to give this term the same meaning as "communicably connected," which corresponds to a subsequent step described

28

in the specification where a "notification indicates that the cloud computing platform 101 is communicably connected to the electronically-controlled appliance 120." '720 patent at 7:39-43; *see also id.* at Abstract, 2:11-14, 3:60-63, 12:6-8.  GMG further argues that the first input should be a data signal that is "express" and indicates that the appliance is in network communication "at the exact moment" of the transmission of the data signal, relying on arguments that were raised in the post-grant review for the '833 patent regarding the "communicably connected" limitation.  RIB at 27-28.

Based on a review of the intrinsic evidence, the undersigned finds that neither Traeger nor GMG has proposed a construction that reflects the ordinary meaning of "in network communication" in the context of the '720 patent.  With respect to Traeger's proposed construction, the intrinsic evidence does not support replacing the claim language "in network communication" with the specification language "permitted to communicate."  Although the specification describes a "first input" that is associated with an indication that an appliance is permitted to communicate, it does not define "first input" to be limited to such an indication. The patentee drafted claim language describing the "first input" as an indication that the appliance is "in network communication," not an indication of permission.  Moreover, there is no evidence that one of ordinary skill in the art would read "in network communication" to mean "permitted to communicate."

The term "in network communication" appears only in the claims and is not used in the specification, although GMG notes that the term "in communication" is used in the descriptions of Figure 2 and Figure 3: "FIG. 2 illustrates an embodiment in which an electronically-controlled appliance is in communication with a cloud service and a mobile electronic device;" and "FIG. 3 illustrates an embodiment in which an electronically-controlled appliance is in communication

29

Appx29

with a cloud service and a mobile electronic device, and is further in communication with analytics, social media or other third party systems." '720 patent at 3:30-37. These descriptions in the specification use the phrase "in communication" in accordance with its plain and ordinary meaning. *See id*. at 9:7-9 ("The smart phone 203 may communicate with a cloud service 201 which, in turn, communicates with the smoker 202.").

With respect to GMG's proposed construction, the undersigned finds that there is no basis for importing limitations requiring an "express" indication or that the appliance is in network communication "at the exact moment" of the transmission of the data signal, for the same reasons discussed above in the context of the "communicably connected" limitation of the '833 patent. Even if GMG's arguments regarding the '833 patent had merit, there would be no basis for importing these limitations into the claims of the '720 patent. GMG relies on arguments that were made during the post-grant review of the '833 patent with respect to the "communicably connected" limitation, but no such arguments were addressed in the post-grant review of the '720 patent with respect to the "in network communication" limitation.[8]

Accordingly, this term shall be construed in accordance with its plain and ordinary meaning, which is ***an input indicating that the appliance is communicating over a network***.

## 2. A "notification indicating that the cloud computing platform is communicably connected"

The term "communicably connected" appears in independent claims 1 and 16 of the '720 patent as part of the "transmitter" limitation, describing a notification sent by the transmitter to one or more software applications: "the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance."

---

[8] The PTAB found that GMG failed to show that Lee teaches the "in network communication" limitation because the metadata that GMG identified in Lee is received from Lee's home gateway rather than the terminal apparatus that was alleged to represent the claimed computing systems. PGR2019-00024 Decision at 25-33.

The parties dispute the meaning of this term, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning consistent with the specification, which is a notification/indication indicating that the grill/appliance is available to communicate | A data signal expressly indicating that the appliance is in network communication at the exact moment of the transmission of the data signal. |

Traeger proposes to construe this term to have its plain meaning, which Traeger defines as a notification/indication indicating that the grill/appliance is available to communicate. CIB at 14-16; CRB at 10-12; *see* Tr. at 17-32. GMG proposes to construe this term to mean a data signal expressly indicating that the appliance is in network communication at the exact moment of the transmission of the data signal. RIB at 13-28; RRB at 1-15; *see* Tr. at 33-59.

GMG argues that "communicably connected" should have the same meaning as "in network communication," tying both of these terms to a signal described in the specification indicating that the grill is connected to a network. RIB at 15-20. GMG further argues for the adoption of an "express" limitation and a requirement that the signal indicate a connection "at the exact moment of the transmission of the data signal," relying on arguments raised in the post-grant review for the '833 patent. RIB at 27-28. Traeger proposes that "communicably connected" mean "available for communication," making the same arguments addressed above in the context of the '833 patent. CIB at 14-15.

The undersigned construes "communicably connected" in accordance with its plain and ordinary meaning, for the same reasons discussed above in the context of the '833 patent. GMG's argument that "communicably connected" has the same meaning as "in network communication" is not supported by the intrinsic evidence, and these terms are presumed to have different meanings because they are separately recited in the claims. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (reversing lower court's ruling

31

that a "pusher assembly" and a "pusher bar" have the same meaning). Moreover, the claim

limitations describe signals that are transmitted in different directions—the "first input"

indicating that an appliance is in network communication is received by the cloud computing

platform from one or more computing systems, while the "notification" indicating that the

appliance is communicably connected is transmitted from the cloud computing platform to one

or more software applications. *See* '720 patent at 15:42-60 (claim 1), 17:61-18:10 (claim 16).

The undersigned further rejects GMG's proposed limitations that require an "express" indication

that the appliance is in network communication "at the exact moment" of the transmission of the

data signal, and the undersigned will not adopt Traeger's proposed construction of

"communicably connected" to mean that the grill is "available to communicate." The parties'

arguments were addressed above in the context of the "communicably connected" limitation of

the '833 patent.

Accordingly, this term shall be construed in accordance with its plain and ordinary

meaning, which is ***a notification indicating that the grill is connected for communication***.

### 3. "maintain independent connections"

The term "maintain independent connections" appears in independent claim 12 of the

'720 patent in a limitation requiring that "the one or more mobile devices and the electronically-

controlled appliance maintain independent connections to the cloud computing platform over the

internet."

The parties dispute the meaning of this term, proposing the following constructions:

| Traeger's Construction | GMG's Construction |
|---|---|
| Plain meaning consistent with the specification, which is the one or more mobile devices and the electronically-controlled appliance are capable of direct communication [to the cloud computing | To keep persistent |

| platform over the internet] | |

Traeger proposes to construe this term to have its plain meaning, which Traeger defines as one or more mobile devices and the electronically-controlled appliance are capable of direct communication.  CIB at 17-19; CRB at 13-15; *see* Tr. at 65-82.  GMG proposes to construe this term to mean "to keep persistent."  RIB at 28-30; RRB at 15-16; *see* Tr. at 60-65.

Traeger submits that claim 12 is related to an embodiment wherein "the cloud computing platform 101 may be configured to communicate directly with the electronically-controlled appliance via an access point 118 within range of the electronically-controlled device 120."  '720 patent at 13:1-4.  Traeger explains that in this embodiment, the electronically-controlled appliance and mobile device have independent connections with the cloud computing platform.  CIB at 17-18.  In response to these arguments, GMG submits that the phrase "maintain independent connections" is not used in the specification and argues that there is no support in the specification for construing this limitation to merely require that the devices are "capable" of connection.  RIB at 29-30; RRB at 15.

In support of its construction, GMG argues that the ordinary meaning of "maintain" is to keep persistent.  RIB at 29.  GMG also cites an argument that Traeger made during post-grant reviews of the '720 patent, where Traeger used the term "maintains" to describe a prior art reference that "maintains its connection with the IR remote control device, irrespective of any heartbeat received by the cloud."  RIB Exhibit 9, PGR2019-00024, Patent Owner's Response at 32-33 (Oct. 22, 2019); *see also* RIB Exhibit 10, PGR2019-00036, Patent Owner's Response at 33 (Dec. 11, 2019).  In response, Traeger submits that the arguments in post-grant review were related to a different limitation in a different claim.  CRB at 14-15.

Based on a review of the intrinsic evidence, the undersigned agrees with Traeger that this term should be construed in accordance with its plain and ordinary meaning.  Traeger's use of

the term "maintain" in post-grant review briefing is not related to this limitation of claim 12, and Traeger has identified an embodiment in the specification where the appliances and mobile devices have independent connections to the cloud computing platform. '720 patent at 13:1-18.

The undersigned agrees with GMG, however, that the claim language "maintain independent connections" does not mean "capable of direct communication," as proposed by Traeger. The specification does not describe mere capability but communicating directly between the cloud computing platform and the electronically-controlled appliance or mobile device. *See* '720 patent at 13:1-18.

Accordingly, this term shall be construed in accordance with its plain and ordinary meaning, which is that the one or more mobile devices and the electronically-controlled appliance ***each communicate directly*** to the cloud computing platform.

## VI.    CONCLUSION

The claim terms addressed herein are construed for the purposes of this section 337 investigation. Hereafter, all discovery, briefing, and the presentation of evidence shall be governed by the claim constructions adopted herein.

**SO ORDERED.**

_____
Charles E. Bullock
Chief Administrative Law Judge

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served upon the following parties as indicated, on **July 28, 2021**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant Traeger Pellet Grills LLC:**

Jay H. Reiziss, Esq.
**MCDERMOTT WILL & EMERY, LLP**
500 North Capitol Street, NW
Washington, DC 20001
Email: jreiziss@mwe.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

**On Behalf of Respondent GMG Products LLC:**

Andrew F. Pratt, Esq.
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, DE 19806
Email: apratt@devlinlawfirm.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN CLOUD-CONNECTED WOOD-PELLET GRILLS AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1237** |

### INITIAL DETERMINATION ON VIOLATION OF SECTION 337
### AND RECOMMENDED DETERMINATION ON REMEDY AND BONDING

Chief Administrative Law Judge Charles E. Bullock

(December 6, 2021)

**Appearances**:

*For Complainant Traeger Pellet Grills LLC:*

Jay H. Reiziss of McDermott Will & Emery LLP in Washington, DC and Michael P. Chu, Charles M. McMahon, Amol A. Parikh, James M. Oehler, Thomas M. DaMario, Ewa A. Wojciechowska, and Colin J. Stalter of McDermott Will & Emery LLP in Chicago, IL.

*For Respondent GMG Products LLC:*

David A. Lowe and Lawrence D. Graham of Lowe Graham Jones PLLC in Seattle, WA and Andrew F. Pratt of Devlin Law Firm LLC in Wilmington, DE.

Pursuant to the Notice of Investigation (Dec. 28, 2020) and Commission Rule 210.42, this is the Chief Administrative Law Judge's final initial determination and recommended determination in the matter of *Certain Cloud-Connected Wood Pellet Grills and Components Thereof*, Commission Investigation No. 337-TA-1237.  19 C.F.R. § 210.42(a)(1)(i).  For the reasons discussed herein, it is the undersigned's final initial determination in this investigation that there is a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain cloud-connected wood-pellet grills and components thereof.

TABLE OF CONTENTS

I.      BACKGROUND ............................................................................... 1
        A.      Procedural History .................................................................. 1
        B.      Private Parties ........................................................................ 2
        C.      Products at Issue .................................................................... 2
        D.      Testimonial Evidence ............................................................. 3
II.     THE '720 PATENT ....................................................................... 4
        A.      Specification ........................................................................... 4
        B.      Asserted Claims ..................................................................... 8
        C.      Post-Grant Review ............................................................... 10
        D.      Claim Construction ............................................................... 13
III.    JURISDICTION ............................................................................ 14
        A.      Subject Matter Jurisdiction .................................................. 14
        B.      Personal Jurisdiction ........................................................... 15
        C.      *In Rem* Jurisdiction ............................................................... 15
IV.     INFRINGEMENT ......................................................................... 15
        A.      Legal Standards .................................................................... 15
        B.      Accused Products ................................................................. 18
        C.      Direct Infringement .............................................................. 21
        D.      Indirect Infringement ........................................................... 51
        E.      Alleged Non-Infringing Designs .......................................... 53
V.      DOMESTIC INDUSTRY ............................................................. 56
        A.      Legal Standards .................................................................... 56
        B.      Domestic Industry Products ................................................. 57
        C.      Technical Prong .................................................................... 57
VI.     INVALIDITY ................................................................................ 67
        A.      Legal Standards .................................................................... 67
        B.      MAK System ........................................................................ 70
        C.      Fireboard .............................................................................. 85
        D.      Estoppel ................................................................................ 87
VII.    INEQUITABLE CONDUCT ........................................................ 92
        A.      Factual Background ............................................................. 92
        B.      Legal Standards .................................................................... 96
        C.      Improper Inventorship ......................................................... 98
        D.      Deceptive Intent ................................................................. 106
VIII.   REMEDY AND BONDING ........................................................ 108
        A.      Limited Exclusion Order .................................................... 108
        B.      Cease and Desist Order ...................................................... 109
        C.      Bond .................................................................................... 109
IX.     CONCLUSIONS OF LAW .......................................................... 111

Appx38

The following abbreviations may be used in this Initial Determination:

| **Tr.** | Transcript |
|---------|------------|
| **WS** | Witness Statement |
| **DWS** | Direct Witness Statement |
| **RWS** | Rebuttal Witness Statement |
| **JX** | Joint Exhibit |
| **CX** | Complainant's exhibit |
| **CPX** | Complainant's physical exhibit |
| **CDX** | Complainant's demonstrative exhibit |
| **RX** | Respondent's exhibit |
| **RPX** | Respondent's physical exhibit |
| **RDX** | Respondent's demonstrative exhibit |
| **CPHB** | Complainant's pre-hearing brief |
| **CIB** | Complainant's initial post-hearing brief |
| **CRB** | Complainant's reply post-hearing brief |
| **RPHB** | Respondent's pre-hearing brief |
| **RIB** | Respondent's initial post-hearing brief (revised) |
| **RRB** | Respondent's reply post-hearing brief |

## I.    BACKGROUND

### A.    Procedural History

The Commission instituted this investigation in response to a complaint filed by Complainant Traeger Pellet Grills LLC alleging violations of section 337 of the Tariff Act of 1930, as amended, by reason of infringement of certain claims of U.S. Patent No. 10,158,720 ("the '720 patent") and U.S. Patent No. 10,218,833 ("the '833 patent").  Notice of Investigation (Dec. 28, 2020).  The investigation was instituted upon publication of the Notice of Investigation in the *Federal Register* on Monday, January 4, 2021.  86 Fed. Reg. 129-30 (2021); *see* 19 C.F.R. § 210.10(b).

Respondent GMG Products LLC filed a response to the Complaint and Notice of Investigation on January 26, 2021.  The response to the complaint was amended to assert additional affirmative defenses pursuant to Order No. 21 (July 27, 2021).

Pursuant to Order No. 26 (Aug. 10, 2021), summary determination was granted with respect to the economic prong of the domestic industry requirement.  *See* Comm'n Notice (Sept. 9, 2021) (determining not to review).  The '833 patent was terminated from the investigation pursuant to Order No. 28 (Sept. 3, 2021), granting a motion for summary determination of non-infringement.  *See* Comm'n Notice and Opinion (Oct. 28, 2021) (affirming summary determination with modification).

An evidentiary hearing was held over four days from September 13-16, 2021.  The parties filed initial post-hearing briefs on October 6, 2021, and the parties reply post-hearing briefs on October 21, 2021.[1]

---

[1] Complainant's initial post-hearing brief is cited herein as "CIB."  Complainants' reply post-hearing brief is cited herein as "CRB."  Respondents' revised initial post-hearing brief is cited

### B.    Private Parties

Complainant Traeger Pellet Grills LLC ("Traeger") is a Delaware Corporation with its principal place of business in Salt Lake City, Utah.  Complaint ¶ 11; CIB at 5-6.  Respondent GMG Products LLC ("GMG") is a Nevada limited liability company with an address in Carson City, Nevada.  Complaint Exhibit 5; Response to Complaint ¶ 14.  Both Traeger and GMG are in the business of making and selling pellet grills.  CIB at 5-6; RIB at 2.

### C.    Products at Issue

The products at issue are cloud-connected wood-pellet grills and components thereof.

#### 1.    Accused Products

The accused products are GMG's cloud-connected wood-pellet grills with "WiFi Smart Control", which includes all of GMG's "Prime Grills" ("Jim Bowie Prime," "Daniel Boone Prime," Davy Crockett Prime," "Big Pig Trailer Prime," Peak, Ledge, and Trek grills) and certain "Choice" grills ("Jim Bowie Choice" and "Daniel Boone Choice") (collectively, the "Accused Products") and related components.  *See* JX-0266C (importation stipulation).  GMG has stipulated to the importation of the Accused Products.  JX-0266C.

#### 2.    Domestic Industry Products

The domestic industry products are Traeger's cloud-connected wood-pellet grills, which include the Pro 575, Pro 780, Ironwood 650, Ironwood 885, Timberline 850, Timberline 1300, Silverton 620, Silverton 810, and Century 885 grills (the "Traeger DI Grills").  *See* CX-0838C (Shoemake DWS) at Q/A 199.

---

herein as "RIB."  *See* Order No. 37 (Oct. 13, 2021) (granting leave to file revised post-hearing brief).  Respondents' reply post-hearing brief is cited herein as "RRB."

**D.    Testimonial Evidence**

At the hearing, the parties presented testimony through witness statements and live examination, and designated deposition transcripts for several witnesses were also received into evidence.

**1.    Fact Witnesses**

The first witness at the hearing was Traeger executive Michael Colston, the named inventor of the '720 patent.  CX-0842 (Colston DWS); Tr. at 25-163; *see* RX-0317C (Colston Dep. Tr.).  Traeger also presented testimony from David Johnson, a manager at third-party DornerWorks Ltd.  CX-1010C (Johnson RWS); Tr. at 370-449.  Traeger further submitted testimony from Traeger director Bart Strong and accountant Andrew Rust.  CX-0839C (Strong DWS); CX-0841C (Rust DWS); *see* RX-0320C (Strong Dep. Tr.).

GMG's first witness was David Baker, one of GMG's co-founders.  RX-0316C (Baker DWS); RX-0366 (Baker RWS); Tr. at 251-68; *see* CX-0426C (Baker Dep. Tr.); CX-0844C (Baker Dep. Tr.).  GMG also presented testimony from David Scott, a director at third-party Fyresite.  RX-0338C (Scott RWS); Tr. at 269-88; *see* CX-0441C (Scott Dep. Tr.).

**2.    Expert Witnesses**

Traeger relies on the expert testimony of Dr. Matthew Shoemake for infringement and invalidity issues.  CX-0838C (Shoemake DWS); CX-1005C (Shoemake RWS); Tr. at 174-250, 453-544.  Traeger relies on the expert testimony of Thomas Vander Veen for remedy and bond.  CX-0840C (Vander Veen DWS).

GMG relies on the expert testimony of David Williams for infringement and invalidity issues.  RX-0315C (Williams DWS); RX-0334C (Williams RWS); Tr. at 289-355, 451-53; *see* CX-0445C (Williams Dep. Tr.).

### 3.    Deposition Designations

Traeger submitted designated deposition transcripts for Jason Baker (CX-0843C), David Scott (CX-0845C), and Nishan Pilibosian (CX-0846C).  GMG submitted designated deposition transcripts for Daniel Altenritter (RX-0319C), Gregory Amero (RX-0322C), Chris Bristol (RX-323C), Chris Capehart (RX-0324C), Ryan Comingdeer (RX-0325C), Theodore Conrad (RX-0326C), Michael Frodsham (RX-0327C), Wes Gilpin (RX-0328C), Shawn Isenhoff (RX-0329C), Michael Nellenbach (RX-0331C), and Bob Tucker (RX-0332C).  Both Traeger and GMG designated portions of the deposition transcript of Matt Czach (CX-0433C; RX-0318C).

## II.    THE '720 PATENT

The '720 patent is entitled "Cloud System for Controlling Outdoor Grill with Mobile Application" and names inventor Michael Colston.  JX-0001, ("the '720 patent").  The patent issued from U.S. Patent Application No. 15,954,199, which was filed on April 16, 2018.  *Id*. This application is a continuation of U.S. Application No. 15/511,319, filed on April 8, 2016, and a continuation-in-part of U.S. Application No. 15/510,966, filed on March 29, 2016, and U.S. Application No. 15/114,744, filed on June 24, 2016.  *Id*. at 1:5-25.  The '720 patent is assigned to Traeger.  JX-0003.

### A.    Specification

The specification of the '720 patent describes "a cloud computing platform" for "communicating with and controlling operation of electronically-controlled appliances."  '720 patent at 4:25-27.  In one embodiment, "a cloud service 301 links various devices including a smoker/grill 302 and a smart phone 303 or other electronic computing device."  *Id*. at 9:40-43.

4



*Figure 3*

The specification describes a "receiver 105" that is "configured to receive inputs from computing systems," including a "first input 115 indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform." *Id*. at 7:27-31. The specification also describes a "notification generator 106" that is "configured to generate notifications (e.g. 112) that are to be sent to software applications such as software application 114 running on mobile computing device 113." *Id*. at 7:32-36. The specification further describes a "transmitter 107" that "may be configured to send a generated notification 112 to software application 114, where the notification indicates that the cloud computing platform 101 is communicably connected to the electronically-controlled appliance 120." *Id*. at 7:39-43.



Figure 1

The specification further describes a method "for communicating with and controlling operation of electronically-controlled appliances." *Id*. at 11:47-49. Five steps of this method are depicted in Figure 5:



*Figure 5*

## B.    Asserted Claims

Traeger asserts claims 1, 2, 12, 16, 21, and 22 of the '720 patent.  Claim 1 is an

independent claim for a "cloud computing platform."

> 1. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:
>
> a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform, the electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker;
>
> a notification generator configured to generate notifications that are to be sent to one or more software applications being executed at a mobile device, the one or more software applications being configured to control one or more functions of the electronically-controlled appliance;
>
> a transmitter configured to send at least one generated notification to at least one of the software applications selected from the one or more software applications, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;
>
> the receiver receiving a second input from the at least one software application indicating that one or more specified functions are to be performed on the electronically-controlled appliance; and
>
> the transmitter sending one or more instructions to the electronically-controlled appliance to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

'720 patent at 15:36-16:2.  Claim 2 depends from claim 1.

> 2. The cloud computing platform of claim 1, wherein the cloud computing platform communicates directly with the electronically-controlled appliance via an access point within range of the electronically-controlled appliance.

*Id*. at 16:3-6.

8

Claim 12 is another independent claim for a "cloud computing platform."

> 12. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:
>
> a receiver at the cloud computing platform configured to receive inputs from one or more mobile devices including at least a first input indicating that the electronically-controlled appliance is in network communication with the cloud computing platform;
>
> wherein the one or more mobile devices have previously established an initial, direct connection with the electronically-controlled appliance, and wherein the one or more mobile devices and the electronically-controlled appliance maintain independent connections to the cloud computing platform over the internet;
>
> the receiver at the cloud computing platform receiving a second input from the one or more mobile devices indicating that one or more end user specified functions are to be performed by the electronically-controlled appliance;
>
> a control signal generator configured to generate control signals that are to be sent to the electronically-controlled appliance, the control signals being configured to control functions of the electronically-controlled appliance according to the received second input; and
>
> a transmitter configured to transmit the generated control signals directly to the electronically-controlled appliance over the internet for performance of the one or more specified functions received from the one or more mobile devices, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

*Id.* at 16:54-17:20.

Claim 16 is an independent claim that is a method claim.

> 16. A method for remotely controlling an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker via one or more mobile devices and an internet-connected network server, the electronically-controlled appliance having at least one hardware controller, the method comprising:
>
> receiving at a network server of a cloud computing platform a first input from one or more mobile devices, the first input indicating that at least a first electronically-controlled appliance is in network communication with a

9

cloud computing platform, the first electronically-controlled appliance comprising an outdoor barbecue grille or outdoor barbecue smoker;

generating a notification at the network server that is to be sent to a software application being executed at a mobile device, the software application being configured to remotely control one or more functions of the electronically-controlled appliance over the internet;

transmitting the generated notification from the network server to the software application at the mobile device, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;

receiving at the network server a second input from the software application, the second input indicating that one or more specified functions initiated by the user on the mobile device are to be performed on the electronically-controlled appliance; and

transmitting from the network server to the electronically-controlled appliance over the internet one or more instructions to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

*Id*. at 17:55-18:21. Claims 21 and 22 depend from claim 16.

21. The method of claim 16, wherein the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet via separate internet connections.

22. The method of claim 16, wherein the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet.

*Id*. at 18:46-52.

### C.    Post-Grant Review

The U.S. Patent Trial and Appeal Board ("PTAB") addressed the '720 patent in two post-grant review proceedings: *GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-00024, Final Written Decision (Sept. 27, 2020) ("PGR2019-00024 Decision"), and PTAB Case No. PGR2019-0036, Final Written Decision (Sept. 17, 2020) ("PGR2019-0036 Decision"). *See* RX-0259 (PGR2019-0024 Docket); RX-0260 (PGR2019-0036 Docket).

In both PGR2019-0024 and PGR2019-0036, the key prior art reference was U.S. Patent

Application Publication No. 2015/0134727 A1, naming inventors Lee *et al.* (JX-0258, "Lee").

PGR2019-0024 Decision at 16-20; PGR2019-0036 Decision at 17-20.  Lee is titled "Cloud-

Based Data Server Providing Home Appliance Management Service and Method Thereof," and

its Abstract describes a "cloud-based data server providing a user of a terminal apparatus with a

management service for one or more home appliances" so that "the user of the terminal

apparatus may remotely monitor states of the home appliances or control actions or operations of

the home appliances in a home network system."  JX-0258.  Figure 5 of Lee is a signal flow

chart illustrating the signals generated and transmitted to monitor home appliances.



FIG. 5

*Id*. at Fig. 5. In Lee, "each of the home appliances 150 may generate information," which "may correspond to metadata associated with each home appliance." *Id*. at ¶ 175. In operation 525, that metadata is transmitted from the home appliance to the home gateway's device subscription function module (DSFM). *Id*. at ¶ 187. Then, in operation 535, home gateway 130 "may transfer the metadata from the home appliances 150 to . . . the data server 110." *Id*. at ¶ 194. Next, in operation 545, data server 110's monitoring service module (MSM) "may receive, from the terminal apparatus 160, a request signal with respect to the metadata." *Id*. at ¶ 201. Subsequently, in operation 550, "[the data server 110's] MSM 245 may transfer the received metadata to the terminal apparatus 160." *Id*. at ¶ 203. "The metadata transferred to the terminal apparatus 160 may include information on states of the home appliances 150." *Id*. at ¶ 203. Lee thus provides "a service for monitoring the home appliances 150 to the user of the terminal apparatus 160." *Id*. at ¶ 66.

The PTAB considered GMG's invalidity contentions with respect to Lee, which identified terminal apparatus 160 as the claimed "computing system" and data server 110 as the claimed "receiver" that receives a "first input indicating that at least a first electronically-controlled appliance is in network communication" in step 545 of Lee. PGR2019-0024 Decision at 26-27. In response to GMG's contentions, Traeger argued that step 545 is a "request" that does not indicate whether the appliance is in network communication, and the PTAB agreed, finding "no disclosure in Lee that terminal apparatus 160 knows the appliance's state when requesting metadata in step 545." *Id*. at 29. The PTAB also considered GMG's contention that metadata generated by the home appliance 150 and received by data server 110 in step 535 indicates that the appliance is in network communication, finding that this was not relevant to the "first input" limitation because the metadata does not originate from terminal apparatus 160,

which GMG had identified as the claimed "computing system." *Id.* at 31-32. The PTAB thus

determined that Lee failed to teach the "receiver" limitation of claims 1 and 16. *Id.* at 32-33; *see*

*also* PGR2019-0035 Decision at 24-33.[2]

### D.     Claim Construction

The parties agreed to construe the term "cloud computing platform" to mean "a platform

for enabling on-demand network access to a shared pool of configurable computing resources."

Order No. 22 at 27. In the *Markman* order, the term "a first input indicating that the

electronically-controlled appliance is in network communication" was construed to mean an

input indicating that the appliance is communicating over a network. *Id.* at 28-30. The term

"notification indicating that the cloud computing platform is communicably connected" was

construed to mean a notification indicating that the grill is connected for communication. *Id.* at

30-32. The term "one or more mobile devices and the electronically-controlled appliance

maintain independent connections to the cloud computing platform" was construed to mean that

the one or more mobile devices and the electronically-controlled appliance each communicate

directly to the cloud computing platform. *Id.* at 32-34.

---

[2] For claims 23-29 of the '720 patent, the PTAB found that Lee rendered the claims obvious in combination with additional references: U.S. Patent Application Publication No. 2015/0025687 A1 (JX-0259, "Henderson"), U.S. Patent Application Publication No. 2016/0072638 A1 (JX-0260, "Amer"), and U.S. Patent No. 9,759,429 (JX-0261, "Tucker"). PGR2019-0024 Decision at 34-50. These claims of the '720 patent describe "an electronic hardware controller" of an "outdoor cooking device," which makes an "initial direct connection with a mobile device" and then "communicate[s] directly with the cloud computing platform over the internet to send a first input indicating that the outdoor cooking device is in network communication with the cloud computing platform." '720 patent at claim 23. The PTAB found that this "initial direct connection" limitation was disclosed in Amer. PGR2019-0024 Decision at 34-43.

## III.    JURISDICTION

To have the power to decide a case, a court or agency must have both subject matter jurisdiction and jurisdiction over either the parties or the property involved.  19 U.S.C. § 1337; *Certain Steel Rod Treating Apparatus and Components Thereof*, Inv. No. 337-TA-97, Comm'n Mem. Op., 215 U.S.P.Q. 229, 231 (1981).

### A.    Subject Matter Jurisdiction

Section 337 confers subject matter jurisdiction on the Commission to investigate, and if appropriate, to provide a remedy for, unfair acts and unfair methods of competition in the importation, the sale for importation, or the sale after importation of articles into the United States.  *See* 19 U.S.C. §§ 1337(a)(1)(B) and (a)(2).  Traeger submits that the Commission has subject matter jurisdiction over this investigation based on the allegations that the accused products are imported into the United States.  CIB at 11.  GMG argues that the Commission does not have jurisdiction because the Accused Products do not infringe any valid and enforceable patent, RIB at 11, but these arguments go to the determination on violation, not jurisdiction.  *See Amgen Inc. v. Int'l Trade Comm'n*, 565 F.3d 846, 854 (Fed. Cir. 2009) ("As is very common in situations where a tribunal's subject matter jurisdiction is based on the same statute which gives rise to the federal right, the jurisdictional requirements of section 1337 mesh with the factual requirements necessary to prevail on the merits. In such a situation, the Supreme Court has held that the tribunal should assume jurisdiction and treat (and dismiss on, if necessary) the merits of the case.").  The undersigned thus finds that the Commission has subject matter jurisdiction based on Traeger's allegations that the accused products are imported and infringe a valid and enforceable patent.  *Id.*

**B.      Personal Jurisdiction**

GMG has submitted to the personal jurisdiction of the Commission by answering the

Complaint and Notice of Investigation, participating in discovery, appearing at hearings, and

filing motions and briefs.  *See Certain Miniature Hacksaws*, Inv. No. 337-TA-237, USITC Pub.

No. 1948, Initial Determination at 4, 1986 WL 379287, *1 (Oct. 15, 1986), *not reviewed in*

*relevant part by* Comm'n Action and Order, 1987 WL 450871 (Jan. 15, 1987).

**C.      *In Rem* Jurisdiction**

The Commission has *in rem* jurisdiction over the accused products by virtue of their

importation into the United States.  *See Sealed Air Corp. v. U.S. Int'l Trade Comm'n*, 645 F.2d

976, 985-86 (C.C.P.A. 1981) (holding that the ITC's jurisdiction over imported articles is

sufficient to exclude such articles).  GMG has stipulated to the importation of the Accused

Products.  JX-0266C.

**IV.    INFRINGEMENT**

Traeger alleges that the Accused Products infringe claims 1, 2, 12, 16, 21, and 22 of the

'720 patent.  CIB at 14-47.

**A.      Legal Standards**

Section 337(a)(1)(B)(i) prohibits "the importation into the United States, the sale for

importation, or the sale within the United States after importation by the owner, importer, or

consignee, of articles that – (i) infringe a valid and enforceable United States patent."  19 U.S.C.

§ 1337(a)(1)(B)(i).  The Commission has held that the word "infringe" in Section 337(a)(1)(B)(i)

"derives its legal meaning from 35 U.S.C. § 271, the section of the Patent Act that defines patent

infringement."  *Certain Electronic Devices with Image Processing Systems, Components*

*Thereof, and Associated Software*, Inv. No. 337-TA-724, Comm'n Op. at 13-14 (December 21,

2011).

Infringement must be proven by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). A preponderance standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

### 1. Claim Construction

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) (citation omitted). The construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (alterations in original) (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991)). "[O]nly those [claim] terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). The words of a claim "'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in art" as of the patent's filing date. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

### 2. Literal Infringement and the Doctrine of Equivalents

A complainant must prove either literal infringement or infringement under the doctrine of equivalents. Literal infringement requires the patentee to prove that the accused device meets each and every limitation of the asserted claim(s). *Frank's Casing Crew & Rental Tools, Inc. v.*

*Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). "If even one limitation is missing or not met as claimed, there is no literal infringement." *Elkay Mfg. Co. v. EBCO Mfg. Co*., 192 F.3d 973, 980 (Fed. Cir. 1999). Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). Under the Doctrine of Equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).

### 3.    Direct and Indirect Infringement

Pursuant to section 271(a) of the Patent Act, direct infringement of a patent consists of making, using, offering to sell, or selling the patented invention without consent of the patent owner. 35 U.S.C. § 271(a).

In addition to direct infringement, a respondent may be liable for indirect infringement, including induced infringement and contributory infringement. Induced infringement is defined in section 271(b) of the Patent Act: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc*) ("To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abett[ed] another's direct infringement.") (citations omitted). "The mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Id.* (citations omitted). The Supreme Court has held that induced infringement "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). In *Suprema, Inc. v. Int'l*

*Trade Comm'n*, the Federal Circuit upheld the Commission's interpretation of the section 337 language "articles that infringe" in the context of induced infringement, holding that the statute "covers goods that were used by an importer to directly infringe post-importation as a result of the seller's inducement." 796 F.3d 1338, 1352-53 (Fed. Cir. 2015).

Contributory infringement is defined in section 271(c) of the Patent Act: "Whoever offers to sell . . . or imports into the United States a component of a patented machine, . . . or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." 35 U.S.C. § 271(c). The intent requirement for contributory infringement is that respondent knows "that the combination for which [the] component was especially designed was both patented and infringing." *Global-Tech*, 563 U.S. at 763. A violation of section 337 based on contributory infringement requires that "the accused infringer imported, sold for importation, or sold after importation within the United States, the accused components that contributed to another's direct infringement." *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1353 (Fed. Cir. 2010).

### B.     Accused Products

There is no dispute that the Accused Products have been imported. *See* JX-0266C (importation stipulation). Traeger's infringement allegations rely on Dr. Shoemake's analysis of a representative grill, the GMG Daniel Boone Prime grill. CX-0838C (Shoemake DWS) at Q/A 90-92.



CDX-0002C.0018. GMG does not dispute that the Daniel Boone Prime grill is representative of the Accused Products for the purposes of infringement, and GMG's non-infringement arguments are directed to the operation of the "GMG System" for all Accused Products. RIB at 14-33; RRB at 5-24.

The "GMG System" includes (1) a mobile GMG App (Android or iOS), (2) an API Server (sometimes also referred to as the "Parse server"), (3) a database, (4) a Grill Server, and (5) a GMG Grill having a grill controller. RIB at 8-9. The Accused Products connect to the GMG System through a "provisioning" process that initiates connections between each part of the GMG System. RIB at 8-9; *see* CX-0838C (Shoemaker DWS) at Q/A 112.

CONFIDENTIAL MATERIAL REDACTED
**PUBLIC VERSION**



CX-0466C.0002. After the connections are initiated, communications can be sent between the GMG App on a mobile device and the GMG Grill *via* the API Server and Grill Server. RIB at 9-11; *see* CX-0838C (Shoemaker DWS) at Q/A 112.



CX-0466C.0004. This mode of operation is referenced in GMG's documents as the "Server Mode."

PUBLIC VERSION



CX-0283C.0003.

