**2022-2171**

# United States Court of Appeals for the Federal Circuit

GMG PRODUCTS LLC,

*Appellant,*

– v. –

INTERNATIONAL TRADE COMMISSION,

*Appellee.*

TRAEGER PELLET GRILLS LLC,

*Intervenor.*

*On Appeal from the United States
International Trade Commission in No. 337-TA-1237*

## REPLY BRIEF FOR APPELLANT

DAVID A. LOWE
LAWRENCE D. GRAHAM
LOWE GRAHAM JONES PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 381-3300
lowe@lowegrahamjones.com
graham@lowegrahamjones.com

*Counsel for Appellant*

APRIL 21, 2023



# TABLE OF CONTENTS

ARGUMENT ................................................................................................1

    **A.**    **The ITC Erred in Claim Construction**................................................1

        *1.*    *The ITC Erred in Construing "One or More Computing Systems" to Encompass the "Hardware Controller"*.....................*1*

        *2.*    *The ITC Erred in Construing "Generated Notification"* ...............6

    **B.**    **The Finding of Infringement was Erroneous** ........................................9

        *1.*    *The GMG System Lacks the Required "First Input" from "One or More Computing Systems"*.................................................9

        *2.*    *The GMG System does not Generate or Send the Required Notification*.................................................................................9

    **C.**    **The ITC Erred in Upholding Validity** ..............................................13

        *1.*    *GMG should not have been estopped from relying on MAK or Fireboard*...................................................................................13

        *2.*    *The claims were anticipated by the MAK system*..........................17

        *3.*    *The claims were obvious in view of the Fireboard system* ............20

    **D.**    **The ITC Erred in not Finding Unenforceability for Inequitable Conduct**...........................................................................24

CONCLUSION................................................................................................29

# TABLE OF AUTHORITIES

### Cases

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
   825 F.3d 1373 (Fed. Cir. 2016) ..........................................................24

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d
   1249 (Fed. Cir. 2010)...................................................................4, 5

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
   320 F.3d 1339 (Fed. Cir. 2003) ..........................................................23

*Driscoll v. Cebalo*, 731 F.2d 878 (Fed. Cir. 1984) .................................29

*Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*,
   292 F.3d 1363 (Fed. Cir. 2002) ..........................................................28

*GS CleanTech Corp. v. Adkins Energy LLC*, 951 F.3d 1310 (Fed.
   Cir. 2020) ....................................................................................24

*In re Etter,* 756 F.2d 852 (Fed. Cir. 1985) ...............................................24

*In re Keller*, 642 F.2d 413 (C.C.P.A. 1981) ............................................24

*Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801 (Fed. Cir. 2021) ...................2

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869
   F.3d 1336 (Fed. Cir. 2017) ................................................................22

*Ironburg Inventions Ltd. v. Valve. Corp.*, 2023 U.S. App. LEXIS
   7794 (Fed. Cir. Apr. 3, 2023) ............................................. 13, 14, 15

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727
   (2007) ........................................................................................22

*Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320 (Fed. Cir.
   2000) ...........................................................................................26

*Linear Tech Corp. v. ITC*, 566 F.3d 1049 (Fed. Cir. 2009)...................5, 6

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..........................2

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011) ....................................................................................................4, 6

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998)...................................................................................................2

# ARGUMENT

## A.    The ITC Erred in Claim Construction

### 1.    The ITC Erred in Construing "One or More Computing Systems" to Encompass the "Hardware Controller"

The ITC erred in construing "one or more computing systems" as encompassing the "hardware controller." Claim 1 literally requires these two distinct components, using different terminology for them. The claim means what it says, requiring multiple distinct computerized components in addition to the server.

The ITC acknowledges the presumption that different terms have different meanings in the absence of evidence to the contrary, asserting that contrary evidence exists in the written description's statement that a hardware controller is a type of computing system. Red Brf. at 17. Traeger advances the same argument. Green Brf. at 27. But this does not undercut the presumption of distinct computerized components, and it offers nothing beyond the bland confirmation that many different devices can be computerized. More importantly, *every* embodiment in the written description is directed to a system having a hardware controller *and* one or more additional computing systems. There are *no embodiments* having a hardware controller without one or more additional computing systems. Nor is there anything in the written description stating that the hardware controller can provide the claimed "first input." The written description does not merely support the proposition that two distinct components are required, it confirms it. At a minimum, there is no

evidence that contradicts the fundamental presumption that the different terms must have different meanings.