Traeger's expert, Dr. Shoemake, analyzed certain source code for the GMG App and the GMG Server (including the API Server and Grill Server). *See, e.g.,* CX-0838C (Shoemake DWS) at Q/A 96 (describing API Server and Grill Server source code), Q/A 102 (describing GMG App source code).

### C.     Direct Infringement

Traeger's infringement allegations are based on the use of the GMG System. CIB at 14-44.[3] Independent claims 1 and 12 are directed to a "cloud computing platform," and independent

---

[3] Traeger identifies videos on GMG's YouTube channel as evidence that GMG itself has used the GMG System. CIB at 15-17 (CX-0577, CX-0578, CX-0579, CX-0580, CX-0581, CX-0582, CX-0583, CX-0584, CX-0585, CX-0586, CX-0587, CX-0588, CX-0589, CX-0590, and CX-0591). GMG does not dispute that it has used the GMG System, and the undersigned thus finds

claim 16 is a method claim. The asserted claims are addressed on a limitation-by-limitation basis below:

### 1.    Claim 1

Claim 1 recites a "cloud computing platform" meeting several limitations, which are discussed in more detail below.

#### a.    Preamble

The preamble of claim 1 requires that the "cloud communication platform" is "for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker" and that the platform include "at least one hardware processor." '720 patent at 15:36-41. The parties agreed to construe the term "cloud computing platform" to mean a platform for enabling on-demand network access to a shared pool of configurable computing resources. Order No. 22 at 27.



Traeger identifies the GMG Server (comprising ███████████████████████ ) as the claimed "cloud communication platform." CIB at 18-19. Dr. Shoemake submits that the GMG Server is "on-demand" because ██████████████████████ ████████████████████████████████████████████ CX-0838C (Shoemake DWS) at Q/A 94. Traeger submits that the GMG Server ████████████ ████████████████████████████████████████████ ████████████ consistent with the specification of the '720 patent, which describes network servers, storage, applications, and services. *See* '720 patent at 6:5-8 ("'cloud

that GMG's use of the GMG System after importation can be the basis for a finding of violation based on direct infringement. *See Certain Blood Cholesterol Testing Strips and Associated Systems Containing the Same,* Inv. 337-TA-1116, Comm'n Op. at 24-33 (May 1, 2020) (finding a violation based on a respondent's importation and direct infringement of a method claim).

computing' is defined as a model for enabling on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services)."). Traeger submits that these resources are shared among multiple users of GMG grills. CIB at 19 (citing CX-0838C (Shoemake DWS) at Q/A 110; Tr. (Williams) at 304-13-305:5; Tr. (Scott) at 277:5-14). Traeger thus contends that the GMG Server infringes the "cloud computing platform" limitation of the '720 patent. CIB at 18-19; CRB at 13-15.

GMG argues that the GMG Server is not a "cloud computing platform" because it is not a "service" that allows customers to access configurable computing resources. RIB at 30-32. Mr. Williams submits that Traeger's allegations with respect to the "cloud computing platform" are overbroad and would cover a broad range of computing systems that he would not consider "cloud" platforms. RX-0334C (Williams RWS) at Q/A 55-57. He suggests that a "cloud computing platform" must "provide a service that allows a customer to spin up new virtual machines" and "allow distinct customers to freely configure and launch new computing resources," and "[i]t is not enough for parties to be sharing a network or storage." *Id.* at Q/A 58.

Based on the evidence identified by Traeger and in consideration of the testimony of Dr. Shoemake and Mr. Williams, the undersigned finds that the GMG Server is a "cloud computing platform" according to the agreed construction for this term. The evidence shows that the GMG Server ███████████████████████████████████████████████████████
███████████████████████████████████████████████████. There is no dispute that the GMG Server provides for communicating with and controlling the operation of outdoor barbecue grills or that the GMG Server has at least one hardware processor. *See* CX-0838C (Shoemake DWS) at Q/A 96; RIB at 30-32 (not disputing these limitations). Accordingly, the GMG System infringes the preamble limitations of claim 1 of the '720 patent.

    **b.**    **"a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform"**

The first limitation of claim 1 requires "a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform, the electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker." '720 patent at 15:42-48. The "first input" described in this limitation was construed to mean an input indicating that the appliance is communicating over a network. Order No. 22 at 28-30.

The functionality that Traeger identifies as infringing the "receiver" limitation is the "Server Mode" connection between the GMG Grill and the GMG Server,



. CIB at 20-23. Dr. Shoemake explains that this process

. CX-0838C (Shoemake DWS) at Q/A 79-83. The user can then select the "Server Mode" to connect the GMG Grill to the GMG Server. *Id.* at Q/A 85.



CDX-0002C.011. In the "Server Mode," the user can monitor the status of the GMG Grill and send commands to the GMG Grill *via* the GMG Server. CX-0838C (Shoemake DWS) at Q/A 86-89.

Traeger submits that the hardware controller of a GMG Grill qualifies as "one or more computing systems" that sends inputs to the GMG Server. CIB at 23-28.[4] ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ . *Id.* at Q/A 100. According to the source code, ████████████████████

████████████████████████ *Id.* ████████████████████

---

[4] Traeger also asserts an alternative theory of infringement based on a "first input" sent from the GMG App, which is addressed below in the context of claim 12. *See infra.*, section IV.D.3.b.

██████████████████████████████████████████

███ *Id*. at Q/A 103.  The GMG Server ██████████████████████████

██████████████████████████ *Id*.  GMG submits that the ████████████

██████████████████████████████████

████████ are each a "first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform," infringing this limitation.  CIB at 25-27.

GMG argues that the grill's hardware controller cannot be one of the "one or more computing systems" referenced in the claim.  RIB at 17-18.  GMG submits that a separate limitation of claim 1 refers to a "hardware controller on the electronically-controlled appliance," and argues that the "hardware controller" must be a separate and distinct component from the "one or more computing systems."  *Id*. at 12-13.  GMG submits that the specification only refers to a mobile device and cloud computing platform as "computing systems," while separately referencing the "hardware controller."  *Id*. at 13-14 (citing '720 patent at 6:64-7:5).  GMG also cites the post-grant review of the '720 patent, where the PTAB found that Lee did not teach this limitation where the identified "input" came from Lee's "home gateway" rather than its "terminal apparatus."  *Id*. at 14 (citing RX-0259.2399).  In addition, GMG argues that the ████

███████████████████████████████████████████.

*Id*. at 17-18; *see* RX-0334C (Williams RWS) at Q/A 22.

In reply, Traeger argues that the specification and prosecution history are consistent with a broad reading "one or more computing systems" that can include the hardware controller on the GMG Grill.  CRB at 2-4.  Traeger submits that there is an explicit indication of connectivity status sent from the GMG Grill, ██████████████████████████

███████████████████████████████████████

████████     CRB at 4-5 (citing CX-0838C (Shoemake WS) at Q/A 100).  Traeger further submits

that ███████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████     *Id.* at 4 (citing CX-0838C (Shoemake WS) at Q/A 103).

GMG argues in reply that allowing the hardware controller to be one of the "one or more

computing devices" would be inconsistent with the claim language and specification.  RRB at 7-

8.  GMG submits that under Traeger's interpretation, the claim would be invalid in view of Lee.

*Id.* at 8-9.  GMG further argues that sending an input from the grill indicating that the grill is in

network communication would be nonsensical, because such an input could only be sent after the

grill is already in network communication.  *Id.* at 9-10.

In consideration of the parties' arguments, the undersigned finds that the term "one or

more computing systems" in claim 1 is broad enough to include the hardware controller of a

GMG Grill.  The specification of the '720 patent broadly describes "various types of computing

systems." '720 patent at 4:46-47.  "Computing systems may, for example, be mobile phones,

electronic appliances, laptop computers, tablet computers, wearable devices, desktop computers,

mainframes, and the like." *Id.* at 4:48-51.  The specification provides an explicit definition of

"computing system," to include "any device, system, or combination thereof that includes at least

one processor, and a physical and tangible computer-readable memory capable of having thereon

computer-executable instructions that are executable by the processor." *Id.* at 4:51-56.  When

describing the hardware controller of a grill, the specification refers to communication between

the hardware controller and "other computing systems." *Id.* at 6:67-7:4.  Based on these

disclosures in the specification, the undersigned finds that the term "computing system" in the '720 patent is broad enough to include grill hardware controllers.

GMG argues that the structure of the claim language requires that the "one or more computing systems" be separate from the "hardware controller," but the Federal Circuit cases cited in GMG's briefs are not applicable to the present claim language. In *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, the Federal Circuit required distinct structures "[w]here a claim lists elements separately." 616 F.3d 1249, 1254 (Fed. Cir. 2010). But the separately listed elements in the '720 patent are "a receiver," "a notification generator," and "a transmitter." '720 patent at 15:35-16:2. The "one or more computing systems" and "hardware controller" are elements of the claim that are defined by their function, and this claim language is more similar to the patents at issue in Federal Circuit cases allowing overlapping structures to infringe separate limitations. *See, e.g., Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir. 2009) (affirming Commission's finding that claimed "second circuit" and "third circuit" do not require separate and distinct circuits); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011) (separately claimed "cutting box" and "dust collection structure" need not be separate components for purposes of infringement analysis). Consistent with this Federal Circuit precedent, the undersigned finds that the open-ended term "one or more computing systems" can include the "hardware controller" referenced in another limitation of claim 1.

The record on post-grant review also does not support GMG's narrow construction of "one or more computing systems." Although the PTAB held that metadata generated by the home appliance in Lee could not be the claimed "first input," this finding was based on GMG's identification of the "computing system" as the terminal apparatus in Lee. PGR2019-0024 Decision at 31-32, RX-0259.4421-22. The PTAB never considered an argument that Lee's home

appliance or a hardware controller therein could be one of the "one or more computing systems."
*See* RX-0259.3256, Petitioner's Reply to Patent Owner's Response at 11 n.4 (Jan. 13, 2020)
(GMG specifically disclaimed signals originating from Lee's appliance as the "first input,"
focusing its arguments on Lee's signal 545 from the mobile device).

The record on post-grant review is further consistent with a broad reading of "one or
more computing systems," because there was no dispute that Lee's terminal apparatus could be
both a "computing system" and a "mobile device" in the '720 patent. *See* RX-0259.0048-52,
Petition for Post-Grant Review at 39-43 (Dec. 18, 2018) (identifying Lee's terminal apparatus as
the claimed "mobile device"). Claim 1 separately identifies "one or more computing systems," a
"mobile device," and a "hardware controller," and the claim language does not preclude the
"mobile device" and "hardware controller" from being among the "one or more computing
systems." Consistent with the Federal Circuit's holding in *CAE Screenplates, Inc. v. Heinrich
Fiedler GmbH & Co.*, each of these different terms has a different meaning, with the "mobile
device" and "hardware controller" part of the broader category of "computing systems." *See* 224
F.3d 1308, 1317 (Fed. Cir. 2000) (finding that claim language describing a "bottom plane"
referred to a specific part of the claimed "bottom"). Including hardware controllers within the
category of "computing systems" is thus consistent with the claim language, specification, and
prosecution history, and supported by Federal Circuit precedent.

Following this interpretation of the "one or more computing systems" limitation, the
undersigned finds a preponderance of the evidence showing that the GMG Grill's hardware
controller sends an input to the GMG Server indicating that the appliance is communicating over
a network. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████     *See* CX-0838C (Shoemake DWS) at Q/A 100, 103.  Accordingly, the

undersigned finds that the "receiver" limitation is infringed in the operation of the GMG System

in "Server Mode."

For the reasons discussed above, the undersigned finds that the "receiver" limitation of

claim 1 is infringed in the GMG System with respect to input from the hardware controller of a

GMG Grill.

<div align="center">

c.      **"a notification generator configured to generate notifications
that are to be sent to one or more software applications"**

</div>

The second limitation of claim 1 requires "a notification generator configured to generate

notifications that are to be sent to one or more software applications being executed at a mobile

device, the one or more software applications being configured to control one or more functions

of the electronically-controlled appliance."  '720 patent at 15:49-54.

████████████████████████████████████████████████████

████████████████████████████████████████.  CX-0838C (Shoemake

DWS) at Q/A 112. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

  

CDX-0002C.021. ███████████████████████████

██████████████████████████████ CX-0838C (Shoemake DWS) at Q/A 112.

Traeger submits that this functionality of the GMG System infringes the "notification generator" limitation. CIB at 32-33. GMG does not dispute infringement of this limitation separately from the "transmitter" limitation, as discussed below.

Based on the evidence presented by Dr. Shoemake, the undersigned finds that the GMG System thus infringes the "notification generator" limitation of claim 1.

> d. **"a transmitter configured to send" a "generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance"**

The third limitation of claim 1 requires "a transmitter configured to send at least one generated notification to at least one of the software applications selected from the one or more

software applications, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance." '720 patent at 15:55-60. The claim language "notification indicating that the cloud computing platform is communicably connected" was construed to mean a notification indicating that the grill is connected for communication. Order No. 22 at 30-32.



. CX-0838C (Shoemake DWS) at Q/A 114. He explains that the

. *Id*. Based on testimony at the hearing, Traeger submits that

CIB at 36-37 (citing Tr. (Williams) at 348. The GMG App also

*Id*. at 37 n.8 (citing Tr. (Williams) at 347

). Users can press a "Refresh" button in the GMG App to display the most recent date and time that the GMG Grill checked in with the GMG Server. Tr. (Williams) at 349; *see* CX-0355 (GMG Manual) at 114 ("Tap the Refresh button to display the last date and time the grill connected to the server."). Traeger thus argues that in the normal operation of the GMG System, the connectivity status displayed in the GMG App

CIB at 36-37.

GMG argues that

RIB at 25-27. Mr. Williams submits that

█████████████████████████████████████████████

████████████████████████████████ RX-0334C (Williams RWS) at Q/A 32.  With respect

to the source code that checks whether the GMG Grill has been disconnected, Mr. Williams

notes that ████████████████████████████████████████████████████████

████ *Id.* at Q/A 36.  Mr. Williams ████████████████████████████████████

██████████████████████████████████████████████████████████████████ *Id.*

at Q/A 37-39.  GMG contends that the GMG System operates in a way that is similar to the Lee

prior art addressed in post-grant review, where information regarding the connectivity status of

an appliance was stored on a server and only sent to the mobile device upon request.  RIB at 27-

28; RX-0334C (Williams RWS) at Q/A 40.  Separately, GMG argues that Traeger has failed to

carry its burden to prove infringement of claim 1, because the connectivity information that

Dr. Shoemake identifies for the "communicably connected" limitation is not one of the alerts he

identified for the "notification generator" limitation.  RIB at 28-29.

Traeger responds to GMG's arguments by citing the *Markman* order, where GMG had

proposed a construction that required connectivity information "at the exact moment of the

input," but this limitation was rejected.  CRB at 10-11 (citing Order No. 22 at 11-15, 30-32).

Traeger argues that ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id.* at 11-12 (citing Tr. (Scott) at 275-76;

Tr. (Williams) at 348).  Traeger distinguishes the Lee prior art because in Lee, there was no

explicit notification regarding connectivity, and there was no specified amount of time for

refreshing the status of the appliance, unlike ███████████████████████████ *Id.* at

12. Traeger concedes that Dr. Shoemake did not explicitly identify the connection status as a notification in his analysis of the "notification generator" limitation but argues that Dr. Shoemake's analysis is sufficient to show that the connection status of the GMG Grill ███ ████████████████████████████████████████████████████ meeting the limitations of both the "notification generator" and "transmitter" limitations. *Id.*

GMG's reply brief cites arguments regarding the Lee prior art that were addressed in the post-grant review for the '833 patent, comparing the state information stored in Lee's server to the connectivity information in the GMG Server. RRB at 16-17. GMG submits that the information stored on the GMG Server is "stale" when sent to the GMG App and never indicates that the GMG Grill "is communicably connected." *Id.* at 17-18. GMG characterizes the GMG System and the Lee prior art as "pull" systems that rely on the GMG App to request previous connectivity information, arguing that the claims require a "push" system that sends current connectivity information at the time it is generated. RRB at 20-21.

In consideration of the parties' arguments, the undersigned finds that the "transmitter" limitation is infringed by the GMG System. ████████████████████████████████ ███████████████████████████████████████████ are notifications indicating that the GMG Grill "is communicably connected." These regular updates indicate the current connectivity status of the grill, and delays on the order of a few seconds do not affect the infringement analysis. GMG's proposed construction requiring the notification to reflect "the exact moment of the input" was rejected in the *Markman* order. *See* Order No. 22 at 11-15, 30-32. GMG's arguments regarding the Lee prior art rely on the post-grant review for the '833 patent, which

does not limit the scope of the claims in the '720 patent.[5]  The undersigned also finds that

Dr. Shoemake's analysis is sufficient to show that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

Accordingly, the undersigned finds that the GMG System infringes the "transmitter"

limitation of claim 1.

        **e.**      **"receiving a second input . . . indicating that one or more**
                    **specified functions are to be performed"**

The fourth limitation of claim 1 requires "the receiver receiving a second input from the

at least one software application indicating that one or more specified functions are to be

performed on the electronically-controlled appliance." '720 patent at 15:61-64.

Dr. Shoemake identifies ████████████████████████████████



████████ CX-0838C (Shoemake DWS) at Q/A 116.  He explains that ████████████████

████████████████████████████████████████████. *Id.*

---

[5] As discussed *supra*, the PTAB distinguished Lee from claim 1 of the '720 patent based on the "first input" in the "receiver" limitation. *See* PGR2019-00024 Decision at 25-33.



CX-0466C.0003. ████████████████████████████

████████████████████████████████████. CX-

0838C (Shoemake DWS) at Q/A 116. ████████████████

████████████ *Id.* Traeger submits that this evidence shows that the GMG System

infringes the "receiver receiving a second input" limitation. CIB at 37-38. GMG does not

dispute infringement of this limitation. *Id.*

Based on the evidence presented by Dr. Shoemake, the undersigned finds that the GMG

System infringes the "receiver receiving a second input" limitation of claim 1.

**f.    "the transmitter sending one or more instructions"**

The final limitation of claim 1 requires "the transmitter sending one or more instructions

to the electronically-controlled appliance to perform the one or more specified functions, the

---

6 

functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance." '720 patent at 15:65-16:2.

Dr. Shoemake explains that ███████████████ ████████████

███████████ CX-0838C (Shoemake DWS) at Q/A 116. ████████

████████████████████████████████████. *Id.* ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████ *Id.* at Q/A 118. ████████████████████████

███████████████████████████████. *Id.* Traeger relies on Dr. Shoemake's

analysis to show infringement of this limitation. CIB at 38-40.

GMG argues that "the transmitter" identified for this limitation is not the same "transmitter" in the GMG System that Traeger identified for infringement of the "transmitter configured to send at least one generated notification" limitation. RIB at 29. Mr. Williams explains that ████████████████████████████████████

████████████████████████████████████. RX-0334C

(Williams RWS) at Q/A 44.

In reply, Traeger argues that the claim language does not require a single unitary transmitter. CRB at 13. Traeger further submits that ████████████████

█████████████████████████████████████████. *Id.*

Both Traeger and GMG cite *Convolve, Inc. v. Compaq Comput. Corp.*, where the Federal Circuit interpreted claim language referring to "a processor" and "the processor." 812 F.3d 1313, 1321 (Fed. Cir. 2016). The court noted that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional

phrase 'comprising.'" *Id*. However, where a claim limitation used the definite article "the" to identify "the processor," referring back to "a processor" in the preamble, the court required "the same processor to perform all of the recited steps." *Id*. In accordance with this precedent, the undersigned agrees with GMG that "the transmitter" in the final limitation of claim 1 of the '720 patent must be the same "transmitter" identified earlier in the claim. Requiring the same hardware transmitter to meet both limitations is also consistent with the specification of the '720 patent. *See* '720 patent at 7:23-26 ("The cloud computing platform 101 has hardware elements including . . . a transmitter 107 . . . ."), 12:8:11 ("After this notification 112 is generated, the transmitter 107 of the cloud computing platform 101 transmits the generated notification to the software application 114 (530)."), 12:24-27 ("The transmitter 107 then transmits control instructions 119 to the electronically-controlled appliance 120 to perform the specified functions 122 (550)."), Fig. 5.

Based on the testimony of Dr. Shoemake, the undersigned finds that the GMG System has a "transmitter" that infringes these limitations. GMG argues that ████████████████████████ ███████████████████████████████████████████ ███████████████████████████ and Dr. Shoemake explains that the ███████████████████████████████████ CX-0838C (Shoemake DWS) at Q/A 118. The claim does not require that the same software service generate both the notifications sent to the software application and the instructions sent to the hardware controller but only that the same "transmitter" sends these signals. In the GMG System, █████████████ ████████████████████████████████████. Accordingly, the undersigned finds that both "transmitter" limitations of claim 1 are infringed.

For the reasons discussed above, the undersigned thus finds that claim 1 of the '720 patent is infringed by the GMG System.

### 2.    Claim 2

Claim 2 depends from claim 1, further requiring that "the cloud computing platform communicates directly with the electronically-controlled appliance via an access point within range of the electronically-controlled appliance." '720 patent at 16:3-6.

Dr. Shoemake identifies evidence that the GMG Grills are "designed to communicate via a Wi-Fi access point to obtain connectivity to the Internet thereby facilitating communication with the GMG cloud computing platform." CX-0838C (Shoemake DWS) at Q/A 120. In particular, Dr. Shoemake identifies a manual showing that GMG Grills connect to a Wi-Fi access point and tutorial videos showing the connection process. CX-0335 (GMG "Smart Grilling" page); *see, e.g.*, CX-0336 (Server Mode tutorial video). Dr. Shoemake cites testimony describing the Wi-Fi controller in GMG Grills and explains that in his own testing, he connected a GMG Grill to a Wi-Fi access point. CX-0838C (Shoemake DWS) at Q/A 120. GMG does not dispute infringement of the limitations recited in claim 2.

Based on the evidence identified by Traeger, the undersigned thus finds that the GMG System infringes claim 2 of the '720 patent.

### 3.    Claim 12

Claim 12 is a separate independent claim with limitations that are similar to those recited in claim 1, with narrower language in the "receiver" limitation, a "wherein" clause requiring a previous direct connection, and a "control signal generator" *in lieu* of a "notification generator." '720 patent at 16:54-17:20. The parties' disputes with respect to infringement are the same for claim 1 and claim 12. *See* CIB at 40-42; RIB at 29-30.

a.      **Preamble**

The preamble of claim 12 is identical to the preamble of claim 1. '720 patent at 16:54-

59. As discussed above in the context of claim 1, the undersigned finds that the GMG Server is a

"cloud computing platform," and the GMG System infringes the limitations of the preamble.

b.      **"a receiver at the cloud computing platform configured to
receive inputs from one or more mobile devices including at
least a first input indicating that the electronically-controlled
appliance is in network communication with the cloud
computing platform"**

The "receiver" limitation of claim 12 is similar to the corresponding limitation of claim 1,

except that the receiver must be "configured to receive inputs from one or more mobile devices."

'720 patent at 16:60-64. In the context of claim 1, this "receiver" limitation was found to be

infringed by an input from the hardware controller of the GMG Grill, but the GMG Grill is not a

"mobile device" as recited claim 12. Traeger thus relies on an alternative theory of infringement

for claim 12 based on inputs from the GMG App running on mobile devices. CIB at 41

(referencing CIB at 29-32); CX-0838C (Shoemake DWS) at Q/A 123 (referencing his

infringement opinions with respect to claim 1).



Dr. Shoemake identifies the ███████████████████████████████████.

CX-0838C (Shoemake DWS) at Q/A 96. ████████████████████████████

████████████████████████████████████████████████████████

██████████ When the user decides to initiate GMG's "Server Mode," the ███████████

█████████████████████████████████████████████. *Id.* at Q/A

102. ███████████████████████████████████████████████

███████████████████████████████████. *Id.*; *see* Tr. (Shoemake) at 240-41.

Traeger argues that ███████████████████████████████████

███████████████ CIB at 29-31.

GMG argues that ███████████████████████████████

███████████████████████████████████████. RIB at 18-21.  Mr. Williams

describes ████████████████████████████████████

████████████████. RX-0334C (Williams RWS) at Q/A 24.  GMG argues that ██

███████████████████████████████████████

█████████████████ ████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████ RIB at 18-20.  GMG argues that ██

██████████████████████ is similar to the request signals in Lee that were

considered by the PTAB in post-grant review.  *Id*. at 20-21.

In reply, Traeger identifies ██████████████████████████

█████████████████████████████ CRB at 8 (citing Tr.

(Shoemake) at 240-41.  Traeger further submits that in normal operation, ████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████ CRB at 8-9.

GMG cites Dr. Shoemake's admission that ███████████████████

████████████████████████████████ █████████████

████████████████ RRB at 13 (citing Tr. (Shoemake) at 208-210). ██████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ RRB at 13-14.  David Scott, a Fyresite manager who worked on the

software for the GMG App, confirmed that ███████████████████████████████████

████████████████████████████████████ Tr. (Scott) at 282-83.

Traeger further argues that this limitation is infringed under the doctrine of equivalents.

CIB at 31-32.  Dr. Shoemake explains that ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████.  CX-0838C (Shoemake DWS) at Q/A 106.  The way that

the GMG App performs this function is █████████████████████████████████████

████████████████████████████████████.  *Id.*  Dr. Shoemake submits that

██████████████████████████████████████████████████████

███████████████████████████████████████████████████.  *Id.*

GMG argues that there is no infringement under the doctrine of equivalents.  RIB at 21-

25.  GMG submits that prosecution history estoppel precludes Traeger from alleging that the

message sent from the GMG App infringes the "in network communication" limitation, because

a similar message was distinguished in post-grant review.  *Id.* at 21-23.  GMG further argues that

there are significant differences between the transmissions from the GMG App and the claim

language.  *Id.* at 23-25.

Based on this record, the undersigned agrees with GMG that the "receiver" limitation of

claim 12 is not infringed literally or under the doctrine of equivalents.  The undisputed facts

show that ████████████████████████████████████████████████████████

███████████████████████████  Accordingly, it is impossible for ███████████████

████████████████████████████████████████████████████████

42

 The source code analyzed by Dr. Shoemake confirms that

Accordingly, the "in network communication" limitation is not literally infringed by any input from the GMG App.

With respect to the doctrine of equivalents, the undersigned finds that there are substantial differences between the "in network communication" limitation and the alleged indication from the GMG App. The evidence of record fails to satisfy a function-way-result test, because the way the GMG System operates is substantially different from the structure of this claim limitation. The function of indicating that the GMG Grill is in network connection with the GMG Server is accomplished through communications between the GMG Grill and the GMG Server, not through any input from the GMG App.

. The undersigned thus finds that Traeger's function-way-result allegations fail to make a *prima facie* case for infringement under the doctrine of equivalents.

Moreover, the undersigned agrees with GMG that Traeger's infringement arguments are inconsistent with the record on post-grant review, where the PTAB rejected arguments that a request sent from a mobile device to obtain data regarding a specific appliance would be an indication that the appliance is in network communication. PGR2019-00024 Decision at 30, RX-0259.4361. The PTAB credited Traeger's expert, who criticized the Lee prior art because "Lee simply assumes that the appliances can communicate within the home network," and "Lee

simply assumes *a priori* the connectivity." *Id*. Traeger is making an analogous argument with respect to the GMG App, assuming that the GMG Grill will complete its connection when the GMG App sends a "connection message" to the GMG Server. Although the record on post-grant review may not rise to the level of prosecution history estoppel, Traeger's inconsistent arguments undermine Dr. Shoemake's contention that there is an insubstantial difference between indicating that a grill is in network communication and assuming that a connection has been established.

Accordingly, the undersigned finds that the GMG System does not infringe the "receiver" limitation of claim 12 of the '720 patent.

> c.   **"wherein the one or more mobile devices have previously established an initial, direct connection"**

The second limitation of claim 12 requires that "the one or more mobile devices have previously established an initial, direct connection with the electronically-controlled appliance, and wherein the one or more mobile devices and the electronically-controlled appliance maintain independent connections to the cloud computing platform over the internet." '720 patent at 16:65-17:3. The "maintain independent connections" limitation was construed to mean that the one or more mobile devices and the electronically-controlled appliance each communicate directly to the cloud computing platform. Order No. 22 at 32-34.

With respect to this limitation, Dr. Shoemake explains that ▮

▮ CX-0838C (Shoemake DWS) at Q/A 124. He performed his own testing where he ▮

▮ *Id*. at Q/A 125. He further

████████████████████████████████████████████████████████ *Id.* at Q/A

125-26.  GMG does not dispute infringement of this limitation.  *See* CIB at 41.

Based on the evidence identified by Dr. Shoemake, the undersigned finds that the

"wherein" limitation of claim 12 is infringed by the GMG System.

> **d.    "receiving a second input . . . indicating that one or more end
> user specified functions are to be performed"**

The "second input" limitation of claim 12 is similar to the corresponding limitation of

claim 1.  '720 patent at 17:4-8.  As discussed above in the context of claim 1, there is no dispute

that the GMG System infringes the "second input" limitation.

> **e.    "a control signal generator configured to generate control
> signals that are to be sent to the electronically-controlled
> appliance"**

The fourth limitation of claim 12 of the '720 patent requires "a control signal generator

configured to generate control signals that are to be sent to the electronically-controlled

appliance, the control signals being configured to control functions of the electronically-

controlled appliance according to the received second input."  '720 patent at 17:9-13.  With

respect to this limitation, Traeger relies on Dr. Shoemake's analysis of the GMG System for the

"second input" and "sending one or more instructions" limitations of claim 1.  CIB at 42; *see*

CX-0838C (Shoemake DWS) at Q/A 128.  In particular, ████████████████████████

█████████████████████████████████████████████████.  CX-0838C

(Shoemake DWS) at Q/A 118.  GMG does not dispute infringement of this limitation.  *See* CIB

at 42.  Based on the evidence identified by Dr. Shoemake, the undersigned finds that the GMG

System infringes the "control signal generator" limitation of claim 12 of the '720 patent.

      f.     **"a transmitter configured to transmit the generated control signals directly to the electronically-controlled appliance"**

The final limitation of claim 12 of the '720 patent requires "a transmitter configured to transmit the generated control signals directly to the electronically-controlled appliance over the internet for performance of the one or more specified functions received from the one or more mobile devices, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance." '720 patent at 17:14-20. With respect to this limitation, Traeger relies on Dr. Shoemake's analysis of the GMG System for the "sending one or more instructions" limitation of claim 1. CIB at 42; CX-0838C (Shoemake DWS) at Q/A 129. GMG does not dispute infringement of this limitation. *See* CIB at 42. For the same reasons discussed above in the context of claim 1, the undersigned finds that the "transmitter" limitation of claim 12 is infringed by the GMG System.

As discussed above, however, the GMG System does not infringe claim 12 because the "receiver" limitation is not infringed with respect to "a first input" from "one or more mobile devices."

      4.     **Claim 16**

Claim 16 is a method claim with limitations that are similar to those recited in claim 1, except that claim 16 requires that the "first input" be received from "one or more mobile devices," which is similar to claim 12. '720 patent at 17:55-18:21. The parties' disputes with respect to infringement of claim 16 are similar to those discussed above in the context of claims 1 and 12. *See* CIB at 42-44; RIB at 30-32.

      a.     **Preamble**

The preamble of claim 16 describes "[a] method for remotely controlling an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue

smoker via one or more mobile devices and an internet-connected network server, the electronically-controlled appliance having at least one hardware controller." '720 patent at 17:55-60. There is no dispute with respect to infringement of the preamble of claim 16, and Traeger relies on Dr. Shoemake's analysis with respect to the preamble, "receiver" and "notification generator" limitations of claim 1. CIB at 42; *see* CX-0838C (Shoemake DWS) at Q/A 132. Based on the evidence identified by Dr. Shoemake, the undersigned finds that the operation of the GMG System infringes the preamble limitations of claim 16.

b.    **"receiving . . . a first input from one or more mobile devices"**

The first limitation of claim 16 requires "receiving at a network server of a cloud computing platform a first input from one or more mobile devices, the first input indicating that at least a first electronically-controlled appliance is in network communication with a cloud computing platform, the first electronically-controlled appliance comprising an outdoor barbecue grille or outdoor barbecue smoker." '720 patent at 16:61-67. This claim language is similar to the "receiver" limitation of claim 12 and requires that the "first input" be received from "one or more mobile devices." Traeger relies on the same infringement theory that is discussed above in the context of claim 12. *See* CIB at 43 (referencing CIB at 29-32); CX-0838C (Shoemake DWS) at Q/A 133 (referencing his infringement opinions with respect to claim 1). GMG disputes infringement of this limitation for the same reasons discussed above in the context of claim 12. RIB at 30 (referencing RIB at 18-25).

For the same reasons discussed above in the context of claim 12, the undersigned finds that the "receiving" limitation of claim 16 is not infringed by the operation of the GMG System, because there is no "first input from one or more mobile devices" indicating that the GMG Grill "is in network communication" with the GMG Server.

c.        **"generating a notification"**

The second limitation of claim 16 requires "generating a notification at the network server that is to be sent to a software application being executed at a mobile device, the software application being configured to remotely control one or more functions of the electronically-controlled appliance over the internet." '720 patent at 18:1-5. With respect to this limitation, Traeger relies on the same evidence discussed above in the context of the "notification generator" limitation of claim 1. CIB at 43 (referencing CIB at 32-33); *see* CX-0838C (Shoemake DWS) at Q/A 134 (referencing Q/A 112). There is no dispute with respect to infringement of this limitation. *See* CIB at 43.

For the same reasons discussed above in the context of the "notification generator" limitation of claim 1, the undersigned finds that the "generating a notification" limitation of claim 16 is infringed by the operation of the GMG System.

d.        **"transmitting the generated notification"**

The third limitation of claim 16 requires "transmitting the generated notification from the network server to the software application at the mobile device, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance." '720 patent at 18:6-10. With respect to this limitation, Traeger relies on the same evidence discussed above in the context of the "transmitter" limitation of claim 1. CIB at 43 (referencing CIB at 33-37); *see* CX-0838C (Shoemake DWS) at Q/A 135 (referencing Q/A 114). GMG raises the same non-infringement arguments that are addressed above in the context of the "transmitter" limitation of claim 1. RIB at 30 (referencing RIB at 25-29).

For the same reasons discussed above in the context of the "transmitter" limitation of claim 1, the undersigned finds that the "transmitting" limitation of claim 16 is infringed by the operation of the GMG System.

> **e.    "receiving . . . a second input from the software application"**

The fourth limitation of claim 16 requires "receiving at the network server a second input from the software application, the second input indicating that one or more specified functions initiated by the user on the mobile device are to be performed on the electronically-controlled appliance." '720 patent at 18:11-15. With respect to this limitation, Traeger relies on the same evidence discussed above in the context of the "receiving a second input" limitation of claim 1. CIB at 43 (referencing CIB at 37-38); *see* CX-0838C (Shoemake DWS) at Q/A 136 (referencing Q/A 116). There is no dispute with respect to infringement of this limitation. *See* CIB at 43.

For the same reasons discussed above in the context of the "receiving a second input" limitation of claim 1, the undersigned finds that the "receiving . . . a second input" limitation of claim 16 is infringed by the operation of the GMG System.

> **f.    "transmitting . . . one or more instructions"**

The final limitation of claim 16 requires "transmitting from the network server to the electronically-controlled appliance over the internet one or more instructions to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance." '720 patent at 18:16-21. With respect to this limitation, Traeger relies on the same evidence discussed above in the context of the "transmitter sending one or more instructions" limitation of claim 1. CIB at 44 (referencing CIB at 38-39); *see* CX-0838C (Shoemake DWS) at Q/A 137 (referencing Q/A 118). There is no dispute with respect to infringement of this limitation. *See* CIB at 44.

49

For the same reasons discussed above in the context of the "transmitter sending one or more instructions" limitation of claim 1, the undersigned finds that the "transmitting . . . one or more instructions" limitation of claim 16 is infringed by the operation of the GMG System.

As discussed above, however, the operation of the GMG System does not infringe claim 16 because the "receiving" limitation is not infringed with respect to "a first input from one or more mobile devices."