GMG is not improperly limiting claim 1 to the embodiment of Figure 3, as the ITC and Traeger contend. Indeed, reference to the written description is a required part of interpretation, because the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). A correct construction cannot allow the claim language to become divorced from what the specification conveys is the invention. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021). Thus, interpreting literal language in view of the description is not the same as reading a limitation into the claim. *See Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1252 (Fed. Cir. 1998).

Claim 1 expressly includes the separate requirements of a computing system and a hardware controller. Similarly, Figures 1 and 2 illustrate a system having a server, a hardware controller and one additional computing system; Figure 3 illustrates a server, a hardware controller and two additional computing systems. Thus, claim 1 aligns with these illustrated embodiments, confirming that it requires

both a hardware controller and at least one additional computing system, in which the additional computing system provides the "first input."

Traeger argues that the written description does not state that the computer system 304 of Figure 3 provides the claimed "first input." Green Brf. at 29-30. But in its next breath, Traeger asserts that the first input can be received from *any* computing device. Green Brf. at 30. Although the claimed "computing system" can take many forms, there is no teaching that the first input can be provided by the hardware controller on the grill. To the contrary, *in every instance* in which the first input is illustrated or described, it is provided by a computing system which is distinct from the hardware controller.

Figure 1 further confirms that the "first input" is provided by a device other than the hardware controller on the grill. In Figure 1, the grill is shown sending its data through the access point 118 to the server's communications module 104 and then along to the mobile device. This transmission does not satisfy the "first input" requirement, because Figure 1 also shows—at the same time—the mobile device separately providing the required first input.

Traeger nonetheless asserts that GMG's position is "untethered to the evidentiary record" (Green Brf. at 28, n.3), implying that GMG's expert Mr. Williams admitted that the hardware controller of claim 1 can be the computing system of claim 1. But the testimony stops well short of this so-called admission.

Mr. Williams acknowledged only that a hardware controller is computerized, while at the same time maintaining the position that claim 1 requires two distinct devices (a hardware controller and an additional computing system).

Traeger characterizes GMG's argument as asserting that "only a mobile device can provide the first input." Green Brf. at 30. GMG did not advance this argument on appeal. Rather, with reference to Figure 1, GMG explained that in every single embodiment the "first input" is provided by some other computing system (such as a mobile computing device), never by the hardware controller. Traeger does not, and cannot, deny this is true. Traeger relatedly points to claim 12, urging that the doctrine of claim differentiation requires the computing system of claim 1 to be broader than a mobile device. This is not inconsistent with the plain requirement of claim 1 that there must be one or more computing systems to provide the first input *and* a separate hardware controller.

The ITC argues that separately recited limitations can be satisfied by a single structure, citing *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) and *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011). GMG agrees that *sometimes* a single structure may satisfy multiple limitations, but not in this instance because (1) the claim expressly recites two structures, (2) every embodiment in the written description has both distinct structures, (3) there is no embodiment in which the hardware controller provides the

"first input," (4) nothing in the written description states that a single component can serve as both the hardware controller and the additional computing system, and (5) it would be nonsensical to allow a single structure to serve both purposes, because the very point of the invention is to enable a distinct computer system to interact with a separate grill and hardware controller.

Traeger likewise errs in distinguishing this Court's precedent. Traeger brushes aside *Becton,* casting it as limited to two components which must be distinct because they were required to be "connected to" each other. But *Becton* reached its conclusion on other grounds before mentioning the "connected to" language. As it explained, where a claim lists elements separately, there is a clear implication that they are distinct elements. *Becton*, 616 F.3d at 1254. This "clear implication" does not require that it be nonsensical to conclude otherwise. *Becton* also found that the specification described the two components as being distinct, with no suggestion that a single component could satisfy the requirements for both. *Becton*, 616 F.3d at 1254-55. Only then did *Becton* state that the "connected to" requirement further cemented its conclusion. *Id*. Here, the same is true: the claim recites two distinct structures, the written description *uniformly* describes systems having both structures, and the hardware controller *never* provides the "first input."

Traeger likewise disputes GMG's description of *Linear Tech Corp. v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir. 2009) as holding that a claimed "second circuit" and

"third circuit" could overlap but could not be the same single circuit, contending that "*Linear Technology* says no such thing." Green Brf. at 34. GMG respectfully submits that it does; indeed, the parties agreed that the second and third circuits must differ, but disagreed regarding whether the additional non-overlapping components must contribute to the unique claimed functions. *Linear Tech,* 566 F.3d at 1055.

Traeger mentions *Powell v. Home Depot*, but offers nothing to dispute GMG's description of it. Instead, Traeger asserts again that, in the 720 Patent, a computing system can reside on an electronic appliance. That proposition misses the point, and is irrelevant because of the distinct nature of the claim language and the written description's limited characterization of the hardware controller.