### 5.     Claim 21

Claim 21 depends from claim 16, further requiring that "the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet via separate internet connections." '720 patent at 18:46-49. With respect to this limitation, Traeger relies on the same evidence discussed above in the context of the "wherein" limitation of claim 12. CIB at 44 (referencing CIB at 41); *see* CX-0838C (Shoemake DWS) at Q/A 139 (referencing Q/A 124-26). There is no dispute with respect to infringement of this limitation. *See* CIB at 44.

For the same reasons discussed above in the context of the "maintain independent connections" limitation of claim 12, the undersigned finds that the limitations recited in claim 21 are infringed by the operation of the GMG System. Claim 21 is not infringed, however, because claim 16 is not infringed.

### 6.     Claim 22

Claim 22 depends from claim 16, further requiring that "the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet." '720 patent at 18:50-52. With respect to this limitation, Traeger relies on the same evidence discussed above in the context of the preamble of claim 1, the "wherein" clause of claim 12, and

the "transmitter" limitation of claim 12. CIB at 44 (referencing CIB at 18-19, 41); *see* CX-0838C (Shoemake DWS) at Q/A 141 (referencing Q/A 94, 124-26). There is no dispute with respect to infringement of this limitation. *See* CIB at 44.

For the same reasons discussed above in the context of the preamble limitation of claim 1 and the "wherein" limitation of claim 12, the undersigned finds that the limitations recited in claim 22 are infringed by the operation of the GMG System. Claim 22 is not infringed, however, because claim 16 is not infringed.

### D.     **Indirect Infringement**

In addition to direct infringement, Traeger contends that GMG induces infringement and contributes to infringement of the asserted claims of the '720 patent by its customers through the importation and sale of the Accused Products. CIB at 14-18.

With respect to inducement, Traeger submits that GMG had knowledge of the '720 patent at least by the time that it filed its petition for post-grant review on December 18, 2018. *See GMG Products LLC v. Traeger Pellet Grills LLC*, PTAB Case No. PGR2019-00024, Petition (Dec. 18, 2018). Traeger identifies user manuals for the GMG grills that include instructions for using GMG's "Server Mode." CX-0355 at 112-115; CX-0130 at 34-35. Traeger's marketing director, Nishan Pilibosian, also described a YouTube channel where GMG distributes videos showing users how to use the "Server Mode." CX-0846C (Pilibosian Dep. Tr.) at 100-101; *see, e.g.,* CX-0577, CX-0578, CX-0579, CX-0580, CX-0581, CX-0582, CX-0583, CX-0584, CX-0585, CX-0586, CX-0587, CX-0588, CX-0589, CX-0590, and CX-0591. Mr. Pilibosian also described GMG statistics showing over 9 million hours grilled in "Server Mode" and over 3,000 daily active users on the GMG System since January 2017. CX-0846C (Pilibosian Dep. Tr.) at 87-89. Traeger submits that the server statistics show that GMG has induced its customers to use

the GMG System. CIB at 15-17. Moreover, Traeger argues that the user manuals and videos are evidence of GMG's specific intent to encourage the use of the Accused Products in the GMG System. *Id*.

Traeger further alleges that the importation and sale of the Accused Products contributes to the infringement of the asserted claims of the '720 patent by GMG's customers because the GMG grills are components of the GMG System that were especially made and/or adapted for use in the "Server Mode" that is accused of infringement. *Id*. at 17-18.

GMG does not dispute Traeger's allegations with respect to indirect infringement. *See* CRB at 4.

Based on the evidence identified by Traeger, the undersigned finds that GMG has induced its customers to use the Accused Products in the GMG System. *See Certain Road Construction Machines and Components Thereof*, Inv. No. 337-TA-1088, Comm'n Op. at 29 (June 10, 2020) (finding induced infringement based on marketing and instructional materials provided to customers). In addition, the undersigned finds that GMG has satisfied the elements of contributory infringement with respect to its customers' use of the Accused Products in the GMG System. *See Certain Mounting Apparatuses for Holding Portable Electronic Devices and Components Thereof*, Inv. No. 337-TA-1086, Remand ID at 6-7 (Apr. 16, 2019) (finding contributory infringement based on respondents' sale of components specifically designed to be used with claimed method), *not reviewed by* Comm'n Notice (May 10, 2019).

Accordingly, the undersigned finds that GMG has both directly and indirectly infringed claims 1 and 2 of the '720 patent through the sale, importation, and use of the Accused Products.

**E.    Alleged Non-Infringing Designs**

GMG has identified two alternative designs for the deployment of infrastructure for the

GMG System. RIB at 32-33. The first redesign would ███████████████████

███████████████ RX-0277C. ████████████████████

████████████████████████████. RIB at 32.

GMG's second redesign would ███████████████████ *Id.* at 33.

████████████████████████████████

██████████████████████. *Id.* GMG argues that ██████████

███████████ ████████████████████

███████████ *Id.*

Traeger argues that the first redesign would still infringe the "cloud computing platform"

limitation, because ██████████████████████████

██████████████████. CIB at 44-46. Traeger further argues that

████████████████████████████████

████████████████████████████████

███████████ *Id.* at 45-46. With respect to the second redesign, Traeger argues that █

███████████████████ is not sufficiently fixed and was not

disclosed during discovery. *Id.* at 46-47.

In reply, GMG argues that the first redesign was clearly disclosed during discovery in a

design document, RX-0277C. CRB at 22-24. ████████████████

████████████████████████ and Traeger had an

opportunity to seek discovery on this issue. *Id.* at 23-24.

CONFIDENTIAL MATERIAL REDACTED
**PUBLIC VERSION**

As an initial matter, the undersigned must first determine whether the GMG's redesigns can be adjudicated in this proceeding. The Commission favors "adjudicating redesigns to prevent subsequent and potentially burdensome proceedings that could have been resolved in the first instance in the original Commission investigation." *Certain Human Milk Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18, 2020 WL 3073788, at *11 (Jun. 8, 2020). The Commission considers the following factors to determine whether a redesigned product should be adjudicated: (1) whether the product is within the scope of the investigation; (2) whether it has been imported; (3) whether it is sufficiently fixed in design; and (4) whether it has been sufficiently disclosed by respondent during discovery. *Id.*

With respect to the first redesign, the undersigned finds that the four *Oligosaccharides* factors favor adjudication. With respect to the first two factors, the redesigned GMG Server would be within the scope of the investigation, and the same imported GMG Grills would connect to the redesigned GMG Server. The design document, RX-0277C, demonstrates that the ▇▇▇▇▇▇▇▇▇ is sufficiently fixed in design, and GMG produced this document and referenced it in interrogatory responses before the close of fact discovery. *See* JX-0020C at 32. Accordingly, the first redesign that is reflected in RX-0277C is ripe for adjudication.

The undersigned finds that the first redesign does not affect the infringement analysis, however. The agreed construction for "cloud computing platform" is a platform for enabling on-demand network access to a shared pool of configurable computing resources. Order No. 22 at 27. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████ ."[7] Accordingly, for the same reasons discussed above with

respect to the preamble of claim 1, the undersigned finds that the GMG System would infringe

the "cloud computing platform" limitation of the '720 patent even if the first redesign reflected

in RX-0277C were implemented ████████████████████████████████

███████████

With respect to the second redesign, the undersigned agrees with Traeger that it was

disclosed too late to be adjudicated in this investigation. GMG's final contentions only

identified the first redesign, without mentioning the second redesign. *See* JX-0020C at 32.

There is no suggestion in GMG's interrogatory response that the redesigned server ███████

█████████████████████████████████████████████████

███████████████████████████████████████ *Id.* The design

document produced during discovery also describes ██████████████████████

██████████████████████████████ RX-0277C; *see*

Tr. (Shoemake) at 508:8-21 (testifying that the design document did not discuss █████████

██████████████████ ). GMG's present arguments regarding the second redesign

are not consistent with the contentions disclosed during discovery. GMG does not ██████████

███████████████████████████████████████████

███████████████████████████████████████ . *See*

RIB at 33. The earliest reference to a proposal █████████████████████████████

was in an expert report, after fact discovery had closed. *See* Tr. (Shoemake) at 508:22-509:1

---

[7] In addition, the redesign ███████████████████████████████████████ ,████
███████████████████████████ *See* Tr. (Scott) at 276:4-19
(identifying ███████████           █           ████████████████████
████████████████████████

(testifying that Mr. Williams discussed ██████████████████). This late

disclosure was insufficient to provide Traeger with a fair opportunity to address the redesign.

In addition, the second redesign is not sufficiently fixed in design to be adjudicated.

Unlike the first redesign, GMG has produced no documents describing a plan to ████████

████████████. ████████████████████████████████

████████████████████████████████████████████

████████████████████ The second redesign appears to consist

solely of legal argument, without any evidence of tangible steps taken by GMG to design or

implement ██████████████████. Accordingly, the undersigned will not

render a determination on infringement with respect to GMG's second redesign, in accordance

with the *Oligosaccharides* factors.

## V.    DOMESTIC INDUSTRY

Traeger contends that the Traeger DI Grills meet the technical prong of the domestic

industry requirement. CIB at 47-61. Summary determination was granted with respect to the

economic prong of the domestic industry requirement, recognizing that Traeger's investments in

research and development for the Traeger DI Grills represented significant employment of labor.

Order No. 26 at 10-11.[8]

### A.    Legal Standards

In patent-based proceedings under section 337, a complainant must establish that an

industry "relating to the articles protected by the patent . . . exists or is in the process of being

established" in the United States. 19 U.S.C. § 1337(a)(2). Under Commission precedent, the

---

[8] Order No. 26 also found significant investments with respect to the manufacture of wood
pellets, but this finding was limited to the '833 patent. *See* Order No. 26 at 9-10.

Appx95

domestic industry requirement of section 337 consists of an "economic prong" and a" "technical prong." *See, e.g., Alloc, Inc. v. Intl Trade Comm'n,* 342 F.3d 1361, 1375 (Fed. Cir. 2003).

To meet the technical prong, the complainant must establish that it practices at least one claim of the asserted patent. *Certain Point of Sale Terminals and Components Thereof,* Inv. No. 337-TA-524, Order No. 40 at 17-18 (Apr. 11, 2005). "The test for satisfying the 'technical prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.,* a comparison of domestic products to the asserted claims." *Alloc,* 342 F.3d at 1375.

**B.      Domestic Industry Products**

The economic prong finding in this investigation was based on investments related to Traeger's cloud-connected wood-pellet grills (the "Traeger DI Grills"). *See* Order No. 26 at 1-2. As discussed above in the context of infringement, practicing the claims of the '720 patent involves the use of grills within a cloud computing platform. The Traeger DI Grills work with a mobile application (the "Traeger App") and a cloud-based server (the "Traeger Server"), and these three components comprise the "Traeger System." CIB at 10. Dr. Shoemake explains how documentation provided by Traeger instructs users to connect the Traeger DI Grills to the Traeger App and the Traeger Server, and he followed these instructions to use the Traeger DI Grills in the Traeger System. CX-0838C (Shoemake DWS) at Q/A 200-219. The undersigned finds that this evidence is sufficient to show that the Traeger DI Grills can be "articles protected by the patent" to the extent that the Traeger System is shown to practice claims of the '720 patent.

**C.      Technical Prong**

Traeger contends that the Traeger System practices claims 1, 2, 16, 21, and 22 of the '720 patent. CIB at 47-61.

1.    **Claim 1**

a.    **Preamble**

With respect to the preamble of claim 1, Dr. Shoemake identifies the Traeger Server

hosted by Amazon Web Services as the claimed "cloud computing platform."  CX-0838C

(Shoemake DWS) at Q/A 226-233.  He identifies a ███████████ in the Traeger Server for

communicating with the Traeger App and the Traeger DI Grills.  *Id.* at 226-232.  Traeger

submits that the Traeger System meets the limitations of the preamble, and there is no dispute

from GMG.  CIB at 47-48.  Based on the evidence identified by Dr. Shoemake, the undersigned

finds that the Traeger System practices the limitations of the preamble.

b.    **"a receiver configured to receive inputs from one or more
computing systems including at least a first input indicating
that an electronically-controlled appliance is in network
communication with the cloud computing platform"**

With respect to the "receiver" limitation of claim 1, Dr. Shoemake identifies a listener for

TCP connections in the ███████████ of the Traeger Server.  CX-0838C (Shoemake DWS) at

Q/A 235.  He also identifies a digital controller for the Traeger DI Grills that has an ███████

███ that connects to the ███████████ of the Traeger Server.  *Id.*  Dr. Shoemake identifies the

███████ sent from the Traeger DI Grill to the Traeger Server as a "first input" indicating that

the grill "is in network communication" with the server.  *Id.*  These ███████████████████

███ for the █████ connection, which indicates that the grill is connected.  *Id.*  Dr. Shoemake

also identifies a █████████████████████████████████ after scanning a QR code

on the Traeger DI Grill.  *Id.* at Q/A 212-13.  This █████████████████████████

█████████████████████████████████████████████, and Traeger

identifies this ██████ as an alternative "first input" meeting the claim limitations.  CIB at 49-50; CX-0838C (Shoemake DWS) at Q/A 235.[9]

GMG disputes the "first input" limitation based on its reading of the claim language that precludes the grill hardware controller from being "one or more computing systems."  RIB at 35-36; RRB at 25.

For the same reasons discussed above in the context of infringement, the undersigned finds that the digital controller on the Traeger DI Grill can be one of the "one or more computing systems" that sends the "first input" to the "receiver" in the Traeger Server.  Accordingly, the undersigned finds that Dr. Shoemake's identification of inputs indicating a connection between the Traeger DI Grill and the Traeger Server is sufficient to show that the GMG System practices the "receiver" limitation of claim 1.

> **c.    "a notification generator configured to generate notifications that are to be sent to one or more software applications"**

With respect to the "notification generator" limitation of claim 1, Dr. Shoemake identifies multiple messages that can be generated by the ██████ of the Traeger Server.  CX-0838C (Shoemake DWS) at Q/A 238; CX-0332C.  This includes a "status message" and "notifications such as grill temperature, ambient temperature and cook cycle status."  *Id.*  Dr. Shoemake further identifies source code in the Traeger App for receiving these messages, including the status message that indicates whether the grill is offline.  *Id.*  Traeger submits that these messages are notifications that meet the limitations of the claim, and there is no dispute from GMG.  CIB at 54-55.

---

[9] Traeger offers an alternative theory with respect to this limitation based on ██████ ██████████████████.  CIB at 53-54.  This alternative theory is addressed *infra* in the context of claim 16.

Based on the evidence identified by Dr. Shoemake, the undersigned finds that the Traeger

System practices the "notification generator" limitation of claim 1.

> **d.     "a transmitter configured to send" a "generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance"**

With respect to the "transmitter" limitation of claim 1, Dr. Shoemake identifies push

notifications sent by the ███████████ from the Traeger Server to the Traeger App.  CX-0838C

(Shoemake DWS) at Q/A 241.  Dr. Shoemake explains that the information in these notifications

is based on status messages that are sent from the Traeger DI Grills to the Traeger Server and

███████████████████████████ *Id.*  He specifically identifies a status message that is

sent to the Traeger App when the Traeger DI Grill disconnects from the server.  *Id.*  In addition,

Dr. Shoemake identifies ███████████ that indicates that there is no activity at the

Traeger DI Grill while there is a connection to the Traeger Server.  *Id.* at Q/A 242.  He identifies

source code in the Traeger App showing that ████████████████████████

█████████████████████████████████████████████████

████████████████████████████████ *Id.*

GMG argues that this limitation is not practiced because Traeger has failed to identify

any status that explicitly indicates whether the Traeger DI Grill is in communication with the

Traeger Server.  RIB at 36.  GMG further argues that there is a delay between the status

information being received from the Traeger DI Grill and sent to the Traeger App.  *Id.* at 36-37.

Mr. Williams observed a delay of nearly three minutes after a Traeger DI Grill is disconnected

before the Traeger App indicated an "Offline" status.  RX-0334C (Williams RWS) at Q/A 104,

105.

In reply, Traeger argues that there is no requirement that the notification be an express indication that the Traeger DI Grill is connected and submits that the Traeger App interprets many of the status messages to indicate a connection, displaying a green indication in the user interface. CRB at 17-19. With respect to the delayed notification in the case a disconnection, Traeger submits that the claim language is only concerned with notifications indicating a connection, and those status messages are regularly sent when the Traeger DI Grills are connected to the Traeger Server. *Id.* at 19.

In consideration of the parties' arguments, the undersigned agrees with Dr. Shoemake's analysis. The status messages sent from the Traeger Server to the Traeger App are notifications indicating that the Traeger DI Grill "is communicably connected," because the evidence shows that the Traeger App interprets these messages as indications of a connection, displaying a green notification in the user interface. The delays between status updates from the Traeger DI Grill are not material in the context of the claim language. GMG's proposed construction requiring an "express" notification that reflects "the exact moment of the input" was rejected in the *Markman* order. *See* Order No. 22 at 11-15, 30-32. GMG's arguments are not consistent with the claim language, as discussed above in the context of infringement. Accordingly, the undersigned finds that the Traeger System practices the "transmitter" limitation of claim 1.

> e.    **"receiving a second input . . . indicating that one or more specified functions are to be performed"**

With respect to the "second input" limitation, Dr. Shoemake identifies commands sent from the ▮▮▮▮▮▮ of the Traeger App for setting the grill temperature, grill timer, alarms, and other functions. CX-0838C (Shoemake DWS) at Q/A 244. These commands are received by the ▮▮▮▮▮▮ of the Traeger Server. *Id.* Traeger submits that these commands meet the claim limitations with respect to the second input, and there is no dispute from GMG. CIB at 57-

58. Based on the evidence identified by Dr. Shoemake, the undersigned finds that the Traeger System practices the "receiving a second input" limitation of claim 1.

      **f.**      **"the transmitter sending one or more instructions"**

With respect to the "transmitter sending one or more instructions" limitation, Dr. Shoemake identifies source code regarding the ████████████ in the Traeger Server. CX-0838C (Shoemake DWS) at Q/A 246. He explains that the ████████████ on the Traeger DI Grill ████████████████████ which comprise commands that were sent from the Traeger App. *Id.* Traeger submits that the operation of this ████████████ practices the "transmitter sending one or more instructions" limitation, and there is no dispute from GMG. CIB at 58. Based on the evidence identified by Dr. Shoemake, the undersigned finds that the Traeger System practices the "transmitter sending one or more instructions" limitation of claim 1.

For the reasons discussed above, the undersigned thus finds that the Traeger System practices claim 1 of the '720 patent.

      **2.**      **Claim 2**

With respect to claim 2, Dr. Shoemake explains that the Traeger DI Grills connect to the Traeger Server through a Wi-Fi access point. CX-0838C (Shoemake DWS) at Q/A 248. Traeger submits that this connection through a Wi-Fi access point practices the limitations of claim 2, and there is no dispute from GMG. CIB at 59. Based on the evidence identified by Dr. Shoemake, the undersigned finds that the Traeger System practices claim 2 of the '720 patent.

      **3.**      **Claim 16**

      **a.**      **Preamble**

With respect to the preamble of claim 16, Dr. Shoemake refers to the same evidence that he identified for the preamble of claim 1. CX-0838C (Shoemake DWS) at Q/A 250. He further

submits that the Traeger Server runs on Amazon Web Services ("AWS"), which provides network servers connected to the internet. *Id.* Traeger submits that using the Traeger System meets the preamble limitations of claim 16 for the same reasons that the Traeger System practices the preamble limitations of claim 1, and there is no dispute from GMG. CIB at 59.

Based on the evidence identified by Dr. Shoemake, the undersigned finds that using the Traeger System practices the preamble limitations of claim 16.

> **b.    "receiving . . . a first input from one or more mobile devices"**

With respect to the "first input" limitation of claim 16, Dr. Shoemake submits that the Traeger Server receives a "first input" from the Traeger App in the form of ███████████ ██████████████████████████████████████████████████████. CX-0838C (Shoemake DWS) at Q/A 251, 236 (describing "alternate method" of practicing claim 1). As discussed above in the context of claim 1, ████████████████████████████ ████████████████████████████████████████. *Id.* at Q/A 213. The Traeger App provides ██████████████████████████████████████████████." *Id.* at Q/A 235. The Traeger Grill ████████████████████████████████████, indicating that the Traeger Grill is in communication with the Traeger Server. *Id.* Traeger submits that the ████████████████ is "a first input from one or mobile devices" because ██████████████ ███████████████████████████. CIB at 53-54.

GMG argues that practicing this limitation through ████████████████████ ███████████ is "nonsensical and renders the claim language meaningless." RIB at 35-36. Mr. Williams explains that when ████████████████████████████████████, there is no connection yet established between the Traeger Grill and the Traeger Server. RX-0334C (Williams RWS) at Q/A 101. GMG further argues that characterizing ████████████████

██████████████████████████████████████████████ is "wholly inconsistent with

the purpose" of the claim limitation. RRB at 25. GMG submits that the Traeger Grill is not

merely used as a vehicle for communicating ███████ to the Traeger Server—██████████

████████████████████████████████████████████████████████████

████████████. *Id.*

In consideration of the parties' arguments, the undersigned finds that the "first input from

one or more mobile devices" limitation is not practiced by the Traeger System. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████ only

indicates that the Traeger Grill is "in network communication" with the Traeger Server in the last

step. When this indication is received by the Traeger Server, it is not an "input from one or more

mobile devices"—it is an input from the Traeger Grill. Traeger has thus failed to identify any

input from the Traeger App that meets the "first input" limitation of claim 16.

   **c.**  **"generating a notification"**

With respect to the "generating a notification" limitation, Dr. Shoemake refers to the

same evidence he identified for the "notification generator" limitation of claim 1. CX-0838C

(Shoemake DWS) at Q/A 252. Traeger submits that this limitation is practiced for the same

reasons discussed above in the context of claim 1, and there is no dispute from GMG. CIB at 60.

For the same reasons discussed above in the context of the "notification generator"

limitation of claim 1, the undersigned finds that using the Traeger System practices the

"generating a notification" limitation of claim 16.

d.    **"transmitting the generated notification"**

With respect to the "transmitting the generated notification" limitation, Dr. Shoemake refers to the same evidence he identified for the "transmitter" limitation of claim 1. CX-0838C (Shoemake DWS) at Q/A 253. Traeger submits that this limitation is practiced for the same reasons discussed above in the context of claim 1. CIB at 60. GMG disputes Traeger's allegations with respect to this limitation for the same reasons discussed above in the context of claim 1. RIB at 38.

For the same reasons discussed above in the context of the "transmitter" limitation of claim 1, the undersigned finds that using the Traeger System practices the "transmitting the generated notification" limitation of claim 16.

e.    **"receiving . . . a second input from the software application"**

With respect to the "second input" limitation, Dr. Shoemake refers to the same evidence he identified for the "second input" limitation of claim 1. CX-0838C (Shoemake DWS) at Q/A 254. Traeger submits that this limitation is practiced for the same reasons discussed above in the context of claim 1, and there is no dispute from GMG. CIB at 60.

For the same reasons discussed above in the context of the "second input" limitation of claim 1, the undersigned finds that using the Traeger System practices the "second input" limitation of claim 16.

f.    **"transmitting . . . one or more instructions"**

With respect to the "transmitting . . . one or more instructions" limitation, Dr. Shoemake refers to the same evidence he identified for the "transmitter sending one or more instructions" limitation of claim 1. CX-0838C (Shoemake DWS) at Q/A 255. Traeger submits that this

limitation is practiced for the same reasons discussed above in the context of claim 1, and there is no dispute from GMG. CIB at 60.

For the same reasons discussed above in the context of the "transmitter sending one or more instructions" limitation of claim 1, the undersigned finds that using the Traeger System practices the "transmitting . . . one or more instructions" limitation of claim 16.

As discussed above, however, using the Traeger System does not practice claim 16 because the "receiving" limitation is not practiced with respect to "a first input from one or more mobile devices."

### 4.    Claim 21

With respect to claim 21, Dr. Shoemake identifies separate IP addresses that are assigned to the Traeger App and the Traeger Grill with respect to the Traeger Server. CX-0838C (Shoemake DWS) at Q/A 257. Dr. Shoemake performed testing where the Traeger App was connected to the Traeger Server through a different Wi-Fi network from the Traeger Grill or using cellular data. *Id.* Traeger submits that the Traeger System practices the limitations recited in claim 21, and there is no dispute from GMG. CIB at 60.

Based on the evidence identified by Dr. Shoemake, the undersigned finds that the Traeger System can be used to practice the limitation recited in claim 21. The undersigned finds that using the Traeger System does not practice claim 21, however, because claim 16 is not practiced, as discussed above.

### 5.    Claim 22

With respect to claim 22, Dr. Shoemake refers to the same evidence he identified for the preamble of claim 1. CX-0838C (Shoemake DWS) at Q/A 259. Traeger submits that this

limitation is practiced for the same reasons discussed above in the context of claim 1, and there is no dispute from GMG. CIB at 61.

For the same reasons discussed above in the context of the preamble of claim 1, the undersigned finds that using the Traeger System practices the limitation recited in claim 22. The undersigned finds that using the Traeger System does not practice claim 22, however, because claim 16 is not practiced, as discussed above.

## VI.    INVALIDITY

GMG contends that the asserted claims of the '720 patent are invalid in view of certain prior art, relying on the opinions of David Williams. RIB at 38-56; RRB at 26-35; RX-0315C (Williams DWS) at Q/A 27-101. Traeger disputes GMG's invalidity contentions. CIB at 68-76; CRB at 22-30. Traeger further argues that GMG is estopped from challenging the invalidity of the '720 patent. CIB at 61-68; CRB at 19-22.

### A.    Legal Standards

It is the respondents' burden to prove invalidity, and the burden of proof never shifts to the patentee to prove validity. *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1380 (Fed. Cir. 2008). "Under the patent statutes, a patent enjoys a presumption of validity, *see* 35 U.S.C. § 282, which can be overcome only through facts supported by clear and convincing evidence . . . ." *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100-114 (2011) (upholding the "clear and convincing" standard for invalidity).

The clear and convincing evidence standard requires a level of proof beyond the preponderance of the evidence. Although not susceptible to precise definition, "clear and convincing" evidence has been described as evidence that produces in the mind of the trier of

fact "an abiding conviction that the truth of a factual contention is 'highly probable.'" *Price v.*

*Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting *Buildex, Inc. v. Kason Indus., Inc.*, 849

F.2d 1461, 1463 (Fed. Cir. 1988)).

### 1.    Anticipation

Pursuant to 35 U.S.C. § 102(a), a patent claim is invalid as anticipated if:

> (1) the claimed invention was patented, described in a printed publication,
> or in public use, on sale, or otherwise available to the public before the
> effective filing date of the claimed invention; or

> (2) the claimed invention was described in a patent issued under section
> 151, or in an application for patent published or deemed published under
> section 122(b), in which the patent or application, as the case may be,
> names another inventor and was effectively filed before the effective filing
> date of the claimed invention.

35 U.S.C. § 102(a). "A patent is invalid for anticipation if a single prior art reference discloses

each and every limitation of the claimed invention. Moreover, a prior art reference may

anticipate without disclosing a feature of the claimed invention if that missing characteristic is

necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva*

*Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted).

### 2.    Obviousness

Section 103 of the Patent Act states:

> A patent for a claimed invention may not be obtained, notwithstanding
> that the claimed invention is not identically disclosed as set forth in
> section 102, if the differences between the claimed invention and the prior
> art are such that the claimed invention as a whole would have been
> obvious before the effective filing date of the claimed invention to a
> person having ordinary skill in the art to which the claimed invention
> pertains. Patentability shall not be negated by the manner in which the
> invention was made.

35 U.S.C. § 103. "Obviousness is a question of law based on underlying questions of fact."

*Scanner Techs.*, 528 F.3d at 1379. The underlying factual determinations include: "(1) the scope

and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). These factual determinations are often referred to as the "*Graham* factors."

When relying on a combination of prior art references, the challenger must demonstrate that the combination references disclose all of the limitations of the claims. *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003) (explaining that a requirement for a finding of obviousness is that "all the elements of an invention are found in a combination of prior art references"); *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1373-1374 (Fed. Cir. 2010), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) (upholding finding of non-obviousness based on substantial evidence that the asserted combination of references failed to disclose a claim limitation);

An important inquiry for determining whether a claimed invention is obvious is finding whether there is a reason to combine the elements disclosed in the prior art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007). In *KSR*, the Supreme Court rejected the Federal Circuit's rigid application of a "teaching-suggestion-motivation" test. While the Court stated that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," it described a more flexible analysis:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . . As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take

> account of the inferences and creative steps that a person of ordinary skill
> in the art would employ.

*Id.* at 418. Applying *KSR*, the Federal Circuit has held that, where a patent challenger contends that a patent is invalid for obviousness based on a combination of prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device . . . and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

### B.    MAK System

GMG contends that the asserted claims of the '720 patent are anticipated and/or obvious in view of a wireless grill system developed by MAK Grills (the "MAK System"). RIB at 46-52. According to Bob Tucker, the co-owner of MAK Grills, the MAK System was in public use in 2012 and a MAK Grills Mobile product using the MAK System was sold by May 2013. RX-0332C (Tucker Dep. Tr.) at 10:13-11:19; JX-0255C. Gregory Amero, an engineer who worked on the MAK System, confirmed that the system was in use prior to October 2015. RX-0322C (Amero Dep. Tr.) at 45:21-46:11. There is no dispute that the MAK System is prior art to the '720 patent.

Mr. Williams reviewed source code and documentation for the MAK System. RX-0315C (Williams DWS) at Q/A 30; RDX-0014. Ryan Comingdeer, an engineer who worked on the MAK System, confirmed that the source code was from December 2014. RX-0325C (Comingdeer Dep. Tr.) at 77:15-78:1. Mr. Comingdeer also identified a diagram of the architecture for the MAK System that he created in 2013. *Id.* at 19:1-32:4.



JX-0126C. In the MAK System, a grill controller (also called the "Pellet Boss") communicates with a cloud-based Web service ("MAK server") to transmit status updates and receive commands (e.g., setpoint temperature settings). RX-0315C (Williams DWS) at Q/A 32; RX-0325C (Comingdeer Dep. Tr.) at 19:1-32:4. A user operates a client device to access a webpage which loads a client-side JavaScript program ("MAK client" or "client app") that allows the user to interact with the grill via the MAK server. RX-0315C (Williams DWS) at Q/A 33; RX-0325C (Comingdeer Dep. Tr.) at 32:17-36:12.

### 1. Claim 1

Mr. Williams identifies features of the MAK System that correspond to each limitation of claim 1. RX-0315C (Williams DWS) at Q/A 54-60. Dr. Shoemake offers a rebuttal to Mr. Williams's opinions. CX-1005C (Shoemake RWS) at Q/A 31-40.

#### a. Preamble

With respect to the claim 1 preamble, Mr. Williams identifies the MAK server as the claimed cloud computing platform, which communicates and controls the operation of a MAK grill through a grill controller. RX-0315C (Williams DWS) at Q/A 54. GMG submits that MAK System discloses the limitations of the claim 1 preamble, and there is no dispute from Traeger. RIB at 46.

71

Accordingly, the undersigned finds that the preamble limitations of claim 1 are disclosed by the MAK System.

> **b.    "a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform"**

With respect to the "receiver" limitation of claim 1, Mr. Williams explains that ████████

██████████████████████████████████. RX-0315C (Williams DWS)

at Q/A 56. In his opinion, the MAK System does not meet the limitations of the "receiver"

limitation. *Id.* at Q/A 55. GMG argues that the MAK System discloses this limitation to the

same extent that it is disclosed in the Lee prior art reference and infringed by the GMG System.

RIB at 46-47. GMG submits that ████████████████████████████

██████████████████████████████████. *Id.*

Traeger argues that GMG failed to disclose this contention in its pre-hearing brief and the

argument has thus been waived pursuant to Ground Rule 8.2. CRB at 22-23. Traeger further

contends that the ████████ sent by the MAK grill controller "do not include any indication

that the grill is communicating with the server over a network, but instead relate to messages

about the functionality of the grill (*i.e.*, temperature)." *Id.* at 23.

The undersigned agrees with Traeger that GMG has waived any contention that a

message from the MAK grill controller discloses the "receiver" limitation. Ground Rule 8.2

requires that "[t]he pre-hearing brief shall set forth a party's contentions on each of the proposed

issues," and "[a]ny contentions not set forth in detail as required herein shall be deemed

abandoned or withdrawn." Order No. 2 at 18 (Dec. 29, 2020); *see Certain Footwear Products*,

Inv. No. 337-TA-936, Initial Determination at 32 (Nov. 17, 2015) (finding arguments abandoned

that were not properly raised in pre-hearing brief). GMG's prehearing brief fails to identify any

CONFIDENTIAL MATERIAL REDACTED
**PUBLIC VERSION**

input from the MAK grill that corresponds to the "receiver" limitation of claim 1—the only

contention disclosed by GMG is based on ███████████████████████████████.

RPHB at 93.[10] GMG's pre-hearing brief contends generally that "this limitation would only be

satisfied by the MAK System if it is also satisfied by Lee and GMG," *Id.*, but there is no

explanation identifying which aspects of the MAK System are similar to Lee and the GMG

System with respect to this limitation. *Id.*[11]

The undersigned finds thus that GMG's post-hearing brief arguments based on a "first

input" from the MAK grill controller have been waived. To the extent that GMG is still relying

on its pre-hearing brief theory based on a "first input" from the MAK client, the undersigned

finds that ████████████████████████ fails to meet the limitations of claim 1. As

explained by Dr. Shoemake, █████████████████████████████████████

███████—it does not indicate that any connection has been made. CX-1005C (Shoemake

RWS) at Q/A 33.

Accordingly, the undersigned finds that GMG has failed to show that the MAK System

discloses the "receiver" limitation of claim 1.

>    c.    **"a notification generator configured to generate notifications**
>          **that are to be sent to one or more software applications"**

With respect to the "notification generator" limitation of claim 1, Mr. Williams identifies

notifications sent from the MAK server to the MAK client, which include set point temperature,

probe temperatures, connection status, and power status. RX-0315C (Williams DWS) at Q/A 57.

---

[10] This contention appears in Mr. Williams's demonstrative slides. RDX-0003C.0003-.0004.

[11] Mr. Williams's testimony comparing the MAK System to Lee and the GMG System was
excluded pursuant a motion *in limine*, because he did not disclose these opinions in his expert
report. Order No. 32 at 2-3 (Sept. 7, 2021).

**PUBLIC VERSION**

GMG submits that the JavaScript code that is loaded onto a web browser on the MAK client is a "software application" in accordance with the claim language. RIB at 47-48.

Traeger argues that JavaScript code running on a web browser is not a "software application," relying on the testimony of Dr. Shoemake. CRB at 23-24; CX-1005C (Shoemake RWS) at Q/A 35. Traeger also argues that GMG has failed to show that the MAK System software is "configured to control one or more functions" of the MAK grill. *Id.*; CX-1005C (Shoemake RWS) at Q/A 34. Traeger further argues that the MAK System has not been shown to work with a "mobile device." *Id.*; CX-1005C (Shoemake RWS) at Q/A 36.

In reply, GMG argues that Traeger's narrow reading of the term "software application" is inconsistent with the specification of the '720 patent. RRB at 29 (citing '720 patent at 10:12-16 (describing "software application" that "may be run on a desktop computing system or may be run through a web browser."). GMG identifies testimony from Mr. Comingdeer, explaining that the system could be used with mobile devices. RRB at 32; *see* RX-0325C (Comingdeer Dep. Tr.) at 31:14-16 ("The user, whatever, device they bring, whether it's a mobile phone, iPad, or laptop, they go to the website."), 76:7-17 (same). At the hearing, Dr. Shoemake admitted that Mr. Comingdeer's deposition testimony explains how the MAK System communicates temperature commands from the MAK server to a MAK grill. Tr. (Shoemake) at 489-92; CX-0325C (Comingdeer Dep. Tr.) at 43-51.

In consideration of the parties' arguments, the undersigned agrees with GMG's interpretation of the term "software application" in the context of the '720 patent. Based on the testimony of Mr. Comingdeer, the undersigned finds there is sufficient evidence in the record to show that the MAK System could be used with software applications on mobile devices.

Accordingly, the undersigned finds that the MAK System discloses the "notification generator"

limitation of claim 1.