The ITC erred in construing "one or more computing systems" to encompass the separately claimed "hardware controller." Claim 1 requires these two components to be separate and distinct from one another, such that a computer system other than the hardware controller must provide the "first input."

### 2.    *The ITC Erred in Construing "Generated Notification"*

The claimed "generated notification" must be something "generated" at the server that "expressly" indicates the grill is connected to the server. A "generated notification" requires more than passing along data from which a notification may be generated at a downstream location. Instead, it requires the "notification" to be "generated" at the server itself, and then to be transmitted to another device.

The ITC and Traeger dismiss the various communication paths described in the patent, saying they have nothing to do with the "express" nature of the generated notification, but that misses the mark and mischaracterizes the various communications. Within the 720 patent, the only "notification" described as being a "generated notification" from a "notification generator" is the specific notification at issue here. Nothing else is "generated" by a "notification generator," and nothing else is a "generated notification." This difference in terminology matters, and it makes it clear that a "generated notification" must be "generated" from some other information, and that because it is a "generated notification" it expressly provides the claimed indication of the communicable connection.

The communication paths of Figure 1 (reproduced below) further confirm that merely forwarding grill data is not the same as generating a notification. Grill data travels through the access point 118 to the cloud platform 101 via the communication module 104, and then through indirect communication 117 to the mobile device 113. The mobile device could conclude, by having received grill data, that the grill must be connected to the cloud computing platform. After all, the mobile device only received grill data because of the grill's connection to the cloud computing platform. Thus, the mobile device could analyze the grill data to draw connectivity inferences and generate a corresponding notification. But the 720 patent claims something different, in which a cloud-based notification generator generates a notification of

such connectivity. The generated notification is sent to the mobile device in a separate channel (as notification 112) apart from the data itself, making it inescapably clear that it is an express one, not something derived downstream by analyzing received grill data.



Figure 1

Traeger argues that any error is harmless because the GMG server sends an express notification anyway. This is incorrect, as addressed below, because the GMG server neither generates nor sends any such notification.

The ITC erred in failing to construe "the generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance" to be (1) an express notification, which is (2) generated at the

server, and which (3) indicates the present connection status at the exact moment of the transmission of the notification.

## B.    The Finding of Infringement was Erroneous

The application of the erroneous claim construction resulted in an erroneous finding of infringement, which thus cannot be supported by substantial evidence.

### 1.    The GMG System Lacks the Required "First Input" from "One or More Computing Systems"

The GMG system includes a grill with hardware controller, but lacks a separate "one or more computing systems" providing the "first input" as claimed and as required under the correct claim construction. Neither the ITC nor Traeger dispute that this is true. Red Brf. at 25; Green Brf. at 40-41.

GMG explained in its opening brief that even if the hardware controller could be the required "computing system," it still would be noninfringing because the grill's transmissions do not indicate the grill is in network communication with the cloud computing platform. GMG will not further address this alternative beyond the remarks in its opening brief.

### 2.    The GMG System does not Generate or Send the Required Notification

The GMG server does not have a notification generator which generates and transmits a "generated notification indicating that the cloud computing platform is communicably connected to the electronically controlled appliance." As with the

prior limitation, the ITC and Traeger do not dispute that there is no infringement if there was an error in the claim construction. Red Brf. at 29; Breen Brf. at 46.

Even with the erroneous construction, there can be no infringement because no "notification" is "generated" at the server and then transmitted, as the claim requires. Instead, the GMG Server simply passes along grill data. The downstream GMG App processes the data to draw inferences about grill connectivity, generating and presenting a resulting notification on the display. Because this generating activity occurs only on the GMG App, there can be no substantial evidence supporting the finding of infringement.

Traeger's argument acknowledges that any notification of connectivity status is generated at the mobile device, not the server as required. Traeger explained that its expert Dr. Shoemake reviewed code for the *GMG App*, concluding that the GMG App software on the mobile device analyzes the age of the data to make inferences about connectivity. Green Brf. at 46-47. The ITC advances the same position. Red Brf. at 29-30. The GMG App presents a notification on the display, based on this locally-performed analysis. This proves that the GMG Server does not generate and send the required notification, because if it did then the GMG App would not need to do it locally. There can be no infringement because this notification is generated at the mobile device, not the server, as the claim requires.