> **d.** **"a transmitter configured to send" a "generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance"**

With respect to the "transmitter" limitation of claim 1, Mr. Williams explains that the

MAK client ██████████████████████████████. RX-0315C (Williams DWS) at

Q/A 58. He explains: ████████████████████████████████████

████████████████████████████████████████████

████████████████ *Id.* GMG submits that these notifications meet the "transmitter"

limitation of claim 1, and there is no dispute from Traeger. RIB at 48-49.

Based on the evidence identified by Mr. Williams, the undersigned finds that the MAK

System discloses the "transmitter" limitation of claim 1.

> **e.** **"receiving a second input . . . indicating that one or more specified functions are to be performed"**

With respect to the "second input" limitation, Mr. Williams identifies the temperature

input that is sent from the MAK client to the MAK server, which ██████████████

████████████████████████. RX-0315C (Williams DWS) at Q/A 59. GMG

submits that this temperature setting meets the "second input" limitation of claim 1, and there is

no dispute from Traeger. RIB at 49.

Based on the evidence identified by Mr. Williams, the undersigned finds that the MAK

System discloses the "second input" limitation of claim 1.

**f.    "the transmitter sending one or more instructions"**

With respect to the "transmitter sending one or more instructions" limitation,
Mr. Williams submits that the MAK grill retrieves the posted temperature, sending the
instructions from the MAK server to the MAK grill.  RX-0315C (Williams DWS) at Q/A 60.
GMG submits that this temperature meets the "sending one or more instructions" limitation of
claim 1.  RIB at 49-50.  GMG further cites testimony from the hearing where Dr. Shoemake
reviewed the deposition testimony of engineers who worked on the MAK System, admitting that
commands are sent to the MAK grill and carried out by a hardware controller on that grill.  Tr.
(Shoemake) at 492-95; CX-0325C (Comingdeer Dep. Tr.) at 43-51; CX-0322C (Amero Dep.
Tr.) at 19-22.  Traeger argues that GMG waived its contention regarding functions being carried
out by the MAK grill, because this argument was not presented in GMG's pre-hearing brief.
CRB at 25.

In consideration of the parties' arguments, the undersigned finds that the MAK System
discloses the "sending one or more instructions" limitation of claim 1.  With respect to the issue
of waiver, the undersigned finds that GMG's pre-hearing brief adequately described ████████
████████████████████████████████████████████████████████  RPHB at 95.  The
cited testimony from the hearing is within the scope of this contention, and based on this
evidence, the undersigned finds that the MAK System discloses the limitation requiring "the
functions being interpreted and carried out by a hardware controller."

For the reasons discussed above, however, the undersigned finds that GMG has not
shown that the MAK System renders claim 1 invalid, because GMG has failed to show that the
MAK System discloses the "receiver" limitation requiring a "first input."

## 2.     Claim 2

With respect to claim 2, GMG submits that the MAK server communicates directly with the MAK grill via a WiFi access point. RIB at 50. There is no dispute with respect to the limitations of claim 2, but the undersigned finds that the MAK System does not render claim 2 invalid because the MAK System does not disclose all the limitations of claim 1, as discussed above.

## 3.     Claim 12

Mr. Williams identifies features of the MAK System that correspond to each limitation of claim 12. RX-0315C (Williams DWS) at Q/A 62-68. Dr. Shoemake offers a rebuttal to Mr. Williams's opinions. CX-1005C (Shoemake RWS) at Q/A 42-55.

### a.     Preamble

The preamble of claim 12 is identical to the preamble of claim 1, and GMG relies on the same evidence with respect to claim 12 that was identified for claim 1. RIB at 50-51; RX-0315C (Williams DWS) at Q/A 62. For the same reasons discussed above with respect to claim 1, the undersigned finds that the MAK System discloses the limitations of the preamble of claim 12.

### b.     **"a receiver at the cloud computing platform configured to receive inputs from one or more mobile devices including at least a first input indicating that the electronically-controlled appliance is in network communication with the cloud computing platform"**

With respect to the "receiver" limitation of claim 12, GMG relies on its arguments with respect to the "receiver" limitation of claim 1. RIB at 50-51; RX-0315C (Williams DWS) at Q/A 63. Claim 12 requires a "first input" that is received "from one or more mobile devices," so GMG's arguments regarding the MAK grill controller are inapplicable, even if they had not been

waived. With respect to a "first input" from the MAK client, the undersigned finds that this limitation is not disclosed for the reasons discussed above in the context of claim 1.

<div align="center">

c.     **"wherein the one or more mobile devices have previously established an initial, direct connection"**

</div>

There is no dispute that the MAK System discloses the "independent connections" of the "wherein" clause of claim 12, but GMG concedes that the MAK System does not disclose the claimed "initial, direct connection." RIB at 51. Dr. Shoemake explains that in the MAK System, the user can input Wi-Fi credentials directly into the MAK grill, which obviates the need for an initial connection to a mobile device. CX-1005C (Shoemake RWS) at Q/A 45. Mr. Williams offers his opinion that one of ordinary skill in the art would have modified the MAK System to use a provisioning process disclosed in multiple prior art references, which would establish the claimed "initial, direct connection" between the mobile device and the grill. RX-0315C (Williams DWS) at Q/A 64. Mr. Williams identifies the provisioning processes described in the Fireboard System, Amer (JX-0260 at Fig. 8 and para. 90), and the Texas Instruments CC3200 Programmer's Guide (JX-0192C at 17, 23-24). *Id.* He submits that one of ordinary skill in the art would have been motivated to implement a provisioning process to avoid the "cumbersome" process of entering WiFi credentials on the grill itself, relying on deposition testimony from one of the engineers who developed software for the Traeger System. *Id.* at Q/A 65.

Traeger argues that this limitation is not rendered obvious because the provisioning processes disclosed in the prior art were not readily compatible with the MAK System. CIB at 70-71; CRB at 25-26. Dr. Shoemake reviews each prior art provisioning process and identifies problems with the proposed combinations. CX-1005C (Shoemake RWS) at Q/A 46-50. With respect to the Fireboard System, Dr. Shoemake submits that the provisioning process relies on a

<div align="center">

78

</div>

Bluetooth connection to the grill, which is not disclosed in the MAK System. *Id*. at Q/A 46-47.

With respect to Amer, Dr. Shoemake explains that the provisioning process relies on a

"bridging" device that connects to the user's mobile device using WiFi but connects to the target

appliance using infrared (IR) communication. *Id*. at Q/A 48. He submits that Mr. Williams fails

to account for the differences between the Amer device's IR connection to an appliance and the

MAK System, which has no such IR device. *Id*. With respect to the Texas Instruments CC3200,

Dr. Shoemake submits that Mr. Williams's opinions are too vague—it is unclear whether GMG

is suggesting that the CC3200 chip be added to a MAK grill or whether there is some specific

teaching in the manual that would lead one of ordinary skill in the art to implement a

provisioning process in the MAK System. *Id*. at Q/A 50.

Based on the disclosures in the prior art and in consideration of the parties' arguments,

the undersigned finds that it would have been obvious to one of ordinary skill in the art to modify

the MAK System to implement a provisioning process as disclosed in Amer.[12] The evidence

shows that the Wi-Fi provisioning process described in Amer would have been compatible with

the Wi-Fi connection in the MAK System—Dr. Shoemake's opinion that Amer is limited to IR

communication represents a view that was rejected by the PTAB during post-grant review. *See*

PGR2019-0024 Decision at 49-50 (recognizing that Amer also discloses a control device that is

"embedded in the appliance").[13] Mr. Williams offers a reason for modifying the MAK System to

---

[12] With respect to the Fireboard System and the CC3200 chip, GMG has failed to meet its burden
to show that one of ordinary skill in the art would have modified the MAK System with
teachings from this prior art, because Mr. Williams failed to identify any reason for adding
additional hardware to the MAK System, such as a Bluetooth transceiver or a new processor.

[13] The PTAB found that it would have been obvious to combine Amer with the Lee and
Henderson prior art to invalidate claims 23-29 of the '720 patent, which include similar

use a provisioning process, recognizing that the manual input at the MAK grill is "very

cumbersome" because of the "limited user interfaces." RX-0315C (Williams DWS) at Q/A 65.

This opinion is supported by testimony from an engineer at DornerWorks, who recognized that

entering Wi-Fi credentials at a grill controller is not "an enjoyable process." *Id.* The

undersigned finds that this evidence is sufficient to show that manual input of Wi-Fi credentials

at the MAK grill and the Wi-Fi provisioning process of Amer were two design choices that were

known to those of ordinary skill in the art for connecting to a Wi-Fi network, and it would have

been obvious to modify the MAK grill with the teaching in Amer. *See Uber Techs., Inc. v. X

One, Inc.*, 957 F.3d 1334, 1341 (Fed. Cir. 2020) (finding obviousness where prior art references

disclosed "two of a finite number of known, predictable solutions at the time of the invention,"

and "a person of ordinary skill would have faced a simple design choice between the two, and

therefore would have been motivated to combine the teachings.").

    Accordingly, the undersigned finds that the limitations of the "wherein" clause are

obvious in view of the MAK System in combination with Amer.

        **d.**    **"receiving a second input . . . indicating that one or more end
user specified functions are to be performed"**

    With respect to the "second input" limitation of claim 12, Mr. Williams refers to the

temperature setting that he identified with respect to the "second input" limitation of claim 1.

RX-0315C (Williams DWS) at Q/A 66. GMG submits that this temperature setting meets the

"second input" limitation of claim 12 for the same reasons that it meets the "second input"

---

limitations requiring an "initial direct connection" between the grill and the mobile device. *Id.* at
48-50.

limitation of claim 1. RIB at 51. Traeger raises arguments similar to those addressed above in the context of the "notification generator" and "second input" limitations of claim 1. CRB at 26.

For the same reasons discussed above in the context of the "notification generator" and "second input" limitations of claim 1, the undersigned finds that the MAK System discloses the "second input" limitation of claim 12.

> **e.     "a control signal generator configured to generate control signals that are to be sent to the electronically-controlled appliance"**

With respect to the "control signal generator" limitation of claim 12, Mr. Williams identifies the GrillServiceController module in the MAK server, which responds to HTTP requests from the grill by formatting grill control parameters stored in the database into an HTTP response. RX-0315C (Williams DWS) at Q/A 67. Relying on this analysis, GMG submits that this controller module meets the "control signal generator" limitation of claim 12. RIB at 51. Traeger raises arguments similar to those addressed above in the context of the "transmitter" limitation of claim 1. CRB at 26.

For the same reasons discussed above in the context of the "transmitter" limitation of claim 1, the undersigned finds that the MAK System discloses the "control signal generator" limitation of claim 12.

> **f.     "a transmitter configured to transmit the generated control signals directly to the electronically-controlled appliance"**

With respect to the "transmitter" limitation of claim 12, Mr. Williams refers to the temperature setting that he identified with respect to the "transmitter" limitation of claim 1. RX-0315C (Williams DWS) at Q/A 68. GMG submits that this temperature setting meets the "transmitter" limitation of claim 12, and there is no dispute from Traeger. RIB at 51.

Based on the evidence identified by Mr. Williams, the undersigned finds that the MAK System discloses the "transmitter" limitation of claim 12.

For the reasons discussed above, however, the undersigned finds that GMG has not shown that the MAK System renders claim 12 invalid, because GMG has failed to show that the MAK System discloses the "receiver" limitation requiring a "first input."

### 4.    Claim 16

With respect to claim 16, GMG relies on the same evidence identified above with respect to claim 1. RIB at 52. Traeger raises the same arguments that are discussed above with respect to claim 1. CIB at 71.

#### a.    Preamble

With respect to the preamble of claim 16, GMG refers to the evidence identified by Mr. Williams with respect to the preamble of claim 1. RRB at 31. In particular, GMG points to Mr. Williams's analysis of the MAK System diagram. RX-0315C (Williams DWS) at Q/A 54. Traeger argues that this evidence is insufficient to meet the preamble limitations requiring a "mobile device" and an "internet-connected network server." CIB at 71; CX-1005C (Shoemake RWS) at Q/A 56.

Based on the evidence identified by Mr. Williams, the undersigned finds that the MAK System discloses the limitations of the preamble of claim 16. Mr. Williams's analysis with respect to the preamble of claim 1 and his general description of the MAK System are sufficient to show that these limitations are present. *See* RX-0315C (Williams DWS) at Q/A 31-33, 54.

#### b.    "receiving . . . a first input from one or more mobile devices"

With respect to the "first input" limitation of claim 16, GMG and Traeger rely on their arguments with respect to the "receiver" limitation of claim 1. RIB at 52; CIB at 71. For the

same reasons discussed above in the context of the "receiver" limitation of claim 1, the undersigned finds that the MAK System does not disclose the "receiving . . . a first input" limitation of claim 16.

### c.    "generating a notification"

With respect to the "generating a notification" limitation, GMG and Traeger rely on their arguments with respect to the "notification generator" limitation of claim 1. RIB at 52; CIB at 71. For the same reasons discussed above in the context of the "notification generator" limitation of claim 1, the undersigned finds that the MAK System discloses the "generating a notification" limitation of claim 16.

### d.    "transmitting the generated notification"

With respect to the "transmitting the generated notification" limitation, GMG and Traeger rely on their arguments with respect to the "transmitter" limitation of claim 1. RIB at 52; CIB at 71. For the same reasons discussed above in the context of the "transmitter" limitation of claim 1, the undersigned finds that the MAK System discloses the "transmitting the generated notification" limitation of claim 16.

### e.    "receiving . . . a second input from the software application"

With respect to the "second input" limitation, GMG and Traeger rely on their arguments with respect to the "second input" limitation of claim 1. RIB at 52; CIB at 71. For the same reasons discussed above in the context of the "second input" limitation of claim 1, the undersigned finds that the MAK System discloses the "second input" limitation of claim 16.

### f.    "transmitting . . . one or more instructions"

With respect to the "transmitting . . . one or more instructions" limitation, GMG and Traeger rely on their arguments with respect to the "transmitter sending one or more instructions" limitation of claim 1. RIB at 52; CIB at 71. For the same reasons discussed above

in the context of the "transmitter sending one or more instructions" limitation of claim 1, the undersigned finds that the MAK System discloses the "transmitting . . . one or more instructions" limitation of claim 16.

For the reasons discussed above, however, the undersigned finds that GMG has not shown that the MAK System renders claim 16 invalid, because GMG has failed to show that the MAK System discloses the "receiving" limitation requiring a "first input."

**5.    Claim 21**

With respect to claim 21, GMG identifies the communications between the MAK client and the MAK server through HTTP requests.  RIB at 52; RX-0315C (Williams DWS) at Q/A 75. Traeger disputes this limitation by arguing that the MAK System does not use a "mobile device." CIB at 72.

As discussed above in the context of claim 1, the undersigned finds that there is clear evidence that the MAK System could be used with mobile devices.  Accordingly, the undersigned finds that the limitations of claim 21 are disclosed by the MAK System.  Claim 21 is not rendered invalid by the MAK System, however, because claim 16 has not be shown to be invalid.

**6.    Claim 22**

With respect to claim 22, GMG submits that the MAK System is accessible over the internet, and there is no dispute from Traeger.  RIB at 52; RX-0315C (Williams DWS) at Q/A 76.

Accordingly, the undersigned finds that the limitations of claim 22 are disclosed by the MAK System.  Claim 22 is not rendered invalid by the MAK System, however, because claim 16 has not be shown to be invalid.

C.    **Fireboard**

GMG contends that the asserted claims of the '720 patent are anticipated and/or obvious in view of a cloud-connected thermometer system for monitoring cooking temperatures that was designed by Fireboard Labs (the "Fireboard system"). RIB at 40-41. According to Theodore Conrad, one of the cofounders of Fireboard Labs, the Fireboard system was in a public beta test in July 2015. RX-0326C (Conrad Dep. Tr.) at 16:22-19:1, 133:16-134:1. There is no dispute that the "beta" version of the Fireboard system is prior art to the '720 patent.

Mr. Williams explains that "[t]he Fireboard System ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ RX-0315C (Williams DWS) at Q/A 40. Mr. Williams submits that the Fireboard device "is coupled to a grill and is configured to take temperature measurements from the grill." *Id.* GMG concedes that the prior art Fireboard system did not have the capability to control the temperature of a grill but submits that one of ordinary skill in the art would have modified the Fireboard system to add temperature control. RIB at 52-53. Mr. Williams identifies prior art systems for remote control of grill temperature, including the MAK System, U.S. Patent No. 9,759,429 (JX-0261, "Tucker"), and U.S. Patent Pub. No. 2015/0025687 (JX-0259, "Henderson"). RX-0315C (Williams DWS) at Q/A 79. He further cites the testimony of Mr. Conrad, who explained that ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████. *Id.* at Q/A 80 (citing RX-0326C (Conrad Dep. Tr.) at 105-07.

Traeger argues that the evidence cited by GMG is insufficient to prove that one of ordinary skill in the art would have modified the Fireboard system to implement temperature

control. CIB at 73. Dr. Shoemake criticizes Mr. Williams's opinions for failing to explain how the Fireboard system would be modified in view of the MAK System, Tucker, or Henderson. CX-1005C (Shoemake RWS) at Q/A 107. Dr. Shoemake submits that it is unclear whether Mr. Williams is suggesting that the Fireboard system be combined with one of the prior art references or all three. *Id.* at Q/A 108. He characterizes Mr. Williams's opinions as "using hindsight bias by identifying pieces of prior art with elements related to each claim limitation and suggesting that a person of ordinary skill in the art would have been motivated to combine them in exactly the way prescribed in the Traeger patents." *Id.*

In consideration of the parties' arguments, the undersigned finds that GMG has failed to clearly show that one of ordinary skill in the art would have modified the Fireboard system to implement temperature control. The primary evidence cited by GMG is the testimony of Mr. Conrad and ███████████████████████████████████. *See* RX-0326C (Conrad Dep. Tr.) at 106:10-107:11. ████████ ██████████████████ were publicly available, however, and the version of the Fireboard system that included temperature control was not released until 2017, after the filing of the parent application for the '720 patent. *Id.* at 107:13-18. Fireboard's business plans and inoperable source code were not available to the public, and accordingly, GMG has failed to identify clear and convincing evidence that one of ordinary skill in the art would have been motivated to modify the Fireboard system to implement temperature control.

GMG's failure to carry its burden on obviousness precludes any invalidity finding with respect to the Fireboard system. Without any temperature control, the Fireboard system cannot meet the limitations of any claim of the '720 patent. In particular, the preambles of claims 1, 12, and 16 all require "controlling" an electronically-controlled grill. Accordingly, the undersigned

finds that GMG has failed to show that any claims of the '720 patent are invalid in view of the Fireboard system.

### D.     Estoppel

Traeger argues that GMG is estopped from challenging the invalidity of the '720 patent based on the MAK System and Fireboard prior art. CIB at 61-67.

#### 1.     Legal Standards

Section 325(e)(2) of the America Invents Act ("AIA") provides that "[t]he petitioner in a post-grant review of a claim in a patent under this chapter that results in a final written decision . . . may not assert either in a civil action . . . or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that post-grant review." 35 U.S.C. § 325(e)(2). *See Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 715 (Fed. Cir. 2021) (precluding invalidity defenses, finding that the defendant "could have reasonably raised in the post-grant review the prior-art combination it raised here."). In cases interpreting similar language in the AIA regarding *inter partes* review, courts have held that the phrase "reasonably could have raised" refers to prior art "that a petitioner actually knew about or that a skilled searcher conducting a diligent search reasonably could have been expected to discover." *Palomar Techs., Inc. v. MRSI Sys.*, LLC, 373 F. Supp. 3d 322, 331 (D. Mass. 2019).

In *GREE, Inc. v. Supercell Oy*, a district court applied a "broad" estoppel with respect to prior art that was not raised in a post-grant review, recognizing that "a petitioner can bring a broad number of grounds in its PGR petition in its attempt to invalidate another's patent." 2020 WL 4999689 at *5, Civ. No. 2:19-CV-00071-JRG-RSP (E.D. Tex. July 9, 2020), *report and recommendation adopted*, 2020 WL 4937111 (E.D. Tex. Aug. 24, 2020). The court

estopped the defendant from asserting two prior art references that it knew about before filing for post-grant review, holding that "[e]ven though it chose not to include these references in its petition, it reasonably could have raised them." *Id.* at *4. The court also precluded the defendant from raising invalidity defenses with respect to prior art references that were not discovered until later. *Id.* at *4-*6. The court reasoned that "when a reference is found in a later prior art search, there is a reasonable inference that it could have been found earlier by a skilled searcher." *Id.* at *5 (citing *Wi-LAN Inc. v. LG Elecs., Inc.*, 421 F. Supp. 3d 911, 925-26 (S.D. Cal. 2019). The defendant admitted that "it did not conduct a prior art search before filing its petition for PGR." *Id.*[14]

### 2. MAK System

David Baker, the co-founder of GMG, admitted that he was aware of the MAK System as early as 2013. RX-0316C (Baker DWS) at Q/A 15; CX-0844C (Baker Dep. Tr.) at 17:1-18:7. When GMG prepared to file for post-grant review of the '720 patent in 2018, a prior art search commissioned by GMG identified the MAK System as a potential prior art reference. RX-0336 (Baker RWS) at Q/A 3-5; RX-0337. Jason Baker, GMG's vice president of marketing, contacted MAK Grills to seek further information about the operation of the MAK System but the request was refused. *Id.* at Q/A 6-7; CX-0843C (J. Baker Dep. Tr.) at 89:6-22. GMG did not identify the MAK System in any of its post-grant review petitions. *See* PGR2019-00024 Decision at 10; PGR2019-0036 Decision at 9.

---

[14] A more extensive discussion of the case law relevant to estoppel for post-grant reviews is set forth in Order No. 9 (Mar. 18, 2021).

**PUBLIC VERSION**

Traeger argues that the record shows that GMG could have identified the MAK System in one of its post-grant review petitions and accordingly, GMG is estopped from now asserting invalidity based on the MAK System.  CIB at 61-67.

GMG argues that it could not have identified the MAK System in its post-grant review petitions because the details of the operation of the MAK System are not discernible by inspection of a grill or through public documentation—in particular whether the MAK System uses a "cloud computing platform" or "cloud service," and whether certain signals are sent.  RIB at 41-42.  GMG cites regulations regarding post-grant proceedings requiring that a petition specify "where each element of the claim is found in the prior art." 37 C.F.R. § 42.204(b)(4).  In addition, the PTAB will not institute a post-grant review proceeding unless it is "more likely than not" that at least one of the claims is unpatentable.  35 U.S.C. § 324(a).  GMG relies on the precedent in *Shaw Indus. Group, Inc. v. Automated Creel Sys., Inc.*, where the Federal Circuit held that no estoppel would apply to references that were cited in an *inter partes* review petition but where the PTAB only instituted review on other references.  817 F.3d 1293, 1300 (Fed. Cir. 2016).[15]  GMG argues that it could not have identified the MAK System in its petition for post-grant review because it did not have evidence that each element of a claim was present, and accordingly, no estoppel should apply.  RIB at 42-44.

Traeger argues that estoppel is appropriate because petitioners for post-grant review are required to conduct a reasonably diligent search for prior art before filing.  CIB at 64-65 (citing 35 U.S.C. § 325(e)(2); *Olaplex v. L'Oréal USA, Inc.*, 855 F. App'x at 715); *GREE, Inc. v.*

---

[15] *Shaw* has been abrogated by the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, which ended the PTAB's practice of instituting review on less than all of the grounds raised in a petition for *inter partes* review (or post-grant review).  138 S. Ct. 1348 (2018).

*Supercell Oy*, 2020 WL 4999689, at *4).  Traeger submits that GMG knew about the MAK

System for years before filing for post-grant review and did not even obtain a sample of a MAK

Grills product.  CIB at 65.  Traeger further submits that "packet sniffing" technology and other

investigative techniques could have been used to observe communications between the

components of the MAK System, pointing to similar analysis conducted by Dr. Shoemake.  *See*

CX-1005C (Shoemake RWS) at Q/A 26-28.  Traeger submits that the PTAB has subpoena

power that would have allowed GMG to obtain confidential information regarding the MAK

System, if necessary.  CIB at 66.  Traeger argues that GMG misinterprets the precedent in *Shaw*

*Indus. Group, Inc. v. Automated Creel Sys., Inc.*, because in that case the references at issue were

presented in a petition but were not part of the PTAB's institution.  817 F.3d at 1300.  Traeger

contends that if GMG had identified the MAK System as part of its petition, even without

explicit evidence that each limitation was present, the PTAB would still have been required to

institute the petition under the Supreme Court's precedent in *SAS Institute, Inc. v. Iancu*, 138 S.

Ct. 1348 (2018).  CIB at 67.

Based on the evidence and arguments of the parties, the undersigned finds that GMG is

estopped from asserting invalidity in this proceeding based on the MAK System pursuant to 35

U.S.C. § 325(e)(2).  There is no dispute that the MAK System was known to GMG as a

competitor product using Wi-Fi to control a grill, and the MAK System was also identified in the

prior art search that GMG commissioned before filing the post-grant review petition.  *See* RX-

0316C (Baker DWS) at Q/A 15; CX-0844C (Baker Dep. Tr.) at 17:1-18:7; RX-0336 (Baker

RWS) at Q/A 3-5; RX-0337.  Despite this knowledge of the MAK System, GMG chose not to

include the MAK System in its post-grant review petitions.  GMG contends that it needed more

information to include the MAK System in its petition, but the record shows that GMG was not

diligent in pursuing that information—GMG did not even purchase and inspect a MAK Grill product. Moreover, the evidence does not support GMG's contention that confidential information from MAK Grills would have been necessary to file a petition. Several of the references identified in GMG's post-grant review petitions disclose less than all of the limitations of the asserted claims. *See* PGR2019-00024 Decision at 20-23 (describing Henderson, Amer, Tucker, and Logue references); PGR2019-0036 Decision at 20-24 (describing Henderson, Porter, Ebrom, GMG Publication, Amer, and Logue references). Based on this record, the undersigned finds that GMG could have identified the MAK System in one of its post-grant review petitions. Because it chose not to include the MAK System in the post-grant reviews that resulted in final written decisions, GMG is now precluded from asserting invalidity based on the MAK System.

### 3.    Fireboard

Jason Baker testified that he was aware of the Fireboard product at least by 2017. CX-0843C (J. Baker Dep. Tr.) at 58:22-59:16. There is no evidence that GMG pursued any information regarding the Fireboard product before filing for post-grant review, and this product was not identified in the prior art search that GMG commissioned. RX-0337. GMG did not identify the Fireboard product in any of its post-grant review petitions. *See* PGR2019-00024 Decision at 10; PGR2019-0036 Decision at 9.

For the same reasons discussed above with respect to the MAK System, the undersigned finds that GMG is precluded from asserting invalidity based on the Fireboard product in this proceeding.[16] There is no evidence that GMG made any attempt to collect information about the

---

[16] GMG's arguments with respect to the Fireboard product are the same as its arguments with respect to the MAK System. *See* RIB at 41-46; RRB at 26-28.

Fireboard product for a post-grant review petition, and this course of conduct cannot satisfy the requirements for a "diligent" search. GMG knew of the existence of the Fireboard product, and the publicly available information would have been sufficient to identify it in a petition for post-grant review.[17]

For the reasons discussed above, the undersigned finds that GMG is precluded from asserting invalidity of any claims of the '720 patent in view of the MAK System or the Fireboard product.

## VII. INEQUITABLE CONDUCT

GMG contends that the claims of the '720 patent are unenforceable for inequitable conduct based on the alleged failure to name the correct inventors. RIB at 56-97. In particular, GMG alleges that Michael Colston is not the sole inventor of the '720 patent and that Traeger intentionally deceived the Patent Office by omitting at least David Johnson of DornerWorks and Wes Gilpin of Oven Bits as co-inventors. *Id.*

### A. Factual Background

Michael Colston was the director of product line management at Traeger in 2014, when he led the development of Traeger's "WiFIRE-enabled" cloud-connected wood pellet grills. CX-0842 (Colston DWS) at Q/A 5-6. In his witness statement, Mr. Colston explains that he conceived of the ideas claimed in the '720 patent between August and December 2014. *Id.* at Q/A 12-14. In September 2014, Mr. Colston hired an engineering firm, Tekna, to help with the industrial design and mechanical engineering of Traeger's grills. *Id.* at Q/A 17. In November

---

[17] GMG's argument that it needed evidence that a prior art system met each limitation of the claims raising it in post-grant review is inconsistent with its invalidity contentions in the present investigation, where GMG has admitted that the Fireboard product alone fails to meet the preamble limitations of any claim. *See* RIB at 52-53.

2014, he hired DornerWorks to help with electrical engineering and software development. *Id.*
In June 2015, he hired Oven Bits to help with software development for Traeger's mobile app.
*Id.*

DornerWorks recommended the use of the Texas Instruments CC3200 microprocessor
for Traeger's grills. CX-1010C (Johnson RWS) at Q/A 26-27; Tr. (Colston) at 53:7-12. David
Johnson, a DornerWorks engineer, recommended the use of ███████████████████████████,
and he wrote the firmware source code for communications between the grill and the server.
CX-0842 (Colston DWS) at Q/A 23; Tr. (Johnson) at 399:9-21. In developing the █████
████ for the Traeger grills, Mr. Johnson worked closely with Wes Gilpin, a software
developer at Oven Bits, who was leading the development of Traeger's mobile app. *Id.*; CX-
1010C (Johnson RWS) at Q/A 80; Tr. (Johnson) at 399:2-400:2.

Mr. Colston submits that the work of Tekna, DornerWorks, and Oven Bits on Traeger's
WiFIRE-enabled grill were based on his ideas. CX-1006C (Colston RWS) at Q/A 6-8. He
describes a whiteboard session in December 2014 involving Tekna and DornerWorks, where
they discussed options for the architecture of the Traeger system. *Id.* at Q/A 14-16. Following
that session, Tekna created a diagram showing the basic architecture of the system, describing
control functions at the grill and connections between a grill controller, mobile device, and cloud
server. *Id.* at Q/A 18-19.



JX-0071C.003 (presentation dated December 11, 2014). He also describes slide decks that he

prepared for Traeger management in 2015 regarding the design for the WiFIRE-enabled grill.

CX-1006C (Colston RWS) at Q/A 20-36; CX-0490C. With respect to Oven Bits, Mr. Colston

describes a "Statement of Work" document (the "Oven Bits SOW") sent in March 2015 defining

the project that Oven Bits was hired to perform for Traeger. *Id*. at Q/A 38-45; CX-0463C. He

explains that the Oven Bits SOW was prepared by Oven Bits to describe the design ideas that he

had told them to implement. *Id*. at Q/A 46. The SOW describes specific features for the Traeger

App, including ███████████████████████████



CX-0463C.0003.

      Mr. Johnson and Mr. Gilpin implemented the source code for establishing connections

between the Traeger WiFIRE-enabled grill, Traeger App, and Traeger Server. CX-1010C

(Johnson RWS) at Q/A 83. In a May 2015 email, Mr. Johnson identifies ███████████

████████████████████████████████████████████████

███████. JX-0207C. In a June 2015 email to Mr. Gilpin, Mr. Johnson describes his

"thoughts" regarding specific steps for ████████████████████████

██████. JX-0061C. Mr. Gilpin sent a follow-up email in July 2015 discussing issues regarding

████████████████████████████████████. JX-0131C.

A working prototype of Traeger's first WiFIRE-enabled grill was completed by August

2015. CX-0842 (Colston DWS) at Q/A 24. The first provisional patent applications related to

'720 patent were filed on October 23, 2015. *See* U.S. Provisional Application Nos. 62/245,549,

62/245,535, and 62/245,530.

### B.     Legal Standards

A patent can be held to be unenforceable for inequitable conduct when the named

inventors deliberately conceal the involvement of an unnamed co-inventor in their application for

a patent. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363, 1376-77

(Fed. Cir. 2002). Inequitable conduct must be proven by clear and convincing evidence, which

requires that "the specific intent to deceive must be 'the single most reasonable inference able to

be drawn from the evidence'" *Therasense Inc. v. Becton Dickinson and Co.*, 649 F.3d 1276,

1290 (Fed. Cir. 2011) (*quoting Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357,

1366 (Fed. Cir. 2008).

Inventorship is a question of law rooted in conception. *Ethicon, Inc. v. United States*

*Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 923 (1998).

"Conception is the touchstone of inventorship." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40

F.3d 1223, 1227 (Fed. Cir. 1994), *cert. denied*, 516 U.S. 1070 (1996). It is the "formation in the

mind of the inventor, of a definite and permanent idea of the complete and operative invention as

it is hereafter to be applied in practice." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d

1367, 1376 (Fed. Cir. 1986). "An idea is sufficiently 'definite and permanent' when 'only

ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.'" *Ethicon*, 135 F.3d at 1460.

A joint invention is "the product of collaboration," and requires that "each of the inventors work on the same subject matter and make some contribution to the inventive thought and to the final result.'" *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1302 (Fed. Cir. 2010) (quoting *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 824 (D.D.C. 1967)) (internal quotation marks omitted). "It is not necessary that the entire invention concept should occur to each of the joint inventors . . . ." *Vanderbilt*, 601 F.3d at 1302 (quoting *Monsanto*, 269 F. Supp. at 824). However, "'[o]ne who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor.'" *Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1356 (Fed. Cir. 2009) (quoting *Ethicon*, 135 F.3d at 1460); *see also Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("[A] person will not be a coinventor if he or she does no more than explain to the real inventors concepts that are well known and the current state of the art."); *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 977, 981 (Fed. Cir. 1997) (denying the inventorship claim of an individual who was "doing nothing more than explaining to the inventors what the then state of the art was and supplying a product for them to use in their invention."). One who designs a product for the named inventor is not necessarily a co-inventor where the "hardware design was dictated explicitly by . . . specifications" provided by the inventor, and where the "design of circuits to carry out [the inventor's] idea was simply the exercise of the normal skill expected of an ordinary chip designer, which did not involve any inventive acts." *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994); *see also Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) ("An inventor 'may

use the services, ideas and aid of others in the process of perfecting his invention without losing

his right to a patent.'" (*quoting Hobbs v. U.S. Atomic Energy Comm'n.*, 451 F.2d 849, 864, 171

USPQ 713, 724 (5th Cir.1971))).

In general, "'[t]he inventors as named in an issued patent are presumed to be correct.'"

*Nartron*, 558 F.3d at 1356 (quoting *Hess*, 106 F.3d at 980). Proof of joint inventorship requires

clear and convincing evidence. *Vanderbilt*, 601 F.3d at 1305.

### C.    **Improper Inventorship**

GMG alleges that Mr. Johnson and Mr. Gilpin were co-inventors of the '720 patent

because they conceived and implemented numerous features of the Traeger WiFIRE-enabled

grills that correspond to limitations in the patent claims. RIB at 71-84.[18] GMG identifies three

features of the Traeger grills that were allegedly conceived by Mr. Johnson and Mr. Gilpin: "(1)

the provisioning, authentication and account creation process involving the mobile device and

the grill; (2) the software application and protocol using ███████ to relay communications

between the grill and the cloud server; and (3) the various indicators and notifications of network

communication and communicable connection between the grill, cloud server and mobile

device." *Id*. at 71. These three features are addressed below in the context of the corresponding

claim limitations in the '720 patent:

---

[18] GMG's briefing begins with arguments addressing the technical capabilities of Traeger and
Mr. Colston with respect to the development of the Traeger WiFIRE-enabled grills, arguing that
the evidence does not support Mr. Colston's sole inventorship. RIB at 60-71. The undersigned
finds that GMG's framing of the argument improperly places the burden on Traeger to prove
sole inventorship, when the law requires a presumption that the named inventors are correct. *See
Hess*, 106 F.3d at 980 (recognizing that "[t]he inventors as named in an issued patent are
presumed to be correct," and finding that "it would be inappropriate to permit a lower standard
than clear and convincing evidence."). Accordingly, GMG's arguments will be considered
within the framework of its allegations that Mr. Johnson and Mr. Gilpin were co-inventors,
placing the burden on the party challenging the inventors named on the patent.

### 1.    Previously establishing an "initial, direct connection"

Claim 12 of the '720 patent provides that the "one or more mobile devices have

previously established an initial, direct connection with the electronically-controlled appliance."