Traeger and the ITC disagree that the construction of "generating" in a related patent confirms that the same term here requires more than passing along data. Their assertions are distinctions without a difference. In the related 833 Patent, passing along a user-specified temperature did not satisfy the requirement to generate and send an instruction "configured to cause a hopper to feed wood pellets" at a particular rate. This was true even though the specified temperature would be converted to an instruction at the grill, causing a particular hopper feed rate.

The present claim limitation is likewise more complicated than merely invoking the word "generating." Instead, it requires a "generated notification indicating that the cloud computing platform is communicably connected to the electronically-controlled appliance." The server does not generate and transmit it, and the grill data does not contain it; instead, as with the 833 patent, a downstream device must generate the notification from the data. The term "generated" should be construed consistently in each case.

Nor does the GMG Server "transmit" the "generated notification" as required. Traeger and the ITC both cite the invocation of a software routine at the GMG App, which they say could not be triggered but for the GMG App having received data from the GMG Server. Traeger Brf. at 48-49. But this only proves the receipt of *something*, not the required "generated notification." The ITC admits that the GMG App uses the received data "to determine whether the GMG Grill is connected to the

GMG Server." Red Brf. at 31. Traeger makes the exact same statement. Green Brf. at 47. The generation of this determination at the GMG App, as Traeger and the ITC concede, confirms that it was not generated at the server and cannot have been transmitted by the server.

GMG's opening brief took issue with the ITC's use of the terms "connectivity status messages" and "connectivity status requests." As GMG explained, even Traeger's expert Dr. Shoemake did not apply this label to messages between the mobile device and the server. The use of this inaccurate label created the impression that the messages contained a generated notification, though they did not. The ITC responds that they are status messages because the GMG App uses them to perform a check to determine if the grill is disconnected. Red Brf. at 32. But this "perform a check" description again confirms that the GMG Server did not generate the required notification, and that the GMG App must perform this analysis to generate it because the server did not.

In summary, the GMG Server does not generate a notification indicating that the grill "is communicably connected" to the server; rather, any analysis and generation of such a notification is performed at the mobile device, not the server.

**C.    The ITC Erred in Upholding Validity**

The ITC erred in not finding the claims to be invalid in view of the prior art MAK system or Fireboard system, either alone or in combination with other references.

### 1.    *GMG should not have been estopped from relying on MAK or Fireboard*

In addition to the reasons set forth in GMG's opening brief, the finding of estoppel should be reversed in view of this Court's decision in *Ironburg Inventions Ltd. v. Valve. Corp.*, Nos. 2021-2296, 2021-2297, 2022-1070, 2023 U.S. App. LEXIS 7794, at *2 (Fed. Cir. Apr. 3, 2023). In *Ironburg*, this Court held that an assertion of estoppel places the burden on the patent holder to prove, by a preponderance of the evidence, that a skilled searcher conducting a diligent search reasonably would have been expected to discover the grounds for invalidating the claims. *Id.* at *44. The ITC committed several errors in view of *Ironburg*.

First, the ITC applied the incorrect burden of proof, stating that patent invalidity requires proof by clear and convincing evidence, and that this burden never shifts from the patent challenger. Appx106. The ITC applied this same burden to the question of estoppel, and plainly did not state that it was Traeger's burden. *See* Appx126-127. The ITC again places the burden on GMG on appeal. Red Brf. at 37 (first sentence: "GMG failed to demonstrate…"); Red Brf at 38 ("GMG failed to

13

establish…"). Accordingly, the ITC applied the incorrect burden, thereby making the finding of estoppel erroneous.

Second, the ITC relied on improper inferences, to GMG's detriment. *Ironburg* held that the "inquiry into what a skilled and diligent searcher would reasonably have discovered is ultimately concerned with what the searcher of ordinary skill *would* find through reasonable diligence and not what an actual researcher in fact *did* find through whatever level of diligence she exercised." *Ironburg*, 2023 U.S. App. LEXIS 7794, at *44 (emphasis original). The ITC did not follow this standard, instead concluding that when a reference is actually found in a later search it raises a reasonable inference that it could have been found earlier by a skilled searcher. Appx127. This improper inference, coupled with the incorrect burden of proof, produced the incorrect application of estoppel.

Relatedly, the ITC improperly relied on what GMG allegedly did *not* do, rather than what a diligent searcher would have found. The ITC rejected GMG's argument that it needed more information about the prior systems "because GMG never attempted to obtain such information in the first place." Red Brf. at 40 (citing Appx129-131). Traeger advances the same argument, complaining that GMG "chose not to investigate … despite knowing the consequences of PGR estoppel." Green Brf. at 57. In accordance with *Ironburg*, this is entirely irrelevant because it

is misdirected to what GMG actually did (or did not do), not what a reasonable searcher would have done, and what such person would have found as a result.