GMG contends that Mr. Johnson conceived of this feature of the claimed invention when he

investigated options for how to establish a connection between the Traeger Grill and the Traeger

Server, and he worked with Mr. Gilpin to implement the provisioning process that was used in

the Traeger System. RIB at 73-77.

GMG's arguments primarily rely on two emails authored by Mr. Johnson: a May 15,

2015 email entitled "Wifi Provisioning and Grill Registering" (JX-0207C), and a June 29, 2015

email entitled "RE: FTP and Uniflash" (JX-0061C). *See* RX-0315C (Williams DWS) at Q/A

122-26. In the May 2015 email, Mr. Johnson describes three "possible options" for provisioning

the grill. JX-0207C. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ In the June 2015 email, Mr. Johnson describes

more details of the provisioning process, consistent with the second option described in the May

2015 email. JX-0061C; *see* RX-0315C (Williams DWS) at Q/A 125 (explaining contents of

June 2015 email). The June 2015 email is addressed to Mr. Gilpin, and it describes ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████. *Id.*; *see* RX-0315C (Williams DWS) at Q/A 126 (explaining steps described in

June 2015 email).

GMG argues that this evidence shows that Mr. Johnson (and not Mr. Colston) conceived

of the idea for establishing an "initial, direct connection" between the mobile device and the grill

before establishing independent connections to the cloud computing platform. RIB at 76-77.

According to Mr. Williams, there were many other ways to implement a provisioning process

and the design was not inherent in the microprocessor used for by Traeger. RX-0315C

(Williams DWS) at Q/A 130, 131. Mr. Williams offers his opinion that Mr. Johnson's

implementation required the application of "the creativity of the human mind to identify,

evaluate, and select the options and functions for provisioning and authenticating the grill." *Id.*

at Q/A 132. GMG thus argues that Mr. Johnson must be a co-inventor of claim 12, because he

conceived the "initial, direct connection" limitation. RIB at 76-77.

In rebuttal, Traeger submits that the idea for an "initial, direct connection" was

Mr. Colston's, citing witness testimony and documents that pre-date Mr. Johnson's emails. CIB

at 81-84. In the Oven Bits SOW draft dated March 27, 2015, an "On-boarding" procedure is

described: "Upon initial use, the app will facilitate a data connection between the grill and the

mobile phone. This process will include a 'handshake' operation to connect the grill to its

permanent internet connection: the user's WiFi connection." CX-0463C at 3. In Mr. Colston's

witness statement, he explains that he had the idea to provide WiFi credentials through the user's

mobile phone rather than implementing a keyboard on the grill. CX-1006C (Colston RWS) at

Q/A 12. In Mr. Johnson's witness statement, he explains that the idea for an "initial, direct

connection" between the mobile device and the grill was part of the project before he joined the

team. CX-1010C (Johnson RWS) at Q/A 44-47; *see* Tr. (Johnson) at 386:5-11 ("The -- the idea that the mobile phone would be used to interact with the grill to get it connected to -- to WiFi was part of the project since the beginning."). With respect to the three alternatives described in his May 2015 email, Mr. Johnson explains that "all the alternatives that were considered required a direct connection to the grill." CX-1010C (Johnson RWS) at Q/A 55; *see* Tr. (Johnson) at 349:6-441:4 (describing content of May 2015 email). Mr. Johnson explains his role in the project as being hired "to implement [Mr. Colston's] ideas in hardware and software." *Id.*

Based on the evidence of record, the undersigned finds that GMG has failed to show that Mr. Johnson or Mr. Gilpin were co-inventors of the "initial, direct connection" limitation of claim 12. There is no dispute that Mr. Johnson and Mr. Gilpin implemented the source code for the first Traeger WiFIRE-enabled grill and the Traeger App, including the steps that were used to establish an initial connection between the mobile device and the grill, and to use that connection to connect to the user's home WiFi network. But the evidence unequivocally shows that the idea for an "initial, direct connection" between the mobile device and the grill was part of the Traeger project before Mr. Johnson and Mr. Gilpin were involved.[19] Mr. Colston and Mr. Johnson offer consistent testimony on this issue. *See* CX-1006C (Colston RWS) at Q/A 12; CX-1010C (Johnson RWS) at Q/A 44-47; *see* Tr. (Johnson) at 386:5-11. The Oven Bits SOW described this feature of the project in March 2015, before either of the emails that originated from Mr. Johnson. The undersigned thus finds that GMG has failed to clearly or convincingly show that Mr. Johnson or Mr. Gilpin were co-inventors of the "initial, direct connection" limitation of

---

[19] As discussed *supra* in the context of invalidity, the "initial, direct connection" of claim 12 is not a novel feature of the claimed invention—provisioning processes were known in the prior art and were disclosed in at least the Amer reference. *See supra*, section VI.B.3.c.

claim 12.[20]

## 2.    Relaying communications

GMG contends that Mr. Johnson and Mr. Gilpin were co-inventors of claim 3 of the '720

patent, which recites a limitation requiring a "software application" that is "configured to relay

communications between the cloud computing platform and the electronically-controlled

appliance." RIB at 81-83. GMG identifies the ▮▮▮▮▮▮ of the Traeger System as the

feature that corresponds to the claim 3 limitation and submits that Mr. Johnson was responsible

for the decision to ▮▮▮▮▮▮▮▮▮. *See* Tr. (Johnson) at 399:9-21 (Mr. Johnson

explaining that he recommended the ▮▮▮▮▮ and was responsible for the decision to ▮

▮▮▮▮▮). GMG identifies a presentation that was prepared by DornerWorks in

February 2015 to pitch their services to Traeger with a slide identifying ▮▮▮▮▮ JX-

0203C.0005; *see* RX-0329C (Isenhoff Dep. Tr.) at 108:8-16, 113:6-15 (explaining background

of DornerWorks presentation). GMG submits that Mr. Johnson conceived of the idea for using

▮▮▮▮▮, made the decision to use it and, along with Mr. Gilpin, wrote the

source code to implement ▮▮▮▮▮ in the Traeger System. RIB at 81-83.

GMG thus contends that at least Mr. Johnson should be named as a co-inventor for claim 3. *Id.*

Traeger submits that the idea to relay communications "represents the core of

---

[20] GMG further argues that Mr. Johnson and Mr. Gilpin conceived of certain related limitations
of claims in the '833 patent. RIB at 77-81. The undersigned finds that these arguments do not
affect the inventorship of any claim in the '720 patent, however. The "attempting to
communicate" and "permitted to communicate" limitations of the '833 patent are not recited in
any claims of the '720 patent. Even if Mr. Johnson and Mr. Gilpin were proper co-inventors for
these '833 patent limitations, it would not affect inventorship for any claim of the '720 patent.
Moreover, any inventorship issue with respect to these limitations of the '833 patent would not
affect the enforceability of the '720 patent, because there is no "immediate and necessary"
relation between these '833 patent limitations and any claim of the '720 patent. *See Consol.
Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808-12 (Fed. Cir. 1990).

Mr. Colston's invention." CIB at 85; *see* CX-1006C (Colston RWS) at Q/A 12 ("This was the very core of my idea, that the cloud would include software to relay communications between the grill and the phone."). Traeger identifies a December 2014 presentation depicting communications between a mobile device, cloud server, and grill. JX-0071C; *see* CX-1006C (Colston RWS) at Q/A 18 (Mr. Colston explains that the diagrams in this presentation "show my idea of relaying two-way communications between the cloud and the grill."). Mr. Johnson testified that he understood from a feature list received from Traeger (JX-0055C) that relaying communications between the cloud platform and the grill was part of the project before he began his work. Tr. (Johnson) at 413:19-414:24 (identifying the "wireless control" feature as requiring the cloud computing platform to relay communications). Traeger submits that this testimony is corroborated by Shawn Isenhoff, a DornerWorks manager who explained that "[Mr. Colston] identified how this grill needed to operate as far as collection of data, what gets pushed to the phone, what gets pushed to the grill. So the bigger picture vision of what this product needs to be." RX-0329C (Isenhoff Dep. Tr.) at 256:8-257:12. Traeger argues that the "relay communications" limitation of claim 3 is broader than ████████ implemented by Mr. Johnson. CRB at 35-36.

Based on the evidence of record, the undersigned finds that GMG has failed to show that Mr. Johnson or Mr. Gilpin were co-inventors of the "relay communications" limitation of claim 3. There is no dispute that Mr. Johnson identified ████████ and together with Mr. Gilpin implemented the source code for relaying communications from the Traeger App between the Traeger Server and Traeger's WiFIRE-enabled grills. But the "relay communications" limitation of claim 3 is not limited to ████████. The specification of the '720 patent only describes a relayed communication in general terms, identifying an "indirect

communication 117" that is relayed "between the cloud computing platform 101 and the electronically-controlled appliance 120." '720 patent at 13:15-18. This feature of relaying communications between the cloud and the grill is depicted in the December 2014 presentation identified by Mr. Colston—in the "Ayla implementation" there is no direct connection between the mobile device and the grill, requiring that any communications be relayed through the cloud. *See* JX-0071C.002. This presentation shows that the idea of relaying communications was part of the Traeger design before Mr. Johnson became involved, and this is consistent with Mr. Johnson's own testimony. *See* CX-1010C (Johnson RWS) at Q/A 69-73; Tr. (Johnson) at 413:19-414:24. GMG has identified no clear evidence in the record showing that Mr. Johnson conceived of the idea of relaying communications from the cloud computing platform to the grill. Accordingly, the undersigned finds that Mr. Johnson or Mr. Gilpin are not co-inventors of "relay communications" limitation of claim 3.

### 3.    Indicators/Notifications of communication status

GMG contends that Mr. Johnson and Mr. Gilpin were co-inventors of the "in network communication" and "communicably connected" limitations of claims 1, 12, and 16 of the '720 patent. RIB at 83-84. GMG relies on the same evidence discussed above, showing that Mr. Johnson was responsible for identifying and choosing to use ▮▮▮▮▮▮▮▮ and that he and Mr. Gilpin wrote the source code to implement ▮▮▮▮▮▮▮▮▮ in the Traeger System. *Id.* GMG further contends that the indications in the display of the Traeger Grill and the Traeger App were developed by others at DornerWorks and Oven Bits. *Id.* (citing Tr. (Johnson) at 405-07; RX-0328C (Gilpin Dep. Tr.) at 45-47, 213-14). GMG cites the testimony of Mr. Gilpin stating that he only received high-level specifications from DornerWorks. RX-0328C (Gilpin Dep. Tr.) at 33-35, 287-93. GMG cites the testimony of Mr. Johnson admitting

that there was no specific instruction from Mr. Colston to implement an input indicating that the grill was in connection. Tr. (Johnson) at 405:16-20. GMG argues that Mr. Colston was only involved at a high level and had little if any involvement in the development of the mobile App and the communication protocol. RIB at 84.

Traeger cites the testimony of Mr. Johnson and Mr. Gilpin that the claimed indications and notifications were part of the project specification before they joined. CIB at 89 (citing CX-1010C (Johnson RWS) at Q/A 78-79; Tr. (Johnson) at 404-05; RX-0328C (Gilpin Dep. Tr.) at 279-85. Mr. Colston testifies that he conceived of the idea for these indications and notifications by December 2014. CX-1006C (Colston RWS) at Q/A 12. Traeger argues that GMG's contentions with respect to these limitations are "both incoherent and inaccurate," relying on unconnected testimony regarding different DornerWorks and Oven Bits employees. CRB at 36-38.

Based on the evidence of record, the undersigned finds that GMG has failed to show that Mr. Johnson or Mr. Gilpin were co-inventors of the "in network communication" or "communicably connected" limitations of claims 1, 12, and 16 of the '720 patent. As discussed above, there is no dispute that Mr. Johnson and Mr. Gilpin implemented the source code for the communications and indications in the Traeger System, but they both disclaim inventorship of these features. *See* CX-1010C (Johnson RWS) at Q/A 78-79; RX-0328C (Gilpin Dep. Tr.) at 279-85. The undersigned agrees with GMG that there is no reliable documentary evidence showing when Mr. Colston allegedly conceived of these features of the Traeger System, but there is a legal presumption that Mr. Colston is the correct inventor. *See Hess,* 106 F.3d at 980. At the hearing, Mr. Johnson explained that these features may not have been documented because these notifications are "standard IoT [Internet of Things] practice." Tr. (Johnson) at

405:3-15.[21] It is GMG's burden to prove improper inventorship, and GMG has failed to identify any clear evidence in the record showing that Mr. Johnson or Mr. Gilpin conceived the "in network communication" or "communicably connected" limitations.[22] Accordingly, the undersigned finds that GMG has failed to clearly or convincingly show that Mr. Johnson or Mr. Gilpin were co-inventors of the "in network communication" or "communicably connected" limitations of the '720 patent.[23]

### D. Deceptive Intent

GMG alleges that Traeger and Mr. Colston intended to deceive the Patent Office by omitting Mr. Johnson and Mr. Gilpin as named inventors. RIB at 84-97. GMG cites evidence that Traeger was involved in a dispute with Tekna over the inventorship of other patents related to the development of the Traeger WiFIRE-connected grills, which resulted in certain additional inventors being added to Traeger patents after the Tekna employees were hired by Traeger. *Id.* at 84-85, 86-92. GMG relies on the testimony of Mike Nellenbach, a Tekna employee, who contends that Traeger did not have the resources to develop the technology for the Traeger

---

[21] As discussed above in the context of invalidity, the "communicably connected" notification is not a novel feature of the claimed invention—notifications indicating that a device is connected were known in the prior art and were used in at least the MAK Grills system. *See supra*, section VI.B.1.d.

[22] As discussed above in the context of the domestic industry requirement, the Traeger System does not practice the "first input" limitation of claim 16. *See supra*, section V.C.3.b. Accordingly, it is not clear that Mr. Johnson and Mr. Gilpin developed any source code embodying these limitations.

[23] GMG argues that the alleged inequitable conduct also applies to the "communicably connected" limitations of the '833 patent, but the parties have not identified any difference between the scope of these limitations between the '720 patent and the '833 patent. *See* RIB at 83-84. Accordingly, the undersigned finds that GMG's inventorship arguments with respect to these limitations in the '833 patent would fail for the same reasons discussed herein with respect to the '720 patent.

WiFIRE-connected grills. *See* RX-0331C (Nellenbach Dep. Tr.) at 54-55. GMG submits that Traeger did not share its patent applications with Tekna, DornerWorks, or Oven Bits, despite their joint work on developing the Traeger WiFIRE-connected grills. RIB at 85-86. GMG argues that Traeger had an incentive to conceal the contributions of non-Traeger employees because it was seeking financial investments and sought to emphasize Traeger's innovation. *Id.* at 92-95. GMG argues that the testimony offered by Mr. Johnson is not credible because DornerWorks has a financial incentive to maintain a good working relationship with Traeger. *Id.* at 95-97.

Traeger argues that GMG cannot prove deceptive intent when Mr. Johnson and Mr. Gilpin do not claim to be co-inventors—Traeger argues that Mr. Colston's belief that he is the sole inventor is reasonable in these circumstances. CIB at 93-95. Traeger contends that the inventorship dispute with Tekna is unrelated to '720 patent, involving different patent families and different technology. CRB at 41-42. Traeger argues that GMG has mischaracterized the facts surrounding the dispute with Tekna, relying on the unfounded speculation of Tekna employees. *Id.* at 42-45. Traeger submits that the testimony of Mr. Colston and Mr. Johnson is reliable and consistent with the testimony of other witnesses—none of these witnesses identified Mr. Johnson or Mr. Gilpin as co-inventors. *Id.* at 45-47. Traeger argues that Mr. Nellenbach— the only fact witness who has challenged Mr. Colston's sole inventorship of the '720 patent—is biased against Traeger, because Traeger hired two employees away from Tekna. *Id.* at 47-48.

Based on the evidence of record, the undersigned finds that GMG has failed to prove deceptive intent. As discussed above, there is no clear evidence that Mr. Johnson or Mr. Gilpin were co-inventors of any claim of the '720 patent. Without such evidence, the undersigned cannot find that Mr. Colston or anyone at Traeger knew about the alleged contributions of

Mr. Johnson or Mr. Gilpin and intentionally withheld their identities from the Patent Office.
Although the Federal Circuit has recognized that "direct evidence of deceptive intent is rare" in
cases of inequitable conduct, intent to deceive may be found only if it is "the single most
reasonable inference able to be drawn from the evidence." *Therasense*, 694 F.3d at 1290-91.
GMG cites circumstantial evidence indicating that Traeger had an incentive to identify
Mr. Colston as the sole inventor for the '720 patent, but the undersigned cannot find that
deceptive intent is the single most reasonable inference on this record. GMG's circumstantial
evidence cannot overcome the consistent testimony of Mr. Johnson and Mr. Gilpin disclaiming
inventorship. GMG challenges the credibility of numerous witnesses, but there is no evidence
that Mr. Gilpin or any Oven Bits employee had any financial incentive to disclaim inventorship,
and their testimony is consistent with that of Mr. Colston and Mr. Johnson. *See* RX-0328C
(Gilpin Dep. Tr.) at 293-95. GMG has not cited any precedent where a challenge to inventorship
has been successful in the absence of affirmative testimony from the alleged co-inventors.
Accordingly, the undersigned cannot find inequitable conduct on this record.

## VIII.   REMEDY AND BONDING

### A.    Limited Exclusion Order

Traeger seeks a limited exclusion order for the Accused Products. CIB at 97. Section
337(d) provides in pertinent part that if the Commission determines that there is a violation, "it
shall direct that the articles concerned . . . be excluded from entry into the United States." 19
U.S.C. § 337(d)(1). The Commission has broad discretion to select the form, scope and extent of
the remedy imposed for violation of section 337. *E.g., Hyundai Elecs. Indus. Co. v Int'l Trade
Comm'n*, 899 F.2d 1204, 1208-09 (Fed. Cir. 1990). In accordance with section 337(d), the

undersigned recommends that a limited exclusion order issue if the Commission finds a violation of section 337.

### B.    Cease and Desist Order

Traeger seeks a cease and desist order, relying on Dr. Vander Veen's identification of commercial significant inventory. *See* CX-0840C (Vander Veen DWS) at Q/A 85. Section 337(f)(1) provides that the Commission may issue cease and desist orders to respondents found to be in violation. *See* 19 U.S.C. § 1337(f)(1). The "well-established purpose of cease and desist orders is to ensure complete relief to complainants when infringing goods are held in inventory in the United States and, therefore, beyond the reach of an exclusion order." *Certain Condensers, Parts Thereof and Prods. Containing Same, Including Air Conditioners for Automobiles Condensers,* Inv. No. 337-TA-334 (Remand), Comm'n Op. at 27 (Sept. 10, 1997). Under Commission precedent, such orders are traditionally issued to respondents that maintain commercially significant U.S. inventories of infringing products or have significant domestic operations that could undercut the remedy provided by an exclusion order. *See, e.g., Certain Stainless Steel Products, Certain Processes for Manufacturing or Relating to Same, and Certain Products Containing Same,* Inv. No. 337-TA-933, Comm'n Op. at 40 (June 9, 2016). In view of Traeger's unrebutted evidence of commercially significant inventory, the undersigned recommends that a cease and desist order issue if the Commission finds a violation of section 337.

### C.    Bond

If the Commission issues a remedy after considering the statutory public interest factors, the President of the United States may, within 60 days, disapprove the Commission's determination "for policy reasons;" if he does so, any remedy issued by the Commission "shall

have no force or effect." 19 U.S.C. § 1337(j)(2). During the 60-day period of Presidential review, imported articles otherwise subject to remedial orders are entitled to conditional entry under bond. 19 U.S.C. § 1337(j)(3). The amount of the bond is specified by the Commission and must be an amount sufficient to protect the complainant from injury. *Id.*; 19 C.F.R. § 210.50(a)(3). The Commission frequently sets a bond amount by calculating a price differential between domestic industry products and infringing products, or based upon a reasonable royalty. *Certain Table Saws Incorporating Active Injury Mitigation Tech. and Components Thereof,* Inv. No. 337-TA-965, Comm'n Op. at 13 (Feb. 1, 2017). Where there is neither information on the price of the subject merchandise nor information which would allow one to determine a reasonable royalty, the Commission has set the bond at 100% of the entered value of the imported infringing products. *Certain Energy Drink Products*, Inv. No. 337-TA-678, Comm'n Op. at 9 (Sept. 8, 2010). Complainants bear the burden of establishing the need for a bond, and the failure to carry that burden may result in no bond being imposed. *Certain Personal Data and Mobile Communication Devices and Related Software,* Inv. No. 337-TA-710, Comm'n Op. at 85 (Dec. 29, 2011).

Traeger seeks a bond of ███ of entered value based on an analysis performed by its expert Dr. Vander Veen, using a weighted average of the actual selling prices for all Accused Products and Traeger DI Products sold in ██. *See* CX-0840C (Vander Veen DWS) at Q/A 90. GMG argues that Dr. Vander Veen's analysis unreliable because it fails to directly compare products with similar features. RIB at 98-99. In addition, GMG argues that Traeger and GMG sell their products through different channels, with GMG selling only through dealers such as

independent hardware stores, and Traeger selling direct-to-consumer and through big box retail stores. RRB at 50.[24]

In consideration of the parties' arguments, the undersigned finds that Dr. Vander Veen's analysis represents a reliable estimate of the price differential between the Accused Products and the Traeger DI Products. Although it may have been possible to compute a more precise price differential between the Accused Products and the Traeger DI Products, there is no such analysis in the record. Accordingly, the undersigned recommends a bond that is ███ of entered value of the Accused Products

## IX.    CONCLUSIONS OF LAW

Based on the foregoing, and the record as a whole, it is my final initial determination that there is a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain cloud-connected wood-pellet grills and components thereof with respect to U.S. Patent No. 10,158,720 (the "'720 patent").

This determination is based on the following conclusions of law:

1. The Commission has subject matter jurisdiction over this investigation, *in personam* jurisdiction over Respondent, and *in rem* jurisdiction over the accused cloud-connected wood-pellet grills and components thereof.

2. There has been an importation into the United States, sale for importation, or sale within the United States after importation of the accused products by Respondent.

3. The accused products infringe claims 1 and 2 of the '720 patent.

4. The accused products do not infringe claims 12, 16, 21, and 22 of the '720 patent.

---

[24] GMG also relies on an analysis performed by its own expert, Vincent Thomas, RIB at 99-100, but Mr. Thomas did not appear at the hearing and his witness statement is not in evidence. *See* Respondents' Post-Hearing Exhibit List (identifying RX-0335C as "Withdrawn").

5. Certain domestic industry products practice claims 1 and 2 of the '720 patent.

6. Respondent is estopped from challenging the invalidity of the '720 patent based on the asserted prior art.

7. The '720 patent is not unenforceable for inequitable conduct.

The record in this investigation is hereby certified to the Commission with this final initial determination and recommended determination. Pursuant to Commission Rule 210.38, the record further comprises the Complaint and exhibits thereto filed with the Secretary, and the exhibits attached to the parties' summary determination motions and the responses thereto. 19 C.F.R. § 210.38(a).

Pursuant to Commission Rule 210.42(c), this initial determination shall become the determination of the Commission 60 days after the service thereof, unless a party files a petition for review pursuant to Commission Rule 210.43(a), the Commission orders its own review pursuant to Commission Rule 210.44, or the Commission changes the effective date of the initial determination. 19 C.F.R. § 210.42(h)(6).

This initial determination is being issued with a confidential designation pursuant to Commission Rule 210.5 and the protective order in this investigation. Within ten days of the date of this document, the parties must jointly submit a statement to the attorney advisor for this investigation stating whether or not each party seeks to have any portion of this document redacted from the public version. Should any party seek to have any portion of this document redacted from the public version thereof, the parties shall attach to the statement a copy of a joint proposed public version of this document indicated with red brackets any portion asserted to contain confidential business. To the extent possible, the proposed redacting should be made electronically, in a PDF of the issued order, using the "Redact Tool" within Adobe Acrobat, wherein the proposed redactions are submitted as "marked" but not yet "applied." The parties'

submission concerning the public version of this document should not be filed with the

Commission Secretary.

**SO ORDERED.**

_____

Charles E. Bullock
Chief Administrative Law Judge

I, Lisa R. Barton, hereby certify that the attached **INITIAL DETERMINATION** has been served upon the following parties as indicated, on **December 6, 2021**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant Traeger Pellet Grills LLC:**

Jay H. Reiziss, Esq.
**MCDERMOTT WILL & EMERY, LLP**
500 North Capitol Street, NW
Washington, DC 20001
Email: jreiziss@mwe.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

**On Behalf of Respondent GMG Products LLC:**

Andrew F. Pratt, Esq.
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, DE 19806
Email: apratt@devlinlawfirm.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

earpiece devices and components thereof that infringe claims 1 and 7 the '852 patent; claims 1 and 8 of the '853 patent; claims 1 and 6 of the '590 patent; and claims 1, 7, and 8 of the '287 patent. The Commission also imposed a bond in the amount of one hundred percent (100%) of the entered value of the imported articles during the period of Presidential review. The Commission remanded certain issues to the ALJ and thereafter the '364 patent was withdrawn from the investigation and the investigation was terminated in its entirety. 84 FR 72382–383 (Dec. 31, 2019).

On February 4, 2022, Fantasia, the importer of record, filed the subject request for an advisory opinion that Anker's Soundcore Liberty 2 Pro ("A3909"), Soundcore Liberty Neo ("A3911"), and Soundcore Life Dot 2 ("A3922") products (collectively, the "Anker Earphones") do not infringe claims 1 and 7 of the '852 patent; claims 1 and 8 of the '853 patent; claims 1 and 6 of the '590 patent; and claims 1, 7, and 8 of the '287 patent, and thus are not covered by the GEO issued in this investigation.

Having reviewed Fantasia's request in view of the record below, the Commission has determined to institute an advisory opinion proceeding under Commission Rule 210.79 to ascertain whether the Anker Earphones infringe claims 1 and 7 of the '852 patent; claims 1 and 8 of the '853 patent; claims 1 and 6 of the '590 patent; and claims 1, 7, and 8 of the '287 patent, and are covered by the GEO issued in this investigation. The Commission has further determined to refer the matter to the CALJ for assignment to an ALJ for appropriate proceedings and to issue an IAO at the earliest practicable time, preferably within 120 days of institution, but no later than 7 months after institution. The ALJ shall set a target date at two months following the date of issuance of the IAO. The target date may be extended for good cause shown. The following entities are named as parties to the proceeding: (1) Bose; and (2) Fantasia.

The Commission vote for this determination took place on March 8, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in part 210 of the Commission's Rules of Practice and Procedure, 19 CFR part 210.

By order of the Commission.

Issued: March 8, 2022.

Lisa Barton,
*Secretary to the Commission.*

[FR Doc. 2022–05275 Filed 3–11–22; 8:45 am]

**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. 337–TA–1237]**

**Certain Cloud-Connected Wood-Pellet Grills and Components Thereof; Commission Determination Not To Review a Final Initial Determination Finding a Violation of Section 337; Request for Written Submissions on Remedy, the Public Interest, and Bonding; and Extension of the Target Date for Completion of the Investigation**

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission ("the Commission") has determined not to review a final initial determination ("ID") of the presiding former chief administrative law judge ("CALJ") finding a violation of section 337 by the accused products of respondent GMG Products LLC ("GMG"). The Commission requests written submissions from the parties, interested government agencies, and other interested persons on the issues of remedy, the public interest, and bonding, under the schedule set forth below. The Commission has also determined to extend the target date for completion of the investigation to May 12, 2022.

**FOR FURTHER INFORMATION CONTACT:** Clint Gerdine, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 708–2310. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.* Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205–1810.

**SUPPLEMENTARY INFORMATION:** The Commission instituted this investigation on January 4, 2021, based on a

complaint filed on behalf of Traeger Pellet Grills LLC ("Traeger") of Salt Lake City, Utah. 86 FR 129–30 (Jan. 4, 2021). The complaint, as supplemented, alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337 ("section 337"), based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain cloud-connected wood-pellet grills and components thereof by reason of infringement of certain claims of U.S. Patent Nos. 10,218,833 ("the '833 patent") and 10,158,720 ("the '720 patent"). The Commission's notice of investigation named GMG of Lakeside, Oregon as the sole respondent. The Office of Unfair Import Investigations is not participating in the investigation.

The Commission previously found that Traeger has satisfied the economic prong of the domestic industry requirement with respect to the '833 and '720 patents. *See* Order No. 26 (Aug. 10, 2021), *unreviewed by* Comm'n Notice (Sept. 9, 2021).

On September 3, 2021, the former CALJ issued an ID (Order No. 28) granting in part GMG's motion for summary determination of non-infringement as to the '833 patent and terminating that patent from the investigation. *See* Order No. 28 (Sept. 3, 2021). On October 28, 2021, the Commission determined, on review, to affirm with modification the subject ID's finding of non-infringement. *See* Comm'n Notice (Oct. 28, 2021). Accordingly, the '833 patent was terminated from the investigation.

On December 6, 2021, the former CALJ issued the final ID finding a violation of section 337 based on infringement (*i.e.,* direct, contributory, and induced) of asserted claims 1 and 2 of the '720 patent. The ID further finds that: (1) Traeger has satisfied the technical prong of the domestic industry requirement; (2) GMG is estopped from challenging the validity of the '720 patent based on the prior art MAK and Fireboard systems; (3) the prior art MAK and Fireboard systems do not render the asserted claims of the '720 patent invalid due to anticipation under 35 U.S.C. 102(a) or obviousness under 35 U.S.C. 103; and (4) the '720 patent is not unenforceable due to inequitable conduct. The former CALJ recommended, should the Commission find a violation, the issuance of a limited exclusion order directed to GMG's infringing products and a cease and desist order directed to GMG, and requiring a bond in the amount of 53.1 percent of the entered value for

importation of infringing articles during the period of Presidential review.

On December 20, 2021, GMG petitioned for review of certain aspects of the final ID. Specifically, GMG petitioned for review of the ID's findings regarding claim construction, infringement, the technical prong of the domestic industry requirement, validity, and enforceability with respect to the '720 patent. On December 28, 2021, Traeger filed a response in opposition to GMG's petition for review.

The Commission received no public interest comments from the public in response to the Commission's **Federal Register** notice seeking comment on the public interest. 86 FR 70860–61 (Dec. 13, 2021). Traeger and GMG did not submit any public interest comments pursuant to Commission Rule 210.50(a)(4) (19 CFR 210.50(a)(4)).

Having reviewed the record of the investigation, including the parties' briefing, the Commission has determined not to review the final ID's finding of a violation of section 337. The Commission has also determined to extend the target date for completion of the investigation to May 12, 2022.

In connection with the final disposition of this investigation, the Commission may (1) issue an order that results in the exclusion of the subject articles from entry into the United States, and/or (2) issue a cease and desist order that could result in the respondent being required to cease and desist from engaging in unfair acts in the importation and sale of such articles. Accordingly, the Commission is interested in receiving written submissions that address the form of remedy, if any, that should be ordered. If a party seeks exclusion of an article from entry into the United States for purposes other than entry for consumption, the party should so indicate and provide information establishing that activities involving other types of entry either are adversely affecting it or likely to do so. For background, *see Certain Devices for Connecting Computers via Telephone Lines,* Inv. No. 337–TA–360, USITC Pub. No. 2843, Comm'n Op. at 7–10 (December 1994).

When the Commission contemplates some form of remedy, it must consider the effects of that remedy upon the public interest. The factors the Commission will consider include the effect that an exclusion order and/or cease and desist orders would have on (1) the public health and welfare, (2) competitive conditions in the U.S. economy, (3) U.S. production of articles that are like or directly competitive with those that are subject to investigation,

and (4) U.S. consumers. The Commission is therefore interested in receiving written submissions that address the aforementioned public interest factors in the context of this investigation.

When the Commission orders some form of remedy, the U.S. Trade Representative, as delegated by the President, has 60 days to approve, disapprove, or take no action on the Commission's determination. *See* section 337(j), 19 U.S.C. 1337(j) and the Presidential Memorandum of July 21, 2005. 70 *FR* 43251 (July 26, 2005). During this period, the subject articles would be entitled to enter the United States under bond, in an amount determined by the Commission. The Commission is therefore interested in receiving submissions concerning the amount of the bond that should be imposed if a remedy is ordered.

*Written Submissions:* Parties to the investigation, interested government agencies, and any other interested parties are encouraged to file written submissions on the issues of remedy, bonding, and the public interest. Such submissions should address the recommended determination by the ALJ on remedy and bonding.

In its initial submission, Complainant is also requested to identify the remedy sought and to submit proposed remedial orders for the Commission's consideration. Complainant is further requested to state the date that the asserted patent expires, to provide the HTSUS subheadings under which the accused products are imported, and to supply the identification information for all known importers of the products at issue in this investigation. The initial written submissions and proposed remedial orders must be filed no later than close of business on March 22, 2022. Reply submissions must be filed no later than the close of business on March 29, 2022. No further submissions on these issues will be permitted unless otherwise ordered by the Commission. Opening submissions are limited to 25 pages. Reply submissions are limited to 20 pages.

Persons filing written submissions must file the original document electronically on or before the deadlines stated above. The Commission's paper filing requirements in 19 CFR 210.4(f) are currently waived. 85 FR 15798 (March 19, 2020). Submissions should refer to the investigation number (Inv. No. 337–TA–1237) in a prominent place on the cover page and/or the first page. (*See* Handbook for Electronic Filing Procedures, *https://www.usitc.gov/ documents/handbook_on_filing_ procedures.pdf*). Persons with questions

regarding filing should contact the Secretary, (202) 205–2000.

Any person desiring to submit a document to the Commission in confidence must request confidential treatment by marking each document with a header indicating that the document contains confidential information. This marking will be deemed to satisfy the request procedure set forth in Rules 201.6(b) and 210.5(e)(2) (19 CFR 201.6(b) & 210.5(e)(2)). Documents for which confidential treatment by the Commission is properly sought will be treated accordingly. A redacted non-confidential version of the document must also be filed simultaneously with any confidential filing. All information, including confidential business information and documents for which confidential treatment is properly sought, submitted to the Commission for purposes of this investigation may be disclosed to and used: (i) By the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or (ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. All contract personnel will sign appropriate nondisclosure agreements. All nonconfidential written submissions will be available for public inspection on EDIS.

The Commission vote for this determination took place on March 8, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in Part 210 of the Commission's Rules of Practice and Procedure, 19 CFR part 210.

By order of the Commission.

Issued: March 8, 2022.

**Lisa Barton,**
*Secretary to the Commission.*

[FR Doc. 2022–05273 Filed 3–11–22; 8:45 am]

**BILLING CODE 7020–02–P**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN CLOUD-CONNECTED**
**WOOD-PELLET GRILLS AND**
**COMPONENTS THEREOF**

**Investigation No. 337-TA-1237**

## NOTICE OF A COMMISSION DETERMINATION TO ISSUE A LIMITED EXCLUSION ORDER AND CEASE AND DESIST ORDER; TERMINATION OF THE INVESTIGATION

**AGENCY**:     U.S. International Trade Commission.

**ACTION**:     Notice.

**SUMMARY**:     Notice is hereby given that the U.S. International Trade Commission, having previously found a violation of section 337, has determined to issue a limited exclusion order ("LEO") directed against infringing cloud-connected wood-pellet grills and components thereof imported by or on behalf of respondent GMG Products LLC ("GMG") of Lakeside, Oregon and a cease and desist order ("CDO") directed against GMG.    The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT**:     Clint Gerdine, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 708-2310.    Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at https://edis.usitc.gov.    For help accessing EDIS, please email EDIS3Help@usitc.gov.    General information concerning the Commission may also be obtained by accessing its Internet server at https://www.usitc.gov.    Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:     The Commission instituted this investigation on January 4, 2021, based on a complaint filed on behalf of Traeger Pellet Grills LLC ("Traeger") of Salt Lake City, Utah.    86 FR 129-30 (Jan. 4, 2021).    The complaint, as supplemented, alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337 ("section 337"), based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain cloud-connected wood-pellet grills and components thereof by reason of infringement of certain claims of U.S. Patent Nos. 10,218,833 ("the '833 patent") and 10,158,720 ("the '720 patent").    The Commission's notice of investigation named GMG as the sole respondent.    The Office of Unfair Import Investigations is not participating in the investigation.