The ITC contends that it did not hold GMG to a scorched earth standard of investigation, and that techniques such as packet sniffing and reverse engineering were not required. Green Brf. at 40. But it then criticizes GMG because it "never attempted to obtain such information in the first place." Green Brf. at 41. Most importantly, as required under *Ironburg*, the ITC did not find that the missing and non-public information about MAK and Fireboard would have been found by a reasonably diligent searcher without employing scorched earth techniques.

Third, in *Ironburg*, this Court made it clear that the question of estoppel applies to the asserted *grounds* for invalidity, not the mere mention of a given reference by its name or title. In the PGRs, GMG could not have asserted the grounds it raises here, based on MAK and Fireboard, because it lacked the information about them to do so. The ITC argues that there is no authority that a "ground" becomes a "new ground" by obtaining additional information, *see* Red Brf. at 39, but that is an inaccurate phrasing of the question. GMG is not, in this action, advancing the same grounds it could have advanced in the PGRs while merely calling it a "new ground." Instead, GMG could not have used MAK and Fireboard in the PGRs to advance the same grounds for invalidity that it asserts here, because GMG lacked the evidentiary details to do so.

The ITC contends that a "ground" is a "specific piece of prior art or combination of prior art" and that MAK and Fireboard are each a single "piece" of prior art. Red Brf. at 39. But in the proceedings below GMG acquired a wealth of information filling in gaps about the structure and operation of these devices, in the form of documentation, computer code, and explanatory testimony. GMG submits that this collection of information is not the same single "piece" of prior art as compared to the publicly available awareness of these products alone, and thus the assertion is a new ground of invalidity as compared with what could have been asserted at the time of the PGRs.

The ITC asserts that GMG "reasonably could have raised" the MAK and Fireboard systems in its PGR petition, simply because it knew about them. Red Brf. at 36. But this ignores the fact that GMG did not know, and could not prove, key details about the manner in which these systems operated. The ITC does not deny this point; rather, it argues that the law does not allow GMG to rely on these devices in this subsequent proceeding by obtaining more and better evidence later. Red Brf. at 39. The ITC bases this on the premise that GMG "ensured" that it would be in this position by "making no effort" to obtain publicly available evidence about the MAK and Fireboard systems. *Id*. Yet again, this argument (1) misdirects the focus to what GMG did, rather than what a reasonable searcher would do, and (2) improperly places the burden on GMG to prove that it should not be estopped.

GMG could not have raised these references with respect to the same grounds for which it raised them in this proceeding. There was fundamental information about each of them that was non-public, and which was only discoverable using the subpoena process available at the ITC. It was Traeger's burden to prove that a reasonably diligent searcher would have obtained that necessary information. Traeger did not do so, and the finding of estoppel should be reversed.

### 2.    *The claims were anticipated by the MAK system*

The ITC found that the MAK system satisfied every limitation of claims 1 and 2 of the 720 Patent except limitation 1.2 concerning the "one or more computing systems" providing the "first input" to the server. The ITC abused its discretion in finding that GMG waived its argument with respect to this limitation.

The ITC relies heavily on the ALJ's Ground Rules and the requirements for the content of the pre-hearing brief as the basis for finding waiver. Red Brf. at 43. According to the ITC, GMG omitted this invalidity position from its pre-hearing brief, thereby waiving it, and nothing more need be said. But GMG *did* advance this position in its pre-hearing brief, and although it may have been succinctly phrased, Traeger understood it and actually litigated it. Indeed, GMG explained in its opening brief on appeal that Traeger understood it, presented evidence on it at the hearing, and addressed it in its post-hearing brief—all without objection. Traeger does not deny that this is true.

17

The applicable portion of GMG's pre-hearing brief is excerpted in the ITC's opposition brief here. Red Brf. at 43. GMG began by stating that the MAK system does *not* teach limitation 1.2. GMG maintains that position now, because the "one or more computer systems" cannot be the same as the "hardware controller," as addressed above with respect to claim construction. As with the GMG system, the MAK system does not employ an additional "one or more computer systems" in this manner; instead, its server only sends data from the grill to a remote computing device.

Based on this application of the claim, GMG drew parallels between its system and that of MAK and Lee, concluding that "this limitation would be satisfied by the MAK system if it is also satisfied by Lee and GMG." *Id.* Thus, if the accused system satisfied the limitation by passing data through the server, then MAK must also meet it because it does the same thing. Despite the brevity of this statement, Traeger understood it, defended it, and did not object to it.