The Commission previously found that Traeger has satisfied the economic prong of the domestic industry requirement with respect to the '833 and '720 patents.  *See* Order No. 26 (Aug. 10, 2021), *unreviewed by* Comm'n Notice (Sept. 9, 2021).

On September 3, 2021, the former chief administrative law judge ("CALJ") issued an initial determination ("ID") (Order No. 28) granting in part GMG's motion for summary determination of non-infringement as to the '833 patent and terminating that patent from the investigation.  *See* Order No. 28 (Sept. 3, 2021).  On October 6, 2021, the Commission determined to review Order 28.  Comm'n Notice (Oct. 6, 2021).  On October 28, 2021, the Commission determined, on review, to affirm with modification the ID's finding of non-infringement as to the '833 patent.  *See* Comm'n Notice (Oct. 28, 2021).  Accordingly, the '833 patent was terminated from the investigation.

On December 6, 2021, the former CALJ issued a final ID finding a violation of section 337 based on infringement (*i.e.*, direct, contributory, and induced) of asserted claims 1 and 2 of the '720 patent.  The ID further finds that:  (1) Traeger has satisfied the technical prong of the domestic industry requirement; (2) GMG is estopped from challenging the validity of the '720 patent based on the prior art MAK and Fireboard systems; (3) the prior art MAK and Fireboard systems do not render the asserted claims of the '720 patent invalid due to anticipation under 35 U.S.C. 102(a) or obviousness under 35 U.S.C. 103; and (4) the '720 patent is not unenforceable due to inequitable conduct.  The former CALJ recommended, should the Commission find a violation, the issuance of an LEO directed to GMG's infringing products and a CDO directed to GMG, and requiring a bond in the amount of 53.1 percent of the entered value for importation of infringing articles during the period of Presidential review.

On December 20, 2021, GMG petitioned for review of certain aspects of the final ID.  Specifically, GMG petitioned for review of the ID's findings regarding claim construction, infringement, the technical prong of the domestic industry requirement, validity, and enforceability with respect to the '720 patent.  On December 28, 2021, Traeger filed a response in opposition to GMG's petition for review.

The Commission received no submissions from the public in response to its *Federal Register* notice requesting comments on the public interest should the Commission find a violation of section 337.  86 FR 70860-61 (Dec. 13, 2021).  Traeger and GMG did not submit any public interest comments pursuant to Commission Rule 210.50(a)(4) (19 C.F.R. 210.50(a)(4)).

On March 8, 2022, the Commission determined not to review the final ID's finding of a violation of section 337 with respect to claims 1 and 2 of the '720 patent, thus adopting that finding.  *See* Comm'n Notice (Mar. 8, 2022); 87 FR 14288-89 (Mar. 14, 2022); *see* 19 CFR 210.42(h)(2).  The Commission also requested written submissions from the parties, interested government agencies, and other interested persons on the issues of remedy, the public interest, and bonding.  *Id.*

2

On March 22, 2022, Traeger and GMG each filed a brief on remedy, the public interest, and bonding.   On March 29, 2022, the parties filed their reply briefs.   The Commission received no other submissions.

Having reviewed the record in this investigation, including the parties' briefing, the Commission has determined that the appropriate form of relief is an LEO prohibiting the entry of unlicensed cloud-connected wood-pellet grills and components thereof that infringe one or more of claims 1 and 2 of the '720 patent, and that are manufactured abroad by or on behalf of, or imported by or on behalf of, GMG or any of its affiliated companies, parents, subsidiaries, agents, or other related business entities, or their successors or assigns (collectively, "the covered articles").   The Commission has also determined to issue a CDO prohibiting GMG from conducting, or aiding and abetting, any of the following activities in the United States: importing, selling, marketing, advertising, distributing, offering for sale, transferring (except for exportation), and soliciting U.S. agents or distributors for cloud-connected wood-pellet grills and components thereof that infringe one or more of claims 1-2 of the '720 patent.

The Commission has further determined that the public interest factors enumerated in sections 337(d)(1) and 337(f)(1) (19 U.S.C. 1337(d)(1) and 1337(f)(1)) do not warrant denying relief.   Finally, the Commission has determined that a bond in the amount of 53.1 percent of the entered value of the covered articles is required during the period of Presidential review pursuant to 19 U.S.C. 1337(j).   The Commission's order was delivered to the President and to the United States Trade Representative on the day of its issuance.

The Commission issues its opinion herewith setting forth its determinations on the remedy, bonding, and public interest issues.   The investigation is terminated.

The Commission vote for this determination took place on May 12, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in Part 210 of the Commission's Rules of Practice and Procedure, 19 CFR part 210.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:   May 12, 2022

3

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN CLOUD-CONNECTED**                    **Investigation No. 337-TA-1237**
**WOOD-PELLET GRILLS AND**
**COMPONENTS THEREOF**

### COMMISSION OPINION

On December 6, 2021, the former chief administrative law judge ("CALJ"), Chief Judge

Bullock, issued an initial determination ("ID") finding a violation of section 337 of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1337 ("section 337"), with respect to asserted claims 1 and 2

of U.S. Patent No. 10,158,720 ("the '720 patent").    On March 8, 2022, the Commission

determined not to review the final ID's finding of a violation, thus adopting that finding.    87

Fed. Reg. 14288-89 (Mar. 14, 2022); 19 C.F.R. § 210.42(h)(2).    The Commission has

determined to issue a limited exclusion order ("LEO") directed to infringing cloud-connected

wood-pellet grills and components thereof of respondent GMG Products LLC ("GMG") of

Lakeside, Oregon, and a cease and desist order ("CDO") directed against GMG.    This opinion

sets forth the Commission's reasoning in support of its determinations on remedy, the public

interest, and bonding during the period of Presidential review based on the record of this

investigation.

### I.    BACKGROUND

The Commission instituted this investigation on January 4, 2021, based on a complaint

filed on behalf of complainant Traeger Pellet Grills LLC ("Traeger") of Salt Lake City, Utah.

86 Fed. Reg. 129-30 (Jan. 4, 2021).    The complaint, as supplemented, alleged violations of

1

section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, based upon the importation

into the United States, the sale for importation, and the sale within the United States after

importation of certain cloud-connected wood-pellet grills and components thereof by reason of

infringement of, *inter alia*, certain claims of the '720 patent and U.S. Patent No. 10,218,833

("the '833 patent").   The Commission's notice of investigation named GMG as the sole

respondent.   The Office of Unfair Import Investigations did not participate in the investigation.

On July 28, 2021, the former CALJ issued a *Markman* Order (Order No. 22) construing

claim limitations in dispute.   On September 9, 2021, the Commission found that Traeger has

satisfied the economic prong of the domestic industry ("DI") requirement with respect to the

'833 and '720 patents.   *See* Order No. 26 (Aug. 10, 2021), *unreviewed by* Comm'n Notice (Sept.

9, 2021).   On October 28, 2021, the Commission affirmed, with supplemental reasoning, the

former CALJ's initial determination granting in part GMG's motion for summary determination

of non-infringement of the '833 patent and terminated that patent from the investigation.   *See*

Order No. 28 (Sept. 3, 2021), *aff'd, with supplemental reasoning, by* Comm'n Notice (Oct. 28,

2021).

On December 6, 2021, the former CALJ issued the final ID finding a violation of section

337 as to claims 1 and 2 of the '720 patent.   The ID also includes the former CALJ's

recommended determination ("RD"), which recommended, should the Commission find a

violation, the issuance of an LEO directed to GMG's infringing products and a CDO directed to

GMG and a requirement to post a bond in the amount of 53.1 percent of the entered value of

infringing articles imported during the period of Presidential review.

The Commission received no submissions from the public in response to its *Federal*

*Register* notice requesting comments on the public interest should the Commission find a violation of section 337.   86 Fed. Reg. 70860-61 (Dec. 13, 2021).   Traeger and GMG did not submit any public interest comments pursuant to Commission Rule 210.50(a)(4) (19 C.F.R. § 210.50(a)(4)).

On March 8, 2022, the Commission determined not to review the final ID.   *See* 87 Fed. Reg. 14288-89.   In the same notice, the Commission also requested written submissions from the parties, interested government agencies, and other interested persons on the issues of remedy, the public interest, and bonding.   *Id.*

On March 22, 2022, Traeger[1] and GMG[2] each filed a brief on remedy, the public interest, and bonding.   On March 29, 2022, the parties filed reply briefs.[3]   The Commission received no other submissions.

As noted above, the Commission previously adopted the final ID's finding of a violation of section 337 as to the '720 patent.   *See* 87 Fed. Reg. 14288-89.   For the reasons set forth below, the Commission has determined that the appropriate relief is an LEO directed to GMG's infringing products and a CDO directed against GMG.   The Commission has also determined to impose a bond in the amount of 53.1 percent of the entered value of the imported infringing articles during the period of Presidential review.

---

[1] *See* Complainant's Submission on Remedy, Bond, the Public Interest, and Additional Requested Information (Mar. 22, 2022) ("Traeger's Sub.").

[2] *See* Initial Brief on the Issues of Remedy and Bonding (Mar. 22, 2022) ("GMG's Sub.").

[3] Complainant's Reply to GMG's Submission on Remedy, Bond, and the Public Interest (Mar. 29, 2022) ("Traeger's Reply"); Reply Brief on the Issues of Remedy and Bonding (Mar. 29, 2022) ("GMG's Reply").

## II.    REMEDY, THE PUBLIC INTEREST, AND BONDING

### A.    Remedy

#### 1.    Relevant Law

The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding.   *Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

Section 337(d)(1) provides that "[i]f the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the [public interest], it finds that such articles should not be excluded from entry."   19 U.S.C. § 1337(d)(1).

Section 337(f)(1) provides that in addition to, or in lieu of, the issuance of an exclusion order, the Commission may issue a CDO as a remedy for violation of section 337.   *See* 19 U.S.C. § 1337(f)(1).   CDOs are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order.[4]

*See, e.g.*, *Certain Table Saws Incorporating Active Injury Mitigation Technology & Components*

---

[4] When the presence of infringing domestic inventory or domestic operations is asserted as the basis for a CDO under section 337(f)(1), Commissioner Schmidtlein does not adopt the view that the inventory or domestic operations needs to be "commercially significant" in order to issue the CDO.   *See, e.g.*, *Certain Magnetic Tape Cartridges and Components Thereof* ("*Certain Magnetic Tape Cartridges*"), Inv. No. 337-TA-1058, Comm'n Op. at 65 n.24 (Apr. 9, 2019) (Public Version); *Certain Table Saws*, Comm'n Op. at 6 n.2 (Feb. 1, 2017).   In Commissioner Schmidtlein's view, the presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO.   *Certain Magnetic Tape Cartridges*, Comm'n Op. at 65 n.24; *Certain Table Saws*, Comm'n Op. at 6 n.2.

4

*Thereof* ("*Certain Table Saws*"), Inv. No. 337-TA-965, Comm'n Op. at 4-6 (Feb. 1, 2017);

*Certain Protective Cases & Components Thereof*, Inv. No. 337-TA-780, USITC Pub. No. 4405,

Comm'n Op. at 28 (Nov. 19, 2012) (citing *Certain Laser Bar Code Scanners & Scan Engines,*

*Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-551, Comm'n Op. at 22 (June

24, 2007)).   Complainants bear the burden on this issue.   "A complainant seeking a cease and

desist order must demonstrate, based on the record, that this remedy is necessary to address the

violation found in the investigation so as to not undercut the relief provided by the exclusion

order."   *Certain Table Saws*, Comm'n Op. at 5 (citing *Certain Integrated Repeaters, Switches,*

*Transceivers, & Prods. Containing Same*, Inv. No. 337-TA-435, USITC Pub. No. 3547 (Oct.

2002), Comm'n Op. at 27 (Aug. 16, 2002); *see also* H.R. REP. No. 100-40, at 160 (1987)).

### 2.    The RD

The RD recommends that, if the Commission finds a violation, it should issue an LEO

directed to GMG's infringing products.   RD at 108-09.   The RD also recommends the issuance

of a CDO because the record supports, as unrebutted by GMG, the presence of a "commercially

significant" inventory maintained by the respondent.   *Id.* at 109 (citing CX-840C (Vander Veen

(Traeger's Expert) Direct Witness Statement ("DWS)) at Q. 85).

In its initial post-hearing brief before the CALJ, GMG stated that, in the event the

Commission issues a CDO, GMG "requests [that] a certification provision and exception for

warranty service/repair be included."   GMG's Initial Post-Hearing Br. ("GIB") at 98 (Oct. 13,

2021).   The RD does not address the issue of a warranty service and repair exemption.   *See* RD

at 108-09.

5

### 3.    The Parties' Submissions

Traeger submits that the Commission should issue an LEO excluding GMG's infringing products from entry into the United States.    Traeger's Sub. at 1-2.    Traeger also submits that issuance of a CDO is warranted here based on the uncontested record showing that GMG maintains a commercially significant inventory of infringing products in the United States.    *Id.* (citing CX-840C at Q. 85).    GMG does not oppose the issuance of an LEO or CDO because it was found in violation of section 337.    GMG's Sub. at 2.    The parties disagree whether the LEO or CDO should include an exemption for parts used for service and repair.

Traeger argues before the Commission that, contrary to GMG's position, the LEO and CDO should contain no exemption for service and repair parts because GMG has presented no evidence justifying the need for such an exemption.    Traeger's Reply at 1.    Traeger contends that, in past investigations, the Commission has required evidence showing a need for such exemptions before granting them.    *Id.*    Traeger argues that, unlike those past cases, GMG has presented no evidence here justifying why such an exemption is necessary, including no record evidence of harm to U.S. consumers or adverse effect on other public interest factors that would warrant an exemption.[5]    *Id.* at 2.    Traeger submits that the only support GMG provides for a service and repair exemption is a new declaration by GMG's co-founder that "describes operating conditions encountered by any grill, such as high temperatures and outdoor weather, the number of grills GMG sold, and the price range of its grills."    *Id.* (citing GMG's Sub. at Ex. A).    Traeger also contends that GMG's submission omits any evidence of warranty obligations

---

[5] Traeger notes that GMG makes no argument as to public interest factors 2-4, and only incorporates its repair parts exemption argument for public interest factor 1.    Traeger's Reply at 2 (citing GMG's Sub. at 9.)

6

or service contracts to repair or supply parts for its grills, and also does not claim that only GMG parts may be used to repair its grills, as opposed to third party aftermarket parts. *Id.* Traeger further argues that GMG does not include any historical information about the amount of repair parts sold or the number of customers who have requested service or repair parts. *Id.*

Traeger contends that, without this necessary factual basis, any alleged harm to consumers is entirely speculative and that an exemption based solely on the respondent's speculation, without any justifying evidence, could potentially apply to any consumer product. Accordingly, Traeger submits that the Commission should not grant an exemption. *Id.* at 3.[6]

GMG contends that any LEO or CDO should include an exemption for the importation of parts necessary to service or repair GMG grills that U.S. customers have previously purchased and possess. GMG's Sub. at 2. GMG submits that its accused grills are for outdoor use and therefore are subject to variable weather conditions that result in wear and tear on the grill. *Id.* (citing Ex. A, Decl. of David Baker (co-founder of GMG) at ¶ 2 (executed Mar. 21, 2022)). GMG contends that this is in addition to the regular wear and tear on the grill due to the extreme heating and cooling from normal use. *Id.* (citing ¶ 3). GMG further argues that: (1) respondent supplies repair parts to its customers and dealers to maintain the integrity of its customers' purchased grills; and (2) because these grills range in price from $399 to $1,139,

---

[6] Traeger also argues (*see* Traeger's Reply at 3-4) that a certification provision for the remedial orders is not necessary because there are no adjudicated "non-infringing" GMG grills, but the Commission generally includes such a provision in its orders, and it is possible that GMG grills may be adjudicated as non-infringing in the future. *See, e.g.*, *Certain Light-Emitting Diode Products, Fixtures, and Components Thereof*, Inv. No. 337-TA-1213 ("*Certain Light-Emitting Diode Products*"), Comm'n Op. at 12-13 (Jan. 14, 2022) (customary inclusion of a certification provision).

GMG's customers purchase these grills with the expectation that they can be used in rugged outdoor conditions and can be serviced with replacement parts to maintain their customers' investment and the safety of the grills. *Id.* at 2-3 (citing ¶¶ 5-6).

GMG submits that the Commission has repeatedly recognized that "it is appropriate to exempt parts necessary for service and repair to ensure that innocent consumers who have already bought excluded articles can continue to safely and productively use those articles." *Id.* at 3. GMG also contends that a service-and-repair exemption is particularly appropriate where, as here, the accused products are pellet grills that combust wood pellets at high temperatures, and that the Commission has previously included such an exemption in a remedial order for a similar product. *Id.* at 3-4 (citing *Certain Road Construction Machines & Components Thereof*, Inv. No. 337-TA-1088 ("*Certain Road Construction Machines*"), Comm'n Op. at 48 (July 15, 2019); *Certain Multiple Mode Outdoor Grills & Parts Thereof*, Inv. No. 337- TA-895 ("*Certain Multiple Mode Outdoor Grills*"), Comm'n Op. at 14, 57-58 (Feb. 20, 2015) (other citations omitted).

Finally, GMG argues that unrepairable damage from ordinary use of a GMG grill may render it useless and that its customers "should not be required to spend hundreds of dollars on a new grill simply because an igniter fails." *Id.* at 4 (citing *Certain Road Construction Machines*, at 49 (exempting services and repair parts given showing of "the harm that would befall these consumers without access to parts for repairs")). GMG submits that an exemption for service and repair "would lessen the effect of an LEO on the more than a quarter million customers for

8

GMG WiFi grills." *Id.* (citing Ex. A, Baker Decl. at ¶ 2).[7]   GMG did not address this issue

further in its reply submission.

### 4.    Analysis

The Commission has determined to issue an LEO (with the standard certification

provision) directed to GMG's unlicensed importation of infringing cloud-connected wood-pellet

grills and components thereof ("the covered products"), and a CDO directed against GMG.   The

Commission has determined not to include any service and repair exemption regarding

replacement parts for previously imported grills in the LEO or CDO.

### a.    LEO

Section 337(d)(1)directs the Commission, subject to consideration of the public interest,

to issue an LEO if it "determines, as a result of an investigation under this section, that there is a

violation of this section[.]"   19 U.S.C. § 1337(d)(1).   The Commission previously adopted the

ID's finding of a violation of section 337 as to the '720 patent with respect to GMG's infringing

cloud-connected wood-pellet grills and components thereof.   *See* 87 Fed. Reg. at 14288-89.   In

accordance with section 337(d)(1) and having considered the public interest (*see* section II.B.

below), the Commission has determined to issue an LEO directed to GMG's unlicensed

importation of such articles.

---

[7] GMG also argues for a standard certification provision for any remedial order that is issued. GMG's Sub. at 4-5.   GMG, however, mistakenly equates a certification provision, which is used to certify that imported products are non-infringing, as properly determined by either the Commission or U.S. Customs and Border Protection ("CBP"), with its previous argument for a service and repair exemption.   *Id.*   Accordingly, because the Commission's LEOs routinely include the standard certification provision, the Commission treats this second argument as superfluous to GMG's argument for a service and repair exemption.

9

**b.    CDO**

Section 337(f)(1) provides that in addition to, or in lieu of, the issuance of an exclusion

order, the Commission may issue a CDO as a remedy for violation of section 337.    *See* 19

U.S.C. § 1337(f)(1).

Under Commission precedent, "[c]ease and desist orders are generally issued when, with

respect to the imported infringing products, respondents maintain commercially significant

inventories in the United States or have significant domestic operations that could undercut the

remedy provided by an exclusion order."    *Certain Air Mattress Systems, Components Thereof,*

*and Methods of Using the Same*, Inv. No. 337-TA-971, Comm'n Op. at 49 (May 17, 2017)

(citations and footnote omitted).

The Commission has determined to issue a CDO directed against GMG because we

concur with the RD that the record shows the presence of a "commercially significant" inventory

maintained in the United States by respondent.[8]    RD at 109 (citing CX-840C (Vander Veen

DWS at Q. 85)).    GMG has not disputed the existence of such an inventory, nor does it argue

against issuance of a CDO.

**c.    Certification Provision**

The Commission has determined that the LEO and CDO shall include the standard

certification provision as typically requested by CBP.    As the Commission has previously held,

"[t]he standard certification 'does not apply to redesigns that have not been adjudicated as non-

---

[8] *See supra* note 4 (indicating that, in Commissioner Schmidtlein's view, the presence of some
infringing domestic inventory or domestic operations, regardless of its commercial significance,
provides a basis to issue a CDO.    *Certain Magnetic Tape Cartridges*, Comm'n Op. at 65 n.24;
*Certain Table Saws*, Comm'n Op. at 6 n.2).    Accordingly, on this record, Commissioner
Schmidtlein agrees with the Commission's determination to issue a CDO directed against GMG.

10

infringing.'"   *See Certain Automated Teller Machines, ATM Modules, Components Thereof and Products Containing the Same*, Inv. No. 337-TA-972, Comm'n Op. at 26-27 (June 12, 2017) (quoting *Certain Marine Sonar Imaging Devices, Including Downscan & Sidescan Devices, Prods. Containing the Same, & Components Thereof*, Inv. No. 337-TA-921, Comm'n Op., 2016 WL 10987364, *53 (Jan. 6, 2016)).   Should the Commission or CBP later determine that an article presented for adjudication does not infringe, the certification provision can operate to exempt those articles.

### d.    Service and Repair Exemption

The Commission has determined not to include a service and repair exemption, allowing importation of replacement parts, in the remedial orders.[9, 10]   GMG has not presented any record

---

[9] The Commission clarifies that the legal authority for this exemption is Section 337(d) which provides that if the Commission finds a violation, "it shall direct that the articles concerned . . . be excluded . . . unless, after considering . . . [the public interest factors], it finds that such articles should not be excluded from entry."   The statute thus requires that any exemption to the remedial orders for otherwise infringing products be evaluated under the relevant public interest factor(s).   While the Commission has often discussed requests for service and warranty exemptions separate from its public interest analysis, the discretion to set the scope of remedial orders based on the record in a particular investigation—as applied to requests for service and warranty exemptions—must be exercised as part of the Commission's evaluation of the public interest.

[10] Chair Kearns and Commissioner Karpel observe that the Commission has repeatedly indicated that it has granted warranty and repair exemptions "when unopposed, in view of the public interest, or upon some showing of a need for service and repair." *See, e.g.*, *Certain Robotic Vacuum Cleaning Devices and Components Thereof Such as Spare Parts*, Inv. No. 337-TA-1057, Comm'n Op. at 58-59 and nn.25-27 (Feb. 1, 2019) (collecting cases); *Certain Variable Speed Wind Turbine Generators and Components Thereof*, 337-TA-1218, Comm'n Op. at 24, 33-49 (Jan. 18, 2022); *Certain Audio Players and Controllers, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1191, Comm'n Op. at 25-26 (Feb. 1, 2022). Further, they observe that while the Commission has granted warranty and repair or similar exemptions on public interest grounds, the Commission has also granted warranty and repair or similar exemptions without reliance on public interest considerations. *See, e.g.*, *Certain Motorized Vehicles and Components Thereof*, Inv. No. 337-TA-1132, Comm'n Op. at 34 (June 11, 2020) (citing *Certain Automated Teller Machines, ATM Modules, Components Thereof, &*

11

evidence of any customer warranty provision or service contracts for its grills or other evidence of customer repair services, including no evidence of previous warranty service imports or customer benefit from replacement parts.   GMG further offers no evidence that infringing parts are required to repair any of its grills or that consumers have no alternative sources for replacement parts that are necessary to repair their grills other than infringing component parts. The only factual support GMG offers before the Commission is a one-page declaration (executed on the same date that the remedy submission to the Commission was filed), the contents of which are summarized above.

GMG cites to a number of Commission cases to support its request for an exemption, but none granted a service and repair exemption in a remedial order without the supporting evidentiary basis (*e.g.*, evidence of a warranty, customer testimonial evidence, etc.).   As

---

*Prods. Containing the Same*, Inv. No. 337-TA-972, Comm'n Op., 2017 WL 11198798, *16 (June 12, 2017)); *Certain Digital Video Receivers and Related Hardware and Software Components*, Inv. No. 337-TA-1103, Comm'n Op. at 24 (Apr. 23, 2020); C*ertain Sortation Systems, Parts Thereof, and Prods. Containing Same*, Inv. No. 337-TA-460, Comm'n Op. at 18-19 (Feb. 19, 2003). In addressing the Commission's remedial authority, the Commission's reviewing court has stated that "the Commission has broad discretion in selecting the form, scope and extent of the remedy." *See Viscofan, S.A. v. USITC*, 787 F.2d 544, 548 (Fed. Cir. 1986) (citing *Canadian Tarpoly Co. v. USITC,* 640 F.2d 1322, 1326 (CCPA 1981); *Sealed Air Corp. v. USITC*, 645 F.2d 976, 989 (CCPA 1981); *Jacob Siegel Co. v. Federal Trade Comm'n*, 327 U.S. 608, 611-13 (1946)).   Consistent with this precedent, the Commission's Administrative Law Judges regularly admit and consider evidence and argument concerning warranty and repair issues in making their recommended remedy determinations, regardless of whether the Commission has delegated public interest in the investigation. Particularly in view of longstanding Commission precedent on this issue and the Court's expression of the Commission's broad remedial authority, Chair Kearns and Commissioner Karpel do not join footnote 9 and are of the view that a decision to limit the Commission's authority with respect to its choice of remedial relief would require a fulsome evaluation of the relevant statutory language governing the issuance of LEOs and CDOs in the context of the statutory framework, Congressional intent as to the nature and extent of the Commission's remedial authority in the legislative history, and judicial precedent concerning the Commission's remedial authority.

explained more fully below, GMG provides no record evidence of harm to U.S. consumers to justify the service and repair exemption. *See, e.g.*, *Certain Road Construction Machines*, at 48 n.50 ("[The Commission] places great value on having a *fulsome evidentiary record* to inform its analysis [of whether to include a service and repair exemption.]") (emphasis added); *Certain Robotic Vacuum Cleaning Devices and Components Thereof such as Spare Parts*, Inv. No. 337-TA-1057, Comm'n Op. at 58 (Feb. 1, 2019) ("[T]here is no record evidence, much less argument, of harm to U.S. consumers or adverse effect on other public interest factors to warrant an exemption."). The Commission finds that the circumstances here are distinguished from *Certain Multiple Mode Outdoor Grills* because in that case respondents' imported infringing products (dual-mode grills) were a small percentage of their largely non-infringing imported products (single-mode grills) and replacement parts were largely the same for both. *See Certain Multiple Mode Outdoor Grills*, at 56-58.

Accordingly, as discussed above, the Commission has determined to issue an LEO and CDO, both containing the standard certification provision. The Commission declines to include the requested exemption for service and repair in the LEO and CDO, as GMG has failed to provide the evidentiary record needed to substantiate its request.

### B.    Public Interest[11]

#### 1.    Relevant Law

Section 337 requires the Commission, upon finding a violation of section 337, to issue an LEO "unless, after considering the effect of such exclusion upon the public health and welfare,

---

[11] The Commission did not ask the former CALJ to make any findings concerning the public interest.

13

competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry." 19 U.S.C. § 1337(d)(l).    Similarly, the Commission must consider these public interest factors before issuing a CDO.    19 U.S.C. § 1337(f)(1).

### 2.    The Parties' Submissions

Traeger submits that issuance of an LEO and CDO is not contrary to the public interest because none of the four statutory public interest factors weigh against these requested remedial orders.    Traeger's Sub. at 4.    GMG's public interest discussion is limited to its previous argument regarding a service and repair exemption in the context of the first statutory public interest factor (public health and welfare).    GMG's Sub. at 9.

### a.    Public Health and Welfare

Traeger submits that there is no record evidence that public health and welfare considerations weigh against the requested remedial orders.    Traeger's Sub. at 5.    Traeger contends that GMG's infringing grills are consumer goods of the type the Commission has consistently found do not present public health, safety, or welfare concerns.    *Id.* (citing, *e.g.*, *Certain Multiple Mode Outdoor Grills*, at 60; *Certain Compact Multipurpose Tools*, Inv. No. 337-TA-416, Comm'n General Exclusion Order and Termination of Investigation at 6 (Aug. 30, 1999)).    As noted above, GMG merely incorporates by reference its position as to its requested exemption for service and repair.    GMG's Sub. at 9.

14

**b.    Competitive Conditions in the U.S. Economy and the Production of Like or Directly Competitive Articles in the United States**

Traeger submits that there is no record evidence that the requested remedial orders would affect competitive conditions in the U.S. economy or affect the production of like or directly competitive articles in the United States.   Traeger's Sub. at 5.

First, Traeger contends that the requested relief would not significantly impact the overall market for wood-pellet grills in the United States because all infringing grills are manufactured overseas.   *Id.* (citing Parties' Importation Stipulation (May 27, 2021)).   Traeger submits that the Commission has previously explained that the consideration of the production of like or directly competitive articles does not weigh against issuance of a remedy when substitute products are available and the accused products are manufactured overseas.   *Id.* (citing *Certain Digital Televisions & Certain Prod. Containing Same & Methods of Using Same*, Inv. No. 337-TA-617, Comm'n Op. at 15 (Apr. 23, 2009)).   Traeger further argues that "[t]he home outdoor grilling market is a diverse field of participants offering products that directly compete with GMG's infringing grills."   *Id.* at 5-6 (citing CX-840C at Q. 23 ("there are a multitude of brands in [the wood-pellet grill] industry")).   Traeger also submits that the protection of intellectual property rights aids the U.S. economy, and that the Commission has long recognized that there is a strong interest in the enforcement of patents.   Traeger's Sub. at 6.

**c.    U.S. Consumers**

Traeger submits that there is no record evidence that the requested remedial orders would harm U.S. consumers.   *Id.*   Traeger argues that no public interest concerns exist where, as here, "the market contains an adequate supply of competitive or substitute products for those subject to

15

a remedial order." *Id.* (citing, *e.g.*, *Certain Lens-Fitted Film Packages*, Inv. No. 337-TA-406,

Comm'n Op. at 18 (Jun. 28, 1999)).



### 3. Analysis

The Commission has determined that, based on the evidence presented, the public interest

factors do not preclude issuance of a remedy. GMG's public interest concerns solely relate to

its argument for a service and repair exemption.

### a. Public Health and Welfare

The covered products are certain cloud-connected wood-pellet grills and components

thereof imported, sold for importation, or sold in the United States after importation by GMG

that infringe one or more claims of the '720 patent. There is no evidence or argument that

excluding the infringing products would adversely affect the public health and welfare, and the

Commission agrees with Traeger that there would be no such adverse effect.

### b. Competitive Conditions in the United States and the Production of Like or Directly Competitive Articles in the United States

The Commission finds, and GMG does not dispute, that there are numerous suppliers of

similar cloud-connected wood-pellet grills and components thereof. *See* Traeger's Sub. at 5-6

16

(citing CX-840C at Q. 23 ("there are a multitude of brands in [the wood-pellet grill] industry")).

GMG itself admits that its sales represent a small percentage of the WiFi grill market as

compared to Traeger and other competitors.  *See* RX-316C at Q. 6.  There is no evidence that

an exclusion order would result in an adverse impact to the domestic production of grills that are

like or directly competitive with the grills at issue here.  Thus, the Commission finds that

issuing the remedial orders will not adversely impact competitive conditions, or the production

of like or directly competitive articles, in the United States.

### c.    United States Consumers

The Commission finds, and GMG does not deny, that there are numerous suppliers of

cloud-connected wood-pellet grills and components thereof.  *See* Traeger's Sub. at 5-6 (citing

CX-840C at Q. 23).  There is no evidence in the record that suggests a shortage would be likely

if GMG's infringing products were no longer available.  *Id.*; *see also* RX-316C at Q. 6.

GMG raises the issue that consumers may be harmed by the absence of an exemption

from the orders for replacement parts for grills that have been sold and are in the hands of

consumers.  GMG, relying upon the declaration of its co-founder David Baker, states that GMG

supplies repair parts to its customers and dealers to maintain the integrity of its customers'

purchased grills; and that because these grills range in price from $399 to $1,139, GMG's

customers purchase these grills with the expectation that they can be used in rugged outdoor

conditions and can be serviced with replacement parts to maintain their customers' investment

and the safety of the grills.  GMG's Sub. at 2-3 (citing Baker Decl. ¶¶ 5-6).  While we

acknowledge that there may be some instances in which parts would be needed for repair, we

have no information in the record to conclude that the only replacement parts that would be

suitable for such repair needs are infringing parts sold by GMG. GMG provides information through its declarant as to the price ranges for its products, but does not supply any information as to, for example, the frequency of repairs, the projected volume of replacement parts necessary for repairs, or whether alternative sources could provide replacement parts. The Commission agrees with Traeger that, without such facts, any alleged harm to consumers is entirely speculative. *See* Traeger's Reply at 2-3 (citing *Certain Optoelectronic Devices for Fiber Optic Communications, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-860, Comm'n Op. at 32-33 (May 9, 2014) (denying request for exemption due to lack of evidence after "acknowledg[ing] the concerns raised by Respondents that there exists the possibility that one or more customers may potentially" be disadvantaged)).

Accordingly, there is no indication in the record that exclusion of the covered products will adversely impact U.S. consumers, who will be able to purchase other competitive products from these and other providers.

Thus, the Commission finds that issuance of an LEO and CDO will not adversely impact U.S. consumers.

## C. Bonding

### 1. Relevant Law

If the Commission enters an exclusion order or a cease and desist order, a respondent may continue to import and sell its products during the 60-day period of Presidential review under a bond in an amount determined by the Commission to be "sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(j)(3); *see also* 19 C.F.R. § 210.50(a)(3). When reliable price information is available in the record, the Commission has often set the bond in an amount that would eliminate the price differential between the domestic product and the

18

imported, infringing product. *See Certain Microsphere Adhesives, Processes for Making Same, & Prods. Containing Same, Including Self-stick Repositionable Notes*, Inv. No. 337-TA-366, USITC Pub. No. 2949, Comm'n Op. at 24 (Jan. 16, 1996). The Commission also has used a reasonable royalty rate to set the bond amount where a reasonable royalty rate could be ascertained from the evidence in the record. *See, e.g.*, *Certain Audio Digital-to-Analog Converters & Prods. Containing Same*, Inv. No. 337-TA-499, Comm'n Op. at 25 (Mar. 3, 2005). Where the record establishes that the calculation of a price differential is impractical and there is insufficient evidence in the record to determine a reasonable royalty, the Commission has imposed a 100 percent bond. *See, e.g.*, *Certain Liquid Crystal Display Modules, Prods. Containing Same, & Methods Using the Same*, Inv. No. 337-TA-634, Comm'n Op. at 6-7 (Nov. 24, 2009). Even then, however, the complainant bears the burden of establishing the need for a bond. *Certain Rubber Antidegradants, Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-533, USITC Pub. No. 3975, Comm'n Op. at 40 (July 21, 2006).

### 2.     The RD

Before the former CALJ, Traeger requested a bond of 53.1 percent of the entered value of the infringing products based on an analysis performed by its expert, Dr. Thomas D. Vander Veen, using a weighted average of the actual selling prices for all accused products and Traeger's DI products sold in 2020. RD at 110 (citing CX-840C at Q. 90). GMG argued that Dr. Vander Veen's analysis was unreliable because it failed to directly compare products with similar features. *Id.* (citing GIB at 98-99). GMG also argued that Traeger and respondent sell their products through different channels, with GMG selling only through dealers such as independent hardware stores, and Traeger selling direct-to-consumer and through big box retail stores. *Id.* at 110-11 (citing GMG's Post-Hearing Reply Br. at 50 (Oct. 21, 2021)).

19

The RD, after considering the parties' arguments, finds that Dr. Vander Veen's analysis represents a reliable estimate of the price differential between GMG's accused products and Traeger's DI products. *Id.* at 111. The RD finds that although it may have been possible to compute a more precise price differential between these products, there is no such analysis in the record.[12] *Id.* Accordingly, the RD recommends a bond that is 53.1 percent of the entered value of GMG's infringing products during the period of Presidential review. *Id.*

### 3.    The Parties' Submissions

Traeger reiterates its arguments before the former CALJ—namely, that the analysis of its expert, Dr. Vander Veen, using a weighted average of the actual selling prices for all accused products and Traeger's DI products sold in 2020 accurately results in a 53.1 percent bond amount ███████████████████████. Traeger's Sub. at 3 (citing CX-840C at Q. 90; CX-853C.0020-21). Traeger notes that the RD agrees that Dr. Vander Veen's analysis is reliable and therefore contends that there is no reason to disrupt that finding. *Id.* (citing RD at 111).