GMG and Traeger elicited testimony on this position at the hearing, and then argued it further in post-hearing briefing. Although the ITC characterizes this as a new argument in the briefing, Traeger did *not* see it as a new argument and did *not* object to it. On appeal, Traeger does not deny that this is so. It was an abuse of discretion to find waiver where (1) GMG identified the argument in its pre-hearing brief, (2) the parties pursued it at the hearing and addressed it in the post-hearing

briefing, and (3) Traeger never objected to either the argument or presentation of evidence on the position at the hearing and in post-hearing briefing. Indeed, if there was waiver then it was Traeger which waived any objection to this invalidity assertion.

Presumably emboldened by the finding of waiver, Traeger argues on appeal that GMG has "flip-flopped" on this point, having "unequivocally" conceded that MAK does not practice limitation 1.2 and then later saying that it does. Green Brf. at 59. As support for the alleged flip-flop, Traeger cites a truncated excerpt from GMG's pre-hearing brief, including the so-called "admission" but omitting the subsequent conditional position to the contrary. This is not a "flip-flop" but rather an entirely consistent conditional argument which was dependent on the outcome of the claim construction and application of the claim.

Traeger's infringement position for this limitation is simple. According to Traeger, when the GMG grill transmits data over the network, formatted as network communications as it necessarily must be, the transmission itself is an indication that the grill is communicating over a network. GMG's conditional position with respect to the MAK grills was equally simple: though that argument should fail as being contrary to the correctly construed claim, if it applies to GMG then it also applies to MAK because MAK also sends its data as network transmissions (and the fact of MAK's network transmissions from the grill is not disputed). This position was not

waived, and it was an abuse of discretion to find that it was. If the ITC had not erroneously applied waiver, it would also have found that MAK satisfied this limitation at least for the same reason it found the GMG system to satisfy it. Consequently, claims 1 and 2 were anticipated by MAK.

### 3. *The claims were obvious in view of the Fireboard system*

Claims 1 and 2 of the 720 Patent were also obvious. The ITC found that the Fireboard system satisfied every claim limitation other than the ability to send instructions to the grill to perform functions, such as to remotely control temperature. Appx124-126. The incorporation of this feature was obvious, and the claim should have been held invalid.

The remote-control feature, contained in the final limitation of claim 1, is generic, requiring only that the cloud computing platform be able to transmit "one or more instructions" to the grill to perform "one or more specified functions." GMG identified several prior art references which taught the remote control of grill temperature, including the MAK System referred to above, as well as U.S. Patent No. 9,759,429 ("Tucker") and U.S. Patent Pub. No. 2015/0025687 ("Henderson"). The ITC acknowledged these teachings within the prior art, Appx124, and neither the ITC nor Traeger disputes them on appeal. Red Brf. at 48; Green Brf. at 63. Because these teachings are not disputed, nothing more need be said about them.

The ITC contends that GMG has now abandoned and waived its arguments with respect to Tucker and Henderson, relying only on MAK for this teaching, but that is incorrect. Red Brf. at 47, n.34; 48, n.35. Rather, on appeal GMG explained that claim 1 was obvious in view of Fireboard, either alone or "in combination with other references such as the MAK system above." Blue Brf. at 49-50. GMG repeated this statement thereafter, saying the claims were obvious in view of the Fireboard system "as combined with other references such as the MAK system." Blue Brf. At 50. Plainly, this referred back to the combined teachings of MAK, Tucker, and Henderson, all of which were admitted.

Despite this undisputed teaching within the prior art, in exactly the same field of endeavor, the ITC found that GMG had not proven that a person of ordinary skill in the art would have found it obvious to modify the Fireboard system to implement temperature control. Appx125-126. Though the ITC canvassed various arguments of the parties, its conclusion was based solely on the purported lack of motivation to modify the Fireboard system to implement the well-known feature of remote temperature control. Appx125.

On appeal, the ITC asserts that GMG's argument was "conclusory," failing to explain "why" a person of ordinary skill in the art would have combined the prior art teachings to modify the Fireboard system to add remote control of a grill. Blue Brf. at 48. This proposition is too demanding and is incorrect. As the Supreme Court

has explained, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420, 127 S. Ct. 1727, 1742 (2007). "The court should consider a range of real-world facts to determine 'whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.'" *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1344 (Fed. Cir. 2017) (quoting *KSR*, 550 U.S. at 418). Plainly, the MAK and Fireboard references are in the exact same field of endeavor, and MAK provides an undisputed articulation of a need or desire to remotely control the temperature of a grill. That admitted teaching is sufficient to provide a motivation to combine.