Traeger contends that, in contrast, GMG proposed either no bond or a product-specific bond "based on certain cherry-picked price differences between Traeger and GMG products, ███████████████████████ *Id.* (citing GIB at 99-100). Traeger submits that GMG's analysis is unreliable because it is "based only on the stated *retail prices* obtained from websites for certain grills selected by GMG and ignores the *actual sales price* data produced by Traeger and GMG." *Id.* (emphasis in original). Traeger argues that GMG cherry picks a few grills and

---

[12] The RD also finds that GMG's exhibit RX-335C (the witness statement of its expert, Mr. Vincent Thomas) is not in evidence because it was expressly identified as "Withdrawn" by GMG in its Post-Hearing Exhibit List. RD at 111 n.24.

a few favorable advertised prices for those grills and compares them to Traeger's prices in order to artificially lower its price difference calculation and, therefore, its bond amount. *Id.* at 3-4 (citing GIB at 99, *compare* CX-333, using $699 from a website for the price of GMG's Daniel Boone Prime WiFi Grill, *with* JX-128C, GMG's own historical sales document ███████████████ ████████████████████████████████████.

Traeger further submits that GMG does not account for all of its grills and does not use the actual sales prices for any of the grills it relies upon. *Id.* at 4 (citing, *e.g.*, JX-128C (Jim Bowie Prime WiFi Grill ($899 on website, ███████████████████ ))). Traeger contends that, in contrast, Dr. Vander Veen's analysis correctly used the average prices for all of GMG's sales in 2020 from JX-128C, which is used in his calculations for setting a 53.1 percent bond amount. *Id.* (citing CX-840C at QQ. 88, 90; CX-853C.0020-22).

Based on the foregoing, Traeger requests that the Commission impose a bond of 53.1 percent of the entered value of GMG's infringing products during the period of Presidential review. *Id.*

GMG's bond argument relies exclusively on exhibit RX-335C, which the RD finds is not in evidence. *See* GMG's Sub. at 5-9; GMG's Reply at 1-6. The Commission previously determined not to review this finding. *See* 87 Fed. Reg. at 14288-89.

### 4.    Analysis

The Commission has determined to impose a bond in the amount of 53.1 percent of the entered value of the covered products during the period of Presidential review based on the evidence of the price differential between the domestic product and the imported, infringing product. Specifically, the Commission finds that Traeger's expert, Dr. Vander Veen, presented a reliable analysis—namely, using a weighted average of the actual selling prices for all accused

21

products and Traeger's DI products sold in 2020 accurately—to calculate the 53.1 percent bond amount.   *See, e.g.*, JX-128C; CX-840C at QQ. 88, 90; CX-853C.0020-22.   GMG's argument in opposition is unsupported because it relies solely on an exhibit that the former CALJ found withdrawn and therefore not part of the evidentiary record; the Commission determined not to review that finding.   *See* RD at 111 n.24; 87 Fed. Reg. 14288-89.

Accordingly, the Commission adopts the RD's recommendation that a 53.1 percent bond is appropriate to protect Traeger during the period of Presidential review.   *See* 19 U.S.C. § 1337(j) (providing for entry of infringing articles during the sixty (60) day period of Presidential review upon payment of a bond and stating that the bond is to be set at a level "sufficient to protect the complainant from any injury.").

## III.    CONCLUSION

For the reasons set forth herein, in view of the Commission's previous determination that there has been a violation of section 337, the Commission determines that the appropriate remedy is:   (1) an LEO prohibiting GMG's unlicensed importation of cloud-connected wood-pellet grills and components thereof that infringe one or more of claims 1-2 of the '720 patent and (2) a CDO directed against GMG.   The Commission further determines that the public interest does not preclude that remedy, and that the bond during the period of Presidential review is set at 53.1 percent of the entered value of the covered products.

By Order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:   May 12, 2022

23

I, Lisa R. Barton, hereby certify that the attached **COMMISSION OPINION** has been served upon the following parties as indicated, on **May 12, 2022**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant Traeger Pellet Grills LLC:**

Jay H. Reiziss, Esq.
**MCDERMOTT WILL & EMERY, LLP**
500 North Capitol Street, NW
Washington, DC 20001
Email: jreiziss@mwe.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

**On Behalf of Respondent GMG Products LLC:**

Andrew F. Pratt, Esq.
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, DE 19806
Email: apratt@devlinlawfirm.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

US010158720B2

(12) **United States Patent**
Colston

(10) Patent No.:    **US 10,158,720 B2**
(45) Date of Patent:    **Dec. 18, 2018**

(54) **CLOUD SYSTEM FOR CONTROLLING OUTDOOR GRILL WITH MOBILE APPLICATION**

(71) Applicant: **Traeger Pellet Grills, LLC**, Salt Lake City, UT (US)

(72) Inventor: **Michael Colston**, Salt Lake City, UT (US)

(73) Assignee: **Traeger Pellet Grills, LLC**, Salt Lake City, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/954,199**

(22) Filed: **Apr. 16, 2018**

(65) **Prior Publication Data**
US 2018/0234501 A1    Aug. 16, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/511,319, filed as application No. PCT/US2016/026736 on Apr. 8, (Continued)

(51) **Int. Cl.**
*G06F 15/16*    (2006.01)
*H04L 29/08*    (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... *H04L 67/125* (2013.01); *G06Q 30/012* (2013.01); *G06Q 30/0267* (2013.01); (Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,036,995 A    7/1977    Koether
4,409,662 A    10/1983    Rao
(Continued)

FOREIGN PATENT DOCUMENTS

CN    202392848    8/2012
CN    203914599    11/2014
(Continued)

OTHER PUBLICATIONS

International Search Report for application No. PCT/US2016/039271 dated Sep. 23, 2016.
(Continued)

*Primary Examiner* — Brian Whipple
(74) *Attorney, Agent, or Firm* — Workman Nydegger

(57) **ABSTRACT**

A cloud computing system for use in remote cooking can receive a first input from a computing system indicating that an electronically-controlled appliance is permitted to communicate with a cloud computing platform. The computer system generates a notification that is to be sent to a software application, where the software application is configured to control functions of the electronically-controlled appliance. The computer system transmits the generated notification to the software application, where the generated notification indicates that the cloud computing platform is communicably connected to the electronically-controlled appliance. The computer system then receives a second input from the software application indicating that specified functions are to be performed on the electronically-controlled appliance, and transmits instructions to the electronically-controlled appliance to perform the specified functions. These functions are interpreted and carried out by a hardware controller on the electronically-controlled appliance.

**30 Claims, 6 Drawing Sheets**



**US 10,158,720 B2**

Page 2

### Related U.S. Application Data

2016, application No. 15/954,199, which is a continuation-in-part of application No. 15/510,996, filed as application No. PCT/US2016/024737 on Mar. 29, 2016, application No. 15/954,199, which is a continuation-in-part of application No. 15/114,744, filed as application No. PCT/US2016/039271 on Jun. 24, 2016.

(60) Provisional application No. 62/245,549, filed on Oct. 23, 2015, provisional application No. 62/245,535, filed on Oct. 23, 2015, provisional application No. 62/245,530, filed on Oct. 23, 2015.

(51) **Int. Cl.**

| | |
|---|---|
| *G08B 21/18* | (2006.01) |
| *G06Q 30/02* | (2012.01) |
| *G06Q 30/00* | (2012.01) |
| *H04L 12/64* | (2006.01) |
| *H04L 12/28* | (2006.01) |
| *G08C 17/02* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *G08B 21/18* (2013.01); *G08B 21/185* (2013.01); *G08C 17/02* (2013.01); *H04L 12/28* (2013.01); *H04L 12/6418* (2013.01); *H04L 29/08* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,474,107 | A | 10/1984 | Cothran |
| 4,837,414 | A | 6/1989 | Edamula |
| 5,360,965 | A | 11/1994 | Ishii et al. |
| D605,216 | S | 12/2009 | Nakano |
| 7,663,502 | B2 | 2/2010 | Breed |
| 7,703,389 | B2 | 4/2010 | McLemore |
| 7,707,606 | B2 | 4/2010 | Hofrichter et al. |
| 7,743,012 | B2 | 6/2010 | Chambers et al. |
| 7,937,484 | B2 | 5/2011 | Julia et al. |
| 8,091,543 | B2 | 1/2012 | Baumann et al. |
| 8,766,144 | B2 | 7/2014 | McLoughlin et al. |
| 8,855,793 | B2 | 10/2014 | Bhargava |
| 8,931,400 | B1 | 1/2015 | Allen |
| 9,149,058 | B2 | 10/2015 | Bilet et al. |
| 9,414,444 | B2 | 8/2016 | Libman et al. |
| 2005/0262226 | A1* | 11/2005 | Holloway .............. G08C 19/28 709/221 |
| 2006/0041655 | A1* | 2/2006 | Holloway ................ G06F 1/18 709/223 |
| 2006/0144384 | A1 | 7/2006 | Santagata |
| 2006/0254432 | A1 | 11/2006 | McLemore |
| 2007/0001012 | A1 | 1/2007 | Kim et al. |
| 2007/0012307 | A1 | 1/2007 | Wiker |
| 2008/0060632 | A1 | 3/2008 | Leverty |
| 2010/0134620 | A1 | 6/2010 | Bielstein |
| 2010/0147823 | A1 | 6/2010 | Anderson |
| 2010/0247721 | A1 | 9/2010 | McGhee |
| 2011/0002677 | A1 | 1/2011 | Cochran et al. |
| 2012/0116820 | A1 | 5/2012 | English et al. |
| 2012/0170247 | A1 | 7/2012 | Do |
| 2012/0210268 | A1 | 8/2012 | Hilbrink |
| 2012/0278454 | A1 | 11/2012 | Stewart |
| 2012/0310416 | A1 | 12/2012 | Tepper et al. |
| 2013/0061765 | A1 | 3/2013 | Reinhart |
| 2013/0171304 | A1 | 7/2013 | Huntley |
| 2013/0188097 | A1 | 7/2013 | Smith |
| 2013/0265159 | A1 | 10/2013 | Durian |
| 2013/0277353 | A1 | 10/2013 | Joseph |
| 2014/0098247 | A1 | 4/2014 | Rao |
| 2014/0148969 | A1 | 5/2014 | Graziano et al. |
| 2014/0170275 | A1 | 6/2014 | Bordin |
| 2014/0295822 | A1 | 10/2014 | Koo |

| | | | |
|---|---|---|---|
| 2014/0326233 | A1 | 11/2014 | Traeger |
| 2015/0025687 | A1 | 1/2015 | Henderson et al. |
| 2015/0056344 | A1 | 2/2015 | Luckhardt |
| 2015/0213711 | A1 | 7/2015 | Rezvani |
| 2015/0229713 | A1 | 8/2015 | Lu et al. |
| 2015/0285513 | A1 | 10/2015 | Matarazzi et al. |
| 2015/0304157 | A1 | 10/2015 | Kim et al. |
| 2016/0080041 | A1 | 3/2016 | Schultz |
| 2016/0147207 | A1 | 5/2016 | Park |
| 2016/0255999 | A1 | 9/2016 | McAdams |
| 2016/0335874 | A1 | 11/2016 | Allen |
| 2017/0176019 | A1 | 6/2017 | Bhogal et al. |
| 2017/0289257 | A1 | 10/2017 | Colston |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 204270170 | 4/2015 |
| DE | 102008043722 | 5/2010 |
| DE | 102012204229 | 9/2013 |
| EP | 0298358 | 11/1990 |
| EP | 0899512 | 3/1999 |
| JP | 2015017711 | 1/2015 |
| KR | 1020020036478 | 5/2002 |
| KR | 1020140008927 | 1/2014 |
| KR | 101457087 | 10/2014 |
| KR | 1020140135318 | 11/2014 |
| KR | 101534514 | 6/2015 |
| WO | 2012171242 | 12/2012 |
| WO | 2017069799 | 4/2014 |
| WO | 086487 | 6/2014 |
| WO | 2015137740 | 9/2015 |
| WO | 2017069801 | 4/2017 |
| WO | 2017069813 | 4/2017 |

#### OTHER PUBLICATIONS

Astrelgroup: "HOTTOH: Electronic solutions for the biomass heating". Mar. 15, 2016 (Mar. 15, 2016), pp. 1-36, Retrieved from the Internet: URL: http://www.astrelgroup.com/wp-content/uploads/2016/06/80H000011R1.1_Hottoh-Catalogue_EN_20160315. pdf[retrieved on Mar. 9, 2017].

"Char-Broil Operations Guide English French", 15.125115 VESCONN 2015 Grilling Guide Eng.indd, Jan. 19, 2016, pp. 1-20.

"SmartChef Grill Guide English Spanish", 17.125395 Smart Chef Grill.indd, Sep. 27, 2016. pp. 1-16.

Non-Final Office Action for U.S. Appl. No. 15/510,996 dated May 11, 2018.

International Search Report for application No. PCT/US2016/026736 dated Jul. 8, 2016.

International Search Report for application No. PCT/US2016/024737 dated Jul. 8, 2016.

Craig Goldwyn, "The Zen of Wood" May 1, 2008, <www.amazingribs. com>, accessed online at <web.archive.org/web/20080504101052/http://www.amazingribs.com/ti[s_and_technique/zen_of_wood. html>.

SmartThings, "Easy & Affordable Smart Home Automation" retrieved from http://www.smartthings.com on Feb. 26, 2018, 5 pages.

SmartThings Product, retrieved from http://www.smartthings.com/prduct/ on Feb. 26, 2018, 9 pages.

SmartThings Hub, retrieved from https://shop.smartthings.com/#!/products/smarthings-hub on Feb. 26, 2018, 16 pages.

SmartThings GE Light & Appliance Plug-and-ControlPower Outlet, retrieved from https://shop.smartthings.com#!/products/ge-z-wave-wireless-lighting-control-lamp-module on Feb. 26, 2018, 14 pages.

Quirky, "Shop for products invented by real people" retireved from http://www.quirky.com on Feb. 26, 2018, 1 page.

Quirky Pivot Power Genius, retrieved from http://www.quirky.com/shop/633-pivot-power-genius-power-control-from-your-smartphone on Feb. 26, 2018, 6 pages.

Quirky Sptter, retrieved from http://www.quirky.com/shop/609-spotter-multi-prupose-sensor on Feb. 26, 2018, 4 pages.

Electric Imp, "Connectivity Made Simple" retrieved from http://electricimp.com on Feb. 26, 2018, 2 pages.

# US 10,158,720 B2

Page 3

(56) **References Cited**

OTHER PUBLICATIONS

Electric Imp Product, retrieved from http://electricimp.com/product/ on Feb. 26, 2018, 3 pages.

Electric Imp, "The Interactive imp: how to manage communication between app, agent and device" retrieved from http://electricimp.com/docs/resources/interactive/ on Feb. 26, 2018, 11 pages.

Electric Imp Lockitron, retrieved from http://electricimo.com/productgallery/lockitron/ on Feb. 26, 2018, 2 pages.

Electric Imp. "Flow to run an imp offline: Making-and breaking-Internet connections" retrieved from http://eletricimp.com/docs/resources/offline/ on Feb. 26, 2018, 9 pages.

Electric Imp, Inc. "specification: imp001 version 20140226" http://www.electricimp.com/ (2014) 14 pages.

Electric Imp, Inc. "specification: imp002 version 20140226" http://www.electricimp.com/ (2014) 18 pages.

Murata Manufacturing Co., Ltd. "WiFi Module Data Sheet, Broadcom BCM43362 WiFi + ST Micro STM32F405 MCU, Tenative P/N: LBWA1ZV1CD-716" http://electricimp.com/docs/attachments/hardware/datasheets/imp003_LBWA1ZV1CD_060314.pdf Feb. 26, 2018, 24 pages.

Crock-Pot, Coming Soon! Crockpot® Smart Slow Cooker enabled with WeMo™ retrieved from http://www.crock-pot.com/slow-cookers/coming-soon%21-crock-pot%C2%AE-smart-slow-cooker-enabled-with-wemo%E2%84%A2/SCCPWM600-V1.html on Feb. 26, 2018, 8 pages.

ttdadmin, 'DADO & Partners Take Home Top Awards at Home Electronics Shows', in DADO [online]. Posted Mar. 16, 2015 [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL.:http://dadolabs.com/march2015awards/>.

ttdadmin, 'Saber, Char-Broil and DADO Make Outdoor Cooking Smart at CES', in DADO [online]. Posted Jan. 7, 2015 [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL:http://dadolabs.com/saberandcbatces/>.

Monitor All Aspects of Grill Performance From Your Smart Phone [online] Saber Grills, 2015 [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL:https://sabergrilss.com/Edge/index.html>.

Get Cookin'—Our Favorite Grills', in Modern in Denver [online]. Posted Jun. 1, 2015 [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL:https://www.modernindenver.com/2015/06/grills/>.

ttadmin, 'Product Showcase: Char-Broil® Simple Smoker with SmartChef™ Technology, in DADO [online]. Posted Mar. 25th, 2016 [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL:http://dadolabs.com/charbroil-simple-smoked>.

'Products', in DADO [online]. [retrieved on Jul. 6, 2018] Retrieved from the Internet: <URL:http://dadolabs.com/category/products/>.

Good, Max. 'Saber Edge Grill Review', in Amazing Ribs [online]. [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL.https://amazingribs.com/grill/saber-edge-grill-review>.

Welcome to Life Lived on the Edge, in Edge: A Smarter Barbecue [online]. Posted Sep. 8, 2015 [retrieved on Jul. 8, 2018]. Retrieved from the Internet: <URL:https://www.sabergrills.com/Edge/features.html>.

ttadmin, 'Smarter Cookouts With IoT-Enabled Grills', in DADO [online]. Posted May 7 2015 [retrieved on Jul. 6, 2018] Retrieved from the Internet: <URL:http://dadolabs.com/smartercookouts-withiot/>.

Tasarra-Twigg, Noemi. 'The Saber Edge Smart Grill: Hi-tech BBQ', in Apple Gazette [online]. Posted Mar. 17, 2015 [retrieved on Jul. 6, 2018]. Retrieved from the Internet: <URL.http://www.applegazette.com/accessories-2/the-saber-edge-smart-grill-hi-tech-bbq/>.

Daugherty, Trevor. 'With summer approaching, SABER introduces the iPhone connected EDGE smart grill", in 9TO5Toys [online]. Posted Mar. 16, 2015 [retrieved Jul. 6, 2018]. Retrieved from the Internet: <URL:https://9to5toys.com/2015/03/16/sbaer-edge-iphone-connected-gril/>.

Screen Captures from YouTube video clip entitled "Network Setup on a Char-Broil Electric Smoker with Smartchef Technology", 5 pages, uploaded on Nov. 18, 2018 by user "Char-Broil Grills". Retrieved from Internet: <https://www.youtube.com/watch?v=bEt9_bLasas>.

Screen captures from YouTube video Clip entitled "Saber Edge Grill", 3 pages, uploaded on Apr. 5, 2015 by user "Max Good". Retrieved from Internet: <https://www.youtube.com/watch?v=mLZobNHMXbo>.

Office Action dated Jul. 18, 2018, Norwegian IP Office, App No. NO 20170757.

Facebook post entitled "Green Mountain Grills—Corporate shared a photo." 4 pages, posted on Jul. 29, 2014 by user "Green Mountain Grills—Corporate". [retrieved Sep. 11, 2018] Retrieved from Internet: <https://www.facebook.com/GreenMountainGrills/posts/826618620691226>.

Screen Captures and Transcript from YouTube video clip entitled "Green Mountain Grills—First Ever AC/DC Powered—Davy Crockett Promo Video", 5 pages, uploaded on Jul. 31, 2014 by user "Green Mountain Grills". [retrieved Sep. 11, 2018] Retrieved from Internet: <https://www.youtube.com/watch?v=R5huHfS5cHA&list=RDQMGcmWL20hfzw&index=17>.

Dankirk. "Got My WiFi Upgraded". Pelletheads [online ]. Posted on Aug. 22, 2014, 10:31:42 PM. [retrieved Sep. 11, 2018] Retrieved from Internet: <http://pelletheads.com/index.php?topic=30181.0>.

GMG App User Guide. Datasheet [online ]. Green Mountain Grills LLC, Jul. 28, 2014. [retrieved Sep. 11, 2018 ] Retrieved from Internet: <https://greenmountaingrills.com/wp-content/uploads/2014/08/GMG-Singles-.pdf>.

Hardwood Peller Grills. Datasheet [online ]. Green Mountain Grills LLC, Apr. 21, 2016. [retrieved Sep. 11, 2018 ] Retrieved from Internet: <https://greenmountaingrills.com/wp-content/uploads/2016/04/GMG_OperatingApp_Manual_Web.pdf>.

Davy Crockett model. Datasheet [online]. Green Mountain Grills LLC, May 28, 2015. [retrieved Sep. 11, 2018] Retrieved from Internet: <https://www.manualslib.com/manual/863329/Green-Mountain-Grills-Davy-Crockett.html>.

Urban Griller. "GMG Server mode available". Smoke Fire and Food [online]. Posted on Jul. 6th, 2016. [retrieved Sep. 11, 2018] Retrieved from Internet: <https://smokefireandfood.com/forum/index.php?thread/1632-gmg-server-mode-available/&s=91c16f3112ff4c847e243b766dee6abeb9553a5b>.

Bennett6. "Server Mode is Here". Pellethead [online]. Posted on Jul. 4, 2016, 11:58:19 AM. [retrieved Sep. 11, 2018]Retrieved from Internet: <http://pelletheads.com/index.php?topic=37421.0>.

Green Mountain Grills Announces Server Mode Is Now Available. Press Release [online]. Green Mountain Grills LLC, Dec. 5, 2017. [retrieved Sep. 11, 2018] Retrieved from Internet: <https://www.pmewswire.com/news-releases/green-mountain-grills-announces-server-mode-is-now-available-300567051.html>.

Notice of Allowance for U.S. Appl. No. 15/510,996, dated Aug. 29, 2018.

* cited by examiner



100
Cloud Computing Platform 101
Processor
102
Memory
103
Communications Module
104
Receiver
105
Notification Generator
106
Transmitter
107
Advertisement Generating Module
108
Analytics Module
109
Remote Diagnostics Module
110
Control Signal Generator
111
Notification
112
Mobile Computing Device 113
Software Application
114
First Input
115
Second Input
116
Indirect Communication
117
Access Point
118
Control Instructions
119
Electronically – Controlled Appliance
120
Electronic Hardware Controller
121
Functions
122
Advertisement
123

Figure 1



Figure 2



- Social Media
- Pellet Locator
- Direct Ordering
- Upload And Download
  Of Cook Cycles
- Party Planner
- Cook By Food Type

303

301

Cloud Service
Global Data Storage

302

- Data Analytics
- 3rd Party Advertising
- Remote Diagnostics
- eCommerce
- Social Media
- Improved Customer Service

304

Figure 3



App Workflow
400
Home
Grill Temperature
Probe Temperatures
Time (If Running)
Active Alerts
Current Cook Cycle
Startup Delay Time
Low Pellet Alert
Empty Hopper ETA
Cook Time ETA
401
Control
Target Grill Temp.
Target Probe Temps.
Set Timer
Set Startup Delay
Remote Start/off
Set Alarms
402
Cook Cycles
Custom Cycle
Save Cycle
Upload
Cycle Play-By-Play
Cook Cycle By Food
Browse & Download
Food Warming Cycle
403
Settings
WiFi Settings
Set Up
Tutorials
Advanced
404
Map
Pellet Locator
Local Butchers
Contribute Location
Events
Grill Distributors
405
Social Media
Photo & Upload
Share
406
Recipes
Browse
Add To Library
View Curated
Contribute
407
Store
Pellet Refill
Sauces
Rubs
Accessories
Parts
Grill Lineup
408
Cook Cycle Creation
Time
Conditions/Triggers
Push To Grill
Save
409

Figure 4





*500*

| Receive Input Indicating That Appliance Is Permitted To Communicate With Cloud | 510 |

| Generate Notification That Is To Be Sent To Software Application | 520 |

| Transmit Notification To Software Application | 530 |

| Receive Input Indicating That Specified Functions Are To Be Performed On Appliance | 540 |

| Transmit Instructions To Appliance For Performance | 550 |

*Figure 5*



*Figure 6*

US 10,158,720 B2

1

# CLOUD SYSTEM FOR CONTROLLING OUTDOOR GRILL WITH MOBILE APPLICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present invention is a continuation of U.S. patent application Ser. No. 15/511,319, filed on Mar. 15, 2017, which is a U.S. National Stage of PCT Application No. PCT/US16/26736 filed on Apr. 8, 2016, which claims the benefit of priority to U.S. Provisional Application No. 62/245,549, filed on Oct. 23, 2015. The present invention is also a continuation-in-part of U.S. patent application Ser. No. 15/510,996, which is a U.S. National Stage of PCT Application No. PCT/US16/24737 filed on Mar. 29, 2016, which claims the benefit of priority to U.S. Provisional Application No. 62/245,535, filed on Oct. 23, 2015. The present invention is also a continuation-in-part of U.S. patent application Ser. No. 15/114,744, which is a U.S. National Stage of PCT Application No. PCT/US16/39271, filed on Jun. 24, 2016, which claims the benefit of priority to U.S. Provisional Application No. 62/245,530, filed on Oct. 23, 2015. The entire content of each of the aforementioned patent applications is incorporated herein by reference.

## BACKGROUND

Outdoor appliances have long been used to prepare food and perform other tasks. For example, outdoor appliances such as grills and smokers are often used to prepare meats, vegetables, fruits, and other types of food. These grills and smokers are typically operated using manual controls that are integrated into the frame of the grill or smoker. For example, many such outdoor appliances have an ignition button that, when pressed, generates a spark near a gas outlet on a burner. The spark ignites the gas and the burner begins to create heat. The amount of heat is generally controlled using a dial or nob that allows more or less gas to be introduced at the burner.

In some cases, the outdoor appliances may have electronic controls. Thus, instead of having a manual dial to adjust the amount of gas being introduced at the burner, an electrical control is set or adjusted by the user. The electrical control then interacts with a solenoid or other electromechanical component to regulate the flow of gas to the burner. Still, however, as is the case with manual dials and nobs, the user of the outdoor appliance has to be present at the grill to make changes to settings on the grill.

To overcome this problem, some newly-manufactured outdoor appliances have been equipped with Bluetooth radios. These Bluetooth radios allow communication with nearby electronic devices including cell phones or tablets of the appliance's owner. Range limitations to the Bluetooth radio, however, necessitate that the user of the appliance still be within a certain proximity of the appliance. Once outside this proximity, the user no longer has any communication with the appliance, and thus cannot control any functionality related to the appliance. Moreover, even when connected to a mobile device, the appliance has very limited options as to what can be controlled over Bluetooth. Indeed, the appliance has no access to any information or control signals beyond the user's mobile device.

## BRIEF SUMMARY

Embodiments described herein are directed to communicating with and controlling operation of electronically-controlled appliances. In one embodiment, a provided computer system includes the following: a receiver that receives inputs from computing systems including a first input indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform. The computer system further includes a notification generator that generates notifications that are to be sent to software applications. The software applications are configured to control functions of the electronically-controlled appliance.

The computer system further includes a transmitter that sends generated notifications to the software applications. A generated notification may indicate that the cloud computing platform is communicably connected to the electronically-controlled appliance. The receiver receives a second input from the software application indicating that various functions are to be performed on the electronically-controlled appliance. In response, the transmitter sends instructions to the electronically-controlled appliance to perform the specified functions. These functions are then interpreted and carried out by a hardware controller on the electronically-controlled appliance.

In another embodiment, a computer system performs a method for controlling an electronically-controlled appliance including receiving a first input from a computing system indicating that an electronically-controlled appliance is permitted to communicate with a cloud computing platform. The computer system generates a notification that is to be sent to a software application, where the software application is configured to control functions of the electronically-controlled appliance. The computer system transmits the generated notification to the software application, where the generated notification indicates that the cloud computing platform is communicably connected to the electronically-controlled appliance. The computer system then receives a second input from the software application indicating that specified functions are to be performed on the electronically-controlled appliance, and transmits instructions to the electronically-controlled appliance to perform the specified functions. These functions are then interpreted and carried out by a hardware controller on the electronically-controlled appliance.

In yet another embodiment, a cloud computing platform is provided for communicating with and controlling operation of electronically-controlled appliances. The cloud computing platform includes the following: a receiver that receives inputs from other computing systems including a first input indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform. The receiver receives a second input indicating that specified functions are to be performed by the electronically-controlled appliance. Within the cloud computing platform, a control signal generator is provided which generates control signals that are to be sent to the electronically-controlled appliance. The control signals are configured to control functions of the electronically-controlled appliance according to the received second input. A transmitter is also provided within the cloud computing platform which transmits the generated control signals to the electronically-controlled appliance for performance of the specified functions. The functions are then interpreted and carried out by a hardware controller on the electronically-controlled appliance.

This Summary is provided to introduce a selection of concepts in a simplified form that are further described below in the Detailed Description. This Summary is not intended to identify key features or essential features of the

US 10,158,720 B2

**3**

claimed subject matter, nor is it intended to be used as an aid in determining the scope of the claimed subject matter.

Additional features and advantages will be set forth in the description which follows, and in part will be apparent to one of ordinary skill in the art from the description, or may be learned by the practice of the teachings herein. Features and advantages of embodiments described herein may be realized and obtained by means of the instruments and combinations particularly pointed out in the appended claims. Features of the embodiments described herein will become more fully apparent from the following description and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

To further clarify the above and other features of the embodiments described herein, a more particular description will be rendered by reference to the appended drawings. It is appreciated that these drawings depict only examples of the embodiments described herein and are therefore not to be considered limiting of its scope. The embodiments will be described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. **1** illustrates a computer architecture in which embodiments described herein may operate including communicating with and controlling operation of electronically-controlled appliances.

FIG. **2** illustrates an embodiment in which an electronically-controlled appliance is in communication with a cloud service and a mobile electronic device.

FIG. **3** illustrates an embodiment in which an electronically-controlled appliance is in communication with a cloud service and a mobile electronic device, and is further in communication with analytics, social media or other third party systems.

FIG. **4** illustrates an embodiment of a software application functionality hierarchy.

FIG. **5** illustrates a flowchart of an example method for communicating with and controlling operation of electronically-controlled appliances.

FIG. **6** illustrates an embodiment of a display that is part of an electronically-controlled smoker appliance.

DETAILED DESCRIPTION

Embodiments described herein are directed to communicating with and controlling operation of electronically-controlled appliances. In one embodiment, a provided computer system includes the following: a receiver that receives inputs from computing systems including a first input indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform. The computer system further includes a notification generator that generates notifications that are to be sent to software applications. The software applications are configured to control functions of the electronically-controlled appliance.

The computer system further includes a transmitter that sends generated notifications to the software applications. A generated notification may indicate that the cloud computing platform is communicably connected to the electronically-controlled appliance. The receiver receives a second input from the software application indicating that various functions are to be performed on the electronically-controlled appliance. In response, the transmitter sends instructions to the electronically-controlled appliance to perform the speci-

**4**

fied functions. These functions are then interpreted and carried out by a hardware controller on the electronically-controlled appliance.

In another embodiment, a computer system performs a method for controlling an electronically-controlled appliance including receiving a first input from a computing system indicating that an electronically-controlled appliance is permitted to communicate with a cloud computing platform. The computer system generates a notification that is to be sent to a software application, where the software application is configured to control functions of the electronically-controlled appliance. The computer system transmits the generated notification to the software application, where the generated notification indicates that the cloud computing platform is communicably connected to the electronically-controlled appliance. The computer system then receives a second input from the software application indicating that specified functions are to be performed on the electronically-controlled appliance, and transmits instructions to the electronically-controlled appliance to perform the specified functions. These functions are then interpreted and carried out by a hardware controller on the electronically-controlled appliance.

In yet another embodiment, a cloud computing platform is provided for communicating with and controlling operation of electronically-controlled appliances. The cloud computing platform includes the following: a receiver that receives inputs from other computing systems including a first input indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform. The receiver receives a second input indicating that specified functions are to be performed by the electronically-controlled appliance. Within the cloud computing platform, a control signal generator is provided which generates control signals that are to be sent to the electronically-controlled appliance. The control signals are configured to control functions of the electronically-controlled appliance according to the received second input. A transmitter is also provided within the cloud computing platform which transmits the generated control signals to the electronically-controlled appliance for performance of the specified functions. The functions are then interpreted and carried out by a hardware controller on the electronically-controlled appliance.

Embodiments described herein may implement various types of computing systems. These computing systems are now increasingly taking a wide variety of forms. Computing systems may, for example, be mobile phones, electronic appliances, laptop computers, tablet computers, wearable devices, desktop computers, mainframes, and the like. As used herein, the term "computing system" includes any device, system, or combination thereof that includes at least one processor, and a physical and tangible computer-readable memory capable of having thereon computer-executable instructions that are executable by the processor. A computing system may be distributed over a network environment and may include multiple constituent computing systems.

A computing system typically includes at least one processing unit and memory. The memory may be physical system memory, which may be volatile, non-volatile, or some combination of the two. The term "memory" may also be used herein to refer to non-volatile mass storage such as physical storage media or physical storage devices. If the computing system is distributed, the processing, memory and/or storage capability may be distributed as well.

US 10,158,720 B2

5

As used herein, the term "executable module" or "executable component" can refer to software objects, routines, methods, or similar computer-executable instructions that may be executed on the computing system. The different components, modules, engines, and services described herein may be implemented as objects or processes that execute on the computing system (e.g., as separate threads).

As described herein, a computing system may also contain communication channels that allow the computing system to communicate with other message processors over a wired or wireless network. Such communication channels may include hardware-based receivers, transmitters or transceivers, which are configured to receive data, transmit data or perform both.

Embodiments described herein also include physical computer-readable media for carrying or storing computer-executable instructions and/or data structures. Such computer-readable media can be any available physical media that can be accessed by a general-purpose or special-purpose computing system.

Computer storage media are physical hardware storage media that store computer-executable instructions and/or data structures. Physical hardware storage media include computer hardware, such as RAM, ROM, EEPROM, solid state drives ("SSDs"), flash memory, phase-change memory ("PCM"), optical disk storage, magnetic disk storage or other magnetic storage devices, or any other hardware storage device(s) which can be used to store program code in the form of computer-executable instructions or data structures, which can be accessed and executed by a general-purpose or special-purpose computing system to implement the disclosed functionality of the embodiments described herein. The data structures may include primitive types (e.g. character, double, floating-point), composite types (e.g. array, record, union, etc.), abstract data types (e.g. container, list, set, stack, tree, etc.), hashes, graphs or other any other types of data structures.

As used herein, computer-executable instructions comprise instructions and data which, when executed at one or more processors, cause a general-purpose computing system, special-purpose computing system, or special-purpose processing device to perform a certain function or group of functions. Computer-executable instructions may be, for example, binaries, intermediate format instructions such as assembly language, or even source code.

Those skilled in the art will appreciate that the principles described herein may be practiced in network computing environments with many types of computing system configurations, including, personal computers, desktop computers, laptop computers, message processors, hand-held devices, multi-processor systems, microprocessor-based or programmable consumer electronics, network PCs, minicomputers, mainframe computers, mobile telephones, PDAs, tablets, pagers, routers, switches, and the like. The embodiments herein may also be practiced in distributed system environments where local and remote computing systems, which are linked (either by hardwired data links, wireless data links, or by a combination of hardwired and wireless data links) through a network, both perform tasks. As such, in a distributed system environment, a computing system may include a plurality of constituent computing systems. In a distributed system environment, program modules may be located in both local and remote memory storage devices.