Still further, GMG demonstrated that Fireboard founder Theodore Conrad had plans to incorporate temperature control, though he did not do so until after the priority date of the 720 patent. That plan by Fireboard confirms from yet another source that there was a known need or problem, including a known desire to add temperature control specifically to the Fireboard system.

The ITC characterizes Mr. Conrad as not "succeeding" with the modification of the Fireboard system until later, asserting on appeal that it supports the conclusion that there would not have been a reasonable likelihood of success in the combination. Red Brf. at 49. But the likelihood of success in making the combination formed no

part of the decision below. *Cf.* Appx109 (mentioning "expectation of success" as part of a longer excerpt of authority, but not applying it thereafter). Indeed, Traeger did not advance this argument below, nor does it do so on appeal. Green Brf. at 63-64. GMG objects to this new issue raised for the first time on appeal.

Moreover, this is not a case in which the concept of "success" in the combination of references is relevant. All that is required is a reasonable expectation of success. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003). Considering that MAK actually *did* succeed in implementing temperature control (which is undisputed), there would be a reasonable expectation of success in implementing it in the Fireboard system as well. The ITC's assertion of failure is based on the notion that Fireboard "failed" because temperature control was added later, not immediately. Red Brf. at 49 n.38. But there is nothing in the record supporting the assertion of failure, nor even any difficulty in achieving success. Rather, the record only addresses the timing of incorporation into the Fireboard product. Appx32006. There can be no dispute that a person of ordinary skill would have had a reasonable expectation of success in the effort to incorporate temperature control into the Fireboard product.

Traeger contends that there was a lack of evidence regarding "how" temperature control would have been incorporated into the Fireboard device specifically. Though the ITC acknowledged this argument by Traeger below, it did

not adopt this alleged defect in its conclusion. More importantly, this is an irrelevant question: the "test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (*quoting In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981)); *see also In re Etter,* 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) (characterizing the ability to physically combine references "basically irrelevant"). The ITC did not adopt Traeger's argument regarding "how" the combination would have been made, and it would be legally erroneous to do so.

Claims 1 and 2 were obvious in view of Fireboard combined with MAK or other references teaching remote temperature control of a grill.

## D.    The ITC Erred in not Finding Unenforceability for Inequitable Conduct

The ITC contends that findings with respect to inequitable conduct are reviewed for abuse of discretion, which it characterizes as being essentially the same as a review for substantial evidence, citing *GS CleanTech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020). GMG submits that there was an abuse of discretion in not finding inequitable conduct, particularly in view of the record below. GMG recited the underlying facts because they are inescapable and demonstrate the absence of substantial evidence to avoid inequitable conduct, not in an effort to revisit the case *de novo* on appeal.

24

The named inventor Mr. Colston lacked the technical background or capability to have conceived of the claimed invention. He hired teams of people from other companies to do it for him, which they did. Every document related to the development was originally authored by others, not Mr. Colston. Beyond the mere inclusion of his name on the patent, there was no evidence (let alone substantial evidence) supporting the proposition that Mr. Colston was the inventor. He merely hired others to invent, then took the credit by naming himself the sole inventor.

GMG proved that Messrs. Johnson and Gilpin originally conceived key aspects of the claimed invention, with corroborating evidence. The second limitation of claim 12 requires that the "mobile devices, having previously established an initial, direct connection…" Appx199 (at col. 16, lines 65-68). It was Mr. Johnson, not Mr. Colston, who conceived of and defined this process, as corroborated in his email dated May 15, 2015. Appx14861.

The ITC cites testimony from Mr. Johnson saying that he and Mr. Gilpin merely "implemented" the ideas given to them, urging that this means they disclaimed inventorship status. Red Brf. at 53. Mr. Gilpin is also quoted as testifying that he "didn't devise the notion of using a cloud to transmit data to and from a grill." *Id*. But of course these are the highest-level abstract concepts of the claimed system, articulated at a level that is not patentable, and GMG never asserted that Mr. Johnson and Mr. Gilpin invented anything at that level. By contrast, Mr. Johnson also

unequivocally testified that he and Wes Gilpin conceived the process which included the step of the above limitation of claim 12, and that Mr. Colston did not. Appx2232-2236; *see also* Appx2238-2239.

Ironically, the ITC asserts that Messrs. Johnson and Gilpin were not inventors because their contributions allegedly already existed in the prior art. Red Brf. at 54-55. Of course, the mere existence of a component in the prior art does not mean that contribution of that component to a larger system is not inventive. *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000) ("It is axiomatic that a claimed invention is not obvious solely because it is composed of elements that are all individually found in the prior art."). Indeed, Traeger denies that its patent is obvious despite every claimed limitation separately existing in the MAK and Fireboard references, along with others. Traeger cannot have this both ways: if these limitations are not contributions to inventorship, then the claim is not inventive at all and should be invalid.