Those skilled in the art will also appreciate that the embodiments herein may be practiced in a cloud computing environment. Cloud computing environments may be dis-

6

tributed, although this is not required. When distributed, cloud computing environments may be distributed internationally within an organization and/or have components possessed across multiple organizations. In this description and the following claims, "cloud computing" is defined as a model for enabling on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services). The definition of "cloud computing" is not limited to any of the other numerous advantages that can be obtained from such a model when properly deployed.

Still further, system architectures described herein can include a plurality of independent components that each contribute to the functionality of the system as a whole. This modularity allows for increased flexibility when approaching issues of platform scalability and, to this end, provides a variety of advantages. System complexity and growth can be managed more easily through the use of smaller-scale parts with limited functional scope. Platform fault tolerance is enhanced through the use of these loosely coupled modules. Individual components can be grown incrementally as business needs dictate. Modular development also translates to decreased time to market for new functionality. New functionality can be added or removed without impacting the core system.

Referring to the figures, FIG. 1 illustrates an environment 100 in which at least one embodiment described herein may be employed. The environment 100 includes a cloud computing platform 101. The cloud computing platform 101 may include any number of local or distributed computer systems. The cloud computing platform 101 includes at least one hardware processor 102 and physical system memory 103. The cloud computing platform 101 further includes modules for performing a variety of different functions.

For instance, the communications module 104 may be configured to communicate with other computing systems (e.g. mobile computing device 113). The communications module 104 may include any wired or wireless communication means that can receive and/or transmit data to or from other computing systems such as wired or wireless network interface cards. The communications module 104 may be configured to interact with databases, mobile computing devices (such as mobile phones or tablets), electronically-controlled appliances (e.g. 120), embedded computing systems or other types of computing systems.

In one embodiment, the cloud computing platform 101 may be configured to communicate with mobile computing device 113 (e.g. a smart phone, laptop, tablet or wearable device) and/or with electronically-controlled appliance 120. The mobile computing device 113 may also be able to communicate with the electronically-controlled appliance 120, either directly or through the cloud computing platform 101. The electronically-controlled appliance 120 may be any type of appliance or device that is electronically-controlled. For example, any device that is controlled by an electronic hardware controller 121 would be an electronically-controlled appliance 120. The electronic hardware controller 121 may include computer memory that has instructions stored thereon for controlling the appliance or device.

In one example embodiment, the electronically-controlled appliance 120 is a grill or smoking appliance, although the embodiments described herein are not limited to such. The grill/smoker may be operated by the electronic hardware controller 121. The controller 121 may be configured to control temperature, control cooking cycles, control fuel burn rate, monitor ambient temperature, or perform other functions. In some cases, the electronic hardware controller

US 10,158,720 B2

7

121 may include or be communicatively connected to a radio such as a Bluetooth or WiFi radio that can wirelessly communicate with other computing systems (e.g. 101 and 113). The electronic hardware controller 121 may control these communications, and may present a display to a user. The display may include a variety of information, including a graphical user interface (GUI) that allows interaction from an appliance user.

The cloud computing platform 101 may be configured to interact with the electronically-controlled appliance 120 through the communications module 104. The cloud computing platform 101 further includes a receiver for receiving inputs from the mobile computing device 113. A software application 114 running on the mobile computing device 113 may include a GUI for controlling the electronically-controlled appliance 120. The GUI may provide various notifications, alerts, buttons, fields, prompts or other elements that allow monitoring and control of the electronically-controlled appliance 120.

In one embodiment, the cloud computing platform 101 is provided for communicating with and controlling operation of electronically-controlled appliances such as appliance 120. The cloud computing platform 101 has hardware elements including a processor 102, memory 103, a receiver 105, a transmitter 107, various communication radios in the communications module 104, and other hardware elements. The receiver 105 may be configured to receive inputs from computing systems (including mobile computing device 113) such as first input 115 indicating that an electronically-controlled appliance is permitted to communicate with the cloud computing platform 101.

The cloud computing platform 101 also includes a notification generator 106 configured to generate notifications (e.g. 112) that are to be sent to software applications such as software application 114 running on mobile computing device 113. The software application 114 may be configured to control functions 122 of the electronically-controlled appliance 120. A transmitter 107 is also part of the cloud computing platform 101. The transmitter 107 may be configured to send a generated notification 112 to software application 114, where the notification indicates that the cloud computing platform 101 is communicably connected to the electronically-controlled appliance 120.

The receiver 105 may then receive a second input 116 from the software application 114 indicating that certain functions are to be performed on the electronically-controlled appliance 120. Upon receiving such an input, the transmitter sends control instructions 119 to the electronically-controlled appliance 120 to perform the specified functions. The functions are then interpreted and carried out by an electronic hardware controller on the electronically-controlled appliance 120 according to the control instructions 119.

These control instructions 119 may include, for example, an indication that a certain amount of fuel pellets are to be added to a smoker's combustion area, or that a specified amount of fuel (such as propane) is to be burned by a grill, or that a specified internal temperature is to be reached and maintained. The software application 114 may send a notification of availability to the cloud computing platform 101 to indicate whether the electronically-controlled appliance 120 is available or not to receive such control instructions 119.

If the notification of availability indicates that the electronically-controlled appliance 120 is currently available to receive instructions, the software application 114 may provide a user interface for a user to interact with. Through this

8

user interface, the user can control the appliance 120. The user interface may provide many different functions 122 that are controllable using the user interface. As mentioned above, these functions 122 may include substantially any function that the electronically-controlled appliance 120 is capable of (or is modified to be capable of) performing. For grill and smokers, this may include controlling burn rate, temperature, cooking cycle, fuel dispensing, controlling timers, accessing recipes, displaying probe temperatures or alerts, turning the device on or off, or other functions.

Other electronically-controlled appliances 115 such as ovens, refrigerators, blenders, toasters, dishwashers, coffee machines, mixers, bread makers, washers and dryers or other appliances may also be controlled using the software application 114 in a manner that is the same as or similar to that used to control a grill or smoker. The software application 114 may provide a notification of availability for the appliance 120, and the application may display a user interface for controlling functions of that appliance. As inputs are received from a user, an instruction generator in the application 114 may generate instructions that are specific to the appliance, and that are interpretable and understandable by the appliance 120. These instruction instructions 119 are then sent to the electronically-controlled appliance 120 to control the functions 122 specified by the user.

In some cases, a user may control whether the electronically-controlled appliance 120 is permitted to communicate with the cloud computing platform 101 or with other computing systems such as mobile computing device 113. The electronically-controlled appliance 120 may send an indication to the cloud computing platform 101, indicating that it wishes to communicate with one or more mobile computing devices 113 (for example, to download a recipe). A user may provide input indicating whether the electronically-controlled appliance 120 is permitted to communicate with the mobile computing device 113 or not. If such communication is permitted by the user, the electronically-controlled appliance 120 may communicate with an access point 118 (such as a router) that permits flow of data between the appliance 120 and the cloud computing platform 101 and/or between the appliance 120 and the mobile computing device 113.

The cloud computing platform 101 further includes an advertisement generating module 108. The advertisement generating module 108 may generate advertisements 123 which are sent to the electronically-controlled appliance 120. The advertisements may be based on the user's use of the appliance, or may be based on a sale that might interest the user (such as a sale on brisket), or may be based on analytics. Indeed, the cloud computing platform 101 includes an analytics module 109 configured to perform analytics on usage data. The analytics module 109 may, for example, perform statistical analyses on usage data received from the appliance 120. Then, based on the statistical analysis, the advertisement generating module 108 can generate an advertisement that would be most likely to be relevant to the user, based on their appliance usage.

Other modules such as the remote diagnostics module 110 and control signal generator 111 may also be included in the cloud computing platform 101. The remote diagnostics module 110 may analyze usage data and determine what problems are currently occurring on the appliance. The remote diagnostics module 110 may also analyze the appliance usage data and determine what problems are likely to occur based on the user's use of the appliance. A control signal generator 111 may be used by the cloud computing platform 101 to generate control instructions 119 that are sent to the electronically-controlled appliance 120 to per-

US 10,158,720 B2

9

form specified functions **122**. The control instructions **119** are interpretable by the appliance's electronic hardware controller **121**. Once interpreted, the functions are carried out on the appliance according to the instructions **119**.

FIG. **2** illustrates an embodiment in which a smoker **202** is controlled via a smart phone **203** (or rather via a software application running on the smart phone). The smart phone **203** may communicate with a cloud service **201** which, in turn, communicates with the smoker **202**. The cloud service **201** may provide data storage along with other features. The data storage may store, for example, recipes used by the smoker **202** to smoke meats, vegetables, fruits or other food items. Using the cloud service **201**, a customer or user may use their phone **203**, tablet, laptop, desktop or other computer system to control the functions of the smoker **202**.

The functionality may include smoker/grill monitoring including monitoring of the internal temperature, external ambient air temperature, probe temperature (e.g. from probes that communicate wirelessly), and alerts that may be raised by the grill or smoker. Other controls may include adjusting the temperature by adding more fuel, or allowing the existing fuel (such as pellets) to burn down so as to reduce the temperature, turning the device on or off or turning certain components on or off, controlling the timer or custom cooking cycles, or monitoring probe temperature alerts. Many more controls may be provided on the smart phone **203**, and the amount and type of controls may be updated over time to add new functionality.

As control inputs are received at the smart phone **203** (or other electronic device), they are passed to the cloud service **201** via a wired or wireless data transmission. The control inputs are then passed to the smoker/grill **202** directly or via an access point such as a WiFi router. In this manner, a user may be able to control their smoker/grill from substantially any location that has internet access. In some cases, the user may even be able to ignite the smoker/grill **202** remotely, while in other cases, such functionality may be disabled unless the user is within a specified distance of the grill, as determined by a GPS or Bluetooth geofence.

FIG. **3** illustrates an environment similar to that of FIG. **2** in which a cloud service **301** links various devices including a smoker/grill **302** and a smart phone **303** or other electronic computing device. The cloud service **301** is also connected to various other services and systems including, but not limited to, data analytics, third party advertising, remote diagnostic services, eCommerce services, social media, customer service assistance and others. For example, usage data for the smoker/grill **302** may be uploaded to the cloud service **301** and stored in the global data storage.

This usage data (such as when the smoker was turned on, how long was it turned on, what temperature did it reach, what was the average internal temperature, what was the average external temperature, what cooking/smoking recipe was used, what controls were used and when or other operational usage data) may be analyzed by an analytics engine in combination with data from other users. As such, usage data from many different users may be logged and analyzed to identify broad patterns of use. These analytics may then be used to refine and improve future smokers or grills, or may be used for other purposes such as providing advertising.

In one example, the cloud service may track users' usage of the smoker/grill, and may determine which products or recipes may be of interest to a given user based on similarities between their usage of the grill and other's usage. The usage data may also be used to perform remote diagnostics of the smoker/grill **302**. For instance, the usage data

10

may indicate that a user's grill temperature exceeded a normal operating temperature (e.g. due to a grease fire). As such, certain parts may have failed or may be likely to fail due to the extreme heat. Other usage data may indicate different problems that may be likely to occur as a result of how the user is using their grill. Usage data may also be sent to social media announcing successful implementation of a recipe, or announcing to party guests that a specified meat is smoking and will be ready at a certain time. Many other social media implementations may also be used as provided by the cloud service **301**.

FIG. **4** illustrates an application workflow **400** for a software application such as application **114** of FIG. **1**. The application may run on a mobile device such as a phone or tablet or wearable device, or may be run on a desktop computing system or may be run through a web browser. It will be understood that the application workflow **400** is one example of an application workflow, and other embodiments and implementations are possible.

The application workflow **400** includes a home menu **401** that, on launch, shows the status of the grill (or other electronically-controlled appliance), the status of any probes in use, the status of any timers in use and any alerts. A first time setup may walk a user through connecting the grill to an access point (such as a WiFi access point), and linking the mobile device to the grill. The first time setup may also take the user through a tutorial on how to use the grill, or at least certain components of the grill. The home menu **401** may show any or all of the following: grill temperature, probe temperature, timer (if running), active alerts (e.g. a low pellet alert or an empty hopper alert), current cook cycle, current cook time-to-completion, startup delay time, or other information.

The application may have many different tabs and menus, including one or more of the following: a control menu **402** that allows users to control the grill's target temperature, control the grill's target probe temperatures, set or restart timers, set startup delays, remotely start or turn grill off, set alerts or perform other functionality. A cook cycles menu **403** may be provided which allows users to select from different cooking cycles (i.e. pre-programmed cooking routines that control temperature for a specified amount of time to cook or smoke the food item in a certain manner), save cooking cycles, upload cooking cycles to a cloud service (e.g. **301** of FIG. **3**), provide the user a play-by-play indicator of what is occurring during a cooking cycle, implement a certain cook cycle for a given food, browse and download recipes and/or cook cycles, provide access to a food warming cycle that keeps the food at a certain temperature for a specified time, or perform other functions.

The cook cycles menu **403** may have one or more submenus including a cooking cycle creation menu **409**. The cook cycle creation menu **409** may allow a user to create his or her own custom cooking cycle. The custom cooking cycle can specify a given time to begin and end, a certain temperature to hold or change to throughout the cycle, various customizable triggers or conditions that may cause changes to the cooking cycle such as shortening or lengthening the cooking time, or increasing or decreasing internal grill temperature for a given length of time. The cook cycle creation menu **409** may allow a user to push the customized cooking cycle to the grill and have the grill begin implementation of the cycle. This customized cooking cycle may also be saved directly on the grill or in the cloud service **301**.

Other menus provided on the application workflow may include a settings menu **404**. The settings menu may allow a user to set up WiFi, Bluetooth or communication means on

US 10,158,720 B2

**11**

the grill. The settings menu **404** may also allow configuration settings to be accessed and changed. The settings menu **404** may further provide tutorial as well as other appliance- or application-specific settings that may be changed using the settings menu. A map menu or tab **405** may be provided which gives access to local retailers including pellet sellers or distributors, local butchers or farms for meat or vegetables, local events including barbeques or tailgate parties, or locations of nearby grill distributors. The map menu **405** may also provide other information that is specific to the appliance, such as a repair shop that specializes in repairs for that appliance.

A social media menu **406** may be provided which allows users to upload photos, recipes, videos or other media which may be of interest to other users. The social media tab may allow the user to post images or status updates to social media websites, including location pins, updates from the grill itself or other information. As such, the social media menu **406** allows users to share their grilling/smoking experience with others.

A recipes menu **407** allows users to browse recipes available online or through the cloud service **301**. When browsing these recipes, the user may select to download the recipes to their phone or other device. These recipes can be collected in a library and shared via social media. Users can sort the recipes, add their own recipes, add pictures to others' recipes or otherwise interact with the recipe database. A store menu **408** allows a user to purchase pellets, propane or other fuel, purchase sauces, rubs, grill accessories, grill parts or full grills/smokers. The store may be expanded to allow the purchase of food items or other items that may be used in conjunction with the grill. The concepts described above will be explained further below with regard to method **500** of FIG. **5**.

In view of the systems and architectures described above, methodologies that may be implemented in accordance with the disclosed subject matter will be better appreciated with reference to the flow chart of FIG. **5**. For purposes of simplicity of explanation, the methodologies are shown and described as a series of blocks. However, it should be understood and appreciated that the claimed subject matter is not limited by the order of the blocks, as some blocks may occur in different orders and/or concurrently with other blocks from what is depicted and described herein. Moreover, not all illustrated blocks may be required to implement the methodologies described hereinafter.

FIG. **5** illustrates a flowchart of a method **500** for communicating with and controlling operation of electronically-controlled appliances. The method **500** will now be described with frequent reference to the components and data of environment **100**.

Method **500** includes receiving a first input from one or more computing systems indicating that at least a first electronically-controlled appliance is permitted to communicate with a cloud computing platform (**510**). For example, cloud computing platform **101** may receive first input **115** from mobile computing device **113** indicating that electronically-controlled appliance **120** is permitted to communicate with the cloud computing platform. The cloud computing platform **101** may thus be apprised that the electronically-controlled appliance **120** will be sending data requests to the platform or will otherwise be attempting to communicate with the platform. In some cases, the communication may include requesting to download a recipe or custom cooking cycle.

Method **500** further includes generating a notification that is to be sent to a software application, the software appli-

**12**

cation being configured to control one or more functions of the electronically-controlled appliance (**520**). The notification generator **106** of the cloud computing platform **101** may generate notification **112** which is sent to be sent to the software application **114** of the mobile computing device **113**. The notification **112** indicates that the cloud computing platform is communicably connected to the electronically-controlled appliance **120**. After this notification **112** is generated, the transmitter **107** of the cloud computing platform **101** transmits the generated notification to the software application **114** (**530**).

Method **500** also includes receiving a second input from the software application indicating that one or more specified functions are to be performed on the electronically-controlled appliance (**540**). For instance, the receiver **105** of the cloud computing platform **101** may receive second input **116** from the mobile computing device **113**. The second input specifies functions **122** that are to be performed on the electronically-controlled appliance **120**. The functions may include adjusting the temperature by increasing or decreasing burn rate, monitoring internal or external temperatures, monitoring wireless probes, adjusting or setting timers, or performing other functions applicable to the appliance. The transmitter **107** then transmits control instructions **119** to the electronically-controlled appliance **120** to perform the specified functions **122** (**550**). The functions **122** are interpreted and carried out by an electronic hardware controller on the electronically-controlled appliance **120**.

The receiver **105** of the cloud computing platform **101** may further receive portions of data including ambient temperature data for the environment in which the electronically-controlled appliance **120** resides. For example, a grill or smoker may record the ambient air temperature using a temperature sensor on the outside of the appliance. The ambient air temperature may be monitored throughout the cooking cycle, and may lead to a change in operation. For example, the control instructions **119** may be altered by the cloud computing platform **101**, prior to transmission to the electronically-controlled appliance **120**, to compensate for the ambient air temperature. For instance, on a hotter day, the cooking cycles may be adjusted to avoid overheating the meat or other food, while on a colder day, the cooking cycles may be adjusted upwards to burn hotter so as to maintain the desired temperature. Other adjustments may also be made based on the ambient air temperature.

The electronic hardware controller **121** of the electronically-controlled appliance **120** may be configured to receive food temperature data from a digital thermometer. The digital thermometer may be communicably connected to the hardware controller **121** of the grill and/or to the cloud computing platform **101**. The digital probes may be configured to interact with the cloud computing platform regardless of which grill or other appliance it is used with. In some cases, prior to transmitting the control instructions **119**, the cloud computing platform adjusts the control instructions to further include an alert based on the food temperature data.

For instance, the hardware controller **121** may communicate with the digital thermometer, and set alerts based on probe temperature. When the alerts are triggered, the electronic hardware controller **121** communicates with the cloud computing platform **101** and/or the mobile computing device **113**. Moreover, a user can use the software application **114** on the mobile computing device **113** to monitor probe temperatures, internal temperatures, and/or ambient temperatures using the software application **114** on the mobile computing device **113**.

US 10,158,720 B2

13

At least in some embodiments, the cloud computing platform **101** may be configured to communicate directly with the electronically-controlled appliance via an access point **118** within range of the electronically-controlled device **120**. A user of the mobile computing device **113** may use the software application **114** to grant permission for the electronically-controlled device **120** to communicate directly with the cloud computing platform **101**. As such, the electronically-controlled device **120** may send and receive data from the cloud computing platform **101** through a wired or wireless access point **118**. In other cases, the cloud computing platform **101** may communicate with the electronically-controlled appliance **120** through the software application **114** provided on the mobile computing device **113**. The software application **114** relays communications (i.e. indirect communication **117**) between the cloud computing platform **101** and the electronically-controlled appliance **120**.

In addition to facilitating communication between the mobile device **113** and the electronically-controlled device **120**, the cloud computing platform **101** may also provide services such as advertising services. The cloud computing platform **101** includes an advertisement generating module **108** configured to generate advertisements **123** for transmission to the electronically-controlled appliance **120** or to the software application **114** running on the mobile device **113**. The advertisement generating module may, for example, access information from local retailers including grocery stores. Based on grill or smoker usage data, the cloud computing platform **101** may determine which ads would be most interesting to a user, and may send those advertisements **123** to the software application **114** or to the grill directly. The advertisements **123** may be tailored for users of the electronically-controlled appliance **120** based on usage information for the user and potentially based on nearby user's appliance usage.

Indeed, the cloud computing platform **101** may receive usage data from many different electronically-controlled devices including device **120**. This usage data may be used for a variety of purposes, including generating targeted advertising. The usage data may also be used by the analytics module **109**. The analytics module **109** may be configured to analyze the usage data associated with the electronically-controlled appliances and generate appliance-related analytics for the electronically-controlled appliance(s). The usage data may include wattage drawn by a hot rod, time turned on, temperature (internal and external), indications of how the user cooks, when they cook, what recipes they use, etc. The analytics data may generally show, for a specific user or for a grouping of users, how the users are using their grills or other appliances.

In one example, the analytics data is used to verify or void a warranty claim. For instance, if a user had a grease fire in the grill causing the internal temperature to exceed 800 degrees Fahrenheit, the cloud computing platform **101** would know what had occurred, and would know that the warranty was voided due to the excessive temperature. Contrariwise, if a user makes a warranty claim and their usage has been within normal parameters, the warranty claim may be verified and fulfilled.

The cloud computing platform **101** may further include a remote diagnostics module **110** that is configured to perform remote diagnostics on the electronically-controlled appliance **120**. The remote diagnostics module **110** may access the user's usage data to predict failures for certain components of the electronically-controlled appliance **120**. If the appliance has been mistreated or heavily used in a certain

14

manner, the remote diagnostics module **110** may be able to determine that a component failure is likely and may prompt the user (via a display on the grill such as that shown in FIG. **6** or via the software application **114**) to replace the component or at least indicate that a failure may be imminent. The remote diagnostics module **110** may also be able to determine why a given part isn't working based on the appliance's usage information.

FIG. **6** illustrates an embodiment of a smoker **601** which is an electronically-controlled device. The smoker **601** has one or more manual controls **603** such as buttons or knobs, as well as a display **602**. The display may be a touchscreen display that allows a user to provide input. The display **602** may include electronic controls such as buttons or sliders or input fields that allow users to adjust settings on the smoker **601**. One input field may be a "Custom Smoking Options" field **605** that allows users to input their own customized smoking cycles or modify existing smoking cycles. These smoking cycles may apply to certain meats or to certain recipes and may be used to achieve a certain result. The display **602** may include other controls including a "Downloadable Recipes" button **606** that allows users to download recipes directly to the smoker **601** through the access point **118** or through the software application **114**. The display **602** may also include a place to display advertisements **607**, a timer **608**, or other items which may be useful to an appliance user.

Additionally or alternatively, an embodiment of a cloud computing platform is provided (e.g. **101** of FIG. **1**) for communicating with and controlling operation of electronically-controlled appliances (e.g. **120**). The cloud computing platform **101** has a hardware processor **102**, a receiver **105** configured to receive inputs from other computing systems including a first input **115** indicating that the electronically-controlled appliance **120** is permitted to communicate with the cloud computing platform. The receiver **105** also receives a second input **116** indicating that various specified functions **122** are to be performed by the electronically-controlled appliance **120**.

The cloud computing platform **101** also includes a control signal generator **111** configured to generate control instructions **119** that are to be sent to the electronically-controlled appliance **120**. The control instructions **119** are configured to control functions **122** of the electronically-controlled appliance **120** according to the second input **116**. The platform **101** also includes a transmitter **107** that transmits the generated control instructions **119** to the electronically-controlled appliance **120** for performance of the specified functions **122**. These functions are then interpreted and carried out by an electronic hardware controller **121** on the electronically-controlled appliance **120**.

In some cases, the cloud computing platform **101** may further include or be communicatively connected to a data store in which recipes, custom smoking patterns, and user appliance usage data are stored. The cloud computing platform **101** may be configured to access selected recipes from the data store and generate control signals for the electronically-controlled appliance according to the recipe. Indeed, the control signal generator **111** may generate control instructions **119** based on a recipe, such that the food is smoked by the appliance **120** according to a smoke pattern specified in the recipe.

In this manner, a user can simply load a recipe on his or her mobile device **113** and provide that recipe to the cloud computing platform **101** where the control signal generator **111** will automatically access the recipe, generate control instructions **119** and send them to the electronically-con-

US 10,158,720 B2

## 15

trolled appliance **120**. The appliance's hardware controller will then receive the control instructions, interpret them and carry them out. Accordingly, as a result of the control instructions, the grill/smoker may ignite and begin a smoking cycle, a timer may be set, alerts may be established and other fuel may begin to be fed into the combustion area. As such, multiple physical and computer-related results may occur based on the user's input at the mobile device **113**. At least in some cases, these control instructions **119** may be overridden by the manual controls (**603** of FIG. **6**) or by the electronic controls **604**.

In some embodiments, the cloud computing platform **101** may be configured to access user appliance usage data from a data store. The platform **101** may then use this usage data to generate advertisements **123** for the appliance user based on the appliance usage data, and further transmit the generated advertisements to the electronically-controlled appliance **120** or to a software application **114** running on the user's mobile electronic device **113**. The advertisements may be tailored to the user, or may be general announcements that may be of interest to owners of that appliance.

Accordingly, methods, systems and computer program products are provided which communicate with and control operation of electronically-controlled appliances. The concepts and features described herein may be embodied in other specific forms without departing from their spirit or descriptive characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the disclosure is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

I claim:

1. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:

a receiver configured to receive inputs from one or more computing systems including at least a first input indicating that an electronically-controlled appliance is in network communication with the cloud computing platform, the electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker;

a notification generator configured to generate notifications that are to be sent to one or more software applications being executed at a mobile device, the one or more software applications being configured to control one or more functions of the electronically-controlled appliance;

a transmitter configured to send at least one generated notification to at least one of the software applications selected from the one or more software applications, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;

the receiver receiving a second input from the at least one software application indicating that one or more specified functions are to be performed on the electronically-controlled appliance; and

the transmitter sending one or more instructions to the electronically-controlled appliance to perform the one or more specified functions, the functions being inter-

## 16

preted and carried out by a hardware controller on the electronically-controlled appliance.

2. The cloud computing platform of claim **1**, wherein the cloud computing platform communicates directly with the electronically-controlled appliance via an access point within range of the electronically-controlled appliance.

3. The cloud computing platform of claim **1**, wherein:

the cloud computing platform communicates with the electronically-controlled appliance through a software application provided on another computing system; and

the software application is configured to relay communications between the cloud computing platform and the electronically-controlled appliance.

4. The cloud computing platform of claim **1**, further comprising an advertisement generating module configured to generate advertisements for transmission to the electronically-controlled appliance or to a software application running on a mobile device.

5. The cloud computing platform of claim **4**, wherein the advertisements are tailored for users of the electronically-controlled appliance based on usage data received from the electronically-controlled appliance, wherein the usage data comprises at least one of digital probe information, duration of use, and amount of power drawn from components of the electronically-controlled appliance.

6. The cloud computing platform of claim **1**, wherein the cloud computing platform receives one or more portions of usage data from the electronically-controlled appliance.

7. The cloud computing platform of claim **6**, further comprising an analytics module configured to:

analyze the usage data associated with the electronically-controlled appliance; and

generate one or more appliance-related analytics for the electronically-controlled appliance;

wherein the usage data comprises digital probe information, duration of use, and amount of power drawn from components of the electronically-controlled appliance.

8. The cloud computing platform of claim **7**, wherein the analytics data is used to verify or void warranty claims.

9. The cloud computing platform of claim **7**, further comprising a remote diagnostics module that is configured to perform remote diagnostics on the electronically-controlled appliance.

10. The cloud computing platform of claim **9**, wherein the remote diagnostics module is configured to predict failures for one or more components of the electronically-controlled appliance.

11. The cloud computing platform of claim **10**, wherein the transmitter is configured to transmit one or more notification messages to:

the electronically-controlled appliance; or

a software application running on a mobile device regarding the predicted component failures.

12. A cloud computing platform for communicating with and controlling operation of an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker, the cloud computing platform having at least one hardware processor, the cloud computing platform comprising:

a receiver at the cloud computing platform configured to receive inputs from one or more mobile devices including at least a first input indicating that the electronically-controlled appliance is in network communication with the cloud computing platform;

wherein the one or more mobile devices have previously established an initial, direct connection with the electronically-controlled appliance, and wherein the one or

US 10,158,720 B2

17

more mobile devices and the electronically-controlled appliance maintain independent connections to the cloud computing platform over the internet;

the receiver at the cloud computing platform receiving a second input from the one or more mobile devices indicating that one or more end user specified functions are to be performed by the electronically-controlled appliance;

a control signal generator configured to generate control signals that are to be sent to the electronically-controlled appliance, the control signals being configured to control functions of the electronically-controlled appliance according to the received second input; and

a transmitter configured to transmit the generated control signals directly to the electronically-controlled appliance over the internet for performance of the one or more specified functions received from the one or more mobile devices, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

13. The cloud computing platform of claim 12, further comprising:

a data store;

wherein the data store stores:

recipes, custom smoking patterns, and user appliance usage data, including cooking temperature, ambient temperature, cooking duration, and power usage of the electronically-controlled appliance; and

control instructions both for groups of related electronically-controlled appliances, as well as control instructions for individual electronically-controlled appliances distinguished by unique identifiers.

14. The cloud computing platform of claim 13, wherein the cloud computing platform is further configured to:

access one or more selected recipes from the data store in response to a message received over the internet indicating a user selection made at the one or more mobile devices; and

generate and send one or more control signals over the internet to the electronically-controlled appliance according to the recipe, such that the electronically-controlled appliance smokes the food according to at least one smoke pattern specified in the recipe.

15. The cloud computing platform of claim 13, wherein the cloud computing platform is further configured to:

receive user appliance usage data directly from the electronically-controlled appliance over the internet;

access one or more portions of the user appliance usage data from the data store;

generate one or more advertisements for the user based on the appliance usage data; and

transmit the one or more generated advertisements to at least one of the one or more mobile devices over the internet.

16. A method for remotely controlling an electronically-controlled appliance comprising an outdoor barbecue grill or outdoor barbecue smoker via one or more mobile devices and an internet-connected network server, the electronically-controlled appliance having at least one hardware controller, the method comprising:

receiving at a network server of a cloud computing platform a first input from one or more mobile devices, the first input indicating that at least a first electronically-controlled appliance is in network communication with a cloud computing platform, the first electronically-controlled appliance comprising an outdoor barbecue grille or outdoor barbecue smoker;

18

generating a notification at the network server that is to be sent to a software application being executed at a mobile device, the software application being configured to remotely control one or more functions of the electronically-controlled appliance over the internet;

transmitting the generated notification from the network server to the software application at the mobile device, the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance;

receiving at the network server a second input from the software application, the second input indicating that one or more specified functions initiated by the user on the mobile device are to be performed on the electronically-controlled appliance; and

transmitting from the network server to the electronically-controlled appliance over the internet one or more instructions to perform the one or more specified functions, the functions being interpreted and carried out by a hardware controller on the electronically-controlled appliance.

17. The method of claim 16, further comprising:

receiving at the network server from the electronically-controlled appliance over the internet one or more portions of data;

wherein the one or more portions of data include ambient temperature data for the environment in which the electronically-controlled appliance resides.

18. The method of claim 17, further comprising the network server altering the instructions, prior to transmitting the instructions over the internet to the electronically-controlled appliance, to compensate for the ambient air temperature data.

19. The method of claim 16, further comprising:

the network server receiving food temperature data from a digital thermometer installed on the electronically-controlled appliance;

wherein the digital thermometer is communicably connected to the cloud computing platform over the internet through the electronically-controlled appliance.

20. The method of claim 19, further comprising:

the network server adjusting the instructions, prior to transmitting the instructions over the internet to the electronically-controlled appliance, to further include an alert based on the food temperature data.

21. The method of claim 16, wherein the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet via separate internet connections.

22. The method of claim 16, wherein the network server is connected to the one or more mobile devices and the electronically-controlled appliance over the internet.

23. An outdoor cooking device for use in a cloud computing environment, the outdoor cooking device comprising an electronically-controlled appliance in the form of an outdoor barbecue grill or outdoor barbecue smoker that is configured to implement instructions from a network server of a cloud computing platform, and to relay information to one or more user-controlled mobile devices at a remote location, the outdoor cooking device comprising:

a combustion area; and

an electronic hardware controller comprising at least a processor, a temperature sensor for providing grill temperature data, a digital probe for providing food temperature data, a network communication component for communicating over the internet via an access point, and a computer memory having computer-ex-

US 10,158,720 B2

19

ecutable instructions stored thereon that, when executed through the electronic hardware controller, cause the outdoor cooking device to perform the following:

communicate wirelessly via an initial direct connection with a mobile device to link the mobile device with the outdoor cooking device;

after the initial direct connection with the mobile device, communicate directly with the cloud computing platform over the internet to send a first input indicating that the outdoor cooking device is in network communication with the cloud computing platform, and cause the outdoor cooking device to disconnect from the mobile device;

after disconnecting from the initial direct connection with the mobile device, receive one or more second inputs from the network server over the internet, the one or more second inputs comprising one or more user selections made on the mobile device regarding control of the outdoor cooking device;

send usage data over the internet to the network server, wherein the usage data comprises temperature data intended for display on the mobile device, and data intended to be stored at the cloud computing platform but not displayed on the mobile device; and

adjust temperature of the outdoor cooking device in response to user-selected instructions provided at the mobile device and received at the outdoor cooking device from the network server over the internet.

**24**. The outdoor cooking device as recited in claim **23**, wherein the network communication component comprises one or more radio components for communicating wirelessly over the internet.

**25**. The outdoor cooking device as recited in claim **23**, wherein the outdoor cooking device is further configured to: implement a custom cooking cycle received over the internet from the cloud computing platform, the custom cooking cycle having been selected by a user at the mobile device.

20

**26**. The outdoor cooking device as recited in claim **23**, wherein the outdoor cooking device is further configured to: change an amount of fuel in response to mobile device instructions received from the cloud computing platform over the internet.

**27**. The outdoor cooking device as recited in claim **26**, wherein the fuel comprises wood pellets.

**28**. The outdoor cooking device as recited in claim **23**, wherein the outdoor cooking device is further configured to: implement one or more user selected recipes selected by a user at the mobile device and received from the cloud computing platform;

wherein the one or more user selected recipes cause the outdoor cooking device to adjust an amount of fuel to be delivered to the combustion area in response to identification of (i) a particular time interval, and (ii) data identified from the digital probe.

**29**. The outdoor cooking device as recited in claim **23**, wherein the outdoor cooking device is further configured to: identify a status of software installed on the electronically-controlled appliance; and

install an updated version of the software received over the internet from the cloud computing platform.

**30**. The outdoor cooking device as recited in claim **29**, wherein the outdoor cooking device is further configured to: send a request to the cloud computing platform upon identifying that the software is out of date;

wherein the request:

informs a user that new operating instructions exist and provides the user with an opportunity to direct an update to the software; or

requests the cloud computing system to directly update the outdoor cooking device with the software update over the internet.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2022-2171

**Short Case Caption:** GMG PRODUCTS LLC, v. INTERNATIONAL TRADE COMMISSION

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  13,769  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 12/19/2022

Signature: /s/ DAVID A. LOWE

Name: DAVID A. LOWE

Form 31
                                                                  July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF CONFIDENTIAL MATERIAL</u>

**Case Number:** 2022-2171

**Short Case Caption:** GMG PRODUCTS LLC, v. INTERNATIONAL TRADE COMMISSION

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda.  *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains __0__ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 12/19/2022          Signature: /s/ DAVID A. LOWE

                          Name: DAVID A. LOWE

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2022-2171

**Short Case Caption** GMG PRODUCTS LLC, v. INTERNATIONAL TRADE COMMISSION

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 12/19/2022

by  ☐  U.S. Mail  ☐  Hand Delivery  ☑ Email  ☐ Facsimile
    ☐  Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Clint A. Gerdine | International Trade Commission, 500 E Street, SW Washington DC 20436 202-708-2310, clint.gerdine@usitc.gov |
| Jay Reiziss | McDermott, Will & Emery LLP,McDermott Building 500 North Capitol Street, NW The McDermott Buildi Washington DC 20001, 202-756-8000, jreiziss@mwe.com |
|  |  |
|  |  |
|  |  |

☐  Additional pages attached.

Date: 12/19/2022

Signature: /s/ DAVID A. LOWE

Name: DAVID A. LOWE