Messrs. Johnson and Gilpin, not Mr. Colston, also originated additional limitations. Mr. Johnson conceived the "attempting to communicate" step. Appx2249-2251. Mr. Johnson also conceived the claimed "permitted to communicate" requirement. Appx14007. Mr. Williams testified that a person of ordinary skill in the art would understand Mr. Johnson's proposal to show that he had possession of the claim limitation, and thus conceived it. Appx29952-29953.

As with the above limitations, it was Mr. Johnson and Mr. Gilpin—and not Mr. Colston—who conceived of the requirement of either an "indication" or "notification" of a "communicable connection" between the grill and the server. The ITC acknowledged that Messrs. Johnson and Gilpin were instrumental in developing this aspect, and that there was "no reliable documentary evidence" supporting Mr. Colston's conception. Appx144. Nonetheless, the ITC concluded that GMG did not prove Messrs. Johnson or Gilpin to be co-inventors, based on their disclaimer of "inventorship" and the notion that this was "standard" to Internet of Things practice. *Id*.

GMG recognizes that Mr. Colston testified that he originated everything in every claim, as the ITC asserts. Red Brf. at 57. But his testimony was self-serving, uncorroborated, and squarely at odds with the corroborated testimony of Messrs. Johnson and Gilpin. This is not a request for *de novo* review of the record, but rather a demonstration that the written record was so one-sided that Mr. Colston's testimony cannot even support the requirement of substantial evidence.

The absence of substantial evidenc is consistent with *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd*., 292 F.3d 1363 (Fed. Cir. 2002). There were no records supporting the notion that Mr. Colston was the sole inventor; indeed, Mr. Colston admitted that he authored no such documents. Traeger's counsel, Mr. Frodsham, likewise testified that he had seen nothing authored by Mr. Colston,

and that he named Mr. Colston based on Mr. Colston's direction alone. In contrast, contemporaneously written records confirmed that both Messrs. Johnson and Gilpin contributed to the conception of the subject matter of at least one claim. *Id*. at 1373 (quoting *Ethicon*, 135 F.3d at 1460). The ITC committed clear error (or lacked substantial evidence) in its failure to find inequitable conduct with respect to incorrect inventorship.

The exclusion of Messrs. Johnson and Gilpin was also with deceptive intent. The ITC discounts the disputes between Traeger and Tekna (in which Mr. Colston was caught doing the very same thing), the complete absence of *any* inventorship records authored by Mr. Colston, and the strong desire to create an impression of technological capability to bolster an imminent initial public offering. Undeniably, Traeger and Mr. Colston profited handsomely as a result of the deceit.

The foregoing facts are cast as speculation and circumstantial evidence, but a challenge of this sort is virtually always circumstantial, rarely accompanied by the amount of corroboration present here. It was not possible for Mr. Colston to have been the sole inventor on dozens of patents covering a wide array of electrical, mechanical, and industrial design subjects of which he admittedly had no technical knowledge or capability and for which he hired large teams of engineers to create, develop and implement. When Tekna caught him in the act, Traeger corrected the inventorship but only after hiring the omitted inventors. He was caught here, too, but

Traeger maintained its position because the true inventors were not in-house Traeger personnel. Traeger's documented pattern of misrepresentation across multiple applications demonstrates an intent to deceive the patent office. *Driscoll v. Cebalo*, 731 F.2d 878, 885 (Fed. Cir. 1984).

On this record, Traeger and Mr. Colston committed inequitable conduct in the Patent Office, and it was an abuse of discretion not to find both the 720 and 833 Patents unenforceable.

## CONCLUSION

For each of the foregoing reasons, the order of the ITC should be reversed, such that the 720 patent is found invalid, unenforceable, and not infringed.

RESPECTFULLY SUBMITTED April 21, 2023.

LOWE GRAHAM JONES<sup>PLLC</sup>

/s/ David A. Lowe

_____

David A. Lowe
Lawrence D. Graham
Lowe@LoweGrahamJones.com
Graham@LoweGrahamJones.com
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
T: 206.381.3300
F: 206.381.3301

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-2171

**Short Case Caption:** GMG PRODUCTS LLC, v. INTERNATIONAL TRADE COMMISSION

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,789 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/21/2022

Signature: /s/ DAVID A. LOWE

Name: DAVID A. LOWE